UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CAVLAM BUSINESS LTD. and JEAN MAURICE
BERGERON,

                       Plaintiffs,

- against -

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

08 CV 2225 (JGK)

AFFIDAVIT OF MARC
ROWIN IN OPPOSITION
TO MOTION TO
DISMISS

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK )

     MARC ROWIN, being duly sworn, deposes and says:

     1.     I am a member of the law firm of Lynch Rowin LLP, counsel for plaintiffs

Cavlam Business Ltd. and Jean Maurice Bergeron.  I submit this affidavit in opposition to

defendant's motion to dismiss, for the purpose of putting certain relevant materials and

facts before the Court.

     2.     Annexed hereto as Exhibit A is a copy of the complaint in this action.  The

complaint seeks a declaratory judgment that the sinking of the yacht "Amira" in December

2004 is an insured peril covered by an insurance policy issued by defendant Certain

Underwriters at Lloyd's, London and that defendant's disclaimer of coverage and refusal

to pay for the loss of the vessel is a breach of the policy. The complaint also alleges that Lloyd's has been guilty of bad faith in disclaiming coverage, since experts retained by plaintiffs have demonstrated that it would have been physically impossible for the vessel to have sunk in the short time and in the manner claimed by Lloyd's.

3.      Annexed hereto as Exhibit B is a copy of the Convention of Establishment, Protocol and Declaration, November 25, 1959, between the United States and France, which grants French citizens such as Bergeron "national treatment" – access to American courts on the same basis as American citizens. The legal effect of national treatment is discussed in plaintiffs' opposing memorandum of law.

4.      Annexed hereto as Exhibit C are copies of documents relating to Lloyd's suit in London, including (a) the notice of claim, (b) court order permitting Lloyd's to make service upon Bergeron by serving papers upon me, (c) Bergeron's acknowledgment of service, which reserves his right to contest jurisdiction, and (c) the multiple stays of that action granted by the High Court of Justice. The parties sought those stays so that an expert retained by Lloyd's could complete a report regarding the sinking and to permit the parties to engage in settlement discussions. The current stay expires on July 25, 2008. However, at the request of Andrew Lee, a solicitor with the firm of Hill Dickinson, which represents Lloyd's in the London action, the parties have agreed to seek an additional two month extension of the stay. If approved by the Court, the Lloyd's suit would be stayed

until September 25, 2008.

5.  Annexed hereto as Exhibit D is a copy of materials downloaded from Lloyd's

website (www.lloyds.com), last visited on July 10, 2008, describing Lloyd's overseas offices,

including its office at 25 West 53rd Street, New York, New York, and comprising the text

of a speech by Lord Levene, Lloyd's chairman, delivered at Lloyd's New York Dinner on

June 25, 2008. These materials demonstrate Lloyd's amenability to service in this district,

one of the reasons this action was brought here.

6.  Annexed hereto as Exhibit E is a redacted letter dated February 15, 2008 from

Justin Reynolds, another solicitor with the Hill Dickinson firm, in which Lloyd's took the

position that the "Amira" was overvalued in the insurance policy and that the actual value

of the vessel at the time of the loss was $325,000, as opposed to the $510,000 Lloyd's insured

it for.

7.  For all of these reasons and the reasons discussed in the plaintiffs'

memorandum of law and the declarations of Jean Maurice Bergeron, Al Golden and

3

Martyn Berkin, Lloyd's motion should be denied in its entirety.

MARC ROWIN

Sworn to before me this
11th  day of July, 2008.

Notary Public

JULIE A. KLEEMAN
Notary Public, State of New York
No. 02KL6178251
Qualified in Queens County
Commission Expires Nov. 26, 2011

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF CASE
Judge Koeltl

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CAVLAM BUSINESS LTD. and JEAN MAURICE
BERGERON,

Index No. 08 cv 2225

                           Plaintiffs,

COMPLAINT

         - against -

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

Jury Trial Demanded
As To All Non-
Admiralty Claims

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      Plaintiffs Cavlam Business Ltd. ("Cavlam") and Jean Maurice Bergeron

("Bergeron"), by their attorneys, Lynch Rowin LLP, for their complaint against defendant

Certain Underwriters at Lloyd's, London ("Lloyd's"), allege as follows:

FIRST CAUSE OF ACTION

      1.     Plaintiffs bring this action for a judgment declaring their rights under an

marine insurance policy issued to them by Lloyd's. This Court has jurisdiction over this

action pursuant to 28 U.S.C. §§1333 and 2201.

      2.     Venue is proper in this district in that Lloyd's resides in the district.

      3.     Cavlam is a corporation organized under the laws of the British Virgin

Islands.

      4.     Bergeron is a citizen of France and is the principal of Cavlam and sole owner

of all of the shares of Cavlam.

5.     On May 19, 1999, the Registrar of Shipping of the British Virgin Islands issued a Certificate of British Registry certifying that Cavlam is the owner of a 63 foot Bertram motor yacht named the "Amira" ("Yacht").

6.     Lloyd's is an insurance market organized under the laws of the United Kingdom and is engaged in the business of issuing and underwriting insurance policies, including marine insurance policies. Lloyd's has an office for the transaction of business at 25 West 53rd Street, New York, New York 10019, issues insurance policies within the State of New York and otherwise does business within the State of New York.

7.     In 2003, Bergeron, acting on behalf of Cavlam, purchased an insurance policy insuring the Yacht for the period March 7, 2003 through March 3, 2004 (the "2003 Policy") from Lloyd's agent, Yachtsure Insurance, International Marine Insurance Services, 208 Piney Narrows Road, Chester, Maryland 21619. The 2003 Policy was represented by Certificate of Insurance No. M/03/08661, was issued and underwritten by Lloyd's and provided that the Yacht was valued at and insured for $500,000 (with a deductible of $11,000) and that the dinghy and outboard were valued at and insured for $10,000 (with a deductible of $500). As written by Lloyd's agent, the 2003 Policy erroneously listed Bergeron and "Cavalam Ltd." as the insureds. The premium for the 2003 Policy was $8,210, which was duly paid by plaintiffs.

2

8.     In 2004, Bergeron, acting on behalf of Cavlam, purchased an insurance policy

insuring the Yacht for the period March 3, 2004 through March 3, 2005 (the "2004 Policy")

from Yachtsure Insurance, International Marine Insurance Services.  The 2004 Policy was

represented by Certificate of Insurance No. M/04/08661, was issued and underwritten by

Lloyd's and provided that the Yacht was valued at and insured for $500,000 (with a

deductible of $11,000) and that the dinghy and outboard were valued at and insured for

$10,000 (with a deductible of $500).   As written by Lloyd's agent, the 2004 Policy

erroneously listed Bergeron and "Cavalam Ltd." as the insureds.  The premium for the

2004 Policy was $8,210, which was duly paid by plaintiffs.

9.     The 2004 Policy insured the Yacht against the following perils:

> Touching the adventures and perils which we, the Assurers,
> are contented to bear, and to take upon us, they are of the seas,
> men-of-war, fire, enemies, pirates, rovers, assailing thieves,
> jettisons, letters of mart and countermart, reprisals, takings at
> sea, arrests, restraints and detainments of all kings, princes and
> people, of what nation, condition or quality soever, barratry of
> the Master and Mariners, and of all other like perils, losses and
> misfortunes, that have or shall come to the hurt, detriment or
> damage of said Yacht or any part thereof.

10.    At all relevant times, the Yacht was maintained in a seaworthy condition and

with all due diligence.

11.    On or about December 12, 2004, Bergeron moored the Yacht along the wharf

at a boatyard called Astillero & Varadero del Caribe, C.A. at Chacachacare, Isla de

3

Margarita, Venezuela. Bergeron then returned to France to attend to personal matters.

12.    The crew employed by Bergeron remained on the Yacht for two days before leaving for Trinidad. They did not report any problems with the vessel.

13.    On or about December 18, 2004 the Yacht sank while moored at the wharf of Astillero & Varadero del Caribe.

14.    Lloyd's was given timely notice of the sinking of the Yacht.

15.    The sinking of the Yacht was a peril covered by the 2004 Policy.

16.    Lloyd's has notified plaintiffs that it declined to cover the sinking of the Yacht on the grounds that the Yacht was not maintained in a seaworthy condition, that the sinking was caused by ordinary wear, tear and deterioration and that, as a result, the sinking was not covered by the 2004 Policy.

17.    Specifically, Lloyd's took the position that the sinking was caused by water leaking into the Yacht through (a) the port propeller shaft packing gland, (b) the port and starboard rudder shaft packing glands and mounting bolts and (c) a PVC pipe section in the centerline bilge sump forward of the aft cabin.

18.    As a result of Lloyd's decision to deny coverage for the sinking of the Yacht, plaintiffs have incurred expenses they would otherwise not have had to incur, including storage charges imposed by the boatyard, the cost of retaining experts and attorneys' fees.

19.    By reason of the foregoing, Lloyd's has breached the 2004 Policy and plaintiffs

4

have suffered compensatory and consequential damages.

### SECOND CAUSE OF ACTION

20.     Paragraphs 1 through 18 are realleged.

21.     In addition to declining coverage completely, Lloyd's has notified plaintiffs of its position that the actual value of the Yacht was $325,000 rather than the insured value of $500,000 and that even if the sinking of the Yacht were covered by the 2004 Policy, plaintiffs would be entitled to a maximum payment of $325,000.

22.     By reason of the foregoing, Lloyd's has breached the 2004 Policy and plaintiffs have suffered compensatory and consequential damages.

### THIRD CAUSE OF ACTION

23.     Paragraphs 1 through 18 and 21 are realleged.

24.     At various times since the sinking of the Yacht, plaintiffs have retained marine experts to inspect the Yacht to determine the cause of its sinking.

25.     In July 2005, Murray & Associates, LLC, a firm of marine surveyors, was retained by plaintiffs to survey the Yacht. In its report, dated January 2, 2006, Murray & Associates concluded that the only possible points of water ingress into the Yacht were from the port propeller shaft packing gland and the port and starboard rudder shaft packing glands, but that it would have taken 14 days for leakage from those entry points to cause the Yacht to sink. Murray & Associates concluded that the Yacht was not

5

unseaworthy and that the sinking was not the result of ordinary wear, tear and deterioration.

26.    Plaintiffs provided the Murray & Associates report to Lloyd's.

27.    In July and August 2005, Dr. Giorgio Neri, a marine engineer, was retained by plaintiffs to survey the Yacht and conduct various experiments.  In his report, dated December 2005, Dr. Neri concluded that it was not possible for leakage from the port propeller shaft packing gland and the port and starboard rudder shaft packing glands to have caused the Yacht to sink.

28.    Plaintiffs provided the Neri report to Lloyd's.

29.    The Murray & Associates and Neri reports demonstrated that it was physically impossible for the Yacht to have sunk as a result of the causes relied upon by Lloyd's in denying coverage under the 2004 Policy.

30.    Despite having been provided with the Murray & Associates and Neri reports, Lloyd's has continued to deny coverage under the 2004 Policy for the sinking of the Yacht.

31.    By continuing to deny coverage under the 2004 Policy for the sinking of the Yacht despite having been provided with the Murray & Associates and Neri reports, Lloyd's has been guilty of bad faith.

32.    By reason of the foregoing, punitive damages should be imposed upon

6

Lloyd's and plaintiff's should be awarded their attorneys' fees and costs.

WHEREFORE, plaintiffs demand judgment in their favor against Lloyd's as follows:

(a)     On their First Cause of Action, declaring that the sinking of the Yacht was a peril covered by the 2004 Policy, that Lloyd's' refusal to indemnify plaintiffs under the 2004 Policy is a breach of that policy and that Lloyd's is obligated to indemnify plaintiffs under the 2004 Policy for the sinking of the Yacht;

(b)     On their Second Cause of Action, declaring that the actual value of the Yacht under the 2004 Policy is the insured value of $500,000, that Lloyd's is obligated to indemnify plaintiffs under the 2004 Policy in the amount of $500,000 and awarding compensatory damages in favor of plaintiffs and against Lloyd's in the amount of $500,000 less any deductible, together with consequential damages in an amount to be determined at trial but not less than $500,000;

(c)     On their Third Cause of Action, awarding them punitive damages in an amount to be determined at trial but not less than $1,500,000 and their attorneys' fees and costs;

(d)     Awarding them interest and the costs and disbursements of this action, including their reasonable attorneys' fees; and

7

(e)    Granting them such other relief as is just and proper.

Dated: New York, New York
       March 5, 2008

                                    LYNCH ROWIN LLP

                                    By:_____
                                         Marc Rowin (MR 6758)
                                    630 Third Avenue
                                    New York, New York 10017
                                    (212) 682-4001
                                    Attorneys for Plaintiffs Jean
                                    Maurice Bergeron and Cavalam
                                    Ltd.

8

# FRANCE

## Establishment

*Convention, with protocol and joint declaration, signed at Paris November 25, 1959;*

*Ratification advised by the Senate of the United States of America August 17, 1960;*

*Ratified by the President of the United States of America August 29, 1960;*

*Ratified by the President of the French Republic, President of the Community, October 28, 1960;*

*Ratifications exchanged at Washington November 21, 1960;*

*Proclaimed by the President of the United States of America December 8, 1960;*

*Entered into force December 21, 1960.*

---

### By the President of the United States of America

### A PROCLAMATION

WHEREAS a convention of establishment between the United States of America and France, together with a protocol relating thereto, was signed at Paris on November 25, 1959, and a joint declaration relating thereto was initialed at Paris on the same date, the originals of which convention, protocol, and joint declaration, being in the English and French languages, are word for word as follows:

---

## CONVENTION OF ESTABLISHMENT
## BETWEEN
## THE UNITED STATES OF AMERICA AND FRANCE

TIAS 4625                    (2398)

The President of the United States of America and the President of the French Republic, President of the Community, desirous of strengthening the ties of peace and friendship traditionally existing between the two countries and of encouraging closer economic intercourse between their peoples, conscious of the contribution which may be made to these ends by arrangements that provide in each country reciprocal rights and privileges on behalf of nationals and companies of the other country, thus encouraging mutually advantageous investments and mutually beneficial commercial relations, have resolved to conclude a convention of establishment and, for that purpose have appointed as Plenipotentiaries:

The President of the United States of America,

The Honorable AMORY HOUGHTON, Ambassador of the United States of America at Paris,

and the President of the French Republic, President of the Community,

M. MAURICE COUVE DE MURVILLE, Minister of Foreign Affairs,

who, having communicated to each other their full powers, found to be in due form, have agreed on the following Articles:

Le Président des Etats-Unis d'Amérique et le Président de la République Française, Président de la Communauté, désireux de renforcer les liens de paix et d'amitié qui existent traditionnellement entre les deux pays, et d'encourager des relations économiques plus étroites entre leurs peuples, conscients de la contribution que peuvent apporter à ces fins des dispositions accordant dans chaque pays des droits et des privilèges réciproques au profit des ressortissants et des sociétés de l'autre pays, favorisant ainsi des investissements profitables pour les deux Hautes Parties Contractantes et des relations commerciales avantageuses pour elles, ont résolu de conclure une convention d'établissement et, à cette fin, ont désigné comme plénipotentiaires:

Le Président des Etats-Unis d'Amérique,

l'Honorable AMORY HOUGHTON, Ambassadeur des Etats Unis d'Amérique à Paris,

et le Président de la République Française, Président de la Communauté,

M. MAURICE COUVE DE MURVILLE, Ministre des Affaires Etrangères,

lesquels, après s'être mutuellement communiqué leurs pleins pouvoirs, reconnus en bonne et due forme, sont convenus des articles suivants:

### ARTICLE I

Each High Contracting Party shall accord equitable treatment to nationals and companies of the other High Contracting Party, both as to their persons and as to their property, enterprises and other interests, and shall assure them within its territories full legal and judicial protection.

### ARTICLE II

1. Nationals of either High Contracting Party shall, subject to the laws relating to the entry and sojourn of aliens, be permitted to enter the territories of the other High Contracting Party, to travel therein freely, and to reside therein at places of their choice. They shall in particular be permitted to enter the territories of the other High Contracting Party and to remain therein, for the purpose of:

(a) carrying on trade between the territories of the two High Contracting Parties and engaging in related commercial activities;

(b) developing and directing the operations of an enterprise in which they have invested, or in which they are actively in the process of investing, a substantial amount of capital.

2. Nationals of each High Contracting Party shall enjoy, within the territories of the other High Contracting Party, freedom of conscience, of worship, of information and of the press.

### ARTICLE I

Chacune des Hautes Parties Contractantes accorde un traitement équitable aux ressortissants et sociétés de l'autre Haute Partie Contractante, tant en ce qui concerne les personnes que les biens, entreprises et autres intérêts, et leur assure dans ses territoires la pleine protection légale et judiciaire.

### ARTICLE II

1. Les ressortissants de chacune des Hautes Parties Contractantes sont, sous réserve de l'application des lois relatives à l'entrée et au séjour des étrangers, autorisés à entrer dans les territoires de l'autre Haute Partie Contractante, à y voyager librement et à y résider dans les lieux de leur choix. Ils sont en particulier autorisés à entrer dans les territoires de l'autre Haute Partie Contractante et à s'y établir, en vue de:

a) se livrer à des opérations commerciales entre les territoires des deux Hautes Parties Contractantes ainsi qu'à des activités commerciales connexes;

b) développer et diriger les opérations d'une entreprise dans laquelle ils ont déjà investi un capital substantiel ou procèdent à un tel investissement.

2. Les ressortissants de chacune des Hautes Parties Contractantes jouissent sur les territoires de l'autre Haute Partie Contractante des libertés de conscience, de culte, d'information et de presse.

3. The provisions of the present Article shall be subject to the right of either High Contracting Party to take measures that are necessary for the maintenance of public order and for the protection of public health, morals, and safety.

## ARTICLE III

1. Nationals and companies of either High Contracting Party shall be accorded national treatment with respect to access to the courts of justice as well as to administrative tribunals and agencies, within the territories of the other High Contracting Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights. Companies of either High Contracting Party not engaged in activities within the territories of the other High Contracting Party shall enjoy such access therein without any requirement of registration. Nationals of either High Contracting Party shall be accorded the benefits of legal aid within the territories of the other High Contracting Party under the same conditions as its own nationals.

2. Contracts entered into between nationals and companies of either High Contracting Party and nationals and companies of the other High Contracting Party, that provide for the settlement by arbitration of controversies, shall not be deemed unenforceable within the territories of such other High

3. Les dispositions du présent article sont subordonnées au droit de chacune des Hautes Parties Contractantes de prendre les mesures nécessaires au maintien de l'ordre public et à la protection de la santé, de la moralité et de la sécurité publiques.

## ARTICLE III

1. Les ressortissants et sociétés de chacune des Hautes Parties Contractantes bénéficient du traitement national en ce qui concerne l'accès aux tribunaux judiciaires ainsi qu'aux tribunaux et organismes administratifs situés dans les territoires de l'autre Haute Partie Contractante, à tous les degrés de juridiction, en vue de l'exercice tant actif que passif de leurs droits. Les sociétés de l'une des Hautes Parties Contractantes ne se livrant à aucune activité dans les territoires de l'autre Haute Partie Contractante n'ont pas à s'y faire immatriculer pour bénéficier du même privilège. Les ressortissants de chacune des Hautes Parties Contractantes bénéficient sur les territoires de l'autre Haute Partie Contractante de l'assistance judiciaire dans les mêmes conditions que les nationaux.

2. Les contrats passés entre les ressortissants et sociétés de l'une des Hautes Parties Contractantes et les ressortissants et sociétés de l'autre Haute Partie Contractante, qui prévoient le règlement des litiges par voie d'arbitrage, ne sont pas réputés inapplicables dans les territoires de ladite autre Haute Partie

Contracting Party merely on the grounds that the place designated for the arbitration proceedings is outside such territories or that the nationality of one or more of the arbitrators is not that of such other High Contracting Party. No award duly rendered pursuant to any such contract, and final and enforceable under the laws of the place where rendered, shall be deemed invalid or denied effective means of enforcement within the territories of either High Contracting Party merely on the grounds that the place where such award was rendered is outside such territories or that the nationality of one or more of the arbitrators is not that of such High Contracting Party.

### Article IV

1. The lawfully acquired rights and interests of nationals and companies of either High Contracting Party shall not be subjected to impairment, within the territories of the other High Contracting Party, by any measure of a discriminatory character.

2. The dwellings, offices, warehouses, factories and other p r e m i s e s of nationals and companies of either High Contracting Party located within the territories of the other High Contracting Party shall be free from molestation and other unjustifiable m e a s u r e s. Official searches conducted on such premises, when necessary, shall be carried out in conformity

Contractante pour le seul motif que le lieu désigné pour la procédure d'arbitrage est situé en dehors desdits territoires, ou que la nationalité de l'un ou de plusieurs des arbitres n'est pas celle de ladite autre Haute Partie Contractante. Aucune sentence arbitrale, dûment rendue conformément à un contrat de cette nature et qui serait définitive et exécutoire en vertu de la loi du lieu où elle aura été rendue, ne sera réputée nulle et ne sera privée de moyens d'exécution efficaces dans les territoires de chacune des Hautes Parties Contractantes pour le seul motif que le lieu où la sentence a été rendue est situé en dehors desdits territoires ou que la nationalité de l'un ou de plusieurs arbitres n'est pas celle de ladite Haute Partie Contractante.

### Article IV

1. Les droits et intérêts légitimement acquis par les ressortissants et sociétés de l'une des Hautes Parties Contractantes ne seront pas compromis sur les territoires de l'autre Haute Partie Contractante par des mesures de caractère discriminatoire.

2. Les résidences, bureaux, entrepôts, usines et autres locaux des ressortissants et sociétés de l'une des Hautes Parties Contractantes situés dans les territoires de l'autre Haute Partie Contractante seront exempts de violation ou autres mesures injustifiées. Les perquisitions officielles dans lesdits locaux, lorsqu'elles seront nécessaires, seront effectuées conformément

with the law and with every consideration for the convenience of the occupants and the conduct of business.

3. Property of nationals and companies of either High Contracting Party shall not be expropriated within the territories of the other High Contracting Party except for a public purpose and with payment of a just compensation. Such compensation shall represent the equivalent of the property taken; it shall be accorded in an effectively realizable form and without needless delay. Adequate provision for the determination and payment of the said compensation must have been made no later than the time of the taking.

4. Nationals and companies of either High Contracting Party shall in no case be accorded, within the territories of the other High Contracting Party, less than national treatment with respect to the matters set forth in paragraphs 2 and 3 of the present Article.

## Article V

1. Nationals and companies of either High Contracting Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other activities for gain within the territories of the other High Contracting Party, whether directly or through the intermediary of an agent or of any other natural or juridical person. Accordingly, such nationals and

à la loi et avec tous égards pour les commodités des occupants et la marche des affaires.

3. Les biens des ressortissants et des sociétés de l'une des Hautes Parties Contractantes ne feront pas l'objet d'une mesure d'expropriation dans les territoires de l'autre Haute Partie Contractante si ce n'est dans l'intérêt public et sous réserve d'une juste indemnité. Cette indemnité représentera l'équivalent des biens expropriés; elle sera accordée sous une forme effectivement réalisable et sans retard inutile. Les dispositions adéquates en vue de la fixation et du paiement de ladite indemnité devront être prises au plus tard au moment de la dépossession.

4. Les ressortissants et les sociétés de l'une des Hautes Parties Contractantes bénéficient dans tous les cas, sur les territoires de l'autre Haute Partie Contractante, d'un traitement au moins aussi favorable que le traitement national en ce qui concerne les matières visées aux paragraphes 2 et 3 du présent article.

## Article V

1. Les ressortissants et les sociétés de chacune des Hautes Parties Contractantes bénéficient du traitement national en ce qui concerne toutes les activités commerciales, industrielles, financières et autres activités de caractère lucratif qu'ils exercent dans les territoires de l'autre Haute Partie Contractante soit directement, soit par l'intermédiaire d'un agent ou de toute autre personne physique ou

TIAS 4625

companies shall be permitted within such territories:

(a) to establish and to maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business;

(b) to organize companies under the general company laws of such other High Contracting Party, and to acquire majority interests in companies of such other High Contracting Party;

(c) to control and manage the enterprises which they have established or acquired.

Moreover, the enterprises which they control, whether in the form of an individual proprietorship, of a company or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other High Contracting Party.

2. Each High Contracting Party reserves the right to determine the extent to which aliens may, within its territories, create, control, manage or acquire interests in, enterprises engaged in communications, air or water transport, banking involving depository or fiduciary functions, exploitation of the soil or other natural resources, and the production of electricity.

morale. En conséquence, lesdits ressortissants et sociétés sont autorisés sur lesdits territoires:

a) à créer et à entretenir des succursales, agences, bureaux, usines et autres établissements appropriés à la conduite de leurs affaires;

b) à créer des sociétés conformément à la législation générale de ladite autre Haute Partie Contractante en matière de sociétés, et à acquérir des intérêts majoritaires dans les sociétés de ladite autre Haute Partie Contractante;

c) à diriger et à gérer les entreprises qu'ils ont créées ou acquises.

En outre, les entreprises qu'ils dirigent, soit à titre de propriété individuelle, de société ou à tout autre titre, bénéficient en ce qui concerne la conduite de leurs activités, d'un traitement non moins favorable que celui qui est accordé aux entreprises similaires dirigées par des ressortissants et sociétés de ladite autre Haute Partie Contractante.

2. Chaque Haute Partie Contractante se réserve le droit de déterminer dans quelle mesure les étrangers peuvent sur ses territoires créer, diriger, gérer ou acquérir des intérêts dans des entreprises de communications, de transport par air ou par eau, de banque procédant à des opérations de dépôt ou à des opérations fiduciaires, d'exploitation du sol ou d'autres ressources naturelles et de production d'électricité.

3. Each High Contracting Party undertakes not to intensify, within its territories, existing limitations as regards enterprises belonging to or controlled by nationals and companies of the other High Contracting Party which are already engaged in the activities cited in the preceding paragraph. Moreover, each High Contracting Party shall permit, within its territories, transportation, communications and banking companies of the o t h e r High Contracting Party to maintain branches and agencies, in conformity with the laws in force, which are necessary to the operations of an essentially international character in which they are engaged.

## Article VI

1. Nationals and companies of either High Contracting Party shall be permitted to engage, at their choice, within the territories of the other High Contracting Party, accountants and other technical experts, lawyers, and personnel who by reason of their special capacities are essential to the functioning of the enterprise. But these persons must fulfill the conditions necessary to the exercise of their calling under the applicable legislation.

2. In any event, such nationals and companies shall be permitted to engage accountants and other technical experts, who are not nationals of the other High Contracting Party, without

3. Chacune des Hautes Parties Contractantes s'engage à ne pas aggraver sur ses territoires les limitations existantes à l'égard des entreprises appartenant à ou dirigées par des ressortissants et sociétés de l'autre Haute Partie Contractante qui s'y livrent déjà aux activités énumérées au paragraphe précédent. En outre, chacune des Hautes Parties Contractantes autorisera sur ses territoires les Sociétés de transport, de communications et de banque de l'autre Haute Partie Contractante à entretenir, conformément aux lois en vigueur, les succursales et agences nécessaires aux opérations de caractère essentiellement international auxquelles elles se livrent.

## Article VI

1. Les ressortissants et les sociétés de chacune des Hautes Parties Contractantes peuvent à leur choix faire appel, sur les territoires de l'autre Haute Partie Contractante, à des experts-comptables et autres experts techniques, ainsi qu'à des Conseils juridiques et engager le personnel indispensable à la marche de l'entreprise en raison de ses capacités spéciales. Mais ces personnes doivent remplir les conditions nécessaires à l'exercice de leur profession, en application de la législation en vigueur.

2. Toutefois, lesdits ressortissants et Sociétés sont autorisés à faire appel à des experts-comptables et autres experts techniques n'ayant pas la nationalité de l'autre Haute Partie

regard to their having qualified to practice a profession within the territories of such other High Contracting Party, but exclusively for conducting studies and examinations for internal purposes on behalf of such nationals and companies.

## ARTICLE VII

1. Nationals and companies of either High Contracting Party shall be accorded, within the territories of the other High Contracting Party, national treatment with respect to leasing, utilizing and occupying real property of all kinds appropriate to the exercise of the rights accorded them by the other Articles of the present Convention. They shall also be accorded therein, as regards the acquisition and possession of real property, all other rights to which aliens and alien companies are entitled under the legislation of such other High Contracting Party, each High Contracting Party reserving the right to invoke reciprocity in this respect.

2. Nationals and companies of either High Contracting Party shall be accorded, within the territories of the other High Contracting Party, national treatment with respect to leasing and acquiring, by purchase or otherwise, as well as with respect to possessing, personal property of every kind, whether tangible or intangible, with the exception of ships. However, either High Contracting Party may impose

Contractante, sans considération des titres qu'ils peuvent avoir à l'exercice d'une profession sur les territoires de l'autre Haute Partie Contractante, mais exclusivement pour leur faire procéder, à des fins internes, à des études et examens à l'intention desdits ressortissants et sociétés.

## ARTICLE VII

1. Les ressortissants et sociétés de chacune des Hautes Parties Contractantes bénéficient sur les territoires de l'autre Haute Partie Contractante du traitement national pour la prise à bail, la jouissance et l'occupation d'immeubles de toute nature, à l'effet d'exercer les droits qui leur sont accordés par les autres articles de la présente convention. Ils y bénéficient également de tous autres droits en ce qui concerne l'acquisition et la possession de biens immobiliers, qui sont reconnus aux ressortissants ou sociétés étrangers par la législation de l'autre Haute Partie Contractante, chacune des Hautes Parties Contractantes se réservant d'invoquer la réciprocité à cet égard.

2. Les ressortissants et sociétés de chacune des Hautes Parties Contractantes bénéficient sur les territoires de l'autre Haute Partie Contractante du traitement national en ce qui concerne le droit d'acquérir la propriété ou la possession de tout bien mobilier corporel ou incorporel, ainsi que celui de louer lesdits biens, à l'exception des navires. Toutefois, chacune des Hautes Parties Contractantes

restrictions on alien ownership of materials dangerous from the viewpoint of public safety and alien ownership of interests in enterprises carrying on particular types of activity, but only to the extent compatible with the enjoyment of the rights and privileges defined in Article V or provided by other provisions of the present Convention.

3. Nationals and companies of either High Contracting Party shall be accorded within the territories of the other High Contracting Party national treatment with respect to the right to dispose of property of all kinds.

## ARTICLE VIII

1. Nationals and companies of either High Contracting Party shall be accorded, within the territories of the other High Contracting Party, national treatment with respect to obtaining and maintaining patents of invention and with respect to rights appertaining to trademarks, trade names and certification marks, or which in any manner relate to industrial property.

2. The High Contracting Parties undertake to cooperate with a view to furthering the interchange and use of scientific and technical knowledge, particularly in the interest of i n c r e a s ing productivity and

peut imposer des restrictions à la possession par des étrangers de matériaux dangereux du point de vue de la sécurité publique ainsi qu'à la possession par des étrangers d'intérêts dans des entreprises se livrant à des activités d'un caractère particulier. Mais elle ne peut le faire que dans la mesure compatible avec l'exercice des droits et privilèges définis à l'article V ou prévus par d'autres dispositions de la présente convention.

3. Les ressortissants et sociétés de chacune des Hautes Parties Contractantes reçoivent sur les territoires de l'autre Haute Partie Contractante le traitement national en ce qui concerne le droit de disposer des biens de toute nature.

## ARTICLE VIII

1. Les ressortissants et sociétés de chacune des Hautes Parties Contractantes bénéficient, dans les territoires de l'autre Haute Partie Contractante, du traitement national en ce qui concerne l'acquisition et la conservation des brevets d'invention et en ce qui concerne les droits attachés aux marques de fabrique ou de commerce, noms commerciaux et labels de garantie, ou qui relèvent à quelque titre que ce soit de la propriété industrielle.

2. Les Hautes Parties Contractantes s'engagent à coopérer en vue de favoriser l'échange et l'utilisation des connaissances scientifiques et techniques afin notamment de permettre l'accroissement de la productivité et

improving standards of living within their respective territories.

l'amélioration du niveau de vie dans leurs territoires respectifs.

### ARTICLE IX

1. The following categories:

(a) nationals of either High Contracting Party residing within the territories of the other High Contracting Party,

(b) nationals of either High Contracting Party not residing within the territories of the other High Contracting Party but engaged in trade or other gainful pursuit within such territories, whether or not through a permanent establishment or a fixed place of business,

(c) companies of either High Contracting Party engaged in trade or other gainful pursuit within the territories of the other High Contracting Party, whether or not through a permanent establishment or a fixed place of business,

(d) associations of either High Contracting Party that are engaged in scientific, educational, religious or philanthropic activities within the territories of the other High Contracting Party, whether through a fixed place of business or otherwise,

shall not be subject to any form of taxation or any obligation relating thereto, within the territories of such other High Contracting Party, which is more burdensome than that to which nationals, companies and associations of such other High Contracting Party in the same situation are or may be subject.

### ARTICLE IX

1. a) Les ressortissants de l'une des Hautes Parties Contractantes résidant sur les territoires de l'autre Haute Partie Contractante,

b) Les ressortissants de l'une des Hautes Parties Contractantes ne résidant pas sur les territoires de l'autre Haute Partie Contractante mais s'y livrant au commerce ou à d'autres opérations lucratives en utilisant ou non une installation fixe d'affaires ou une base fixe d'activité,

c) Les sociétés de l'une des Hautes Parties Contractantes se livrant dans les territoires de l'autre Haute Partie Contractante au commerce ou à d'autres activités lucratives en utilisant ou non une installation fixe d'affaires ou une base fixe d'activité,

d) Les associations de l'une des Hautes Parties Contractantes se livrant dans les territoires de l'autre Haute Partie Contractante à des activités scientifiques, pédagogiques, religieuses ou philantropiques en utilisant ou non une base fixe d'activité,

ne seront soumis sur les territoires de cette autre Haute Partie Contractante à aucune imposition ou obligation y relative, qui soit plus lourde que celle à laquelle sont ou pourront être assujettis les ressortissants, les sociétés et les associations de ladite autre Haute Partie Contractante se trouvant dans la même situation.

2. Nationals, companies and associations of either High Contracting Party, not falling within one of the categories specified in paragraph 1 above, shall not be subject, within the territories of the other High Contracting Party, to any form of taxation or any obligation relating thereto which is more burdensome than that to which nationals, companies and associations of any third country in the same situation are or may be subject.

3. Enterprises of e i t h e r High Contracting Party, the capital of which is owned or controlled in whole or in part, directly or indirectly, by one or more nationals of the other High Contracting Party, shall not be subject in the first High Contracting Party to any form of taxation or any obligation relating thereto which is more burdensome than that to which other like enterprises of the first High Contracting Party are or may be subject.

4. The nationals, companies and associations of either High Contracting Party referred to in paragraph 1 (b), (c), and (d) of the present Article shall not be subject, within the territories of the other High Contracting Party, to any form of taxation upon capital, income, profits or any other basis, except by reason of the property which they possess within those territories, the income and profits derived from sources therein, the business in which they are there en-

2. Les ressortissants, les Sociétés et Associations de l'une des Hautes Parties Contractantes qui n'entrent pas dans l'une des catégories prévues au paragraphe 1 ne seront pas assujettis, sur les territoires de l'autre Haute Partie Contractante, à des impositions ou obligations y relatives qui soient plus lourdes que celles auxquelles sont ou pourront être assujettis les ressortissants, sociétés et associations d'un tiers pays quelconque qui se trouveraient dans la même situation.

3. Les entreprises de l'une des Hautes Parties Contractantes dont le capital est en totalité ou en partie, directement ou indirectement détenu ou contrôlé par un ou plusieurs ressortissants de l'autre Haute Partie Contractante, ne seront soumises dans la première Haute Partie Contractante à aucune imposition ou obligation y relative qui soit plus lourde que celle à laquelle sont ou pourront être assujetties les autres entreprises de même nature de cette première Haute Partie Contractante.

4. Les ressortissants, les sociétés et les associations d'une Haute Partie Contractante visés au paragraphe 1, sous les alinéas b), c) et d) du présent article ne seront assujettis, sur les territoires de l'autre Haute Partie Contractante, aux impositions frappant le capital, les revenus ou bénéfices, ou qui sont établies sur toutes autres bases, qu'à raison des biens qu'ils y possèdent, des revenus et bénéfices qu'ils y réalisent, des affaires qu'ils y traitent, des

gaged, the transactions which they accomplish there, or any other bases of taxation directly related to their activities within those territories.

5. The term "form of taxation", as used in the present Article, includes all taxes of whatever nature or denomination.

6. Each High Contracting Party reserves the right to:

(a) extend to the nationals, companies and associations of third countries, specific tax advantages on the basis of reciprocity;

(b) accord special tax advantages by virtue of agreements with third countries for the avoidance of double taxation;

(c) apply special provisions in allowing, to non-residents, exemptions of a personal nature in connection with income and inheritance taxes;

(d) extend special advantages to its own nationals and residents in connection with joint returns by husband and wife.

7. The foregoing provisions shall not prevent the levying, in appropriate cases, of fees relating to the accomplishment of police and other formalities, if these fees are also levied on other foreigners. The rates for such fees shall not exceed those charged the nationals of any other country.

opérations qu'ils y font ou de toutes autres bases d'imposition en relation directe avec leurs activités dans ces territoires.

5. Le terme "imposition" désigne dans le présent article les impôts de toute nature ou dénomination.

6. Chaque Haute Partie Contractante se réserve le droit

a) de concéder aux ressortissants, sociétés et associations de pays tiers des avantages fiscaux particuliers sur la base de la réciprocité;

b) d'accorder des avantages fiscaux spéciaux en vertu d'accords conclus avec des pays tiers en vue d'éviter la double imposition;

c) de prendre des dispositions spéciales tendant à faire bénéficier des non-résidents d'exonérations de caractère personnel en matière d'impôt sur le revenu et d'impôt sur les successions;

d) d'accorder des avantages spéciaux à ses propres ressortissants et résidents en matière de déclarations conjointes souscrites par des époux.

7. Les dispositions qui précèdent ne font pas obstacle à la perception, le cas échéant, de taxes afférentes à l'accomplissement des formalités de police ou de toute autre formalité, si ces taxes sont également perçues sur les autres étrangers. Le taux de ces taxes ne pourra être supérieur à celui des taxes perçues sur les ressortissants de tout autre pays.

### ARTICLE X

1. Nationals and companies of either High Contracting Party shall be accorded by the other High Contracting Party the same treatment as nationals and companies of such other High Contracting Party in like situations, with respect to payments, remittances and transfers of funds or financial instruments between the territories of the two High Contracting Parties as well as between the territories of such other High Contracting Party and any third country. This treatment shall be not less favorable than that accorded to nationals and companies of any third country in like situations.

2. Neither High Contracting Party shall impose exchange restrictions as defined in paragraph 5 of the present Article except to the extent necessary to prevent its monetary reserves from falling to a very low level or to effect a moderate increase in very low monetary reserves. The provisions of the present Article do not alter the obligations either High Contracting Party may have to the International Monetary Fund or preclude imposition of particular restrictions whenever the Fund specifically authorizes or requests a High Contracting Party to impose such restrictions.

### ARTICLE X

1. Les ressortissants et sociétés de chacune des Hautes Parties Contractantes bénéficient de la part de l'autre Haute Partie Contractante du même traitement que les ressortissants et sociétés de cette dernière se trouvant dans des situations similaires, en ce qui concerne les paiements, remises et transferts de fonds ou de moyens de paiement entre les territoires des deux Hautes Parties Contractantes ainsi qu'entre les territoires de l'autre Haute Partie Contractante et ceux d'un pays tiers. Ce traitement ne peut pas être moins favorable que celui qui serait accordé aux ressortissants et sociétés se trouvant dans des situations similaires et relevant d'un pays tiers.

2. Aucune des Hautes Parties Contractantes n'imposera, en matière de changes, de restrictions telles que définies au paragraphe 5 du présent article, si ce n'est dans la mesure qui serait requise pour empêcher ses réserves monétaires de tomber à un niveau très bas, ou en vue de réaliser un accroissement modéré de ses réserves monétaires insuffisantes. Les dispositions du présent article ne modifient pas les obligations que l'une des Hautes Parties Contractantes a pu contracter à l'égard du Fonds monétaire international, et n'excluent pas l'adoption de restrictions particulières lorsque le Fonds aura spécialement autorisé ou invité l'une des Hautes Parties Contractantes à imposer de telles restrictions.

TIAS 4625

3. The two High Contracting Parties, recognizing that the freedom of movement of investment capital and of the returns thereon would be conducive to the realization of the objectives of the present Convention, are agreed that such movements shall not be unnecessarily hampered. In this spirit, each High Contracting Party will make every effort to accord, in the greatest possible measure, to nationals and companies of the other High Contracting Party the opportunity to make investments and to repatriate the proceeds of the liquidation thereof. This principle shall apply also to the compensation referred to in Article IV, paragraph 3, of the present Convention. Each High Contracting Party shall make reasonable provision for the withdrawal of earnings from investments, whether in the form of salaries, dividends, interest, commissions, royalties, payments for technical services, or payments for other current transactions relative to investments. If more than one rate of exchange is in force, the rate applicable to such withdrawals shall be a rate which is specifically approved by the International Monetary Fund for such transactions or, in the absence of a rate so approved, a rate which, inclusive of any taxes or surcharges on exchange transfers, is just and reasonable.

3. Les deux Hautes Parties Contractantes, reconnaissant que la liberté des mouvements de capitaux d'investissement et des revenus correspondants est susceptible de permettre la réalisation des objectifs de la présente convention, conviennent que lesdits mouvements ne seront pas inutilement entravés. Dans cet esprit, chacune des Hautes Parties Contractantes s'efforcera d'accorder, dans toute la mesure du possible, aux ressortissants et sociétés de l'autre Haute Partie Contractante, la faculté d'effectuer des investissements et de retransférer le produit de leur liquidation. Ce principe s'applique également à l'indemnité visée à l'article IV paragraphe 3 de la présente convention.

Chacune des Hautes Parties Contractantes accordera des facilités raisonnables pour le transfert des gains provenant d'investissements sous la forme de salaires, dividendes, intérêts, commissions, redevances, rémunérations pour services techniques, ou des sommes correspondant à d'autres transactions courantes en matière d'investissements. Si les taux de change en vigueur sont multiples, le taux applicable à de tels retraits sera le taux expressément approuvé par le Fonds monétaire international pour des transactions de cette nature ou, en l'absence d'un taux ainsi approuvé, un taux qui, compte tenu de toutes taxes et surtaxes sur les transferts de devises, sera juste et raisonnable.

4. E x c h a n g e restrictions shall not be imposed by either High Contracting Party in a manner unnecessarily detrimental or arbitrarily discriminatory to the claims, investments, transport, trade, and other interests of the nationals and companies of the other High Contracting Party, nor to the competitive position thereof.

5. The term "exchange restrictions" as used in the present Article includes all restrictions, charges and taxes, regulations, or other requirements imposed by either High Contracting Party which burden or interfere with payments, remittances, or transfers of funds or of financial instruments between the territories of the two High Contracting Parties.

## ARTICLE XI

Each High Contracting Party will take the measures it deems appropriate with a view to preventing commercial practices or a r r a n g e m e n t s, whether effected by one or more private or public commercial enterprises, which restrain competition, limit access to markets or foster monopolistic control, whenever such practices or arrangements have or might have harmful effects on trade between the two countries.

4. Aucune des Hautes Parties Contractantes n'imposera de restrictions de change, d'une manière inutilement préjudiciable ou arbitrairement discriminatoire en matière de créances, investissements, transports, commerce et en ce qui concerne les autres intérêts des ressortissants et sociétés de l'autre Haute Partie Contractante ou à l'égard de la position concurrentielle de ladite autre Haute Partie Contractante.

5. L'expression "restriction de change" figurant au présent article comprend toutes restrictions, droits et taxes, tous règlements ou autres exigences imposés par l'une ou l'autre Haute Partie Contractante, affectant ou entravant les paiements, remises ou transferts de fonds ou de moyens de paiement entre les territoires des deux Hautes Parties Contractantes.

## ARTICLE XI

Chacune des Hautes Parties Contractantes prendra les mesures qu'elle estimera appropriées, afin d'empêcher les pratiques ou arrangements commerciaux, qu'ils soient le fait d'une ou plusieurs entreprises privées ou publiques, qui entravent la concurrence, restreignent l'accès aux marchés ou favorisent un contrôle tendant à instituer un monopole, dans tous les cas où ces pratiques ou arrangements ont ou pourraient avoir des effets nuisibles aux échanges commerciaux entre les deux pays.

TIAS 4625

## Article XII

The provisions of the present Convention shall not preclude the a p p l i c a t i o n of measures:

(a) regulating the importation and exportation of gold and silver;

(b) regarding fissionable materials, the radio-active by-products of the utilization or manufacture of such materials, or raw materials which are the source of fissionable materials;

(c) regulating the manufacture of and traffic in arms, munitions and implements of war, as well as traffic in other materials carried on directly or indirectly for the purpose of supplying military establishments;

(d) necessary to fulfill the obligations of a High Contracting Party for the maintenance or restoration of international peace and security, or necessary to protect its essential security interests.

## Article XIII

The High Contracting Parties may deny to any company, in the ownership or direction of which nationals of a third country or countries have directly or indirectly a controlling interest, the advantages of the present Convention, except with respect to recognition of juridical status and access to the courts.

## Article XII

1. Aucune disposition de la présente convention ne fait obstacle à l'application de mesures:

a) règlementant l'importation et l'exportation de l'or et de l'argent;

b) relatives aux substances fissiles, aux sous-produits radioactifs résultant de l'utilisation ou de la transformation desdites substances, ou aux matières premières qui sont à la base des substances fissiles;

c) règlementant la fabrication et le commerce des armes, munitions et matériels de guerre, ainsi que le commerce d'autres matériels effectué directement ou indirectement en vue d'approvisionner des installations militaires;

d) nécessaires pour l'exécution des obligations souscrites par l'une des Hautes Parties Contractantes en vue du maintien ou du rétablissement de la paix et de la sécurité internationales, ou nécessaires à la protection de ses intérêts essentiels en matière de sécurité.

## Article XIII

Les Hautes Parties Contractantes peuvent refuser à toute société dans laquelle des ressortissants d'un ou plusieurs pays tiers ont directement ou indirectement un intérêt prépondérant du fait de leur participation au capital ou à la direction de ladite société, les avantages de la présente convention, sauf en ce qui concerne la reconnaissance de la personnalité morale et l'accès aux Tribunaux.

## ARTICLE XIV

1. The term "national treatment" means treatment accorded to nationals and companies of either High Contracting Party within the territories of the other High Contracting Party upon terms no less favorable than the treatment therein accorded, in like situations, to the nationals and companies, as the case may be, of such other High Contracting Party.

2. National treatment accorded under the provisions of the present Convention to French companies shall, in any State, territory or possession of the United States of America, be the treatment accorded therein to companies constituted in other States, territories and possessions of the United States of America.

3. As used in the present Convention, the term "nationals" ("ressortissants") means natural persons having the nationality of a High Contracting Party and not domiciled in a non-metropolitan territory thereof to which the present Convention does not extend.

4. As used in the present Convention, the term "companies" ("sociétés") means:

(a) as concerns the United States of America, corporations, partnerships, limited liability companies, and other entities having legal personality, whether or not with limited liability, but for pecuniary profit;

## ARTICLE XIV

1. L'expression "traitement national" signifie le traitement accordé aux ressortissants et sociétés d'une des Hautes Parties Contractantes sur les territoires de l'autre Haute Partie Contractante dans des conditions non moins favorables que le traitement qui y est accordé, dans des situations similaires, aux ressortissants et sociétés, selon le cas, de cette dernière Haute Partie Contractante.

2. Le traitement national accordé en vertu des dispositions de la présente convention aux sociétés françaises est dans tout Etat, tout territoire ou toute possession des Etats-Unis d'Amérique, le traitement qui y est accordé aux Sociétés constituées dans les autres Etats, territoires et possessions des Etats-Unis d'Amérique.

3. Aux fins de la présente convention: le terme "ressortissants" ("nationals") désigne les personnes physiques possédant la nationalité de l'une des Hautes Parties Contractantes et ne résidant pas habituellement sur un territoire non métropolitain de ce pays auquel ne s'applique pas la présente convention.

4. Aux fins de la présente convention, le terme "société" ("company") désigne:

a) en ce qui concerne les Etats-Unis d'Amérique, les "corporations", "partnerships", "limited liability companies" et autres personnes morales à responsabilité limitée ou non, mais à but lucratif;

(b) as concerns France, "sociétés civiles", "sociétés en nom collectif", "associations en participation", "sociétés en commandite simple", "sociétés en commandite par actions", "sociétés anonymes", "sociétés à responsabilité limitée" and, in general, entities having legal personality for pecuniary profit.

5. Companies constituted under the applicable laws and regulations within the territories of either High Contracting Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other High Contracting Party.

6. Non-profit associations lawfully constituted within the territories of either High Contracting Party shall have their juridical status recognized by the other High Contracting Party and shall, *inter alia*, be accorded within the territories thereof the rights provided in Article III, paragraph 1, of the present Convention.

### ARTICLE XV

1. The present Convention shall apply:

(a) As concerns the United States of America, to all territories under the sovereignty or authority thereof, other than the Panama Canal Zone and the Trust Territory of the Pacific Islands;

(b) As concerns the French Republic, to the metropolitan departments, the Algerian departments, the departments of The

b) en ce qui concerne la France, les sociétés civiles, les sociétés en nom collectif, les associations en participation, les Sociétés en commandite simple, les Sociétés en commandite par actions, les Sociétés anonymes, les Sociétés à responsabilité limitée et en général les personnes morales à but lucratif.

5. Les Sociétés constituées, conformément aux lois et règlements en vigueur, dans les territoires de l'une des Hautes Parties Contractantes sont réputées être des sociétés de ladite Haute Partie Contractante et voient leur personnalité morale reconnue dans les territoires de l'autre Haute Partie Contractante.

6. Les Associations à but non lucratif légalement constituées sur le territoire de l'une des Hautes Parties Contractantes voient leur personnalité morale reconnue par l'autre Haute Partie Contractante et bénéficient notamment dans ces territoires des dispositions de l'article III paragraphe 1 de la présente convention.

### ARTICLE XV

1. La présente convention est applicable:

a) En ce qui concerne les Etats-Unis d'Amérique, à tous les territoires placés sous leur souveraineté ou leur autorité à l'exclusion de la zone du canal de Panama et du territoire sous tutelle des Iles du Pacifique.

b) En ce qui concerne la République Française, aux départements métropolitains, aux départements algériens, aux dé-

Oasis and Saoura, the departments of Martinique, Guadaloupe, Guiana and Reunion.

2. The present Convention may be made applicable, by virtue of exchanges of notes between the Governments of the High Contracting Parties, to the Overseas Territories of the French Republic or to one or several such Territories, under the conditions fixed, in each case, in the said exchanges of notes.

3. The present Convention may be made applicable, in the same manner, to the member States of the Community or to one or several such States.

### Article XVI

1. Each High Contracting Party shall accord sympathetic consideration to such representations as the other High Contracting Party may make with respect to any question affecting the application of the present Convention, and shall afford opportunity for an exchange of views relative thereto.

2. Any dispute between the High Contracting Parties as to the interpretation or application of the present Convention, not satisfactorily adjusted by diplomacy, shall be submitted to the International Court of Justice, unless the High Contracting Parties agree to settlement by some other pacific means.

partements des Oasis et de la Saoura, aux départements de la Guadeloupe, de la Martinique, de la Guyane et de la Réunion.

2. La présente convention pourra être rendue applicable, en vertu d'échanges de lettres entre les Gouvernements des deux Hautes Parties Contractantes, aux Territoires d'Outre-Mer de la République Française ou à l'un ou à plusieurs d'entre eux, selon les modalités fixées, dans chaque cas, auxdits échanges de lettres.

3. La présente convention pourra, dans les mêmes conditions, être rendue applicable aux Etats-membres de la Communauté ou à l'un ou à plusieurs d'entre eux.

### Article XVI

1. Chacune des Hautes Parties Contractantes accordera une considération bienveillante à toute représentation que l'autre Haute Partie Contractante pourra faire concernant toute question intéressant l'application de la présente Convention et se prêtera à des échanges de vues à ce sujet.

2. Tout litige entre les Hautes Parties Contractantes relativement à l'interprétation ou à l'application de la présente Convention, qui n'aura pas fait l'objet d'un règlement satisfaisant par la voie diplomatique, sera soumis à la Cour Internationale de Justice, à moins que les Hautes Parties Contractantes ne se mettent d'accord pour aboutir à un règlement par tout autre moyen pacifique.

### ARTICLE XVII

The entry into force of the present Convention shall terminate the Trade-mark Convention signed at Washington April 16, 1869.[1]

### ARTICLE XVIII

1. The present Convention shall be ratified. It will enter into force one month after the exchange of the instruments of ratification, which will take place at Washington.

2. The present Convention shall have an initial term of ten years. It shall remain in force thereafter until either High Contracting Party terminates it by giving to the other High Contracting Party a written notice one year in advance.

IN WITNESS WHEREOF the respective Plenipotentiaries have signed the present Convention and have hereunto affixed their seals.

DONE in duplicate, in the English and French languages, both equally authentic, at Paris, this twenty-fifth day of November, one thousand nine hundred fifty-nine.

AMORY HOUGHTON

[SEAL]

M COUVE DE MURVILLE

[SEAL]

### ARTICLE XVII

L'entrée en vigueur de la présente Convention met fin aux effets de la Convention pour la garantie réciproque de la propriété des marques de fabrique, signée à Washington le 16 avril 1869.

### ARTICLE XVIII

1. La présente Convention sera ratifiée. Elle entrera en vigueur un mois après l'échange des instruments de ratification qui aura lieu à Washington.

2. La présente Convention aura une durée initiale de dix ans. Elle restera en vigueur après ce terme à moins que l'une des Hautes Parties Contractantes n'en fasse cesser les effets après avoir informé l'autre Haute Partie Contractante par écrit et avec un préavis d'un an.

En foi de quoi les Plénipotentiaires respectifs ont signé la présente Convention et y ont apposé leurs sceaux.

Fait en double exemplaire, en langue anglaise et française, les deux textes faisant également foi,

à Paris, le vingt-cinq Novembre mil neuf cent cinquante neuf.

AMORY HOUGHTON

[SEAL]

M COUVE DE MURVILLE

[SEAL]

---

[1] TS 94; 16 Stat. 771.

TIAS 4625

## PROTOCOL

The undersigned Plenipotentiaries, duly authorized by their respective Governments, are further agreed on the following provisions, which shall form an integral part of the Convention of Establishment between the United States of America and France dated the twenty-fifth of November, one thousand nine hundred fifty-nine.

1. (a) The protection provided in Article I engages the competent authorities of each High Contracting Party to inform immediately the consuls of the other High Contracting Party of the arrest or detention of any of its nationals, if the latter so requests. The consul may then be authorized to visit such national, in conformity with the regulations of the institution of detention, and to confer with him. The competent authority will assure the transmission to the consul of all correspondence directed to him by such national.

(b) Such national shall have the right to all guaranties provided in the laws of the High Contracting Party within the territories of which he is detained, and which assure accused persons of humane treatment, the right to be informed immediately of the accusations against them, to be defended by an attorney of their choice, and to be judged as rapidly as possible.

## PROTOCOLE

Les Plénipotentiaires soussignés, dûment autorisés par leurs Gouvernements respectifs, sont également convenus des dispositions suivantes, qui font partie intégrante de la Convention d'Etablissement entre les Etats-Unis d'Amérique et la France en date du vingt-cinq Novembre mil neuf cent cinquante neuf.

1. a) La protection stipulée à l'article 1 entraîne pour les autorités compétentes de chacune des Hautes Parties Contractantes l'obligation d'informer immédiatement les Consuls de l'autre Haute Partie Contractante de l'arrestation ou de la détention d'un de ses ressortissants si celui-ci en fait la demande. Le Consul peut alors être autorisé à visiter ce ressortissant conformément aux règlements de l'établissement de détention et à s'entretenir avec lui. Toute correspondance adressée par ce ressortissant au Consul lui sera transmise par les soins de l'autorité compétente.

b) Ce ressortissant aura droit aux garanties accordées par les lois de la Haute Partie Contractante sur les territoires de laquelle il est détenu et qui assurent aux prévenus un traitement humain, le droit d'être immédiatement informés des accusations formulées contre eux, de faire assumer leur défense par un avocat de leur choix, et d'être jugés aussi rapidement que possible.

2. (a) Notwithstanding the provisions of the present Convention, the laws and regulations in force within the territories of either High Contracting Party which govern the access of aliens to the professions and occupations, as well as the exercise of such callings and other activities by them, remain applicable as concerns nationals and companies of the other High Contracting Party.

(b) However, the procedures provided for by the above-mentioned laws and regulations, as well as those provided for by the laws and regulations governing the entry and sojourn of aliens, must not have the effect of impairing the substance of the rights set forth in Article II, paragraph 1 (a) and (b).

(c) The provisions of Article II, paragraph 1 (b), shall be construed as extending to nationals of either High Contracting Party proceeding to the territories of the other High Contracting Party for the purpose of occupying a position of responsibility in an enterprise on behalf of nationals and companies of the first High Contracting Party that have invested a substantial amount of capital in such enterprise or that are in the process of making such an investment.

(d) The advantages accorded a national of either High Contracting Party under the provisions of Article II, paragraph 1 (a) and (b), with respect to entry and sojourn in the territories of the other High Con-

2. a) Nonobstant les dispositions de la présente Convention, les dispositions légales et réglementaires en vigueur sur les territoires de l'une des Hautes Parties Contractantes et régissant l'accès des étrangers aux professions salariées et non salariées, ainsi que l'exercice par eux de ces professions et autres activités, restent applicables aux ressortissants et sociétés de l'autre Haute Partie Contractante.

b) Toutefois, les dispositions prévues par les lois et règlements précités ainsi que celles prévues par les lois et règlements sur l'admission et le séjour des étrangers ne doivent pas avoir pour effet de porter atteinte à l'essentiel des droits mentionnés à l'article II, paragraphe 1 a et b.

c) Les dispositions de l'article II paragraphe 1 b sont considérées comme s'étendant aux ressortissants de l'une des Hautes Parties Contractantes se rendant sur les territoires de l'autre Haute Partie Contractante afin d'y occuper un poste de responsabilité dans une entreprise pour le compte des ressortissants et sociétés de la première Haute Partie Contractante, qui ont déjà investi un capital substantiel dans cette entreprise, ou procèdent à un tel investissement.

d) Les avantages accordés en matière d'admission et de séjour dans les territoires de l'une des Hautes Parties Contractantes à un ressortissant de l'autre Haute Partie Contractante appelé à bénéficier des dispositions de

tracting Party, shall extend to his spouse and minor unmarried children who accompany or next follow to join him.

3. The provision of Article III, paragraph 1, relating to access to the courts of justice, shall not affect the regulations in force within the territories of either High Contracting Party concerning the *cautio judicatum solvi.*

4. The provisions of the last sentence of Article III, paragraph 2, shall not affect the reservation concerning the place where the award is rendered, made by France in adhering to the Convention of New York of June 10, 1958 for the recognition and execution of foreign arbitral awards.

5. In Article IV, paragraph 3, the term "expropriated . . . for a public purpose" extends *inter alia* to nationalizations.

6. The provisions of Article IV, paragraph 3, providing for the payment of compensation, shall extend to interests held directly or indirectly by nationals and companies of either High Contracting Party in property expropriated within the territories of the other High Contracting Party.

7. The provisions of Article V, paragraph 1, shall not impair the laws and regulations in force within the territories of either High Contracting Party which reserve the practice of certain professions to nationals.

l'article II paragraphe 1 a et b s'étendent à son épouse et à ses enfants mineurs non mariés qui l'accompagnent ou viennent le rejoindre.

3. La disposition de l'article III paragraphe 1 relative à l'accès aux tribunaux n'affecte pas les règles en vigueur sur les territoires de chacune des Hautes Parties Contractantes en matière de caution judicatum solvi.

4. Les dispositions de l'article III paragraphe 2 in fine ne portent pas atteinte à la réserve relative aux territoires sur lesquels la sentence est rendue, formulée par la France en adhérant à la Convention de New York du 10 juin 1958 pour la reconnaissance et l'exécution des sentences arbitrales étrangères.

5. Dans l'article IV, paragraphe 3, le terme "expropriation . . . dans l'intérêt public" désigne également les nationalisations.

6. Les dispositions de l'article IV, paragraphe 3, prévoyant le paiement d'indemnités, s'étendent aux intérêt détenus directement ou indirectement par des ressortissants et des Sociétés de l'une des Hautes Parties Contractantes dans des biens expropriés dans les territoires de l'autre Haute Partie Contractante.

7. Les dispositions de l'article V paragraphe 1 ne portent pas atteinte aux dispositions légales et réglementaires en vigueur sur les territoires de l'une des Hautes Parties Contractantes et réservant certaines professions aux nationaux.

TIAS 4625

8. The provisions of Article V, paragraph 1, do not preclude the right of either High Contracting Party to apply special requirements to alien insurance companies to the end that they furnish guaranties, in the interest of insured persons and of third parties, equivalent to those required of companies of the country.

9. The provisions of Article VI, paragraph 2, are adopted with regard to accountancy until such time as it may have become possible to conclude an agreement concerning the exercise of this profession.

10. The right to invoke reciprocity as provided in Article VII, paragraph 1, shall permit the French Government, taking into account the treatment accorded French nationals and companies in a State, territory or possession of the United States of America, to apply analogous treatment to nationals and companies of the United States of America, respectively domiciled in such State, territory or possession or constituted under its laws.

11. In the event that a French national or company, having acquired real property by testate or intestate succession, should be precluded by reason of alienage from enjoying rights of ownership in such property in a State, territory or possession of the United States of America, such national or company will be allowed a period of at least five years in which to dispose of it.

8. Les dispositions de l'article V paragraphe 1 ne font pas obstacle au droit pour les Hautes Parties Contractantes d'appliquer des dispositions spéciales aux sociétés d'assurances étrangères afin que celles-ci fournissent, dans l'intérêt des assurés et des tiers, des garanties équivalentes à celles qui sont requises des sociétés nationales.

9. Les dispositions de l'article VI paragraphe 2 sont adoptées, en ce qui concerne les experts-comptables et comptables agréés, jusqu'au moment où il aura été possible de conclure un accord sur l'exercice de cette profession.

10. Le droit d'invoquer la réciprocité prévu à l'article VII paragraphe 1, permet au Gouvernement français, compte tenu du traitement accordé aux sociétés et ressortissants français dans un Etat, possession ou territoire des Etats-Unis d'Amérique, d'appliquer un traitement analogue aux ressortissants et sociétés des Etats-Unis d'Amérique, respectivement domiciliés dans l'Etat, possession ou territoire en question ou constituées suivant sa législation.

11. Dans le cas où une société ou un ressortissant français ayant acquis des biens immobiliers par succession ou par testament, perdraient, en raison de leur qualité d'étrangers, la faculté d'exercer leurs droits de propriété sur ces biens dans un Etat, territoire ou possession des Etats-Unis d'Amérique, ils obtiendraient un délai d'au moins cinq ans pour en disposer.

12. The provisions of Article VII, paragraphs 2 and 3, shall not prevent the enforcement of regulations governing transactions on the part of nonresidents and aliens in foreign stocks and bonds.

13. The provisions of Article X, paragraph 1, shall not preclude differing treatment from being applied to different currencies, as may be required by the state of the balance of payments of either High Contracting Party.

14. Either High Contracting Party, with a view to protecting its currency or facilitating the servicing of the proceeds of investments and the repatriation of capital, may subject to authorization the making of investments by foreign nationals and companies.

15. The phrase, "in the greatest possible measure", employed in Article X, paragraph 3, shall be understood to refer to the conditions cited in Article X, paragraph 2.

16. Residence criteria may be applied for purposes of determining whether or not nationals and companies of either High Contracting Party are in "like situations" as that term is employed in paragraph 1 of Article XIV and in the other provisions of the present Convention.

17. Article XV does not apply to territories which are subject to the authority of either High Contracting Party solely as a military base or by reason of temporary military occupation.

12. Les dispositions de l'article VII paragraphe 2 et 3 ne font pas obstacle à l'application des textes réglementant les transactions effectuées par les non résidents et les personnes de nationalité étrangère sur les valeurs mobilières étrangères.

13. Les dispositions de l'article X, paragraphe 1 ne font pas obstacle à l'application aux diverses monnaies de traitements différents, selon que l'exige l'état de la balance des paiements de l'une ou l'autre Haute Partie Contractante.

14. Chacune des Hautes Parties Contractantes peut, en vue de protéger sa monnaie ou de faciliter le service des revenus d'investissements et le retransfert du capital, subordonner à autorisation les constitutions d'investissements par des ressortissants et sociétés étrangers.

15. L'expression "dans toute la mesure du possible" figurant à l'article X, paragraphe 3, s'entend référence faite aux conditions mentionnées à l'article X paragraphe 2.

16. Le critère de résidence peut servir à apprécier si les ressortissants et les Sociétés de chacune des Hautes Parties Contractantes se trouvent ou non dans des "situations similaires" au sens du paragraphe 1 de l'article XIV et des autres dispositions de la présente convention.

17. L'article XV ne s'applique pas aux territoires qui sont soumis à l'autorité de l'une des Hautes Parties Contractantes uniquement en tant que base militaire ou en raison d'une occupation militaire temporaire.

IN WITNESS WHEREOF the respective Plenipotentiaries have signed the present protocol and have hereunto affixed their seals.

DONE in duplicate, in the English and French languages, both equally authentic, at Paris, this twenty-fifth day of November, one thousand nine hundred fifty-nine.

AMORY HOUGHTON

[SEAL]

M COUVE DE MURVILLE

[SEAL]

En foi de quoi, les Plénipotentiaires respectifs ont signé le présent Protocole et y ont apposé leurs sceaux.

Fait en double exemplaire, en langue anglaise et française, les deux textes faisant également foi,

à Paris, le vingt-cinq Novembre mil neuf cent cinquante neuf.

AMORY HOUGHTON

[SEAL]

M COUVE DE MURVILLE

[SEAL]

## JOINT DECLARATION

The two Governments deem it appropriate to clarify, at the moment of proceeding to the signing of the Convention of Establishment between the United States of America and France, the import of the reservations relating, on the one hand, to the enforcement of the laws governing the entry and sojourn of aliens and, on the other hand, to the enforcement of the laws regulating the access of aliens to the professions and occupations.

It is expressly stipulated in the Protocol to the Convention that those reservations shall not impair the substance of the rights granted to the nationals of either High Contracting Party who have invested a substantial amount of capital or are in the

## DECLARATION COMMUNE

Les deux Gouvernements jugent utile que soit précisée, au moment de la signature de la Convention d'Etablissement entre les Etats-Unis d'Amérique et la France, la portée des réserves relatives d'une part à l'application des lois concernant l'admission et le séjour des étrangers et, d'autre part, à l'application des lois règlementant l'accès des étrangers aux professions salariées et non salariées.

Il est expressément stipulé dans le Protocole de la Convention que ces réserves ne peuvent porter atteinte à l'essentiel des droits reconnus aux ressortissants de l'une des Hautes Parties Contractantes qui ont déjà investi un capital substantiel ou procèdent

process of making such an investment within the territories of the other High Contracting Party, or who proceed thereto for the purpose of engaging in trade between the two High Contracting Parties.

However, the two Governments also have the intention of facilitating, to the greatest possible extent and on a basis of real and effective reciprocity, the establishment of nationals who are not within the above-cited categories and, in particular, of qualified personnel who are indispensable to the conduct of the enterprises created by nationals and companies of either High Contracting Party within the territories of the other High Contracting Party.

Consequently, and in conformity with the spirit which animated the negotiation of the present Convention, the two Governments consider that they should reciprocally exercise the greatest possible liberality consistent with their national laws both with respect to the entry and sojourn of aliens and with respect to their establishment, effective reciprocity being understood by them as pertaining globally to the whole of the two systems of regulation.

The present Declaration shall be annexed to the Convention of Establishment between the United States of America and France dated the twenty-fifth of November, one thousand nine hundred fifty-nine.

AH
M C M

à un tel investissement sur les territoires de l'autre Haute Partie Contractante, ou qui s'y rendent en vue d'exercer des activités commerciales entre les territoires des deux Hautes Parties Contractantes.

Mais l'intention des deux Gouvernements est également de faciliter, dans toute la mesure du possible et sur la base d'une réciprocité réelle et effective, l'établissement des ressortissants qui ne rentrent pas dans les catégories précitées, et en particulier du personnel qualifié indispensable à la marche des entreprises créées par les ressortissants et sociétés de l'une des Hautes Parties Contractantes sur les territoires de l'autre Haute Partie Contractante.

En conséquence, et conformément à l'esprit qui a présidé à la négociation de la présente Convention, les deux Gouvernements estiment qu'ils devront faire réciproquement l'usage le plus libéral possible des pouvoirs que leur donnent leurs législations nationales en ce qui concerne tant l'entrée et le séjour que l'établissement des étrangers, la réciprocité effective étant entendue par eux comme portant globalement sur l'ensemble de ces deux ordres de réglementations.

La présente déclaration sera annexée à la Convention d'Etablissement entre les Etats-Unis d'Amérique et la France en date du vingt-cinq Novembre mil neuf cent cinquante neuf.

AH
M C M

*Issued Pursuant to order of Mr Timothy Walker dated 8th May 2006*



### IN THE HIGH COURT OF JUSTICE
### QUEEN'S BENCH DIVISION
### COMMERCIAL COURT
### ROYAL COURTS OF JUSTICE

## Claim Form

| | for court use only |
|---|---|
| Claim No. | 2006 Folio 440 |
| Issue Date | |

**Claimant(s)**

Talbot 2002 Underwriting Capital Ltd of Lloyd's Syndicate No. 1183 (suing on behalf of itself for its proportion of 100.00% and as representative Underwriter on behalf of all other members of Lloyd's Syndicate Nos. 2001, 2003, 2987, 2020 and 1084)





**Defendant(s)**

(1)  JEAN MAURICE BERGERON
     PO Box SS 6174
     Nassau
     BAHAMAS

(2)  CAVALAM LTD
     PO Box SS 6174
     Nassau
     BAHAMAS

(3)  CAVLAM BUSINESS LTD
     1st Floor
     Columbus Centre BLD
     PO Box 901, Road Town
     Tortola
     BRITISH VIRGIN ISLANDS

Name and address of Defendant receiving this claim form

See above



| Amount claimed | To be assessed |
|---|---|
| Court fee | 1,700 |
| Solicitor's costs | To be assessed |
| Total amount | To be assessed |

| Claim No. | |
|-----------|--|

Does, or will, your claim include any issues under the Human Rights Act 1998?    ☐ Yes    ☒ No

Brief details of claim

The Defendants are the owners of a 1973 Bertram 63' Motor Yacht, the "M/Y AMIRA" which sank on or about 18th December 2004 and was subsequently refloated at Del Caribe Boatyard, Margarita Island, Venezuela. The Claimant issued a policy of insurance no.YS04/0001 and a schedule thereto forming part of certificate number M/04/08661 covering certain risks to the vessel for the policy period 3rd March 2004 to 3rd March 2005.

The Claimant seeks a declaration that it is not liable to indemnify the Defendants under the relevant policy of insurance or in the alternative a declaration that its liability, if any, under the policy should be limited to an amount equating to the loss which the Defendants would have incurred had they acted timeously as a prudent uninsured following the casualty.

Particulars of claim *XXXXXXXX (will follow if an acknowledgment of service is filed that indicates an intention to defend the claim)

---

Statement of Truth
*XXXXXXX (The Claimant believes) that the facts stated in this claim form *XXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXX are true.
*I am duly authorised by the claimant to sign this statement
Full name Justin Stephen Reynolds

Name of *XXXXXXX ('s solicitor's firm) Hill Dickinson LLP

signed _____    position or office held Partner

*(Claimant) ('s solicitor)    (if signing on behalf of firm, company or corporation)
*delete as appropriate

---

Hill Dickinson LLP
Sun Court
66/67 Cornhill
London EC3V 3RN

Claimant's or solicitor's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

020 7695 1001

CLAIM NO. 2006 FOLIO 410

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

Mr Justice Langley

BETWEEN



TALBOT 2002 UNDERWRITING CAPITAL LIMITED OF LLOYD'S
SYNDICATE NO. 1183

(suing on behalf of itself for its proportion of 100.00% and as representative
underwriter on behalf of all other members of Lloyd's Syndicate nos. 2001, 2003,
2987, 2020 and 1084)

<u>Claimant</u>

and

(1)  JEAN MAURICE BERGERON

(2)  CAVALAM LIMITED

(3)  CAVLAM BUSINESS LIMITED

<u>Defendants</u>

---

## ORDER

---

**UPON** the Claimant's application without notice;

**AND UPON** reading the first, second, third and fourth witness statements of Mr J S
Reynolds;

**IT IS ORDERED THAT:**

1.   the time for service of the Claim Form herein be further extended for a period of
     3 months to 5th August 2007;

2.   the Claimant do have permission to serve the Claim Form, a response pack and
     this Order on the First Defendant by an alternative method pursuant to CPR rule
     6.8, by courier delivery to the attorney acting for the First Defendant, namely

Mr Rowin of Lynch Rowin LLP, 630 Third Avenue, New York, New York 10017;

3.   documents served in accordance with paragraph 2 above will be deemed to be served on the day of delivery if delivered by 4pm on a business day, or otherwise on the next business day.

Dated this 25th day of April of 2007

CLAIM NO. 2006 FOLIO 410

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

<u>Mr Justice Langley</u>

BETWEEN

TALBOT 2002 UNDERWRITING CAPITAL LIMITED OF LLOYD'S
SYNDICATE NO. 1183

(suing on behalf of itself for its proportion of 100.00% and as representative
underwriter on behalf of all other members of Lloyd's Syndicate nos. 2001, 2003,
2987, 2020 and 1084)

<u>Claimant</u>

**and**

(1) JEAN MAURICE BERGERON

(2) CAVALAM LIMITED

(3) CAVLAM BUSINESS LIMITED

<u>Defendants</u>

---

### ORDER

---

**UPON** the Claimant's application without notice;

**AND UPON** reading the first, second, third and fourth witness statements of Mr J S Reynolds;

**IT IS ORDERED THAT:**

1.   the time for service of the Claim Form herein be further extended for a period of 3 months to 5th August 2007;

2.   the Claimant do have permission to serve the Claim Form, a response pack and this Order on the First Defendant by an alternative method pursuant to CPR rule 6.8, by courier delivery to the attorney acting for the First Defendant, namely

Mr Rowin of Lynch Rowin LLP, 630 Third Avenue, New York, New York 10017;

3.  documents served in accordance with paragraph 2 above will be deemed to be served on the day of delivery if delivered by 4pm on a business day, or otherwise on the next business day.

4   The First Defendant must file an Acknowledgment of Service, or an Admission, within 22 days after service of the Claim Form. The Claimant must file and serve Particulars of Claim within 28 days following the filing of the Acknowledgment of Service. The First Defendant must file and serve a Defence within 28 days from service of the Particulars of Claim.

5   The Defendants may apply to have this Order set aside or varied, pursuant to CPR Rule 23.10.

Dated this 25th day of April of 2007

Re-dated this 30th day of July 2007

Aug-15-07 01:48P la dorada                                                                    P.01

# Acknowledgment of Service

Defendant's full name if different from the name given on
the claim form

| | IN THE HIGH COURT OF JUSTICE<br>QUEEN'S BENCH DIVISION<br>COMMERCIAL COURT<br>ROYAL COURTS OF JUSTICE |
|---|---|
| Claim No. | 2008 Folio 410 |
| Claimant(s)<br>(including ref.) | Talbot 2002 Underwriting Capital Ltd of Lloyd's Syndicate No. 1183 (suing on behalf of itself for its proportion of 100.00% and as representative Underwriter on behalf of all other members of Lloyd's Syndicate Nos. 2001, 2003, 2987, 2020 and 1084)<br><br>(JSR/224962/36) |
| Defendant(s) | (1) Jean Maurice Bergeron<br>(2) Cavalam Ltd<br>(3) Cavlam Business Ltd |
| Defendant returning this form | Jean Maurice Bergeron |

Address in England or Wales to which documents about this claim should be sent (including reference if appropriate)

| | | | if applicable |
|---|---|---|---|
| c/o Ferman Law<br>27 Bruton Street<br>London | | fax no. | |
| | | DX no. | |
| Tel. no. 2074995702 | Postcode W156QN | e-mail | |

**Tick the appropriate box**

1. (I admit) (The Defendant admits) this claim ☐

2. (I intend) (The Defendant intends) to defend all of this claim ☒

3. (I intend) (The Defendant intends) to defend part of this claim ☐

4. (I intend) (The Defendant intends) to contest jurisdiction ☒

5. My date of birth is `2` `4` `0` `5` `1` `9` `3` `3`

If you file an acknowledgment of service but do not file a defence within *(28 days)( 28 days) of the date of service of the particulars of claim, and you have not indicated that you intend to contest jurisdiction, judgment may be entered against you.

If you do not file an application to contest the jurisdiction within 28 days 25 days of the date of service of the acknowledgment of service, it will be assumed that you accept the court's jurisdiction.

*Claimant should alter as appropriate if the claim form is to be served out of the jurisdiction together with particulars of claim; see CPR rule 6.20

| Signed | Position or office held | 15/08/07 |
|---|---|---|
| (Defendant) | (if signing on behalf of firm, company or corporation) | Date |

IN THE ROYAL COURTS OF JUSTICE          CLAIM NO. 2006 Folio 680
QUEEN'S BENCH DIVISION
ADMIRALTY & COMMERCIAL COURT
THE HON MR JUSTICE AIKENS

**BETWEEN**

TALBOT 2002 UNDERWRITING CAPITAL LTD OF LLOYD'S SYNDICATE NO. 1183
(suing on behalf of itself for its proportion of 100.00% and as representative
Underwriter on behalf of all other members of Lloyd's Syndicate Nos.
2001, 2003, 2987, 2020 and 1084)

                                                          **Claimant**

-and-

(1)  MR JEAN MAURICE BERGERON
(2)  CAVALAM LTD
(3)  CAVLAM BUSINESS LTD

                                                          **Defendants**

---

### CONSENT ORDER

---

The Claimant and First Defendant wish to explore the possibility of an amicable compromise.

**IT IS HEREBY ORDERED BY CONSENT THAT:**

1.      The action be stayed for 3 months from the date of this Order; and

2.      There be liberty to apply to lift or to extend the stay.

The parties agree to an Order in the above terms.

Dated this 21st day of SEPTEMBER 2007

CLAIM NO. 2006 FOLIO 419

IN THE ROYAL COURTS OF JUSTICE
QUEEN'S BENCH DIVISION
ADMIRALTY AND COMMERCIAL COURT
THE HON. MR JUSTICE CRESVELL
BETWEEN

TALBOT 2002 UNDERWRITING CAPITAL LTD OF LLOYD'S SYNDICATE NO. 1183
(suing on behalf of itself for its proportion of 100.00% and as representative Underwriter on behalf of all other members of Lloyd's Syndicate Nos. 2001, 2003, 2987, 2020 and 1084)

**Claimant**

**and**

(1) **MR. JEAN MAURICE BERGERON**
(2) **CAVALAM LTD**
(3) **CAVLAM BUSINESS LTD**

**Defendants**

---

### CONSENT ORDER

---

The Claimant and the First Defendant wish to continue their efforts to settle this matter amicably.

**IT IS HEREBY ORDERED BY CONSENT THAT:-**

1.    The action be stayed for a further 2 months from the date of this Order; and

2.    There be liberty to apply to lift or to extend the stay.

The parties agree to an Order in the above terms.

Dated this 18th day of December 2007.

CLAIM NO. 2006 FOLIO 410

IN THE ROYAL COURTS OF JUSTICE
QUEEN'S BENCH DIVISION
ADMIRALTY AND COMMERCIAL COURT

The Hon Mr Justice Walker

BETWEEN

**TALBOT 2002 UNDERWRITING CAPITAL LTD OF LLOYD'S
SYNDICATE NO. 1183 (suing on behalf of itself for its proportion of 100.00%
and as representative Underwriter on behalf of all other members of Lloyd's
Syndicate Nos. 2001, 2003, 2987, 2020 and 1084)**

-and-

**(1) MR. JEAN MAURICE BERGERON
(2) CAVALAM LTD
(3) CAVLAM BUSINESS LTD**



---
**CONSENT ORDER**
---

**IT IS HEREBY ORDERED BY CONSENT THAT:-**

1.    The action be stayed for a further 2 months from the date of this Order; and

2.    There be liberty to apply to lift or to extend the stay.


The parties agree to an Order in the above terms.

Dated this 25th day of February 2008.

CLAIM NO. 2006 FOLIO 410

IN THE ROYAL COURTS OF JUSTICE
QUEEN'S BENCH DIVISION
ADMIRALTY AND COMMERCIAL COURT

The Hon Mr Justice Walker

BETWEEN

**TALBOT 2002 UNDERWRITING CAPITAL LTD OF LLOYD'S
SYNDICATE NO. 1183 (suing on behalf of itself for its proportion of 100.00%
and as representative Underwriter on behalf of all other members of Lloyd's
Syndicate Nos. 2001, 2003, 2987, 2020 and 1084)**

-and-

**(1)  MR. JEAN MAURICE BERGERON
(2)  CAVALAM LTD
(3)  CAVLAM BUSINESS LTD**

---

### CONSENT ORDER

---

The parties are seeking to settle this matter by way of negotiation.

**IT IS HEREBY ORDERED BY CONSENT THAT:-**

1.    The action be stayed for a further 3 months up to and including 25th July 2008; and

2.    There be liberty to apply to lift or to extend the stay, but any application to extend the stay must be supported by a witness statement and skeleton argument, and made to a Judge in Court, time estimate 30 minutes.

The parties agree to an Order in the above terms.

Dated this 24th day of April 2008



# Lloyd's international offices

**Select a country:**



Select a country          Go

Lloyd's international offices are a valuable resource for the Lloyd's market and a key part of Lloyd's commitment to its customers worldwide. If as a participant in the Lloyd's market, you need help with a particular issue or just want some information about Lloyd's or about local markets please get in touch. The list of offices and representatives is shown below - they will be glad to take your call.

Alternatively, if you require general information about the international network, the services it can provide, when representatives will be visiting London and how the network can assist you in developing your business, please contact:

**Kevin Reeves**, Head of Operations
International Markets
Tel: +44 (0)20 7327 6264
Email: kevin.reeves@lloyds.com

Each office provides a range of services to support the Lloyd's market in conducting business in a country.

Principally they offer the following:

- Maintaining strong and close relationships with leading brokers, insurers, local regulatory authorities and insurance industry associations
- Providing Lloyd's businesses with extensive local commercial knowledge and market information, both in person and through the Lloyd's Worldwide section of this website
- Enhancing Lloyd's reputation through strong customer support
- Working to raise Lloyd's profile and assisting with Lloyd's promotional activity.
- Acting as underwriters legal representative in respect of service of suit
- Assisting in public authorities tender processes in certain EU countries.

Lloyd's has an office and/or representation in the following territories:

| | |
|---|---|
| Argentina | Namibia |
| Australia | Netherlands |
| Belgium | New Zealand |
| Canada | Norway |
| China | Singapore |
| Cyprus | South Africa |
| Denmark | Spain |
| France | Sweden |
| Germany | Switzerland |
| Greece | **United Kingdom** |
| Hong Kong | United States, Illinois |
| India | United States, Kentucky |
| Ireland | United States, New York |
| Israel | United States, US Virgin Islands |
| Italy | Zimbabwe |
| Japan | |
| Malta | |

Last updated on 17 Jun 2008

**LLOYD'S**

## Lloyd's New York City Dinner

27 June 2008



David Paterson, Governor of State of New York, and Lord Levene, Chairman of Lloyd's.

On 25th June, Lord Levene, Chairman of Lloyd's, hosted Lloyd's inaugural New York City Dinner.

Former Secretary of the Treasury, The Honourable John Snow, was the keynote speaker at the event which was attended by over 150 insurance and business leaders at the St. Regis Hotel in New York.

Other distinguished guests included the Governor of the State of New York, David Paterson, and the Deputy Mayor for Economic Development, Robert Lieber.

In his speech, Lord Levene spoke about the close partnership that Lloyd's has with New York, and how the cities of London and New York need to harness their collective strength to meet the economic challenges we face.

The Governor of New York paid credit to the role that Lloyd's plays in the US and New York and publicly supported a move to "level the playing field" and remove "prejudicial restrictions" for foreign reinsurance entities, allowing them to do business in New York without imposing unnecessary collateral burdens not required of domestic carriers. He expressed hope that the work undertaken by the Superintendent for Insurance Eric Dinallo will create a regulatory system that is a model for the rest of the world.

A copy of Lord Levene's speech and a transcript of John Snow's speech are available using the links on the right hand side.

This article is provided for general information purposes only and is subject to the terms and conditions on our website. Any policies referred to in this article will be subject to separate terms and conditions and this article should not be regarded as a substitute for referring to those terms and conditions.

Last updated on 27 Jun 2008



# Remarks to Lloyd's New York City Dinner

**Date:** 25 June 2008
**Speaker:** Lord Levene, Chairman of Lloyd's
**Event:** Lloyd's New York City Dinner

Ladies and gentlemen:

This is the first time that Lloyd's has organised such a dinner in New York, in line with our annual London event. We instituted it in London to recognise the importance of the relationship between insurance and the UK economy, and to demonstrate Lloyd's continued strength and expertise in helping business to manage its risk for over 300 years.

However, we realised that if this is an important message for the UK, it is even more relevant for the US, which represents not only the largest economy in the world, but also the largest insurance market in the world, and the largest source of business for Lloyd's by a considerable margin – equal to over 12.5 billion dollars last year.

So we are delighted to bring together such a distinguished group from the London and US insurance sector together with leaders from the wider economy this evening. As we face up to the economic challenges ahead, how we strengthen our overseas relationships and foster new ones will become vitally important for our future health and growth. Moreover, how well and how closely London and New York work together will play a significant role in determining whether the financial services sector is a winner or a loser in the future.

I was mulling over on my flight here how only 100 years ago, the US was still an emerging market for us at Lloyd's. It was really around the time of the San Francisco Earthquake in 1906 that US retailers and other businesses in the then burgeoning economy began to turn to Lloyd's for property and fire insurance. In the aftermath of the quake, while other insurers quibbled over whether policyholders were covered for their losses, Lloyd's underwriter Cuthbert Heath famously cabled his agents and told them: "Pay all our policyholders in full, irrespective of the terms of their policies." In doing so, Lloyd's was able to play its part in transforming San Francisco from a by-product of the gold rush into the "Paris of the Pacific".

That same emerging US economy has grown over the last century to represent today 40 percent of Lloyd's global business. Lloyd's is the second largest surplus lines – or specialist – insurer in the nation. Our share of the US reinsurance market is a key factor in our ranking as the world's fifth largest reinsurer. Today, over 93 percent of Dow Jones listed companies have policies at Lloyd's, as do nearly half the companies listed on the NASDAQ.

Of course, given New York's prominence as an economic hub and leadership as a financial centre, your city is of particular importance to us. Our relationship goes back more than 100 years, but it has become stronger than ever since the millennium. We played a leading role in helping to get New York back on track following the tragedy of 9/11- paying out over eight billion dollars in related claims. And we are still helping Manhattan to rebuild: Lloyd's is one of the insurers providing excess liability cover for the construction of the new World Trade Center.

Lloyd's continues to insure many top industries in New York against terrorism, and we provide property cover for your airports, ports and transportation infrastructure. We continue to insure your celebrities too; someone for whom the New York Yankees must appreciate Lloyd's cover is third baseman Alex Rodriguez, or A-Rod as many know him here in New York– the player with the most expensive contract in baseball history.

There are many more examples I could mention, but my primary intent is to emphasise the close nature of the partnership between Lloyd's and New York.

We often see media commentary pitching the financial centres of London and New York against one another: Who's number one? Who has the best quality of living? Certainly, we are competitors – but we each have our unique attributes which complement each other. And most importantly we enjoy a high level of co-operation. As a result, it's not just about flows of money: the two-way flow of people and ideas between our cities is also hugely important.

In my view, this creates a very important advantage which we need to exploit as we face our economic challenges together. This is not a time of unbridled optimism. In the midst of uncertainty, it is imperative that we use our collective resources and our critical mass. In the months ahead, a strong London and a strong UK will become even more important for New York and the US, and a strong New York and US will become more important for London and the UK.

This is certainly true for those of us working in the insurance market. In order to deliver the products and service our customers need, we need to improve our connectivity, to streamline our communications and processes, and to manage the cycle effectively so that CFOs can forecast and plan their insurance spend more efficiently each year.

As we face economic challenges at home, it also increasingly important to look abroad. In April the World Bank published a very interesting report, which went almost unnoticed at the time, but a short article in the Financial Times caused me to do a double–take. It said that China has now overtaken Germany and Japan to become the world's second-largest economy after the US . What's more, India is hot on its heels in fourth place.

In order to succeed in the future, we must cultivate a more global outlook. We can no longer expect business simply to come to our door. Companies in London and New York should certainly be investing capital in emerging markets, and building alliances. More than this though, professional services firms should be looking at these developing countries as markets for their products, especially when it is more difficult to grow the business at home.

At Lloyd's, emerging markets are top of our agenda. Last month, Lloyd's became the first reinsurer to be admitted in Brazil under new legislation which has opened up the market there. And, a year ago, we launched Lloyd's China in Shanghai.

Even now, we are pragmatic about the amount of business we will see from these new markets in the short-term, but we have no doubt about the strategic importance of this step for the future. To succeed in the future, boards have got to take a long-term view and start work now.

And, as we work together more closely and look overseas, we also need to fight for greater harmonisation. Financial services, in particular, depend upon freedom to trade across borders. Right now, worried by the economic landscape, some are tempted to tighten up their boundaries and their regulations. But this is an approach taken by those with a narrow view.

The current credit crisis only highlights the international nature of our markets and the need for a better harmonised, more integrated infrastructure. Our response needs to be well thought-through and we must avoid regulation which could harm us on either side of the Atlantic. Europe and the US need to develop joint standards – we should not be in competition against each other.

We also need to work to remove trade barriers, which only harm industries and consumers in the long run. One of the issues which European reinsurers complain about is US reinsurance regulation which discriminates according to geography rather than financial strength.

No other major reinsurance market in the world has such requirements and progressive-minded state regulators have long been advocating change. These regulators recognise the benefits that this will bring – economic efficiency, lower cost of making reinsurance available to consumers, and more transparent financially-based criteria for regulation. We are greatly encouraged to see the leadership of the New York Superintendent of Insurance on this issue, and we welcome the progress now being made by the NAIC Reinsurance Task Force.

Conclusion

Changing world dynamics mean that we are moving closer to a post-protectionist era. An era where, to take advantage of opportunities, we must take an ever more international and harmonised approach.

As we do so, it is vitally important that London and New York harness their collective strength to meet the economic challenges we face too. Despite the current uncertainty, the world's two greatest financial cities face the future from a position of great strength. In the UK, the contribution of financial services to GDP has doubled since the millennium.

On behalf of Lloyd's and my many Lloyd's market colleagues present this evening, I can assure you that, for our part, continued support of New York and the US economy will be core to our own business plan.

At the EU-United States summit held in Slovenia just a few weeks ago, the politicians concluded: "We stand stronger when we stand together especially in meeting new global challenges". That it is a sentiment which I can wholeheartedly endorse, and one which I trust will continue to shape our relationship in the years to come.

Last updated on 27 Jun 2008

Hill Dickinson LLP
Irongate House
Duke's Place
London EC3A 7HX

Tel: +44 (0)20 7283 9033
Fax: +44 (0)20 7283 1144
DX 550 City of London

www.hilldickinson.com

# HILL DICKINSON

For the Attention of Marc Rowin, Esq
Lynch Rowin LLP
630 Third Avenue
New York
New York 10017
USA

*Our Ref:* JSR/224962-36
*Date:* 15 February 2008

Justin Reynolds@hilldickinson.com

Please ask for Justin Reynolds

Dear Sir,

Re:    **M/Y "AMIRA"**



OFFICIAL LAWYERS

Hill Dickinson LLP has offices in Liverpool, Manchester, London and Chester, and its associated firm Hill Dickinson International has offices in London and Greece

Hill Dickinson LLP is a limited liability partnership registered in England and Wales with registered number OC310070. It is regulated by the Solicitors Regulation Authority. A list of the members of the LLP is displayed at the registered office, Pearl Assurance House, 2 Derby Square, Liverpool L2 9XL, together with a list of those non members who are designated as partners. Any reference to a partner in relation to the LLP means a member or employee of, or consultant to, the LLP.

**END QUOTE**

Given these findings, our client sees no reason to alter its position on this claim.

In any event, our client also, takes issue on quantum.  The vessel was insured at a sum insured of US$510,000 (including US$10,000 dinghy, outboard) with a US$11,000 deductable.

We enclose for your perusal (without any waiver of privilege) a copy of an email exchange originating between Hugo Castañeda and Mr Frank B Hill (which was then forwarded on by Mr Frank B Hill to our client), which sets out comparable costs as at 20th January 2005.  You will see from this document that the average cost for a Bertram Motor Yacht (built in 1972) was

US$325,000.  Our client, therefore, has concerns relating to the apparent over valuation of the vessel.  Naturally, there is no suggestion of a deliberate misrepresentation on your client's behalf.

Accordingly, our client still takes issue with your client on both liability and quantum.

Yours faithfully,

**Marine Division**
**Hill Dickinson LLP**