UNITED STATES DISTRICT COURT
SOUTHERN DISRTICT OF NEW YORK
-----------------------------------------------------------x

CAVLAM BUSINESS LTD. and JEAN MAURICE
BERGERON,                                                    08 CV 2225(JGK)

                                        Plaintiffs,

            Against                          DECLARATION OF
                                             MARTYN DAVID MAURICE
                                             BERKIN

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON,

                                        Defendants


-----------------------------------------------------------x

     MARTYN DAVID MAURICE BERKIN, declares under penalty of perjury

pursuant to 28 U.S.C. 1746 as follows:

1. I am a Barrister of the Inner Temple, London. I have a MA degree in law from

Cambridge University and I was called to the Bar of England and Wales in 1966. I

have been in practice continuously since 1967 to this day and am a member of Crown

Office Chambers, 2 Crown Office Row, Temple, London EC4Y7HJ.  I specialize in

cross border litigation  especially within the European Union and am the author of

*International Contracts*  2nd edition dealing  with governing law under the Contracts

(Applicable Law) Act 1990 and international contracts generally. Recent international

cases in which I have acted for English clients include an AAA arbitration involving a

commercial dispute with a  Swiss  company, a dispute involving a Slovenian supplier

of steel, a dispute with an Italian *studio legale* over fees. I was also asked recently to

submit evidence to a Slovenian bankruptcy appeal court on English Company Law

and acted  in a contested enforcement of judgment of £1million in London from the

High Court of Tanzania.

2.   I   have been retained by Mr Bergeron to represent him in an action in the High
Court of Justice, Queen's Bench Division, Commercial Court, Claim No: 2006 Folio
410 entitled Talbot 2002 Underwriting Capital Limited of Lloyd's Syndicate Nos
2001,2003,2987,2020 and 1084 v. (1) Jean Maurice Georges Bergeron (2) Cavalam
Limited (3) Cavlam Business Limited ("the English action") in which the Claimants
seek a declaration that they are not liable to indemnify the Defendants or in the
alternative that their liability is limited.  For ease of reference I will refer to the
Claimants in the English action as "Lloyd's". Although the English action was issued
on 3 May 2006  no effective steps have been taken in the action by Lloyd's  save to
obtain successive stays. Only Mr Bergeron has been served and on 15 August  2007
within  the time allowed for filing an Acknowledgment of Service, an
Acknowledgment of Service was filed on Mr Bergeron's behalf stating that he
disputed the Court's jurisdiction. Application Notice and supporting Witness
Statement  disputing the Court's jurisdiction to try the claim and/or that the Court
should not exercise its jurisdiction, which have been prepared in case the stay is lifted.
True and correct copies of the Application Notice and Mr Bergeron's Witness
Statement are attached hereto as Exhibit A. The procedure for disputing the
jurisdiction of the English court is set out in Civil Procedure Rules (CPR Part 11). Mr
Bergeron  has  not submitted to the jurisdiction of the English Court.


3.   I am asked to consider whether the forum selection clause referred to in URS's
February 20, 2004 renewal quotation and/or the quotations 19 November 2002 and 2
February 2003 were effectively incorporated into the policy in English law. I should
say at the outset that in my opinion the bald statement in the Memorandum of Law in

Support of Lloyd's Motion to Dismiss page 14 that , *Moreover under English law, which governs this dispute (and under US law), Plaintiffs accepted the forum clause when their broker accepted URS's quotation and confirmation of the premium...* is not based on a correct statement of English law . First it does not take into account relevant principles of English/EU law clearly set out in the material cited below. Second the further statement that: *URS communicated the forum selection clause to the Plaintiffs through their broker, the clause is mandatory and not permissive, and it covers these parties and their claim* is a meaningless statement that assumes the exclusive jurisdiction clause is effective   Accordingly in the absence of an effective exclusive jurisdiction clause there is no mandatory jurisdiction.

4. In my opinion there is no effective exclusive jurisdiction clause in this case.

Preliminary Observations.

(1) In the English action   Mr Bergeron who   appears to be effectively   the sole contracting party/ defendant would be deemed a "consumer". The definition of a "consumer" under regulation 3(1) of Unfair Terms in Consumer Contracts Regulations 1999 (1999 Regulations) is: *any natural person who, in contracts covered by these Regulations, is acting for purposes which are outside his trade, business or profession.* MV Amira was used solely for recreation.

(2) The Contracts (Applicable Law) Act 1990 as amended (the Act) deals with applicable law/ choice of law whilst Council Regulation (EC) No 44/2001 deals with jurisdiction. In relation to both the 1999 Regulations  may also be a factor.

(3) Even if Cavlam Business Limited was a contracting party, the doctrine of piercing the corporate veil should apply because as sole shareholder it was Mr Bergeron' *alter ego*.

(4) Council Regulation (EC) No: 44/2001, Section 3 deals with jurisdiction in relation to insurance whilst Article 23 (formerly Article 17 of the Brussels Convention) deals with jurisdiction clauses.

(5) Accepting for the purpose of Lloyd's present motion only but otherwise making no admissions that the applicable or choice of law is English law, the governing regime is the Act as applied by The Financial Services and Markets Act 2000 (Law Applicable to Contracts of Insurance) Regulations 2001. It should be noted that before the 2000 Regulations, insurance was outside the scope of the 1990 Act.

(6) The relevant laws quoted mostly emanate from the EU and in so far as they are derived from EU directives they have to be implemented by UK legislation. In so far as they are from EU regulations they are self-implementing.

(7) The English courts will apply the Act 1990 as amended to any case where there is a foreign element; see for example *Egon Oldendorff v. Libera Corpn* [1995] 2 Lloyd's Rep 65 which was a dispute between Japanese and a German companies.

(8) On his evidence Mr Bergeron is not resident in the France or anywhere in the EU. The misleading statement in Mr Absolom's affidavit in paragraph 4 to the effect that Mr Bergeron is resident in France is apparently solely based on the writing on the Quote Request where someone has written: ...*the insured expects to ship the vessel back to France where he is from...*

(9) The underlying theme of European civil practice is the protection of the weaker party: see Explanatory Memorandum to Regulation Proposal 1999 A1.905

(10) EU rules of fairness and effective communication would override any rule that a communication to a broker/agent binds the insured. The Unfair Terms in Consumer Contracts Regulations 1999, especially rr. 5 (unfair terms), 6 (assessment of unfair terms), 7. (written contracts),8 (Choice of law clauses) and Schedule 2,  r.1(q) are particularly relevant.

(11) With regard to applicable law r.6 (1) of the 2000 Regulations says: *Any choice made by the parties under regulation 4 must be expressed or demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case.* It is reasonable to apply the same test to exclusive jurisdiction.

(12) Part II of Financial Services and Markets Act 2000 (Regulated Activities) Regulations  2001, SI 2001/2635 sets out specific rules relating to applicable law (general insurance) which according to Part 1 article 6 Financial Services and Markets Act 2000 (Regulated Activities) Order 2001, SI 2001/544 includes ships.

5.    In other words, looked at in the round in my opinion the answer to these difficult questions have to be decide in Mr Bergeron's favour and is to be found in the following:

<u>The Framework</u>

(1)    Council Regulation (EC) No: 44/2001

(2)    The Jenard Report *, para  A1 103

(3)    Jenard Moller Report* A1 749 *et seq*

(4)    The  Sclosser Report* para 179

(5)    Explanatory Memorandum to Regulation Proposal 1999* A1.905

(6)  *Estasis Salotti di Colzani v. RUWA*  ECJ Case No: 24/76 [1976] ECR 1831;

    *Galeries Segoura v. Rahim Bonakdarian* [1976] ECR 1851;

(7)  Financial Services and Markets Act 2000 (Regulated Activities) Order 2001,

    SI 2001/544, Schedule 1, articles .6,12

(8)  Financial Services and Markets Act 2000 (Regulated Activities) Regulations

    2001, SI 2001/2635, rr 2(1),(2),4(1), (2), (6),(8),5(1) especially 6

(9)  Marine Insurance Act 1906, ss. 1,21,22,23

(10)  FSA Fairness of Terms in Consumer Contracts – Statement of Good Practice

    May 2005

(11)  Lloyds Compliance Matters recording cooperation between FSA and Society

    of Lloyd's

(12)  Unfair Terms in Consumer Contracts Regulations 1999 (implementing EC

    Council Directive 93/13/EEC)

True and correct copies of the above are attached hereto as Exhibit B.

\* These are committee reports  chaired by leading academics which are commissioned and published  by the EU.  They are regarded by EU national courts and the ECJ as an authoritative sources of interpretation. See for example, page 1845 *Estasis* case, where the Jenard report was cited by the Advocate General.

6.  Looked at more closely  the exclusive jurisdiction clause could not have been an effective contract term. First if Lloyd's wanted to make the exclusive jurisdiction clause a contract term at minimum they should have specifically included the term in the policy.  The starting points are  r.6(1) of SI 200/2635

which says: *Any choice made by the parties under regulation 4 must be expressed or demonstrated with reasonable certainty by the terms of the contract* and Council Regulation (EC) No 44/2001, Article 13 which says: *The provisions of this section may be departed from only by an agreement... (2) which allows the policyholder, the insured or a beneficiary to bring proceedings in courts other than those indicated in this section...* Similarly in Article 23 (formerly Article 17 Brussels Convention) requires written agreement and effective communication. The *Estasis* and *Galeries Segoura* cases (item 5 above), Schlosser Report para 179 (item 3), FSA publications(item 9 ), Lloyd's compliance instructions (item 10) looked at together, point to a powerful argument that the Courts will protect a party especially a consumer from inadvertently finding himself bound by a standard form of agreement containing an exclusive jurisdiction clause which he could not negotiate or was not properly brought to his attention. Putting it another way insurers have an overreaching general obligation to treat their customers fairly: see 1.10 FSA Fairness of Terms in Consumer Contracts. To rely solely on notice to the brokers would be grossly unfair. Further as the ECJ ruled in *Estasis* page 1843 :*Where a clause conferring jurisdiction is included among the general conditions of sale of one of the parties, printed on the back of a contract, the requirement of a writing under the first paragraph of Article 17 of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters is fulfilled only if the contract signed by both parties contains an express reference to those general conditions/ In the case of a contract by reference to earlier offers, which were themselves made with reference to the general conditions of one of the parties including a clause conferring jurisdiction, the requirement of a writing under the first paragraph of*

*Article 17 of the Convention is satisfied only if the reference is express and can therefore be checked by a party exercising reasonable care.* The second paragraph of the ECJ ruling in *Galeries Segoura* importantly says: *The fact that the purchaser does not raise any objections against a confirmation issued unilaterally by the other party does not amount to acceptance on his part of the clause conferring jurisdiction unless the oral agreement comes within the framework of a continuing trading relationship between the parties which is based on the general conditions of one of them, and those conditions contain a clause conferring jurisdiction.* In my opinion Mr Bergeron's positioned is strengthened because *Estasis* and *Galeries Segoura* are predate FSA regulation and EU consumer protection laws.

### Disadvantage

7.    With regard to the question of security for costs if the action were tried in England; as Mr Bergeron would be obliged to counterclaim in the action Lloyd's could apply for security for costs under CPR Part 25.12,13 on the basis that Mr Bergeron is not resident in the jurisdiction or another EU state. The usual order would be payment into court in a sum specified based on the estimated costs of the action or by lodging a bankers draft of the same with Lloyd's solicitors.

8.    Secondly under English law expert evidence is given in written reports. Although the Court can direct an expert witness to attend a hearing there are no pre-trial depositions. On disclosure of expert reports a party may (only once) unless the court directs or the other party agrees put written questions to an expert witness (see CPR Part 35.5,6)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 10 day of July, 2008

_____
MARTYN DAVID MAURICE BERKIN

# Application Notice

- You must complete Parts A and B, and Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| In the | High Court of Justice<br>Queen's Bench Division<br>Commercial Court<br>Royal Courts of Justice |
|---|---|
| Claim No. | 2006 Folio 410 |
| Warrant no.<br>(if applicable) | |
| Claimant(s)<br>(including ref.) | TALBOT 2002 UNDERWRITING CAPITAL LIMITED OF LLOYD'S SYNDICATE Nos 2001.2003,2987,2020 and 1084 |
| Defendant(s)<br>(including ref.) | (1) JEAN MAURICE GEORGES BERGERON<br>(2) CAVALAM LIMITED<br>(3) CAVLAM BUISNESS LIMITED |
| Date | |

### You should provide this information for listing the application

Time estimate  3  (hours)  (mins)

Is this agreed by all parties?  Yes ☐  No ☑

Please always refer to the Commercial Court Guide for details of how applications should be prepared and be heard, or in a small number of exceptional cases can be dealt with on paper.

### Part A

**1.** Where there is more than one claimant or defendant, specify which claimant or defendant

~~(The claimant)(The defendant)~~(1)

The first named Defendant

**2.** State clearly what order you are seeking (if there is room) or otherwise refer to a draft order (which must be attached)

intend(s) to apply for an order (~~a draft of which is attached~~) that(2)

1. A declaration that the Court has no jurisdiction or will not exercise its jurisdiction; and
2. Pursuant to CPR Part 6 and CPR Part 11 the Orders dated 25 April and 30 July 2007 giving the Claimants permission to serve the Claim Form on the 1st Defendant out of the jurisdiction be set aside and the service of the Claim Form by which this claim was commnceed be set aside and all subsequent proceedings in this claim be stayed or that such relief may be granted to the 1st Defendant as may be appropriate;
3. That this claim be dismissed with costs to be assessed and paid by the Claimants to the 1st Defendant and the costs of this application be the 1st Defendant's costs in any event.

**3.** Briefly set out why you are seeking the order. Identify any rule or statutory provision

because(3)

1. This action concerns a marine insurance policy issued by Lloyd's purchased by the 1st and 3rd Defendants from Yachtsure Insurance in the state of Maryland USA in respect of a private yacht "Amira" . The 1st and 3rd Defendants dealt with Yachtsure as a consumer. The 1st Defendant is a citizen of France domiciled in the Bahamas. The 3rd Defendant (a limited company incorporated in the British Virgin Islands) has not been served. The 2nd Defendant does not exist. Amira sank on 18 April 2004 whilst moored against a wharf at Margarita Island, Venezuela;
2. Accordingly Regulation (EC) No:44/2001 does not apply and England is not a convenient forum for the reasons set out in the 1st Defendan's witness statement;
3. In the alternative if it be determined  that the 1st Defendant is domiciled in France proceedings may only be brought in France pursuant to Regulation Article 12.1

---

The court office at the Admiralty & Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2II

is open from 10am to 4.30 pm Monday to Friday. When corresponding with the court please address forms or letters to the Clerk to the Commercial Court and quote the claim number.

N244 (CC) - w3  Application Notice (April 1999)                    Crown Copyright. Reproduced by Sweet & Maxwell Ltd

## Part B

(The claimant)(The defendant)[1] wishes to rely on: *tick one:*

the attached (witness statement)(affidavit) ☑    (the claimant)(the defendant)'s[1] statement of case ☐

evidence in Part C overleaf in support of this application ☐

| Signed | | Position or office held | |
|---|---|---|---|
| | | (if signing on behalf of firm, company or corporation) | |

(Applicant)('s litigation friend)('s solicitor)

| 4. If you are not already a party to the proceedings, you must provide an address for service of documents | Address to which documents about this claim should be sent (including reference if appropriate)[c] | | |
|---|---|---|---|
| | | | if applicable |
| | | Tel. no. | |
| | | fax no. | |
| | | DX no. | |
| | Postcode | e-mail | |

**Part C**

Claim No. | 2006 Folio 410

**(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)**

(The claimant)(The defendant)[1] wishes to rely on the following evidence in support of this application:

**Statement of Truth**

*(I believe)(The applicant believes) that the facts stated in this application notice are true

*I am duly authorised by the applicant to sign this statement

Full name.................................................................................................................

Name of*(Applicant)('s litigation friend)('s solicitor)

..................................................................................................................

Signed | Position or office held (if signing on behalf of firm, company or corporation)

*(Applicant)('s litigation friend)('s solicitor)

*delete as appropriate | Date

IN THE HIGH COURT OF JUSTICE          CLAIM No: 2006 Folio 410
QUEEN'S BENCH DIVISION
COMMERCIAL COURT


Between:

TALBOT 2002 UNDERWRITING CAPITAL LIMITED OF LLOYD'S
SYNDICATE No:1183
(Suing on behalf of itself for its proportion of 100% and as representative
underwriter on behalf of all other members of Lloyd's Syndicate
Nos 2001,2003, 2987,2020 and 1084)

**Claimant**


and


(1) JEAN MAURICE GEORGES  BERGERON
(2) CAVALAM LIMITED
(3) CAVLAM BUSINESS LIMITED

**Defendants**


**WITNESS STATEMENT**


Suffolk House,
Nassau,
Commonwealth of Bahamas

IN THE HIGH COURT OF JUSTICE          CLAIM No: 2006 Folio 410
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Between:

**TALBOT 2002 UNDERWRITING CAPITAL LIMITED OF LLOYD'S
SYNDICATE No:1183
(Suing on behalf of itself for its proportion of 100% and as representative
underwriter on behalf of all other members of Lloyd's Syndicate
Nos 2001,2003, 2987,2020 and 1084)**

<u>Claimant</u>

**and**

**(1) JEAN MAURICE GEORGES BERGERON
(2) CAVALAM LIMITED
(3) CAVLAM BUSINESS LIMITED**

<u>Defendants</u>

<u>WITNESS STATEMENT</u>

I, JEAN MAURICE GEORGES BERGERON, retired, of Suffolk House, Nassau,
Commonwealth of Bahamas will say:

1. I am the above first named Defendant. This witness statement is in support of my
application to discharge the without notice permission to serve the Claim Form on me
and for an order dismissing and/or staying proceedings on the ground of *forum non
conveniens*. The Claimant is the insurer of private yacht MY Amira, which sank on
18 December 2004. The Claimant claims against the Defendants a negative
declaration in the English Courts that it is not liable to indemnify the Defendants. So
far as I am aware these proceedings have been served only on me. Acknowledgment
of service has been returned on my behalf indicating that I dispute jurisdiction. The
third named Defendant Cavlam Business Limited ("CBL") and myself have issued a
complaint in the United States District Court Southern District of New York (Index
N0.08 cv2225) against the Claimant for a declaration of their rights under the policy

and punitive damages, (a copy of the Complaint is included in exhibit "JMGB1"at Tab 1)

2.   The history of this action in this Court is as follows:

3 May 2006          Claim Form issued (with permission of Timothy Walker J.)

20 October 2006     Claim Form renewed until 5 May 2007

2 May 2007          Time for service extended by 3 months to 5 August 2007 with substituted service ordered on New York attorneys Lynch Rowin in
                    respect of my self (Langley J.)

30 July 2007        Order 2 May 2007 re-served (direction for service of Acknowledgment of Service within 22 days of service/Claimant to file
                    Particulars of Claim with 28 days/ Defence to be filed within 28 days of service of Particulars of Claim/ permission to set aside
                    order

15 August 2007      Acknowledgment of Service

21 September 2007   Action stayed 3 months (Aikens J.)

18 December 2007    Further stay 2 months (Creswell J.)

25 February 2008    Further stay 2 months (Walker J.)

## Domicile

3   I was born in Bordeaux, France on 24 May 1933; I am approaching 75.  About 21 years ago I emigrated to the Bahamas where I intended to live out the rest of my life and the Bahamas became my domicile of choice.  I share an apartment with friends and although I spend a lot of time travelling, over the last two decades the Bahamas has been my home and it is to where I always return. Accordingly although my nationality is French citizenship I ceased to be domiciled in France since the mid-1980's.  I have annually renewed residence in the Bahamas and have become fully integrated in Bahamian social life with no longer more than minimal  contacts with France.  Throughout the 1990's until I started to cruise, I was involved with the Bahamian Rugby Football Union, for which I was in charge of international relationships with FIRA  (La Federation International de Rugby Amateur) and IRB (International Rugby Board). I obtained for the Bahamian Rugby Football Union subsidies for the development of youth rugby and an invitation for a Bahamas team to participate in Uruguay for the first Seven's Rugby World Cup. I was also manager of the Bahamas national team for the 1998 Commonwealth Games in Kuala Lumpur, (please see copies permits to reside issued by the Commonwealth of the Bahamas, immatricule certificates issued by the French Consulate in Miami, most recent Bahamas driver's licence and XVI Commonwealth Games Accreditation contained in exhibit "JHGB1"at Tab 2). Please also see my current and previous passport which

were issued by "Le Directeur des Francais a l'etranger et des etrangers en France - Le Ministre des Affaires Etrangeres" which shows the extent of my travels. As the Court will be aware the Bahamas is an independent state in the Caribbean.

4.    The second named defendant does not exist.

5.    The third named defendant, CBL whose address is as shown in the Claim Form is 1st Floor, Columbus Centre Building, PO Box 901, Road Town, Tortola, British Virgin Islands, was incorporated in the British Virgin Islands as an International Business Company on 20 July 1998. CBL is shown in British Virgin Islands certificate of registry as the registered owner of MY Amira on 19 May 1995 (for company documents and Amira certificate of registry please see exhibit "JHGB1"Tab 3). The entire shareholding of CBL is owned by me.

6.  Since about 2000 I have increasing spent more and more time cruising the Caribbean and the US Atlantic coast using the Bahamas as my base. I have no place of residence in France and my domicile outside of France is recognised by the French authorities.

7.  For the purposes of Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the Regulation) and its predecessor the Brussels Convention neither CBL nor I are domiciled in France or any EU member state. I am domiciled in the Bahamas and CBL is domiciled in British Virgin Islands.

8.  Insurance represented by Policy M/03/08661 was purchased through International Marine Insurance, of 208 Piney Narrows Road, Chester, Maryland 21619 from Yachtsure Insurance , and on the telephone the broker said the policy should be in the name of CBL; however he mis-spelled "Cavalam" and left out the word "Business". He also added my name recording my interest. Please see Certificates of Insurance for the period 3 March 2003/ 3 March 2005 exhibit "JHGB1". Although the Certificate refers to insurance "underwritten by certain underwriters at Lloyd's" the identity of the Claimant is not disclosed. The insurance was sold and paid to International Marine Insurance in the United States.

### Jurisdiction

9.  Without prejudice to my detailed submissions on merits which I will deal with should this honourable court see fit to assume jurisdiction, I say that that New York State is clearly the  natural or appropriate forum and  clearly more appropriate than the English forum because:

(1).  No defendant (including myself) is domiciled in England;

(2)  To the extent that the Regulation applies to insurance, the rules of jurisdiction should be applied more favourably to the interests of the weaker party (see Preamble (13) of the Regulation);

(3)  Yachtsure (the trading name of Underwriting Risk Services Limited) belongs to the same group of companies as Talbot 2002 Underwriting Capital Limited;

(4)  Lloyd's has an office for the transaction of business at 25 West 53rd Street, New York, NY 10019.

(5)  The United States of America is the place of closest connection with the insurance contract;

(6)  Amira is located at the Caribbean Island of Margarita, Venezuela;

(7)  In the context of marine insurance the value of the claim is relatively modest;

(8)  This is a consumer dispute in that MY Amira is used for leisure not for business and that Yachtsure dealt with me as a consumer;

(9)  If the English Court assumes jurisdiction my rights as a consumer and/or "the weaker party" to defend or take legal action will be hindered;

(10)  The terms of the insurance limit the geographic area where MY Amira could be sailed (below 12.5 degrees north during the period 1 July/30 November);

(11)  As the Claimant does business in the United States it should expect to be sued there;

(12)  If the Claimant wanted choice of jurisdiction in the English courts it should have made that a contract term;

(13) The Court is further asked to note that the policy is clearly designed for the United States market because it excludes claims under Federal "Longshoremen's and Harbor Workers' Compensation Act" and the currency referred to is US$;

(14)  The parties will not be on an equal footing if the action is allowed to proceed in England;

(15)  The costs of the action will increase disproportionately;

(16)  The issues are not complicated;

(17)  There will be inconvenience and considerable additional expense if my witnesses, experts and I have to travel to thousand of miles to London (the Court is asked to note that in places the Bahamas are only 55 miles from Miami;

(18)  The Defendants do not have the financial resources of Lloyd's of London;

(19)  A foreign insured is disadvantaged in the English courts with regard to remedies and costs (in the United States an insured may claim punitive damages).

STATEMENT OF TRUTH

The contents of this Witness Statement are true.

JEAN MAURICE GEORGES BERGERON

..............................................

27 March 2008

Important legal notice

BG  ES  CS  DA  DE  ET  EL  EN  FR  GA  IT  LV  LT  HU  MT  NL  PL  PT  RO  SK  SL  FI  SV

Site map | LexAlert | FAQ | Help | Contact | Links

EUROPA > EUR-Lex > Official Journal > 2001 > L 012

# Official Journal

## of the European Communities

ISSN 0378-6978

# L 12

**Volume 44**
**16 January 2001**

English edition | Legislation

Contents | I *Acts whose publication is obligatory*

\* **Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters** ............ 1

**EN**

Acts whose titles are printed in light type are those relating to day-to-day management of agricultural matters, and are generally valid for a limited period.
The titles of all other Acts are printed in bold type and preceded by an asterisk.

**Managed by the Publications Office**

16.1.2001          EN          Official Journal of the European Communities          L 12/1

# I

*(Acts whose publication is obligatory)*

## COUNCIL REGULATION (EC) No 44/2001

### of 22 December 2000

### on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty establishing the European Community, and in particular Article 61(c) and Article 67(1) thereof,

Having regard to the proposal from the Commission ([1]),

Having regard to the opinion of the European Parliament ([2]),

Having regard to the opinion of the Economic and Social Committee ([3]),

Whereas:

(1) The Community has set itself the objective of maintaining and developing an area of freedom, security and justice, in which the free movement of persons is ensured. In order to establish progressively such an area, the Community should adopt, amongst other things, the measures relating to judicial cooperation in civil matters which are necessary for the sound operation of the internal market.

(2) Certain differences between national rules governing jurisdiction and recognition of judgments hamper the sound operation of the internal market. Provisions to unify the rules of conflict of jurisdiction in civil and commercial matters and to simplify the formalities with a view to rapid and simple recognition and enforcement of judgments from Member States bound by this Regulation are essential.

(3) This area is within the field of judicial cooperation in civil matters within the meaning of Article 65 of the Treaty.

(4) In accordance with the principles of subsidiarity and proportionality as set out in Article 5 of the Treaty, the objectives of this Regulation cannot be sufficiently achieved by the Member States and can therefore be better achieved by the Community. This Regulation confines itself to the minimum required in order to achieve those objectives and does not go beyond what is necessary for that purpose.

(5) On 27 September 1968 the Member States, acting under Article 293, fourth indent, of the Treaty, concluded the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, as amended by Conventions on the Accession of the New Member States to that Convention (hereinafter referred to as the 'Brussels Convention') ([4]). On 16 September 1988 Member States and EFTA States concluded the Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, which is a parallel Convention to the 1968 Brussels Convention. Work has been undertaken for the revision of those Conventions, and the Council has approved the content of the revised texts. Continuity in the results achieved in that revision should be ensured.

(6) In order to attain the objective of free movement of judgments in civil and commercial matters, it is necessary and appropriate that the rules governing jurisdiction and the recognition and enforcement of judgments be governed by a Community legal instrument which is binding and directly applicable.

(7) The scope of this Regulation must cover all the main civil and commercial matters apart from certain well-defined matters.

---

([1]) OJ C 376, 28.12.1999, p. 1.
([2]) Opinion delivered on 21 September 2000 (not yet published in the Official Journal).
([3]) OJ C 117, 26.4.2000, p. 6.

([4]) OJ L 299, 31.12.1972, p. 32.
OJ L 304, 30.10.1978, p. 1.
OJ L 388, 31.12.1982, p. 1.
OJ L 285, 3.10.1989, p. 1.
OJ C 15, 15.1.1997, p. 1.
For a consolidated text, see OJ C 27, 26.1.1998, p. 1.

L 12/2    EN    Official Journal of the European Communities    16.1.2001

(8) There must be a link between proceedings to which this Regulation applies and the territory of the Member States bound by this Regulation. Accordingly common rules on jurisdiction should, in principle, apply when the defendant is domiciled in one of those Member States.

(9) A defendant not domiciled in a Member State is in general subject to national rules of jurisdiction applicable in the territory of the Member State of the court seised, and a defendant domiciled in a Member State not bound by this Regulation must remain subject to the Brussels Convention.

(10) For the purposes of the free movement of judgments, judgments given in a Member State bound by this Regulation should be recognised and enforced in another Member State bound by this Regulation, even if the judgment debtor is domiciled in a third State.

(11) The rules of jurisdiction must be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile and jurisdiction must always be available on this ground save in a few well-defined situations in which the subject-matter of the litigation or the autonomy of the parties warrants a different linking factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

(12) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close link between the court and the action or in order to facilitate the sound administration of justice.

(13) In relation to insurance, consumer contracts and employment, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules provide for.

(14) The autonomy of the parties to a contract, other than an insurance, consumer or employment contract, where only limited autonomy to determine the courts having jurisdiction is allowed, must be respected subject to the exclusive grounds of jurisdiction laid down in this Regulation.

(15) In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States. There must be a clear and effective mechanism for resolving cases of lis pendens and related actions and for

obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously.

(16) Mutual trust in the administration of justice in the Community justifies judgments given in a Member State being recognised automatically without the need for any procedure except in cases of dispute.

(17) By virtue of the same principle of mutual trust, the procedure for making enforceable in one Member State a judgment given in another must be efficient and rapid. To that end, the declaration that a judgment is enforceable should be issued virtually automatically after purely formal checks of the documents supplied, without there being any possibility for the court to raise of its own motion any of the grounds for non-enforcement provided for by this Regulation.

(18) However, respect for the rights of the defence means that the defendant should be able to appeal in an adversarial procedure, against the declaration of enforceability, if he considers one of the grounds for non-enforcement to be present. Redress procedures should also be available to the claimant where his application for a declaration of enforceability has been rejected.

(19) Continuity between the Brussels Convention and this Regulation should be ensured, and transitional provisions should be laid down to that end. The same need for continuity applies as regards the interpretation of the Brussels Convention by the Court of Justice of the European Communities and the 1971 Protocol [1] should remain applicable also to cases already pending when this Regulation enters into force.

(20) The United Kingdom and Ireland, in accordance with Article 3 of the Protocol on the position of the United Kingdom and Ireland annexed to the Treaty on European Union and to the Treaty establishing the European Community, have given notice of their wish to take part in the adoption and application of this Regulation.

(21) Denmark, in accordance with Articles 1 and 2 of the Protocol on the position of Denmark annexed to the Treaty on European Union and to the Treaty

[1] OJ L 204, 2.8.1975, p. 28.
OJ L 304, 30.10.1978, p. 1.
OJ L 388, 31.12.1982, p. 1.
OJ L 285, 3.10.1989, p. 1.
OJ C 15, 15.1.1997, p. 1.
For a consolidated text see OJ C 27, 26.1.1998, p. 28.

16.1.2001    EN    Official Journal of the European Communities    L 12/3

establishing the European Community, is not participating in the adoption of this Regulation, and is therefore not bound by it nor subject to its application.

(22) Since the Brussels Convention remains in force in relations between Denmark and the Member States that are bound by this Regulation, both the Convention and the 1971 Protocol continue to apply between Denmark and the Member States bound by this Regulation.

(23) The Brussels Convention also continues to apply to the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 299 of the Treaty.

(24) Likewise for the sake of consistency, this Regulation should not affect rules governing jurisdiction and the recognition of judgments contained in specific Community instruments.

(25) Respect for international commitments entered into by the Member States means that this Regulation should not affect conventions relating to specific matters to which the Member States are parties.

(26) The necessary flexibility should be provided for in the basic rules of this Regulation in order to take account of the specific procedural rules of certain Member States. Certain provisions of the Protocol annexed to the Brussels Convention should accordingly be incorporated in this Regulation.

(27) In order to allow a harmonious transition in certain areas which were the subject of special provisions in the Protocol annexed to the Brussels Convention, this Regulation lays down, for a transitional period, provisions taking into consideration the specific situation in certain Member States.

(28) No later than five years after entry into force of this Regulation the Commission will present a report on its application and, if need be, submit proposals for adaptations.

(29) The Commission will have to adjust Annexes I to IV on the rules of national jurisdiction, the courts or competent authorities and redress procedures available on the basis of the amendments forwarded by the Member State concerned; amendments made to Annexes V and VI should be adopted in accordance with Council Decision 1999/468/EC of 28 June 1999 laying down the procedures for the exercise of implementing powers conferred on the Commission (¹),

_____
(¹) OJ L 184, 17.7.1999, p. 23.

HAS ADOPTED THIS REGULATION:

CHAPTER I

SCOPE

*Article 1*

1. This Regulation shall apply in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters.

2. The Regulation shall not apply to:

(a) the status or legal capacity of natural persons, rights in property arising out of a matrimonial relationship, wills and succession;

(b) bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings;

(c) social security;

(d) arbitration.

3. In this Regulation, the term 'Member State' shall mean Member States with the exception of Denmark.

CHAPTER II

JURISDICTION

Section 1

**General provisions**

*Article 2*

1. Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.

2. Persons who are not nationals of the Member State in which they are domiciled shall be governed by the rules of jurisdiction applicable to nationals of that State.

L 12/4    EN    Official Journal of the European Communities    16.1.2001

### Article 3

1.   Persons domiciled in a Member State may be sued in the courts of another Member State only by virtue of the rules set out in Sections 2 to 7 of this Chapter.

2.   In particular the rules of national jurisdiction set out in Annex I shall not be applicable as against them.

### Article 4

1.   If the defendant is not domiciled in a Member State, the jurisdiction of the courts of each Member State shall, subject to Articles 22 and 23, be determined by the law of that Member State.

2.   As against such a defendant, any person domiciled in a Member State may, whatever his nationality, avail himself in that State of the rules of jurisdiction there in force, and in particular those specified in Annex I, in the same way as the nationals of that State.

## Section 2

### Special jurisdiction

### Article 5

A person domiciled in a Member State may, in another Member State, be sued:

1. (a) in matters relating to a contract, in the courts for the place of performance of the obligation in question;

   (b) for the purpose of this provision and unless otherwise agreed, the place of performance of the obligation in question shall be:

   — in the case of the sale of goods, the place in a Member State where, under the contract, the goods were delivered or should have been delivered,

   — in the case of the provision of services, the place in a Member State where, under the contract, the services were provided or should have been provided,

   (c) if subparagraph (b) does not apply then subparagraph (a) applies;

2. in matters relating to maintenance, in the courts for the place where the maintenance creditor is domiciled or habitually resident or, if the matter is ancillary to proceedings concerning the status of a person, in the court which, according to its own law, has jurisdiction to entertain those proceedings, unless that jurisdiction is based solely on the nationality of one of the parties;

3. in matters relating to tort, *delict* or *quasi-delict*, in the courts for the place where the harmful event occurred or may occur;

4. as regards a civil claim for damages or restitution which is based on an act giving rise to criminal proceedings, in the court seised of those proceedings, to the extent that that court has jurisdiction under its own law to entertain civil proceedings;

5. as regards a dispute arising out of the operations of a branch, agency or other establishment, in the courts for the place in which the branch, agency or other establishment is situated;

6. as settlor, trustee or beneficiary of a trust created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, in the courts of the Member State in which the trust is domiciled;

7. as regards a dispute concerning the payment of remuneration claimed in respect of the salvage of a cargo or freight, in the court under the authority of which the cargo or freight in question:

   (a) has been arrested to secure such payment, or

   (b) could have been so arrested, but bail or other security has been given;

   provided that this provision shall apply only if it is claimed that the defendant has an interest in the cargo or freight or had such an interest at the time of salvage.

### Article 6

A person domiciled in a Member State may also be sued:

1. where he is one of a number of defendants, in the courts for the place where any one of them is domiciled,

16.1.2001    EN    Official Journal of the European Communities    L 12/5

provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

2. as a third party in an action on a warranty or guarantee or in any other third party proceedings, in the court seised of the original proceedings, unless these were instituted solely with the object of removing him from the jurisdiction of the court which would be competent in his case;

3. on a counter-claim arising from the same contract or facts on which the original claim was based, in the court in which the original claim is pending;

4. in matters relating to a contract, if the action may be combined with an action against the same defendant in matters relating to rights *in rem* in immovable property, in the court of the Member State in which the property is situated.

### Article 7

Where by virtue of this Regulation a court of a Member State has jurisdiction in actions relating to liability from the use or operation of a ship, that court, or any other court substituted for this purpose by the internal law of that Member State, shall also have jurisdiction over claims for limitation of such liability.

### Section 3

### Jurisdiction in matters relating to insurance

### Article 8

In matters relating to insurance, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

### Article 9

1. An insurer domiciled in a Member State may be sued:

(a) in the courts of the Member State where he is domiciled, or

(b) in another Member State, in the case of actions brought by the policyholder, the insured or a beneficiary, in the courts for the place where the plaintiff is domiciled,

(c) if he is a co-insurer, in the courts of a Member State in which proceedings are brought against the leading insurer.

2. An insurer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

### Article 10

In respect of liability insurance or insurance of immovable property, the insurer may in addition be sued in the courts for the place where the harmful event occurred. The same applies if movable and immovable property are covered by the same insurance policy and both are adversely affected by the same contingency.

### Article 11

1. In respect of liability insurance, the insurer may also, if the law of the court permits it, be joined in proceedings which the injured party has brought against the insured.

2. Articles 8, 9 and 10 shall apply to actions brought by the injured party directly against the insurer, where such direct actions are permitted.

3. If the law governing such direct actions provides that the policyholder or the insured may be joined as a party to the action, the same court shall have jurisdiction over them.

### Article 12

1. Without prejudice to Article 11(3), an insurer may bring proceedings only in the courts of the Member State in which the defendant is domiciled, irrespective of whether he is the policyholder, the insured or a beneficiary.

2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

### Article 13

The provisions of this Section may be departed from only by an agreement:

1. which is entered into after the dispute has arisen, or

L 12/6     EN     Official Journal of the European Communities     16.1.2001

2. which allows the policyholder, the insured or a beneficiary to bring proceedings in courts other than those indicated in this Section, or

3. which is concluded between a policyholder and an insurer, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which has the effect of conferring jurisdiction on the courts of that State even if the harmful event were to occur abroad, provided that such an agreement is not contrary to the law of that State, or

4. which is concluded with a policyholder who is not domiciled in a Member State, except in so far as the insurance is compulsory or relates to immovable property in a Member State, or

5. which relates to a contract of insurance in so far as it covers one or more of the risks set out in Article 14.

### Article 14

The following are the risks referred to in Article 13(5):

1. any loss of or damage to:

    (a) seagoing ships, installations situated offshore or on the high seas, or aircraft, arising from perils which relate to their use for commercial purposes;

    (b) goods in transit other than passengers' baggage where the transit consists of or includes carriage by such ships or aircraft;

2. any liability, other than for bodily injury to passengers or loss of or damage to their baggage:

    (a) arising out of the use or operation of ships, installations or aircraft as referred to in point 1(a) in so far as, in respect of the latter, the law of the Member State in which such aircraft are registered does not prohibit agreements on jurisdiction regarding insurance of such risks;

    (b) for loss or damage caused by goods in transit as described in point 1(b);

3. any financial loss connected with the use or operation of ships, installations or aircraft as referred to in point 1(a), in particular loss of freight or charter-hire;

4. any risk or interest connected with any of those referred to in points 1 to 3;

5. notwithstanding points 1 to 4, all 'large risks' as defined in Council Directive 73/239/EEC (¹), as amended by Council Directives 88/357/EEC (²) and 90/618/EEC (³), as they may be amended.

### Section 4

### Jurisdiction over consumer contracts

### Article 15

1. In matters relating to a contract concluded by a person, the consumer, for a purpose which can be regarded as being outside his trade or profession, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5, if:

    (a) it is a contract for the sale of goods on instalment credit terms; or

    (b) it is a contract for a loan repayable by instalments, or for any other form of credit, made to finance the sale of goods; or

    (c) in all other cases, the contract has been concluded with a person who pursues commercial or professional activities in the Member State of the consumer's domicile or, by any means, directs such activities to that Member State or to several States including that Member State, and the contract falls within the scope of such activities.

2. Where a consumer enters into a contract with a party who is not domiciled in the Member State but has a branch, agency or other establishment in one of the Member States, that party shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that State.

3. This Section shall not apply to a contract of transport other than a contract which, for an inclusive price, provides for a combination of travel and accommodation.

(¹) OJ L 228, 16.8.1973, p. 3. Directive as last amended by Directive 2000/26/EC of the European Parliament and of the Council (OJ L 181, 20.7.2000, p. 65).
(²) OJ L 172, 4.7.1988, p. 1. Directive as last amended by Directive 2000/26/EC.
(³) OJ L 330, 29.11.1990, p. 44.

### Article 16

1.    A consumer may bring proceedings against the other party to a contract either in the courts of the Member State in which that party is domiciled or in the courts for the place where the consumer is domiciled.

2.    Proceedings may be brought against a consumer by the other party to the contract only in the courts of the Member State in which the consumer is domiciled.

3.    This Article shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

### Article 17

The provisions of this Section may be departed from only by an agreement:

1.  which is entered into after the dispute has arisen; or

2.  which allows the consumer to bring proceedings in courts other than those indicated in this Section; or

3.  which is entered into by the consumer and the other party to the contract, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which confers jurisdiction on the courts of that Member State, provided that such an agreement is not contrary to the law of that Member State.

## Section 5

### Jurisdiction over individual contracts of employment

### Article 18

1.    In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

2.    Where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

### Article 19

An employer domiciled in a Member State may be sued:

1.  in the courts of the Member State where he is domiciled; or

2.  in another Member State:

    (a) in the courts for the place where the employee habitually carries out his work or in the courts for the last place where he did so, or

    (b) if the employee does not or did not habitually carry out his work in any one country, in the courts for the place where the business which engaged the employee is or was situated.

### Article 20

1.    An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

2.    The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

### Article 21

The provisions of this Section may be departed from only by an agreement on jurisdiction:

1.  which is entered into after the dispute has arisen; or

2.  which allows the employee to bring proceedings in courts other than those indicated in this Section.

## Section 6

### Exclusive jurisdiction

### Article 22

The following courts shall have exclusive jurisdiction, regardless of domicile:

1.  in proceedings which have as their object rights *in rem* in immovable property or tenancies of immovable property, the courts of the Member State in which the property is situated.

L 12/8    EN    Official Journal of the European Communities    16.1.2001

However, in proceedings which have as their object tenancies of immovable property concluded for temporary private use for a maximum period of six consecutive months, the courts of the Member State in which the defendant is domiciled shall also have jurisdiction, provided that the tenant is a natural person and that the landlord and the tenant are domiciled in the same Member State;

2. in proceedings which have as their object the validity of the constitution, the nullity or the dissolution of companies or other legal persons or associations of natural or legal persons, or of the validity of the decisions of their organs, the courts of the Member State in which the company, legal person or association has its seat. In order to determine that seat, the court shall apply its rules of private international law;

3. in proceedings which have as their object the validity of entries in public registers, the courts of the Member State in which the register is kept;

4. in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of a Community instrument or an international convention deemed to have taken place.

Without prejudice to the jurisdiction of the European Patent Office under the Convention on the Grant of European Patents, signed at Munich on 5 October 1973, the courts of each Member State shall have exclusive jurisdiction, regardless of domicile, in proceedings concerned with the registration or validity of any European patent granted for that State;

5. in proceedings concerned with the enforcement of judgments, the courts of the Member State in which the judgment has been or is to be enforced.

## Section 7

## Prorogation of jurisdiction

### Article 23

1.    If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall

have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. Such an agreement conferring jurisdiction shall be either:

(a) in writing or evidenced in writing; or

(b) in a form which accords with practices which the parties have established between themselves; or

(c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned.

2.    Any communication by electronic means which provides a durable record of the agreement shall be equivalent to 'writing'.

3.    Where such an agreement is concluded by parties, none of whom is domiciled in a Member State, the courts of other Member States shall have no jurisdiction over their disputes unless the court or courts chosen have declined jurisdiction.

4.    The court or courts of a Member State on which a trust instrument has conferred jurisdiction shall have exclusive jurisdiction in any proceedings brought against a settlor, trustee or beneficiary, if relations between these persons or their rights or obligations under the trust are involved.

5.    Agreements or provisions of a trust instrument conferring jurisdiction shall have no legal force if they are contrary to Articles 13, 17 or 21, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 22.

### Article 24

Apart from jurisdiction derived from other provisions of this Regulation, a court of a Member State before which a defendant enters an appearance shall have jurisdiction. This rule shall not apply where appearance was entered to contest the jurisdiction, or where another court has exclusive jurisdiction by virtue of Article 22.

16.1.2001    EN    Official Journal of the European Communities    L 12/9

## Section 8

### Examination as to jurisdiction and admissibility

#### Article 25

Where a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 22, it shall declare of its own motion that it has no jurisdiction.

#### Article 26

1.   Where a defendant domiciled in one Member State is sued in a court of another Member State and does not enter an appearance, the court shall declare of its own motion that it has no jurisdiction unless its jurisdiction is derived from the provisions of this Regulation.

2.   The court shall stay the proceedings so long as it is not shown that the defendant has been able to receive the document instituting the proceedings or an equivalent document in sufficient time to enable him to arrange for his defence, or that all necessary steps have been taken to this end.

3.   Article 19 of Council Regulation (EC) No 1348/2000 of 29 May 2000 on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters (¹) shall apply instead of the provisions of paragraph 2 if the document instituting the proceedings or an equivalent document had to be transmitted from one Member State to another pursuant to this Regulation.

4.   Where the provisions of Regulation (EC) No 1348/2000 are not applicable, Article 15 of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters shall apply if the document instituting the proceedings or an equivalent document had to be transmitted pursuant to that Convention.

## Section 9

### Lis pendens — related actions

#### Article 27

1.   Where proceedings involving the same cause of action and between the same parties are brought in the courts of

different Member States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established.

2.   Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

#### Article 28

1.   Where related actions are pending in the courts of different Member States, any court other than the court first seised may stay its proceedings.

2.   Where these actions are pending at first instance, any court other than the court first seised may also, on the application of one of the parties, decline jurisdiction if the court first seised has jurisdiction over the actions in question and its law permits the consolidation thereof.

3.   For the purposes of this Article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

#### Article 29

Where actions come within the exclusive jurisdiction of several courts, any court other than the court first seised shall decline jurisdiction in favour of that court.

#### Article 30

For the purposes of this Section, a court shall be deemed to be seised:

1. at the time when the document instituting the proceedings or an equivalent document is lodged with the court, provided that the plaintiff has not subsequently failed to take the steps he was required to take to have service effected on the defendant, or

2. if the document has to be served before being lodged with the court, at the time when it is received by the authority responsible for service, provided that the plaintiff has not subsequently failed to take the steps he was required to take to have the document lodged with the court.

---

(¹) OJ L 160, 30.6.2000, p. 37.

L 12/10    EN    Official Journal of the European Communities    16.1.2001

## Section 10

### Provisional, including protective, measures

#### Article 31

Application may be made to the courts of a Member State for such provisional, including protective, measures as may be available under the law of that State, even if, under this Regulation, the courts of another Member State have jurisdiction as to the substance of the matter.

#### CHAPTER III

#### RECOGNITION AND ENFORCEMENT

#### Article 32

For the purposes of this Regulation, 'judgment' means any judgment given by a court or tribunal of a Member State, whatever the judgment may be called, including a decree, order, decision or writ of execution, as well as the determination of costs or expenses by an officer of the court.

## Section 1

### Recognition

#### Article 33

1.    A judgment given in a Member State shall be recognised in the other Member States without any special procedure being required.

2.    Any interested party who raises the recognition of a judgment as the principal issue in a dispute may, in accordance with the procedures provided for in Sections 2 and 3 of this Chapter, apply for a decision that the judgment be recognised.

3.    If the outcome of proceedings in a court of a Member State depends on the determination of an incidental question of recognition that court shall have jurisdiction over that question.

#### Article 34

A judgment shall not be recognised:

1. if such recognition is manifestly contrary to public policy in the Member State in which recognition is sought;

2. where it was given in default of appearance, if the defendant was not served with the document which instituted the proceedings or with an equivalent document in sufficient time and in such a way as to enable him to arrange for his defence, unless the defendant failed to commence proceedings to challenge the judgment when it was possible for him to do so;

3. if it is irreconcilable with a judgment given in a dispute between the same parties in the Member State in which recognition is sought;

4. if it is irreconcilable with an earlier judgment given in another Member State or in a third State involving the same cause of action and between the same parties, provided that the earlier judgment fulfils the conditions necessary for its recognition in the Member State addressed.

#### Article 35

1.    Moreover, a judgment shall not be recognised if it conflicts with Sections 3, 4 or 6 of Chapter II, or in a case provided for in Article 72.

2.    In its examination of the grounds of jurisdiction referred to in the foregoing paragraph, the court or authority applied to shall be bound by the findings of fact on which the court of the Member State of origin based its jurisdiction.

3.    Subject to the paragraph 1, the jurisdiction of the court of the Member State of origin may not be reviewed. The test of public policy referred to in point 1 of Article 34 may not be applied to the rules relating to jurisdiction.

#### Article 36

Under no circumstances may a foreign judgment be reviewed as to its substance.

#### Article 37

1.    A court of a Member State in which recognition is sought of a judgment given in another Member State may stay the proceedings if an ordinary appeal against the judgment has been lodged.

2.    A court of a Member State in which recognition is sought of a judgment given in Ireland or the United Kingdom may stay the proceedings if enforcement is suspended in the State of origin, by reason of an appeal.

16.1.2001     [EN]     Official Journal of the European Communities     L 12/11

## Section 2

### Enforcement

#### Article 38

1.   A judgment given in a Member State and enforceable in that State shall be enforced in another Member State when, on the application of any interested party, it has been declared enforceable there.

2.   However, in the United Kingdom, such a judgment shall be enforced in England and Wales, in Scotland, or in Northern Ireland when, on the application of any interested party, it has been registered for enforcement in that part of the United Kingdom.

#### Article 39

1.   The application shall be submitted to the court or competent authority indicated in the list in Annex II.

2.   The local jurisdiction shall be determined by reference to the place of domicile of the party against whom enforcement is sought, or to the place of enforcement.

#### Article 40

1.   The procedure for making the application shall be governed by the law of the Member State in which enforcement is sought.

2.   The applicant must give an address for service of process within the area of jurisdiction of the court applied to. However, if the law of the Member State in which enforcement is sought does not provide for the furnishing of such an address, the applicant shall appoint a representative *ad litem*.

3.   The documents referred to in Article 53 shall be attached to the application.

#### Article 41

The judgment shall be declared enforceable immediately on completion of the formalities in Article 53 without any review under Articles 34 and 35. The party against whom enforcement is sought shall not at this stage of the proceedings be entitled to make any submissions on the application.

#### Article 42

1.   The decision on the application for a declaration of enforceability shall forthwith be brought to the notice of the applicant in accordance with the procedure laid down by the law of the Member State in which enforcement is sought.

2.   The declaration of enforceability shall be served on the party against whom enforcement is sought, accompanied by the judgment, if not already served on that party.

#### Article 43

1.   The decision on the application for a declaration of enforceability may be appealed against by either party.

2.   The appeal is to be lodged with the court indicated in the list in Annex III.

3.   The appeal shall be dealt with in accordance with the rules governing procedure in contradictory matters.

4.   If the party against whom enforcement is sought fails to appear before the appellate court in proceedings concerning an appeal brought by the applicant, Article 26(2) to (4) shall apply even where the party against whom enforcement is sought is not domiciled in any of the Member States.

5.   An appeal against the declaration of enforceability is to be lodged within one month of service thereof. If the party against whom enforcement is sought is domiciled in a Member State other than that in which the declaration of enforceability was given, the time for appealing shall be two months and shall run from the date of service, either on him in person or at his residence. No extension of time may be granted on account of distance.

#### Article 44

The judgment given on the appeal may be contested only by the appeal referred to in Annex IV.

#### Article 45

1.   The court with which an appeal is lodged under Article 43 or Article 44 shall refuse or revoke a declaration of enforceability only on one of the grounds specified in Articles 34 and 35. It shall give its decision without delay.

2.   Under no circumstances may the foreign judgment be reviewed as to its substance.

#### Article 46

1.   The court with which an appeal is lodged under Article 43 or Article 44 may, on the application of the party against whom enforcement is sought, stay the proceedings if an ordinary appeal has been lodged against the judgment in the Member State of origin or if the time for such an appeal has not yet expired; in the latter case, the court may specify the time within which such an appeal is to be lodged.

2.   Where the judgment was given in Ireland or the United Kingdom, any form of appeal available in the Member State of origin shall be treated as an ordinary appeal for the purposes of paragraph 1.

L 12/12    [EN]    Official Journal of the European Communities    16.1.2001

3. The court may also make enforcement conditional on the provision of such security as it shall determine.

### Article 47

1. When a judgment must be recognised in accordance with this Regulation, nothing shall prevent the applicant from availing himself of provisional, including protective, measures in accordance with the law of the Member State requested without a declaration of enforceability under Article 41 being required.

2. The declaration of enforceability shall carry with it the power to proceed to any protective measures.

3. During the time specified for an appeal pursuant to Article 43(5) against the declaration of enforceability and until any such appeal has been determined, no measures of enforcement may be taken other than protective measures against the property of the party against whom enforcement is sought.

### Article 48

1. Where a foreign judgment has been given in respect of several matters and the declaration of enforceability cannot be given for all of them, the court or competent authority shall give it for one or more of them.

2. An applicant may request a declaration of enforceability limited to parts of a judgment.

### Article 49

A foreign judgment which orders a periodic payment by way of a penalty shall be enforceable in the Member State in which enforcement is sought only if the amount of the payment has been finally determined by the courts of the Member State of origin.

### Article 50

An applicant who, in the Member State of origin has benefited from complete or partial legal aid or exemption from costs or expenses, shall be entitled, in the procedure provided for in this Section, to benefit from the most favourable legal aid or the most extensive exemption from costs or expenses provided for by the law of the Member State addressed.

### Article 51

No security, bond or deposit, however described, shall be required of a party who in one Member State applies for enforcement of a judgment given in another Member State on the ground that he is a foreign national or that he is not domiciled or resident in the State in which enforcement is sought.

### Article 52

In proceedings for the issue of a declaration of enforceability, no charge, duty or fee calculated by reference to the value of the matter at issue may be levied in the Member State in which enforcement is sought.

### Section 3

### Common provisions

### Article 53

1. A party seeking recognition or applying for a declaration of enforceability shall produce a copy of the judgment which satisfies the conditions necessary to establish its authenticity.

2. A party applying for a declaration of enforceability shall also produce the certificate referred to in Article 54, without prejudice to Article 55.

### Article 54

The court or competent authority of a Member State where a judgment was given shall issue, at the request of any interested party, a certificate using the standard form in Annex V to this Regulation.

### Article 55

1. If the certificate referred to in Article 54 is not produced, the court or competent authority may specify a time for its production or accept an equivalent document or, if it considers that it has sufficient information before it, dispense with its production.

2. If the court or competent authority so requires, a translation of the documents shall be produced. The translation shall be certified by a person qualified to do so in one of the Member States.

### Article 56

No legalisation or other similar formality shall be required in respect of the documents referred to in Article 53 or Article 55(2), or in respect of a document appointing a representative *ad litem*.

CHAPTER IV

AUTHENTIC INSTRUMENTS AND COURT SETTLEMENTS

*Article 57*

1.    A document which has been formally drawn up or registered as an authentic instrument and is enforceable in one Member State shall, in another Member State, be declared enforceable there, on application made in accordance with the procedures provided for in Articles 38, et seq. The court with which an appeal is lodged under Article 43 or Article 44 shall refuse or revoke a declaration of enforceability only if enforcement of the instrument is manifestly contrary to public policy in the Member State addressed.

2.    Arrangements relating to maintenance obligations concluded with administrative authorities or authenticated by them shall also be regarded as authentic instruments within the meaning of paragraph 1.

3.    The instrument produced must satisfy the conditions necessary to establish its authenticity in the Member State of origin.

4.    Section 3 of Chapter III shall apply as appropriate. The competent authority of a Member State where an authentic instrument was drawn up or registered shall issue, at the request of any interested party, a certificate using the standard form in Annex VI to this Regulation.

*Article 58*

A settlement which has been approved by a court in the course of proceedings and is enforceable in the Member State in which it was concluded shall be enforceable in the State addressed under the same conditions as authentic instruments. The court or competent authority of a Member State where a court settlement was approved shall issue, at the request of any interested party, a certificate using the standard form in Annex V to this Regulation.

CHAPTER V

GENERAL PROVISIONS

*Article 59*

1.    In order to determine whether a party is domiciled in the Member State whose courts are seised of a matter, the court shall apply its internal law.

2.    If a party is not domiciled in the Member State whose courts are seised of the matter, then, in order to determine whether the party is domiciled in another Member State, the court shall apply the law of that Member State.

*Article 60*

1.    For the purposes of this Regulation, a company or other legal person or association of natural or legal persons is domiciled at the place where it has its:

(a) statutory seat, or

(b) central administration, or

(c) principal place of business.

2.    For the purposes of the United Kingdom and Ireland 'statutory seat' means the registered office or, where there is no such office anywhere, the place of incorporation or, where there is no such place anywhere, the place under the law of which the formation took place.

3.    In order to determine whether a trust is domiciled in the Member State whose courts are seised of the matter, the court shall apply its rules of private international law.

*Article 61*

Without prejudice to any more favourable provisions of national laws, persons domiciled in a Member State who are being prosecuted in the criminal courts of another Member State of which they are not nationals for an offence which was not intentionally committed may be defended by persons qualified to do so, even if they do not appear in person. However, the court seised of the matter may order appearance in person; in the case of failure to appear, a judgment given in the civil action without the person concerned having had the opportunity to arrange for his defence need not be recognised or enforced in the other Member States.

*Article 62*

In Sweden, in summary proceedings concerning orders to pay *(betalningsföreläggande)* and assistance *(handräckning)*, the expression 'court' includes the 'Swedish enforcement service' *(kronofogdemyndighet)*.

*Article 63*

1.    A person domiciled in the territory of the Grand Duchy of Luxembourg and sued in the court of another Member State pursuant to Article 5(1) may refuse to submit to the jurisdiction of that court if the final place of delivery of the goods or provision of the services is in Luxembourg.

L 12/14    [EN]    Official Journal of the European Communities    16.1.2001

2.  Where, under paragraph 1, the final place of delivery of the goods or provision of the services is in Luxembourg, any agreement conferring jurisdiction must, in order to be valid, be accepted in writing or evidenced in writing within the meaning of Article 23(1)(a).

3.  The provisions of this Article shall not apply to contracts for the provision of financial services.

4.  The provisions of this Article shall apply for a period of six years from entry into force of this Regulation.

### Article 64

1.  In proceedings involving a dispute between the master and a member of the crew of a seagoing ship registered in Greece or in Portugal, concerning remuneration or other conditions of service, a court in a Member State shall establish whether the diplomatic or consular officer responsible for the ship has been notified of the dispute. It may act as soon as that officer has been notified.

2.  The provisions of this Article shall apply for a period of six years from entry into force of this Regulation.

### Article 65

1.  The jurisdiction specified in Article 6(2), and Article 11 in actions on a warranty of guarantee or in any other third party proceedings may not be resorted to in Germany and Austria. Any person domiciled in another Member State may be sued in the courts:

(a) of Germany, pursuant to Articles 68 and 72 to 74 of the Code of Civil Procedure (*Zivilprozessordnung*) concerning third-party notices,

(b) of Austria, pursuant to Article 21 of the Code of Civil Procedure (*Zivilprozessordnung*) concerning third-party notices.

2.  Judgments given in other Member States by virtue of Article 6(2), or Article 11 shall be recognised and enforced in Germany and Austria in accordance with Chapter III. Any effects which judgments given in these States may have on third parties by application of the provisions in paragraph 1 shall also be recognised in the other Member States.

### CHAPTER VI

### TRANSITIONAL PROVISIONS

### Article 66

1.  This Regulation shall apply only to legal proceedings instituted and to documents formally drawn up or registered as authentic instruments after the entry into force thereof.

2.  However, if the proceedings in the Member State of origin were instituted before the entry into force of this Regulation, judgments given after that date shall be recognised and enforced in accordance with Chapter III,

(a) if the proceedings in the Member State of origin were instituted after the entry into force of the Brussels or the Lugano Convention both in the Member State of origin and in the Member State addressed;

(b) in all other cases, if jurisdiction was founded upon rules which accorded with those provided for either in Chapter II or in a convention concluded between the Member State of origin and the Member State addressed which was in force when the proceedings were instituted.

### CHAPTER VII

### RELATIONS WITH OTHER INSTRUMENTS

### Article 67

This Regulation shall not prejudice the application of provisions governing jurisdiction and the recognition and enforcement of judgments in specific matters which are contained in Community instruments or in national legislation harmonised pursuant to such instruments.

### Article 68

1.  This Regulation shall, as between the Member States, supersede the Brussels Convention, except as regards the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 299 of the Treaty.

2.  In so far as this Regulation replaces the provisions of the Brussels Convention between Member States, any reference to the Convention shall be understood as a reference to this Regulation.

### Article 69

Subject to Article 66(2) and Article 70, this Regulation shall, as between Member States, supersede the following conventions and treaty concluded between two or more of them:

— the Convention between Belgium and France on Jurisdiction and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Paris on 8 July 1899,

— the Convention between Belgium and the Netherlands on Jurisdiction, Bankruptcy, and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Brussels on 28 March 1925,

— the Convention between France and Italy on the Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 3 June 1930,

— the Convention between Germany and Italy on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 9 March 1936,

— the Convention between Belgium and Austria on the Reciprocal Recognition and Enforcement of Judgments and Authentic Instruments relating to Maintenance Obligations, signed at Vienna on 25 October 1957,

— the Convention between Germany and Belgium on the Mutual Recognition and Enforcement of Judgments, Arbitration Awards and Authentic Instruments in Civil and Commercial Matters, signed at Bonn on 30 June 1958,

— the Convention between the Netherlands and Italy on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 17 April 1959,

— the Convention between Germany and Austria on the Reciprocal Recognition and Enforcement of Judgments, Settlements and Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 6 June 1959,

— the Convention between Belgium and Austria on the Reciprocal Recognition and Enforcement of Judgments, Arbitral Awards and Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 16 June 1959,

— the Convention between Greece and Germany for the Reciprocal Recognition and Enforcement of Judgments, Settlements and Authentic Instruments in Civil and Commercial Matters, signed in Athens on 4 November 1961,

— the Convention between Belgium and Italy on the Recognition and Enforcement of Judgments and other Enforceable Instruments in Civil and Commercial Matters, signed at Rome on 6 April 1962,

— the Convention between the Netherlands and Germany on the Mutual Recognition and Enforcement of Judgments and Other Enforceable Instruments in Civil and Commercial Matters, signed at The Hague on 30 August 1962,

— the Convention between the Netherlands and Austria on the Reciprocal Recognition and Enforcement of Judgments and Authentic Instruments in Civil and Commercial Matters, signed at The Hague on 6 February 1963,

— the Convention between France and Austria on the Recognition and Enforcement of Judgments and Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 15 July 1966,

— the Convention between Spain and France on the Recognition and Enforcement of Judgment Arbitration Awards in Civil and Commercial Matters, signed at Paris on 28 May 1969,

— the Convention between Luxembourg and Austria on the Recognition and Enforcement of Judgments and Authentic Instruments in Civil and Commercial Matters, signed at Luxembourg on 29 July 1971,

— the Convention between Italy and Austria on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, of Judicial Settlements and of Authentic Instruments, signed at Rome on 16 November 1971,

— the Convention between Spain and Italy regarding Legal Aid and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Madrid on 22 May 1973,

— the Convention between Finland, Iceland, Norway, Sweden and Denmark on the Recognition and Enforcement of Judgments in Civil Matters, signed at Copenhagen on 11 October 1977,

— the Convention between Austria and Sweden on the Recognition and Enforcement of Judgments in Civil Matters, signed at Stockholm on 16 September 1982,

— the Convention between Spain and the Federal Republic of Germany on the Recognition and Enforcement of Judgments, Settlements and Enforceable Authentic Instruments in Civil and Commercial Matters, signed at Bonn on 14 November 1983,

— the Convention between Austria and Spain on the Recognition and Enforcement of Judgments, Settlements and Enforceable Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 17 February 1984,

— the Convention between Finland and Austria on the Recognition and Enforcement of Judgments in Civil Matters, signed at Vienna on 17 November 1986, and

L 12/16    EN    Official Journal of the European Communities    16.1.2001

— the Treaty between Belgium, the Netherlands and Luxembourg in Jurisdiction, Bankruptcy, and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Brussels on 24 November 1961, in so far as it is in force.

### Article 70

1.  The Treaty and the Conventions referred to in Article 69 shall continue to have effect in relation to matters to which this Regulation does not apply.

2.  They shall continue to have effect in respect of judgments given and documents formally drawn up or registered as authentic instruments before the entry into force of this Regulation.

### Article 71

1.  This Regulation shall not affect any conventions to which the Member States are parties and which in relation to particular matters, govern jurisdiction or the recognition or enforcement of judgments.

2.  With a view to its uniform interpretation, paragraph 1 shall be applied in the following manner:

(a) this Regulation shall not prevent a court of a Member State, which is a party to a convention on a particular matter, from assuming jurisdiction in accordance with that convention, even where the defendant is domiciled in another Member State which is not a party to that convention. The court hearing the action shall, in any event, apply Article 26 of this Regulation;

(b) judgments given in a Member State by a court in the exercise of jurisdiction provided for in a convention on a particular matter shall be recognised and enforced in the other Member States in accordance with this Regulation.

Where a convention on a particular matter to which both the Member State of origin and the Member State addressed are parties lays down conditions for the recognition or enforcement of judgments, those conditions shall apply. In any event, the provisions of this Regulation which concern the procedure for recognition and enforcement of judgments may be applied.

### Article 72

This Regulation shall not affect agreements by which Member States undertook, prior to the entry into force of this

Regulation pursuant to Article 59 of the Brussels Convention, not to recognise judgments given, in particular in other Contracting States to that Convention, against defendants domiciled or habitually resident in a third country where, in cases provided for in Article 4 of that Convention, the judgment could only be founded on a ground of jurisdiction specified in the second paragraph of Article 3 of that Convention.

### CHAPTER VIII

### FINAL PROVISIONS

### Article 73

No later than five years after the entry into force of this Regulation, the Commission shall present to the European Parliament, the Council and the Economic and Social Committee a report on the application of this Regulation. The report shall be accompanied, if need be, by proposals for adaptations to this Regulation.

### Article 74

1.  The Member States shall notify the Commission of the texts amending the lists set out in Annexes I to IV. The Commission shall adapt the Annexes concerned accordingly.

2.  The updating or technical adjustment of the forms, specimens of which appear in Annexes V and VI, shall be adopted in accordance with the advisory procedure referred to in Article 75(2).

### Article 75

1.  The Commission shall be assisted by a committee.

2.  Where reference is made to this paragraph, Articles 3 and 7 of Decision 1999/468/EC shall apply.

3.  The Committee shall adopt its rules of procedure.

### Article 76

This Regulation shall enter into force on 1 March 2002.

16.1.2001    EN    Official Journal of the European Communities    L 12/17

This Regulation is binding in its entirety and directly applicable in the Member States in accordance with the Treaty establishing the European Community.

Done at Brussels, 22 December 2000.

*For the Council*
*The President*
C. PIERRET

———

ANNEX I

### Rules of jurisdiction referred to in Article 3(2) and Article 4(2)

The rules of jurisdiction referred to in Article 3(2) and Article 4(2) are the following:

— in Belgium: Article 15 of the Civil Code (*Code civil/Burgerlijk Wetboek*) and Article 638 of the Judicial Code (*Code judiciaire/Gerechtelijk Wetboek*);

— in Germany: Article 23 of the Code of Civil Procedure (*Zivilprozessordnung*),

— in Greece, Article 40 of the Code of Civil Procedure (Κώδικας Πολιτικής Δικονομίας);

— in France: Articles 14 and 15 of the Civil Code (*Code civil*),

— in Ireland: the rules which enable jurisdiction to be founded on the document instituting the proceedings having been served on the defendant during his temporary presence in Ireland,

— in Italy: Articles 3 and 4 of Act 218 of 31 May 1995,

— in Luxembourg: Articles 14 and 15 of the Civil Code (*Code civil*),

— in the Netherlands: Articles 126(3) and 127 of the Code of Civil Procedure (*Wetboek van Burgerlijke Rechtsvordering*),

— in Austria: Article 99 of the Court Jurisdiction Act (*Jurisdiktionsnorm*),

— in Portugal: Articles 65 and 65A of the Code of Civil Procedure (*Código de Processo Civil*) and Article 11 of the Code of Labour Procedure (*Código de Processo de Trabalho*),

— in Finland: the second, third and fourth sentences of the first paragraph of Section 1 of Chapter 10 of the Code of Judicial Procedure (*oikeudenkäymiskaari/rättegångsbalken*),

— in Sweden: the first sentence of the first paragraph of Section 3 of Chapter 10 of the Code of Judicial Procedure (*rättegångsbalken*),

— in the United Kingdom: rules which enable jurisdiction to be founded on:

   (a) the document instituting the proceedings having been served on the defendant during his temporary presence in the United Kingdom; or

   (b) the presence within the United Kingdom of property belonging to the defendant; or

   (c) the seizure by the plaintiff of property situated in the United Kingdom.

16.1.2001    EN    Official Journal of the European Communities    L 12/19

ANNEX II

The courts or competent authorities to which the application referred to in Article 39 may be submitted are the following:

— in Belgium, the *tribunal de première instance* or *rechtbank van eerste aanleg* or *erstinstanzliches Gericht*,

— in Germany, the presiding judge of a chamber of the *Landgericht*,

— in Greece, the *Μονομελές Πρωτοδικείο*,

— in Spain, the *Juzgado de Primera Instancia*,

— in France, the presiding judge of the *tribunal de grande instance*,

— in Ireland, the High Court,

— in Italy, the *Corte d'appello*,

— in Luxembourg, the presiding judge of the *tribunal d'arrondissement*,

— in the Netherlands, the presiding judge of the *arrondissementsrechtbank*;

— in Austria, the *Bezirksgericht*,

— in Portugal, the *Tribunal de Comarca*,

— in Finland, the *käräjäoikeus/tingsrätt*,

— in Sweden, the *Svea hovrätt*,

— in the United Kingdom:

  (a) in England and Wales, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court on transmission by the Secretary of State;

  (b) in Scotland, the Court of Session, or in the case of a maintenance judgment, the Sheriff Court on transmission by the Secretary of State;

  (c) in Northern Ireland, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court on transmission by the Secretary of State;

  (d) in Gibraltar, the Supreme Court of Gibraltar, or in the case of a maintenance judgment, the Magistrates' Court on transmission by the Attorney General of Gibraltar.

L 12/20     [EN]     Official Journal of the European Communities     16.1.2001

*ANNEX III*

The courts with which appeals referred to in Article 43(2) may be lodged are the following:

— in Belgium,

    (a) as regards appeal by the defendant: the *'tribunal de première instance'* or *'rechtbank van eerste aanleg'* or *'erstinstanzliches Gericht'*,

    (b) as regards appeal by the applicant: the *'Cour d'appel'* or *'hof van beroep'*,

— in the Federal Republic of Germany, the *'Oberlandesgericht'*,

— in Greece, the *'Εφετείο'*,

— in Spain, the *'Audiencia Provincial'*,

— in France, the *'cour d'appel'*,

— in Ireland, the High Court,

— in Italy, the *'corte d'appello'*,

— in Luxembourg, the *'Cour supérieure de Justice'* sitting as a court of civil appeal,

— in the Netherlands:

    (a) for the defendant: the *'arrondissementsrechtbank'*,

    (b) for the applicant: the *'gerechtshof'*,

— in Austria, the *'Bezirksgericht'*,

— in Portugal, the *'Tribunal de Relação'*,

— in Finland, the *'hovioikeus/hovrätt'*,

— in Sweden, the *'Svea hovrätt'*,

— in the United Kingdom:

    (a) in England and Wales, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court;

    (b) in Scotland, the Court of Session, or in the case of a maintenance judgment, the Sheriff Court;

    (c) in Northern Ireland, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court;

    (d) in Gibraltar, the Supreme Court of Gibraltar, or in the case of a maintenance judgment, the Magistrates' Court.

16.1.2001          EN          Official Journal of the European Communities          L 12/21

*ANNEX IV*

The appeals which may be lodged pursuant to Article 44 are the following

— in Belgium, Greece, Spain, France, Italy, Luxembourg and the Netherlands, an appeal in cassation,

— in Germany, a '*Rechtsbeschwerde*',

— in Ireland, an appeal on a point of law to the Supreme Court,

— in Austria, a '*Revisionsrekurs*',

— in Portugal, an appeal on a point of law,

— in Finland, an appeal to the '*korkein oikeus/högsta domstolen*',

— in Sweden, an appeal to the '*Högsta domstolen*',

— in the United Kingdom, a single further appeal on a point of law.

L 12/22          EN          Official Journal of the European Communities          16.1.2001

ANNEX V

**Certificate referred to in Articles 54 and 58 of the Regulation on judgments and court settlements**

(English, inglés, anglais, inglese, ...)

1. Member State of origin

2. Court or competent authority issuing the certificate

   2.1. Name

   2.2. Address

   2.3. Tel./fax/e-mail

3. Court which delivered the judgment/approved the court settlement (*)

   3.1. Type of court

   3.2. Place of court

4. Judgment/court settlement (*)

   4.1. Date

   4.2. Reference number

   4.3. The parties to the judgment/court settlement (*)

       4.3.1. Name(s) of plaintiff(s)

       4.3.2. Name(s) of defendant(s)

       4.3.3. Name(s) of other party(ies), if any

   4.4. Date of service of the document instituting the proceedings where judgment was given in default of appearance

   4.5. Text of the judgment/court settlement (*) as annexed to this certificate

5. Names of parties to whom legal aid has been granted

The judgment/court settlement (*) is enforceable in the Member State of origin (Articles 38 and 58 of the Regulation) against:

Name:

Done at  . . . . . . . . . . . . . . . . . . . . . . . . . , date  . . . . . . . . . . . . . . . . . . . . . . . . . .

Signature and/or stamp  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

―――――

(*) Delete as appropriate.

16.1.2001    EN    Official Journal of the European Communities    L 12/23

ANNEX VI

**Certificate referred to in Article 57(4) of the Regulation on authentic instruments**

(English, inglés, anglais, inglese ............)

1. Member State of origin

2. Competent authority issuing the certificate

    2.1. Name

    2.2. Address

    2.3. Tel./fax/e-mail

3. Authority which has given authenticity to the instrument

    3.1. Authority involved in the drawing up of the authentic instrument (if applicable)

        3.1.1. Name and designation of authority

        3.1.2. Place of authority

    3.2. Authority which has registered the authentic instrument (if applicable)

        3.2.1. Type of authority

        3.2.2. Place of authority

4. Authentic instrument

    4.1. Description of the instrument

    4.2. Date

        4.2.1. on which the instrument was drawn up

        4.2.2. if different: on which the instrument was registered

    4.3. Reference number

    4.4. Parties to the instrument

        4.4.1. Name of the creditor

        4.4.2. Name of the debtor

5. Text of the enforceable obligation as annexed to this certificate

The authentic instrument is enforceable against the debtor in the Member State of origin (Article 57(1) of the Regulation)

Done at .........................,    date ...........................

Signature and/or stamp ...............................................

**2**

therefore litigate in
ed liability, a judg-
ers. An action may
business name.
ame. A limited lia-
ality. In the case of
ent against the club
sired to enforce the
uld be included as

civil litigation, and
assisted person has

onality, residence or
ith proceedings in a
urt of Session and
dministrative tribu-
eria relating to his
aat he has a sound
justify expenditure
ontribution towards
s, and he may ulti-
n sums recovered in
cts of a case, but a
n of the application
t to  application
ty.
he words "assisted
ourt papers. If the
iable in expenses of
nent's taxed expen-
e amount for which
ble by the assisted
ie court will cap the
aided party may be
ven if he has been

APPENDIX 1*

## OFFICIAL REPORTS AND EXPLANATORY MEMORANDUM

| | | PARA. NO. | | | PARA. NO. |
|---|---|---|---|---|---|
| 1. | Jenard Report | A1.001 | 5. | Jenard/Möller Report | A1.675 |
| 2. | Jenard Report (Protocols) | A1.269 | 6. | De Almeida Cruz/Desantes | |
| 3. | Schlosser Report | A1.287 | | Real/Jenard Report | A1.871 |
| 4. | Evrigenis/Kerameus | | 7. | Explanatory Memorandum | |
| | Report | A1.570 | | to Regulation Proposal | A1.903 |

1. Jenard Report

## REPORT ON THE CONVENTION

### on jurisdiction and the enforcement of judgments in civil and commercial matters

### (Signed at Brussels, 27 September 1968)

### by Mr P. Jenard

*Director in the Belgian Ministry of Foreign Affairs and External Trade.*

A committee of experts set up in 1960 by decision of the Committee of Permanent Representatives of the Member States, following a proposal by the Commission, prepared a draft Convention, in pursuance of Article 220 of the EEC Treaty, on jurisdiction and the enforcement of judgments in civil and commercial matters. The committee was composed of governmental experts from the six Member States, representatives of the Commission, and observers. Its rapporteur, Mr P. Jenard, Directeur d'Administration in the Belgian Ministry for Foreign Affairs and External Trade, wrote the explanatory report, which was submitted to the governments at the same time as the draft prepared by the committee of experts. The following is the text of that report. It takes the form of a commentary on the Convention, which was signed in Brussels on 27 September 1968. **A1.001**

## CONTENTS **A1.002**

| | Pages |
|---|---|
| CHAPTER I  Preliminary remarks | 3 |
| CHAPTER II  Background to the Convention | 3 |
| A. The law in force in the six States | 3 |
| B. Existing conventions | 6 |

*[Editor's note: In the text of this Appendix bold numerals in square brackets denote the page numbering of the original texts of the Reports.]

nflicting judgments
n or as regards the
usly preferable that
ich the company or
ut the company or
ie rule adopted will
xim "*actor sequitur*
rman law and, as


lic register is kept
r effects of entries


orresponds to the
tracting States; it
s and commercial


on or validity of
hich protect fruit
registered.
ng to patent law.
t it will not apply
its Convention.
'ereignty, Article
n in proceedings

govel. J by the

. for" takes into
)atent subject to
ll have exclusive
s for a patent to
e arises over the

ieemed *to* have
ient of 14 April
Brussels on 14
November 1925
of 6 November
it London on 2
or model at the
origin has the
n or model had
d at the Inter-
ourts will have
e mark should

### Enforcement of judgments

Article 16(5) provides that the courts of the State in which a judgment has been or is to be enforced have exclusive jurisdiction in proceedings concerned with the enforcement of that judgment.    **A1.162**

What meaning is to be given to the expression "proceedings concerned with the enforcement of judgments"?

It means those proceedings which can arise from "recourse to force, constraint or distraint on movable or immovable property in order to ensure the effective implementation of judgments and authentic instruments."[1]

Problems arising out of such proceedings come within the exclusive jurisdiction of the courts for the place of enforcement.

Provisions of this kind appear in the internal law of many Member States.[2]


## Section 6

### Prorogation of jurisdiction

This section includes Article 17, on jurisdiction by consent, and Article 18, which concerns jurisdiction implied from submission.    **A1.163**


### Article 17

Jurisdiction deriving from agreements conferring jurisdiction is already a feature of all the Conventions concluded between Member States of the Community, whether the rules of jurisdiction are direct or indirect: see the Convention between France and Belgium (Article 3), and between Belgium and the Netherlands (Article 5); the Benelux Treaty (Article 5); the [37] Convention between France and Italy (Article 12), between Germany and Italy (Article 2(2)), between Italy and the Netherlands (Article 2(2)), between Italy and Belgium (Article 2(1)(2)), between Germany and Belgium (Article 3(2)), and between Germany and the Netherlands (Article 4(1)(b)).    **A1.164**

This jurisdiction is also the subject of international conventions, namely the Hague Convention of 15 April 1958 on the jurisdiction of the contractual forum in matters relating to the international sale of goods, and the Hague Convention of 25 November 1965 on the choice of court.[1]

It is unnecessary to stress the importance of this jurisdiction, particularly in commercial relations.

However, although agreement was readily reached on the basic principle of including such a jurisdiction in the Convention, the Committee spent much time in drafting Article 17.    **A1.165**

Like the draftsmen of the Convention between Germany and Belgium, the report of which may usefully be quoted, the Committee's first concern was "not to impede commercial practice, yet at the same time to cancel out the effects of clauses in

---

[1]    BRAAS, Précis de procedure civile, Vol. I, No. 808.

[2]    See LEREBOURS-PIGEONNIERE, Droit international privé, seventh edition, p. 9; LOUSSOUARN, No. 411: "French courts have exclusive jurisdiction over measures for enforcement which is to take place in France (preventive measures, distress levied on a tenant's chattels, writs of attachment and applications for enforcement of a foreign judgment); over distraint levied on immovable or movable property, and over proceedings concerned with the validity of measures for enforcement."

[1]    By September 1, 1966 neither of these Conventions had entered into force.

contracts which might go unread. Such clauses will therefore be taken into consideration only if they are the subject of an agreement, and this implies the consent of all the parties. Thus, clauses in printed forms for business correspondence or in invoices will have no legal force if they are not agreed to by the party against whom they operate."

**A1.166**  The Committee was further of the opinion that, in order to ensure legal certainty, the formal requirements applicable to agreements conferring jurisdiction should be expressly prescribed, but that "excessive formality which is incompatible with commercial practice"[2] should be avoided.

In this respect, the version adopted is similar to that of the Convention between Germany and Belgium, which was itself based on the rules of the Hague Convention of 15 April 1958, in that a clause conferring jurisdiction is valid only if it is in writing, or if at least one of the parties has confirmed in writing an oral agreement.[3]

Since there must be true agreement between the parties to confer jurisdiction, the court cannot necessarily deduce from a document in writing adduced by the party seeking to rely on it that there was an oral agreement. The special position of the Grand Duchy of Luxembourg in this matter necessitated an additional restriction which is contained in the second paragraph of Article I of the Protocol.

The question of how much weight is to be attached to the written document was left open by the Committee. In certain countries, a document in writing will be required only as evidence of the existence of the agreement; in others, however, it will go to the validity of the agreement.

**A1.167**  Like the Conventions between Belgium and the Netherlands and between France and Belgium, and also the Benelux Treaty and the Hague Convention, the first paragraph of Article 17 provides that the court agreed on by the parties shall have exclusive jurisdiction. This solution is essential to avoid different courts from being properly seised of the matter and giving conflicting or at least differing judgments. In order to meet practical realities, the first paragraph of Article 17 also covers specifically cases of agreement that a particular court in a Contracting State or the courts of a Contracting State are to have jurisdiction, and is similar in this to the 1958 Hague Convention. As Professor Batiffol pointed out in his report on that Convention, an agreement conferring jurisdiction generally on the courts of a Contracting State "may have no legal effect if, in the absence of any connecting factor between the contractual situation and the State whose courts have been agreed on as having jurisdiction, the law of that State provides no way of determining which court can or should be seised of the matter."[4] But as Batiffol remarks, this is a matter which the parties should consider at the appropriate time.

**A1.168**  The first paragraph of Article 17 applies only if at least one of the parties is domiciled in a Contracting State. It does not apply where two parties who are domiciled in the same Contracting State have agreed that a court of that State shall have jurisdiction, since the Convention, [38] under the general principle laid down in the preamble, determines only the international jurisdiction of courts (see Commentary, Chapter III, section 1, International legal relationships).

Article 17 applies where the agreement conferring jurisdiction was made either between a person domiciled in one Contracting State and a person domiciled in another Contracting State, or between a person domiciled in a Contracting State and a person domiciled outside the Community, if the agreement confers jurisdiction on the courts of a Contracting State; it also applies where two persons domiciled in one

---

[2]  Hague Conference on private international law, documents of the eighth session. FREDERICQ, Report on the work of the Second Committee, p. 303.
[3]  Hague Conference on private international law, Final Act of the tenth session. Convention on the choice of court, Article 4.
[4]  Hague Conference on private international law, documents of the eighth session, p. 305.

Contracting State agree that a particular court of another Contracting State shall have jurisdiction.

The second paragraph of Article 17 provides that agreements conferring jurisdiction shall have no legal force if they are contrary to the provisions of Article 12 (insurance) or Article 15 (instalment sales), or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 16.

**A1.169**

The intention behind the Convention is to obviate cases of refusal of recognition and enforcement on the basis of Articles 28 and 34, and so, as already stated, to promote the free movement of judgments.

The third paragraph of Article 17 provides that if the agreement conferring jurisdiction was concluded for the benefit of only one of the contracting parties, that party shall retain the right to bring proceedings in any other court which has jurisdiction.[1] Agreements conferring jurisdiction cannot of course affect the substantive jurisdiction of the courts.

**A1.170**

### Article 18

Article 18 governs jurisdiction implied from submission. If a defendant domiciled in a Contracting State is sued in a court of another Contracting State which does not have jurisdiction under the Convention, two situations may arise: the defendant may either, as he is entitled to do, plead that the court has no jurisdiction under the Convention, in which case the court must declare that it does not have jurisdiction; or he may elect not to raise this plea, and enter an appearance. In the latter case, the court will have jurisdiction.

**A1.171**

Unlike the case of conventions based on indirect jurisdiction, the defendant may, by virtue of the Convention, rely on its provisions in the court seised of the proceedings and plead lack of jurisdiction. It will be necessary to refer to the rules of procedure in force in the State of the court seised of the proceedings in order to determine the point in time up to which the defendant will be allowed to raise this plea, and to determine the legal meaning of the term "appearance."

Moreover, by conferring jurisdiction on a court in circumstances where the defendant does not contest that court's jurisdiction, the Convention extends the scope of Title II and avoids any uncertainty. The main consequence of this rule is that if a defendant domiciled in a Contracting State is, notwithstanding the provisions of the second paragraph of Article 3, sued in another Contracting State on the basis of a rule of exorbitant jurisdiction, for example in France on the basis of Article 14 of the Civil Code, the court will have jurisdiction if this is not contested. The only cases in which a court must declare that it has no jurisdiction and where jurisdiction by submission will not be allowed are those in which the courts of another State have exclusive jurisdiction by virtue of Article 16.

---

[1]  See also the Conventions between France and Belgium, Article 3, between France and Italy, Article 2, and between Belgium and the Netherlands, Article 5 and the Benelux Treaty, Article 5.

918                    APPENDIX 1—OFFICIAL REPORTS, ETC.

reference is made to "κάθε ενδιαφερόμενος" (any interested party) rather than to "κάθε διάδικος" (any litigant) as being entitled to apply for the recognition or enforcement of a judgment. The general term has been used in order to avoid the impression that the text of the Convention itself confines such entitlement to the litigants in the original proceedings before the foreign court.

(e)   In point 2 of Article 16 clearly "ακυρότητα" (nullity) and not "εγκυρότητα" is meant in contrast to the immediately following term "κύρος" (validity).

(f)   The meaning of "καταχώρηση" (article 16, point 4, of the Convention) and of "εγγραφή" (Article V d of the 1968 Protocol) of patents is the same. What is involved in both cases is the public act which formally protects the right of the inventor. Both terms render the term "registration" into Greek.

**A1.674    104: Entry into force of the Convention**

The 1968 Convention entered into force on 1 February 1973 and the 1971 Protocol on 1 September 1975. As at 31 March 1986 the 1978 Accession Convention had been ratified by five States; it has not yet entered into force(). The entry into force of the 1982 Accession Convention is governed by Article 15, in accordance with which the Convention "shall enter into force, as between the States which have ratified it, on the first day of the third month following the deposit of the last instrument of ratification by the Hellenic Republic and those States which have put into force the 1978 Convention in accordance with Article 39 of that Convention". The entry into force of the 1982 Accession Convention therefore depends on the entry into force of the 1978 Accession Convention and on the ratification of the 1982 Accession Convention by Greece.

**5. Jenard/Möller Report**

## CONVENTION

### on jurisdiction and the enforcement of judgments in civil and commercial matters done at Lugano on 16 September 1988

#### (90/C 189/07)

### REPORT

### by Mr P. JENARD

*Honorary Director of Administration at the Belgian Ministry of Foreign Affairs,*

### and Mr. G. MÖLLER

*President of the Court of First Instance in Toijala*

**A1.675**   In addition to the draft Convention and the other instruments drawn up by the government experts, the draft explanatory report was submitted to the Governments

of the Member Stat
Trade Association b
September 1988.
This report takes
the amendments ma
the form of a comm
1988.

**Chapter 1**
— *General Consid*

1. Introductory
2. Justification f
3. Identity of st
   Lugano Con

**Chapter II**
—*Respective scop
vention (Article 5*

**Chapter III**
— *Provisions wi
Brussels Con*

1. Summary o
2. Detailed ex
   — Title I:
   — Title II
      — Sect
      a) I
      b) 
         
      c) 
         t

   — Sec
   a)
   b)
   c)
   pe
   — Se
   in
   (A

944          APPENDIX 1—OFFICIAL REPORTS, ETC.                    JE

This possibility of a reservation only concerns such cases in which the immovable property is situated [76] in the State where recognition and enforcement are sought. If, thus, for instance, Spain makes use of this possibility, that does not mean that Spain is entitled to refuse the recognition or enforcement of a judgment given in proceedings which had as their object a tenancy referred to in Article 16 (1) (b) if the immovable property is situated in another State e.g. Italy, and the judgment is given by a court in a third State, where the defendant has his domicile, e.g. Sweden. Whether the State where the immovable property is situated has made use of the reservation is in this case completely irrelevant.

It was however understood that any State which wishes to use this reservation may make a narrower reservation than that provided for. Thus a State may, for instance, declare that the reservation is limited to the case where the landlord is a legal person.

A1.748

54. Article 16 (1) applies only if the property is situated in the territory of a Contracting State. The text is sufficiently explicit on this point. If the property is situated in the territory of a third State, the other provisions of the Convention apply, e.g. Article 2 if the defendant is domiciled in the territory of a Contracting State, and Article 4 if he is domiciled in the territory of a third State, etc.


Section 6

## Prorogation of jurisdiction (Articles 17 and 18)

### (a) Article 17—Prorogation by an agreement

A1.749

55. 1. Paragraph 1 of this Article essentially concerns the formal requirements for agreements conferring jurisdiction. The question of whether an agreement on jurisdiction has been validly entered into (e.g. lack of due consent) is to be regulated by the applicable law (judgment of the Court of Justice of 11 November 1986 in Iveco Fiat v. Van Hool, see Chapter VI). As to whether such an agreement can be validly entered into in specific matters it should be pointed out that the Court of Justice (judgment of 13 November 1979 in Sanicentral v. Collin, see Chapter VI) ruled that in matters governed by the Convention national procedural law was set aside in favour of the Convention's provisions.

A1.750

56. According to the original version of Article 17 of the Brussels Convention, an agreement conferring jurisdiction must be in writing or evidenced in writing. In the light of the interpretation of the Court of Justice of the European Communities in some of its first judgments concerning Article 17 of the Brussels Convention (see Chapter VI), the working party preparing the 1978 Convention on the accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland to the Brussels Convention and to the Protocol of 3 June 1971 on its interpretation by the Court of Justice was of the opinion that these formal requirements did not cater adequately for the customs and needs of international trade. Therefore a relaxation of these formal requirements as far as agreements on jurisdiction in international trade or commerce are concerned was felt necessary. According to Article 17 of the Brussels Convention as amended by the 1978 Accession Convention, an agreement conferring jurisdiction may in international trade or commerce be in a form which accords with practices in that trade or commerce of which the parties are or ought to have been aware.

A1.751

57. During the negotiations on the Lugano Convention, the EFTA Member States, however, felt that this provision was too vague and might create legal uncertainty. Those States feared that Article 17 (1), as far as agreements on jurisdiction in international commerce or trade are concerned, might make it possible to consider an agreement established by the mere fact that no protest has been launched against a jurisdiction clause in certain unilateral statements by one party, for instance

in an invoice or in terms of  
Therefore the EFTA Member  
second sentence of Article 17 (  
"Such an agreement conferri  

(a) in writing (or clearly evid  
telegrams and telexes (or  
or  

(b) included or incorporated  
document."  

The representatives of the Co  
proposal would not only lead t  
contradiction with the rulings  
according to which it should  
(judgment of 14 December 19  

[77] 58. Article 17 (1) (a) of  
graph 2 of the 1980 United N.  
Sale of Goods (the so-called  
EEC and the EFTA States m  
party found it desirable to ali  
Article 9 paragraph 2 of the  
compromise between the two  

First, according to Article  
conferring jurisdiction fulfils t  
with practices which the part  
provided for in the working of  
the case law of the Court of J  
this seems, however, to be the  
tion. The working party wa  
explicitly reflected in the text  

Secondly, in international tr  
fulfils the formal requirement  
the parties are or ought to hav  
to, and regularly observed by  
ticular trade or commerce co  

Thus, even in international  
ment conferring jurisdiction b  
such trade or commerce of wl  
moreover required that the  
international trade or comme  
contracts of the type involvec  

In particular, having regar  
"usages" which are used in t  
Brussels Convention, it seems  
between the provisions conc  
uniform interpretation it wa  
wording of paragraph 1 (c) w  

59. Article 17 of the Brusse  
of judgments by the Court  
nection, readers are referred  
12.  

However, it should be men  
that an agreement between th  
constitutes a ground of juris

ich the immovable
ement are sought,
oes not mean that
udgment given in
cle 16 (1) (b) if the
judgment is given
cile, e.g. Sweden,
s made use of the

is reservation may
may, for instance,
d is a legal person,
the territory of a
If    property is
f the Convention
of a Contracting
tate, etc.

8)

requirements for
agreement on jur-
to be regulated by
ber 1986 in Iveco
ent can be validly
Court of Justice
ter VI) ruled that
was set aside in

ls Cc    ention, an
in w.  .ng. In the
Communities in
Convention (see
n the accession of
Great Britain and
of 3 June 1971 on
that these formal
s of international
as agreements on
as felt necessary.
ded by the 1978
y in international
in that trade or

EFTA Member
ight create legal
greements on jur-
nake it possible to
as been launched
party, for instance

in an invoice or in terms of trade presented as a confirmation of the contract. Therefore the EFTA Member States proposed the following amendment of the second sentence of Article 17 (1):

"Such an agreement conferring jurisdiction shall be either

(a) in writing (or clearly evidenced in writing) including an exchange of letters, telegrams and telexes (or other modern means of technical communications), or

(b) included or incorporated by reference in a bill of lading or a similar transport document."

The representatives of the Community Member States found however that this proposal would not only lead to an excessive amount of rigidity but would also be in contradiction with the rulings of the Court of Justice of the European Communities, according to which it should be possible to take into account particular practices (judgment of 14 December 1976 in Segoura v. Bonakdarian, see Chapter VI).

[77] 58. Article 17 (1) (a) of the Lugano Convention is based on Article 9 paragraph 2 of the 1980 United Nations Convention on Contracts for the International Sale of Goods (the so-called Vienna Convention). Since the Member States of the EEC and the EFTA States may become parties to that Convention, the working party found it desirable to align in this respect the text of Article 17 on the text of Article 9 paragraph 2 of the Vienna Convention. The provision can be seen as a compromise between the two groups of States.

First, according to Article 17 (1) (b) of the Lugano Convention, an agreement conferring jurisdiction fulfils the formal requirements if it is in a form that accords with practices which the parties have established between themselves. This is not provided for in the working of Article 17 of the Brussels Convention. In the light of the case law of the Court of Justice of the European Communities (see Chapter VI), this seems, however, to be the understanding of Article 17 of the Brussels Convention. The working party was of the opinion that this understanding should be explicitly reflected in the text of the Lugano Convention.

Secondly, in international trade or commerce an agreement conferring jurisdiction fulfils the formal requirements if it is in a form that accords with a usage of which the parties are or ought to have been aware and which in such trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned.

Thus, even in international trade or commerce, it is not sufficient that an agreement conferring jurisdiction be in a form which accords with practices (or a usage) in such trade or commerce of which the parties are or ought to have been aware. It is moreover required that the usage shall be, on the one hand, widely known in international trade or commerce and, on the other, regularly observed by parties to contracts of the type involved in the particular trade or commerce concerned.

In particular, having regard to the words "internationale Handelsbräuche" and "usages" which are used in the German and French versions of Article 17 of the Brussels Convention, it seems that there are at least no major differences in substance between the provisions concerned in the two Conventions. In order to ensure a uniform interpretation it was, however, felt by the EFTA States that the present wording of paragraph 1 (c) was necessary in the Lugano Convention.

59. Article 17 of the Brussels Convention has given rise to a considerable number of judgments by the Court of Justice of the European Communities. In this connection, readers are referred to Chapter VI.2, point 12 "Article 17", paragraphs 1 to 12.

However, it should be mentioned in this context that the Court of Justice has ruled that an agreement between the parties with regard to the place of performance, which constitutes a ground of jurisdiction pursuant to Article 5 (1), is sufficient to confer

A1.752

A1.753

jurisdiction without being subject to the formal requirements laid down in Article 17 for prorogation of jurisdiction (judgment of 17 January 1980 in Zelger v. Salinitri, see Chapter VI).

**A1.754**    60. 2. Article 17 (5) was proposed by the EFTA Member States. It provides that in matters relating to contracts of employment an agreement conferring jurisdiction within the meaning of the first paragraph shall have legal force only if it is entered into after the dispute has arisen. The background of this provision is the same as that for Article 5 (1), i.e. the protection of the employee, who from the socioeconomic point of view is regarded as the weaker in the contractual relationship. It seemed desirable that it should not be possible for the protection intended to be given to employees by virtue of Article 5 (1) to be taken away by prorogation agreements entered into before the dispute arose. As in the case of Article 5 (1) this provision applies only to individual employment relationships and not to collective agreements concluded between employers and employees' representatives.

**A1.755**    61. During the Diplomatic Conference, stress was laid on the difference between the Brussels and Lugano Conventions as regards agreements conferring jurisdiction with respect to contracts of employment, and a number of problems were highlighted. The example given was that of an agreement conferring jurisdiction which, at the time, was concluded between parties domiciled in the territory of two States which had ratified the Brussels Convention. Under that Convention, prorogation of jurisdiction by agreement may, as regards a contract of employment, be effected before the dispute arises.

What happens if, at a later stage, one of the parties transfers his domicile to an EFTA Member State? What would be the attitude either of the court in a Community Member State to which a dispute is referred on the basis of that agreement conferring jurisdiction, or of a court in an EFTA Member State to which a dispute is referred despite the agreement?

The question was left open and, although the solutions adopted by the Brussels and the Lugano Conventions are not without their merits, might possibly be resolved in the Convention on the accession [78] of Spain and Portugal to the Brussels Convention by aligning the Brussels Convention on the Lugano Convention.

### (b) Article 18—Submission to jurisdiction

**A1.756**    62. Discrepancies have been noted between the various versions of the Brussels Convention. A number of versions, for example the English and the German ones, provide that the rule whereby the court of the Contracting State has jurisdiction does not apply where appearance was entered "solely" to contest the jurisdiction, which restriction is not included in the French text.

However, no amendment was made to the various texts in view of a judgment given by the Court of Justice to the effect that Article 18 applies under certain conditions where the defendant contests the court's jurisdiction and also makes submissions on the substance of the action (judgment of 24 June 1981 in Elefanten Schuh v. Jacqmain, see Chapter VI).

### Section 7

### Examination as to jurisdiction and admissibility (Articles 19 and 20)

**A1.757**    63. Although these Articles correspond to Articles 19 and 20 of the Brussels Convention, Article 20 requires some comment, given that it is a particularly important provision where the defendant fails to enter an appearance (see Jenard report, page 39).

786      APPENDIX 1—OFFICIAL REPORTS, ETC.

**3. Schlosser Report**

### [71] REPORT ON THE CONVENTION

A1.287    on the Association of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland to the Convention on jurisdiction and the enforcement of judgments in civil and commercial matters and to the Protocol on its interpretation by the Court of Justice

(Signed at Luxembourg, 9 October 1978)

by Professor Dr Peter SCHLOSSER,

*of the Chair of German, international and foreign civil procedure, of the general theory of procedure and of civil law at the University of Munich*

Pursuant to Article 3(2) of the Act of Accession of 22 January 1972 a Council working party, convened as a result of a decision taken by the Committee of Permanent Representatives of the Member States, prepared a draft Convention on the accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland to the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters and to the Protocol of 3 June 1971 on its interpretation by the Court of Justice. This working party was composed of government experts from the nine Member States and representatives from the Commission. The rapporteur, Mr P. Schlosser, Professor of Law at the University of Munich, drafted the explanatory report which was submitted to the governments at the same time as the draft prepared by the experts. The text of this report, which is a commentary on the Convention of Accession signed at Luxembourg on 9 October 1978, is now being published in this issue of the Official Journal.

*INDEX*

A1.288    CHAPTER 1

| | Para. | Page |
|---|---|---|
| Preliminary remarks | 1 | 77 |

CHAPTER 2

| | Para. | Page |
|---|---|---|
| Reasons for the Convention | 4 | 78 |
| A. The law in force in the new Member States | | |
|     1. The United Kingdom | 5 | 78 |
|     2. Ireland | 12 | 79 |
|     3. Denmark | 13 | 79 |
| B. Existing Conventions | 14 | 79 |
| C. General arrangement of the proposed adjustments | 15 | 80 |

: from the choice of law to
ving jurisdiction. Secondly,
Convention, of agreements
nunity or agreements con-
two parties both domiciled
be made for provisions in
hether it was reasonable to
been placed upon it by the
be repeated (see paragraph
tion on a court other than
o be taken into account by



sdiction

n of a connection between
al jurisdiction of the courts
tice of United Kingdom or
the entry into force of the
. This explains the transi-
Accession Convention. The
ision refers to the date on
State in question. For the
see paragraph 11.



side the Community

ites before the courts of a
s obviously nothing in the
themselves competent, if
e onl     uestion is whether
priving Community courts
e exclusive or concurrent.
the conclusion that such
the 1968 Convention does
within the Community is
validity of the agreement
h its own *lex fori*. In so far
y of provisions of foreign
the agreement is found to
968 Convention become

before a court within the
ide the Community, have
. no reason for the Con-
court stipulated by such
t for the Community to
t of such an agreement on

---

57(63); Droz ("Compétence
. 216 *et seq.*, Weser ("Con-
l des decisions") No. 265.

---

jurisdiction is recognized throughout the EEC. The new third sentence of the first paragraph of Article 17 is designed to cater for this. It covers the situation where, despite the fact that both parties are domiciled outside the Community, a court in a Community State ("X") would, were it not for a jurisdiction agreement, have jurisdiction, *e.g.* on the ground that the place of performance lies within that State. If in such a case the parties agree that the courts of another Community State are to have exclusive jurisdiction, that agreement must be observed by the courts of State X, provided the agreement meets the formal requirements of Article 17. Strictly speaking, it is true, this is not a necessary adjustment. Such situations were possible before, in relations between the original Member States of the Community. However, owing to the frequency with which jurisdiction is conferred upon United Kingdom courts in international trade, the problem takes on considerably greater importance with the United Kingdom's accession to the Convention than hitherto.

### 3. Jurisdiction clauses in trusts

178. A trust (see paragraph 111) need not be established by contract. A unilateral legal instrument is sufficient. As the previous version of Article 17 dealt only with "agreements" on jurisdiction, it needed to be expanded. **A1.473**

### 4. The form of agreements on jurisdiction in international trade

179. Some of the first judgments given by the Court of Justice of the European Communities since it was empowered to interpret the 1968 Convention were concerned with the form of jurisdiction clauses incorporated in standardized general conditions of trade.[47] The Court of Justice's interpretation of Article 17 of the 1968 Convention does protect the other party to a contract with anyone using such general conditions of trade from the danger of inadvertently finding himself bound by standard forms of agreement containing jurisdiction clauses without realizing it. However, the Court's [125] interpretation of that Article, which many national courts have also shown a tendency to follow,[45] does not cater adequately for the customs and requirements of international trade. In particular, the requirement that **A1.474**

---

[47] In the case of an orally concluded contract, the requirements of the first paragraph of Article 17 of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters as to form are satisfied only if the vendor's confirmation in writing accompanied by notification of the general conditions of sale has been accepted in writing by the purchaser (Case No. 25/76, [1976] ECR 1851.

The fact that the purchaser does not raise any objections against a confirmation issued unilaterally by the other party does not amount to acceptance on his part of the clause conferring jurisdiction unless the oral agreement comes within the framework of a continuing trading relationship between the parties which is based on the general conditions of one of them, and those conditions contain a clause conferring jurisdiction (Case No. 25/76).

Where a clause conferring jurisdiction is included among the general conditions of sale of one of the parties, printed on the back of a contract, the requirement of a writing under the first paragraph of Article 17 of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters is fulfilled only if the contract signed by both parties contains an express reference to those general conditions (Case No. 24/76 [1976] ECR 1831).

In the case of a contract concluded by reference to earlier offers, which were themselves made with reference to the general conditions of one of the parties including a clause conferring jurisdiction, the requirements of a writing under the first paragraph of Article 17 of the Convention is satisfied only if the reference is express and can therefore be checked by a party exercising reasonable care (Case No. 24/76).

854      APPENDIX 1—OFFICIAL REPORTS, ETC.

the other party to a contract with anyone employing general conditions of trade has to give written confirmation of their inclusion in the contract before any jurisdiction clause in those conditions can be effective is unacceptable in international trade. International trade is heavily dependent on standard conditions which incorporate jurisdiction clauses. Nor are those conditions in many cases unilaterally dictated by one set of interests in the market; they have frequently been negotiated by representatives of the various interests. Owing to the need for calculations based on constantly fluctuating market prices, it has to be possible to conclude contracts swiftly by means of a confirmation of order incorporating sets of conditions. These are the factors behind the relaxation of the formal provisions for international trade in the amended version of Article 17. This is however, as should be clearly emphasized, only a relaxation of the formal requirements. It must be proved that a consensus existed on the inclusion in the contract of the general conditions of trade and the particular provisions, though this is not the place to pass comment on whether questions of consensus other than the matter of form should be decided according to the national laws applicable or to unified EEC principles. Dealing with the form of jurisdiction agreements in a separate second sentence in the first paragraph of Article 17, rather than in passing in the first sentence as hitherto, is designed merely to obviate rather cumbersome wording.

## Section 7

### Examination of own motion

A1.475     Adjustments and further clarification were not necessary.

## Section 8

### "Lis pendens" and related actions[48]

A1.476     180. As regards *lis pendens*, there are two structural differences between the laws of the United Kingdom and Ireland, on the one hand, and the Continental legal systems on the other. However, neither of them necessitated a technical amendment of the 1968 Convention.

### 1. Discretion of the court

A1.477     181. The rules governing *lis pendens* in England and Wales, and to some extent in Scotland, are more flexible than those on the Continent. Basically, it is a question for the court's discretion whether a stay should be granted. The doctrine of *lis pendens* is therefore less fully developed there than in the Continental States. The practice is in a sense an application of the doctrine of *forum conveniens* (see paragraph 77 *et seq.*). Generally a court will in fact grant an application for a stay of proceedings, where the matter in dispute is already pending before another court. Where proceedings are pending abroad, the courts in England and Wales exercise great caution, and if they grant a stay of proceedings at all, they will do so only if the plaintiff in England or Wales is also the plaintiff in the proceedings abroad. Scottish courts take into

---

[48] For further questions in section 8, see paragraphs 22 and 240.

1022    Appendix 1—Official Reports, etc.

[2]

## EXPLANATORY MEMORANDUM*

### Contents

A1.904  1. GENERAL                                                    3

        1.1  Background                                               3
        1.2  Work on revision of the Brussels and Lugano Conventions 3

        2. PROPOSAL FOR A COUNCIL REGULATION                         4

        2.1  Subject-matter                                          4
        2.2  Legal basis                                             4

        3. JUSTIFICATION FOR PROPOSAL IN TERMS OF
           PROPORTIONALITY AND SUBSIDIARITY PRINCIPLES               5

        4. INDIVIDUAL PROVISIONS                                     6

        4.1  General objective                                       6
        4.2  Continuity                                              6
        4.3  Adaptations                                             7
        4.4  Comparative table                                       9
        4.5  Individual Articles                                    12

[3]

## 1. GENERAL

### 1.1. Background

A1.905   By Article 2 of the Treaty on European Union, the Member States set themselves the objective of maintaining and developing the Union as an area of freedom, security and justice, in which the free movement of persons is assured and litigants can assert their rights, enjoying facilities equivalent to those they enjoy in the courts of their own country.

To establish such an area the Community is to adopt, among others, the measures relating to judicial cooperation in civil matters needed for the sound operation of the internal market. Reinforcement of judicial cooperation in civil matters, which many believe has developed too slowly, represents a fundamental stage in the creation of a European judicial area which will bring tangible benefits for every Union citizen.[1]

The sound operation of the internal market creates a need to create clear rules on jurisdiction and to improve and speed up the recognition and enforcement of judgments in civil and commercial matters. To this end, rapid enforcement procedures and legal certainty as regards jurisdiction are of the essence at a time when the

---

\* For the legislative history of Regulation 44/2001, see Vol.I, para.11.009.

[1] Action Plan of the Council and the Commission on how best to implement the provisions of the Treaty of Amsterdam on an area of freedom, security and justice, point 16: OJ C 19, 23.1.1999.

increasing frequen
ferent Member St

### 1.2. Wor

On 27 Septembe
munity concluded
civil and commer
(formerly 220(4))
Convention by
1971. The Conv
have been exten
vention was also
the Member Sta
tion—the Lugar
 At its meetir
working party o
States parties t
undertake wor
The Commissio
Convention or
proposal has b
Opinion, and
 Work conti
Commission t
on 1 May 199
of the work d

The purpose
internationa
recognition
replaces and
view *inter al*
The propos
revision neg
incorporate
needed bet
gation. It is
have conse
particular
The effe
the new ru
The Bruss

---

[2] The co
Austria, Fi
[3] OJ L 3
[4] OJ C 3

1030   Appendix 1—Official Reports, etc.

### Article 8

This Article is unchanged. But in matters of reinsurance it must be interpreted as not applying in relations between insurers or in relations between insurers and reinsurers. There is no particular need for weaker-party protection. On the other hand the Article does apply actions brought by policy-holders against reinsurers.

### Article 9

The right of the applicant to sue in his own courts, originally conferred by this Article solely on insurance policy-holders (first paragraph, point (2)) is now extended to the insured person and the beneficiary where they are the applicant. The objective of protecting the weaker party in the case, which warrants an exception from the principle that jurisdiction lies in the defendant's domicile in favour of the applicant's domicile, also applies to applicants who are insured persons or beneficiary, who are likewise in a weak position in relation to the insurer.

### Article 11

As in Article 6, Article V of the Protocol applicable to Austria and Germany, where the procedural law makes no provision for claims for guarantees or intervention but only "*litis denuntiatio*" (third-party notices).

### Articles 13 and 14

The derogation provided for by paragraph 5 of Article 13 from the strict rules governing clauses conferring jurisdiction in relation to insurance is extended to all "large risks" that are or will be defined in Article 5(d) of Council Directive 73/239/EEC of 24 July 1973 on the coordination of laws, regulations and administrative provisions relating to the taking-up and pursuit of the business of direct insurance other than life assurance, as amended by Council Directives 88/357/EEC and 90/618/EEC, and to ancillary risks. Subsequent amendments to Directive 73/239/EEC will affect the scope of the concept of large risks to which Article 14 applies.

### Section 4

### Jurisdiction over consumer contracts

**A1.920**   The jurisdiction conferred by this Section is substituted for that conferred by Sections 1 and 2.

### Article 15

Article 15 confirms the orientation reached in the Council concerning the need to protect consumers, as the weaker parties to a contract. The contracts traditionally covered by this Article—sale of goods on instalment credit terms and contracts for loans repayable by instalments other and similar credit arrangements to finance the sale of goods—automatically entitle the consumer to sue in the courts for his **[16]** domicile, and in this respect there is no change to the content of Article 13 of the

COURT OF JUSTICE
OF THE
EUROPEAN COMMUNITIES

# Reports

of

Cases before the Court



1976

PART II

LUXEMBOURG

1830

its tender was far higher than that which the applicant had itself agreed.

However let me point out that this is an area in which the administration has extensive discretionary powers, and that it cannot be accepted that there has been a misuse of powers on the basis of mere presumptions.

First of all, the fact that in the past Pellegrini has performed the cleaning services to the satisfaction of the administration and has indisputably acquired experience in that connexion did not confer upon it any vested right to a fresh contract on the basis of an invitation to tender. It was in competition with other undertakings and the Commission had to take its decision in consideration of the technical and economic guarantees as well as guarantees of professional competence put forward by each of the tenderers.

The other undertakings were also able to put their own experience in evidence and to present references based on their previous activities.

Secondly, as I have already said, the procedure for invitation to tenders leaves the administration full discretion to assess the various factors in the tenders submitted. In comparing these offers the factor of performance is not a decisive factor.

At all events the Commission's choice fell upon an applicant the fact that the

Finally, I am of the opinion that the application should be dismissed and that the applicant should be ordered to bear the costs.

undertaking asking a higher price does not, of itself, disclose any misuse of powers. Indeed the Commission could lawfully come to its decision, as it states it did, on the basis of the technical and manpower resources of Flexon, which, the Commission tells us, was, in relation to other competitors, 'of fully satisfactory commercial and industrial size', which was capable of ensuring the training of specialist staff, and whose references guaranteed a high standard of performance.

Furthermore, it appears that the said undertaking undertook to pay its staff appreciably higher wages than those offered by the applicant and this consideration was certainly not without effect upon the Commission's choice, because of the problem posed by the comparison between the level of pay of the employees and the level of the undertaking and the level of pay of the cleaning local staff employed in the establishment at Ispra.

For the Court to find that there has been a misuse of powers, the facts supporting the reasons given for the Commission's choice would have to be patently incorrect, and in my view this has not been shown. I also think that it is not open to the Court to substitute its own assessment for that of the institution.

Therefore, the misuse of powers which, in the applicant's submission, consisted in giving Flexon an unfair advantage is not proved.

# JUDGMENT OF THE COURT
## 14 DECEMBER 1976 [1]

Estasis Salotti di Colzani Aimo e Gianmario Colzani
v RÜWA Polstereimaschinen GmbH
(preliminary ruling requested by the Bundesgerichtshof)

'Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Article 17 (jurisdiction by consent)'

## Case 24/76

### Summary

1. *Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial matters — Validity — Manner in which applied — Strict interpretation — Consensus between the parties*
(Convention of 27 September 1968, Article 17)

2. *Convention of 27 September 1968 — Courts having jurisdiction — Jurisdiction by consent — In writing — Contract signed by the parties — General conditions of sale printed on the back — Clause conferring jurisdiction — Necessity for an express reference to those conditions in the contract*
(Convention of 27 September 1968, Article 17)

3. *Convention of 27 September 1968 — Courts having jurisdiction — Jurisdiction by consent — In writing — Contract — Entered into by reference to prior offers — Reference to general conditions of sale — Clause conferring jurisdiction — Necessity for an express reference*
(Convention of 27 September 1968, Article 17)

1. The way in which Article 17 of the Convention of 27 September 1968 is to be applied must be interpreted in the light of the effect of the conferment of jurisdiction by consent, which is to exclude both the jurisdiction determined by the general principle laid down in Article 2 and the special jurisdictions provided for in Articles 5 and 6 of that Convention. In view of the consequences that such an option may have on the position of the parties to the action, the requirements set out in Article 17 governing the validity of clauses conferring jurisdiction must be strictly construed. By making the validity of clauses conferring jurisdiction subject to the existence of an 'agreement' between the parties, Article 17 imposes on the court before which the matter is brought the duty of examining, first, whether the clause conferring

1 — Language of the Case: German.

1831

In Case 24/76

Reference to the Court for a preliminary ruling pursuant to Article 1 of the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters by the Bundesgerichtshof (Federal Court of Justice) in the action pending before that court between

Estasis Salotti di Colzani Aimo e Gianmario Colzani, having its registered office at Meda (Milan),

and

RÜWA Polstereimaschinen GmbH, having its registered office at Cologne,

on the interpretation of the first paragraph of Article 17 of the Convention of 27 September 1968,

THE COURT

composed of: H. Kutscher, President, A. M. Donner and P. Pescatore, Presidents of Chambers, J. Mertens de Wilmars, M. Sørensen, Lord Mackenzie Stuart and A. O'Keeffe, Judges,

Advocate-General: F. Capotorti
Registrar: A. Van Houtte

gives the following

jurisdiction upon it was in fact the subject of a consensus between the parties, which must be clearly and precisely demonstrated, for the purpose of the formal requirements imposed by Article 17 is to ensure that the consensus between the parties is in fact established.

2. In the case of a clause conferring jurisdiction, which is included among the general conditions of sale of one of the parties, printed on the back of the contract, the requirement of a writing under the first paragraph of Article 17 of the Convention of 27 September 1968 is only fulfilled if the contract signed by the two parties includes an express reference to those general conditions.

3. In the case of a contract concluded by reference to earlier offers, which were themselves made with reference to the general conditions of one of the parties including a clause conferring jurisdiction, the requirement of a writing under the first paragraph of Article 17 of the Convention of 27 September 1968 is satisfied only if the reference is express and can therefore be checked by a party exercising reasonable care.

# JUDGMENT

## Facts

I — Facts and written procedure

By letter of 18 September 1969 the undertaking RÜWA Polstereimaschinen GmbH (hereinafter referred to as: 'RÜWA'), having its registered office at Cologne, sent to the undertaking Estasis Salotti di Colzani Aimo e Gianmario Colzani (hereinafter referred to as 'Colzani') seven written offers, dated 11 September 1969, relating to the supply of machines for the manufacture of upholstered furniture.

These offers were written either in German or in Italian. They all begin with the sentence:

'... subject to the general conditions of sale No. 6904 overleaf ... I offer to supply you as follows:'.

RÜWA's general conditions of sale No 6904 state at Article 13:

1. The place of performance in respect of any claims by either party arising out of this agreement or by reason of its conclusion is Cologne.

2. The same condition applies to jurisdiction and also in the event of actions in relation to bills of exchange. I am at all times entitled to elect to commence proceedings at the buyer's place of establishment.

The facts of the case, the procedure and the observations submitted pursuant to Article 20 of the Protocol of 3 June 1971 concerning the interpretation by the Court of Justice of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters may be summarized as follows:

3. The law of the Federal Republic of Germany applies to the whole of the legal relations between myself and my customers including the creation thereof.'

On 31 October 1969, RÜWA and Colzani entered into a contract in Milan. It was in German and was written on commercial paper bearing RÜWA's letterhead, on the back of which were printed RÜWA's general conditions of sale were printed. By that contract Colzani gave RÜWA the order to supply 'the machines offered for sale pursuant to the letter of 18 September 1969'.

The contract was not performed, Colzani having refused to take delivery of the machines.

On 18 January 1973, RÜWA brought an action before the Landgericht (Regional Court), Cologne, for damages against Colzani. In particular, RÜWA claimed that Colzani should be ordered to pay it the sum of DM 100 000 with interest thereon at 5% per annum from 1 January 1972.

In its judgment of 9 April 1974, the Landgericht, Cologne, declared that it had no jurisdiction. It held that the parties had not validly agreed that the courts of Cologne were to have jurisdiction.

On 22 May 1974 RÜWA lodged an appeal against that judgment with the Oberlandesgericht (Higher Regional Court), Cologne.

The latter, in a judgment of 18 November 1974, overruled the judgment of the Landgericht. It declared that the Landgericht had jurisdiction and referred the case back to it.

Colzani appealed to the Bundesgerichtshof (Federal Court of Justice) on a point of law. The VIIIth civil Senate of the Bundesgerichtshof took the view that the case raised questions of interpretation of the first paragraph of Article 17 of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, which provides:

If the parties, one or more of whom is domiciled in a Contracting State, have, by agreement in writing or by an oral agreement confirmed in writing, agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connexion with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.

Accordingly, by order of 18 February 1976 it decided, pursuant to Article 2 (1) and Article 3 (1) of the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 to suspend judgment until the Court of Justice has given a preliminary ruling on the following questions:

1. Does a clause conferring jurisdiction, which is included among general conditions of sale printed on the back of a contract signed by both parties, fulfil the requirement of a writing under the first paragraph of Article 17 of the Convention?

2. Does the requirement of a writing under the first paragraph of Article 17 of the Convention fulfilled if the parties expressly refer in the contract to a prior offer in writing in which reference was made to general conditions of sale including a clause conferring jurisdiction and to which these conditions were annexed?

The order of the Bundesgerichtshof was received at the Court Registry on 11 March 1976.

---

Pursuant to Article 5 (1) of the Protocol of 3 June 1971 and Article 20 of the Statute of the Court of Justice of the EEC written observations were submitted on 17 May 1976 by the Commission of the European Communities, on 25 May by Aimo e Gianmario Colzani, and on 24 May by the Government of the Federal Republic of Germany, and on 1 June 1976 by the Government of the Italian Republic.

Upon hearing the report of the Judge-Rapporteur and the views of the Advocate-General, the Court decided to open the oral procedure without preparatory inquiry.

II — Written observations submitted to the Court

The *undertaking Estasis Salotti* Colzani *Aimo e Gianmario Colzani*, appellant in the main action, remits the Court of the origins of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters. It says that the purpose of the Convention is to bring a principle of equality of treatment of judgments in free circulation. It is the rights of nationals of all the Member States also intended to protect the rights of the defendant in proceedings before the State where judgment must be delivered. Article 17 of the Convention contains a uniform substantive rule as to jurisdiction is to be ascertained. It should be applied in a uniform way. Its content is identical to that of the rule contained in the Convention between Germany and Belgium concerning enforcement, which itself is based on Article 2 of the Hague Convention of 15 April 1958 on jurisdiction of the selected forum.

███████████████████████████████████
███████████████████████████████████

The mere fact that a clause conferring jurisdiction has been included among general conditions of sale and that the general conditions printed on the back of a document signed by one of the parties...

---

The second question should therefore receive the following reply:

Neither is the requirement of a writing laid down by the first paragraph of Article 17 of the Convention fulfilled where the parties expressly refer in the text of the contract to a prior offer in writing in which reference was made to general conditions of sale including a clause conferring jurisdiction and to which these conditions of sale were annexed.

The *Government of the Federal Republic of Germany* takes the view that the first task of the Court of Justice is to decide whether the requirements as to form set out in the first paragraph of Article 17 of the Convention of 1968 must be interpreted in a uniform way for all the States which signed the Convention, or whether the Convention makes reference to the national law of the Contracting State for the determination of the meaning and content of the requirement of a writing in a particular case.

The purpose of Article 17 of the Convention is to ensure legal certainty. To this end, express provision must be made as to the form which the agreement conferring jurisdiction must take, without however, lapsing into excessive formalism, which would be irreconcilable with commercial practice. Accordingly, Article 17 should, as regards the form of agreements conferring jurisdiction, be understood as a uniform rule. National law cannot determine whether, in a particular case, there is or is not an agreement in writing. Considerable differences between the national laws exist on points of detail. The fact that in certain circumstances a consensus *ad idem* between the parties has arisen may depend on the given national law does not prevent the consideration of questions as to form without reference to national law. On this point it should be noted that the wording of Article 17 of the Convention is close to that of the

first paragraph of Article 2 of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

Speaking generally, in interpreting the Convention, it is necessary, in order that it may be applied in a uniform way throughout the Community, to attribute to arrive at a uniform interpretation, which does not refer to national law, whenever reference to national law is absolutely necessary. Moreover, the provision does not contain any clause [...] be applied here.

Therefore, notwithstanding the absence of a specific definition of a writing analogous to the definition contained in Articles 2 (2) of the United Nations Convention of 10 June 1958, the requirements as to form laid down by the first paragraph of Article 17 of the Convention should, in all material particulars, be interpreted in a uniform way for all the Contracting States.

According to the second paragraph, Article 1 of the Protocol annexed to the Convention, the effects of an agreement conferring jurisdiction have to be expressly and specifically agreed on with respect to persons domiciled in Luxembourg. Accordingly, as regards Article 17 of the Convention, a reference when the written agreement refers to general conditions of sale containing a clause conferring jurisdiction and where those conditions are printed on the agreement.

In regard to the first question, the Court is really being asked whether the reference to the general conditions of sale containing a clause conferring jurisdiction must be in a writing. Written agreements must show clearly that the parties intend that the general conditions of sale and the clause

[...middle of page obscured by ink smear...]

conferring jurisdiction contained therein or form part of the contract. The mere fact that the general conditions of sale contain a clause conferring jurisdiction [...] jurisdiction were reproduced on the back of the agreement expressly concluded between the parties would not suffice, in view of the preventive function of the requirement of a writing. The decisive question is rather whether there is any evidence that the agreement made between the parties also covers in general conditions of sale joined in the Convention does not contain any clause conferring jurisdiction appearing on the back.

Contrary to certain national provisions concerning written form, the first paragraph of Article 17 does not require the signature of both parties must [...] does it require that every written agreement between them must be contained in a single document. [...] therefore the parties can add to what is agreed between them by reference to another document. At least in circumstances where the document to which reference is made itself expressly refers to the general conditions of sale signed to it, and where those conditions contain a clause conferring jurisdiction, a reference to another document known to both parties, within the meaning of the Court, must be considered sufficient. This is so a priori when the general conditions of sale to which reference is made in the contract concluded between the parties.

Accordingly, the two questions put by the Bundesgerichtshof should be answered as follows:

A clause conferring jurisdiction contained in the general conditions of sale printed on the back of a contract signed by both parties fulfils the requirement of a writing under the first paragraph of Article 17 of the Convention when the parties have made a general, clear reference to those general conditions of sale.

The requirement of a writing under the first paragraph of Article 17 of the Convention is also fulfilled if the parties expressly refer in the contract to an offer in writing in which reference was made to general conditions of sale including an agreement conferring jurisdiction and to which these conditions of business were annexed.

The *Government of the Italian Republic* is of the opinion that, for the purpose of answering the questions referred, some useful information may be gleaned from the criteria adopted in this field by laws of the various Member States. Nevertheless, the surest way to a correct interpretation of a provision is an understanding of the rule on which it is based.

In that it allows the interested parties, in certain circumstances, to agree that a court or the courts of a Member State shall have jurisdiction to settle any disputes which have arisen or which may arise in connexion with a particular legal relationship, and in requiring that the said agreement conferring jurisdiction shall be an agreement in writing, or an oral agreement confirmed in writing, the first paragraph of Article 17 of the Convention of 1968 is intended to ensure that, by means of the intended form, the contracting parties are acting in full knowledge of the facts, especially in relation to the party who accepts the stipulation of the other party concerning jurisdiction which that court shall have jurisdiction to

1838

settle any dispute. The requirement of a writing arises not only from the need for evidence, but also and primarily from the deliberate intention to make certain that the contracting parties have specifically and knowingly stipulated the clause whereby the normal rules of jurisdiction are waived.

The main action makes it clear that it is necessary to prevent the party who has laid down the general conditions of the contract in advance, and in particular the clause conferring jurisdiction, from being able to abuse the good faith of the other contracting party, who is generally weaker, by a general reference to clauses of which the latter may not actually have had knowledge. Such actual knowledge can only be guaranteed by requiring that the clause whereby the normal rules of jurisdiction are waived is expressed expressly and specifically to clauses waiving the normal rules of jurisdiction. In the case of contracts printed in advance by the other contracting party, has actual knowledge of the clauses which might be disadvantageous to him at a later stage, such as the clause waiving the normal rules of jurisdiction. In the case of general conditions stipulated in advance by one of the interested parties alone, the written form required by the first paragraph of Article 17 should be understood as the express and specific approval of the clause waiving the normal rules of jurisdiction.

Notwithstanding the above, specific approval of such a clause is not necessary when the general conditions are stipulated in advance by a public authority, that is to say by a body organically attuned to the dictates of the public good, of impartiality and of justice, which are inherent in its nature.

Therefore the two questions set out in the order making the reference should be answered in the negative. It should be answered in the negative, that the normal rules of first jurisdiction, which is allowed by the first paragraph of Article

17 of the Convention of 27 September 1968, it is to be considered in the provision in favour of Luxembourg in the second paragraph of Article 1 of the Protocol annexed to the Convention.

... conditions stipulated in advance by ... of the interested parties alone, subject to the one condition that it must be specifically approved in writing by the other contracting party. Secondly, it should be stated that the ... circumstance in which this special approval is not required is where general conditions are stipulated in advance by a public authority.

*The Commission of the European Communities* points out that there are two purposes behind Article 17 of the Convention of 27 September 1968 ...

III — Oral procedure

The undertaking, Estasis Salotti di Colzani Aimo e Gianmario Colzani, the appellant in the main action, represented by Giuseppe Celona, Advocate at Milan, and the Commission of the European Communities, represented by its Legal Adviser, Rolf Wägenbaur, submitted oral observations at the hearing on 13 October 1976. Colzani stressed the importance of the existence of a real agreement between the parties as a necessary precondition to any agreement conferring jurisdiction for the purposes of Article 17 of the Convention of 27 September 1968.

The *Advocate General* delivered his opinion at the hearing on 17 November 1976.

Law

... an order of 18 February 1976, received at the Court Registry on 11 March 1976, the Bundesgerichtshof referred to the Court of Justice pursuant to the Protocol of 3 June 1971 on the Interpretation of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (hereinafter referred to as 'the Convention', certain questions concerning the interpretation of Article 17 of the said Convention.

... appears from the order making the reference that at the present stage the action, which was brought before the Bundesgerichtshof by way of appeal on a point of law, concerns the jurisdiction of the Landgericht Köln to hear an action brought by an undertaking established within the area of jurisdiction of that court against an Italian undertaking whose registered office is at Meda (Milan) for failure to perform a contract relating to the supply by the German undertaking to the Italian undertaking of machines for the manufacture of upholstered furniture.

1839

3. It appears from the facts stated in the order making the reference that delivery in question had been agreed in a written contract, signed at Milan, on commercial paper bearing the letter-head of the German undertaking, on the reverse of which the general conditions of sale of that undertaking were printed.

Those general conditions include a clause conferring jurisdiction on the courts of Cologne to settle any dispute which might arise between the parties concerning the contract.

Although it is true that the text of the contract does not expressly mention the said general conditions, it refers to previous offers made by the German undertaking, which contained an express reference to the same general conditions, which were also printed on the reverse of the papers in question.

4. In a judgment delivered on 9 April 1974, the Landgericht Köln, before which the matter was brought by the German undertaking, declared that it had no jurisdiction to hear the dispute.

It held that the clause conferring jurisdiction had not validly been agreed between the parties, having regard to the provisions of Italian law, to which, in the view of that court, the contract between the parties is subject.

That judgment was reversed by a judgment of 18 November 1974 of the Oberlandesgericht Köln which, taking the view that the contract in question is subject to the provisions of German law, overruled the judgment of the lower court, declared that the Landgericht had jurisdiction and remitted the case to it.

5. The Italian undertaking appealed on a point of law to the Bundesgerichtshof and that court is of the opinion that the question at issue must be resolved on the basis of Article 17 of the Convention.

In this connexion, the Bundesgerichtshof has referred two questions on the interpretation of the first paragraph of that article.

On the interpretation of Article 17 of the Convention in general

6. The first paragraph of Article 17 of the Convention provides: 'If the parties, one or more of whom is domiciled in a Contracting State, have, by agreement in writing or by an oral agreement confirmed in writing, agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any

disputes which have arisen or which may arise in connexion with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.'

...e way in which that provision is to be applied must be interpreted in the ...t of the effect of the conferment of jurisdiction by consent, which is to ...clude both the jurisdiction determined by the general principle laid down ... Article 2 and the special jurisdictions provided for in Articles 5 and 6 of ... Convention.

... view of the consequences that such an option may have on the position of ...t parties to the action, the requirements set out in Article 17 governing the ...validity of clauses conferring jurisdiction must be strictly construed.

...y making such validity subject to the existence of an 'agreement' between ...e parties, Article 17 imposes on the court before which the matter is ...rought the duty of examining, first, whether the clause conferring ...jurisdiction upon it was in fact the subject of a consensus between the parties, ...which must be clearly and precisely demonstrated.

...e purpose of the formal requirements imposed by Article 17 is to ensure ...at the consensus between the parties is in fact established.

...e questions referred to the Court by the Bundesgerichtshof must be ...amined in the light of these considerations.

...n the question referred by the Bundesgerichtshof

...e first question asks whether a clause conferring jurisdiction, which is ...cluded among general conditions of sale printed on the back of a contract ...gned by both parties, fulfils the requirement of a writing under the first ...paragraph of Article 17 of the Convention.

...aking into account what has been said above, it should be stated that the ...ere fact that a clause conferring jurisdiction is printed among the general ...conditions of one of the parties on the reverse of a contract drawn up on the ...commercial paper of that party does not of itself satisfy the requirements of ...Article 17, since no guarantee is thereby given that the other party has really ...consented to the clause waiving the normal rules of jurisdiction.

...t is otherwise in the case where the text of the contract signed by both ...parties itself contains an express reference to general conditions including a ...clause conferring jurisdiction.

10    Thus it should be answered that where a clause conferring jurisdiction is included among the general conditions of sale of one of the parties, printed on the back of a contract, the requirement of a writing under the first paragraph of Article 17 of the Convention is fulfilled only if the contract signed by both parties contains an express reference to those general conditions.

11    The *second question* asks whether the requirement of a writing under the first paragraph of Article 17 of the Convention is fulfilled if the parties expressly refer in the contract to a prior offer in writing in which reference was made to general conditions of sale including a clause conferring jurisdiction.

12    In principle, the requirement of Article 17 is fulfilled if the parties have referred in the text of their contract to an offer in which reference was expressly made to general conditions including a clause conferring jurisdiction.

13    This view of the matter, however, is valid only in the case of an express reference, which can be checked by a party exercising reasonable care, and only if it is established that the general conditions including the clause conferring jurisdiction have in fact been communicated to the other contracting party with the offer to which reference is made.

14    But the requirement of a writing in Article 17 would not be fulfilled in the case of indirect or implied references to earlier correspondence, for that would not yield any certainty that the clause conferring jurisdiction was in fact part of the subject-matter of the contract properly so-called.

15    Thus it should be answered that in the case of a contract concluded by reference to earlier offers, which were themselves made with reference to the general conditions of one of the parties including a clause conferring jurisdiction, the requirement of a writing under the first paragraph of Article 17 of the Convention is satisfied only if the reference is express and can therefore be checked by a party exercising reasonable care.

Costs

The costs incurred by the Government of the Federal Republic of Germany, the Government of the Italian Republic and the Commission of the European

1842

---

Communities, which have submitted observations to the Court, are not recoverable. As these proceedings are, in so far as the parties to the main action are concerned, in the nature of a step in the action pending before the Bundesgerichtshof, the decision on costs is a matter for that court.

On those grounds,

THE COURT

in answer to the questions referred to it by the Bundesgerichtshof by order of 9 February 1976, hereby rules:

- Where a clause conferring jurisdiction is included among the general conditions of sale of one of the parties, printed on the back of a contract, the requirement of a writing under the first paragraph of Article 17 of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters is fulfilled only if the contract signed by both parties contains an express reference to those general conditions.

- In the case of a contract concluded by reference to earlier offers, which were themselves made with reference to the general conditions of one of the parties including a clause conferring jurisdiction, the requirement of a writing under the first paragraph of Article 17 of the Convention is satisfied only if the reference is express and can therefore be checked by a party exercising reasonable care.

Kutscher    Donner    Pescatore

Mertens de Wilmars    Sørensen    Mackenzie Stuart    O'Keeffe

Van Houte    H. Kutscher
Registrar    President

Delivered in open court in Luxembourg on 14 December 1976.

1843

1844

## OPINION OF MR ADVOCATE-GENERAL CAPOTORTI
## DELIVERED ON 17 NOVEMBER 1976 [1]

*Mr President,*
*Members of the Court,*

1. In the present case the Court is called upon to resolve a question of interpretation of Article 17 of the Brussels Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters. I take the liberty of reminding the Court that the question is concerned with the article governing jurisdiction by consent: it covers the situation when 'the parties, one or more of whom is domiciled in a Contracting State, have ... agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connexion with a particular legal relationship, on the court or courts designated provided that the agreement between the parties takes the form of an agreement confirmed in writing or ... an oral agreement confirmed in writing'. The meaning of this formal requirement is in fact the subject of the questions referred to the Court by the Bundesgerichtshof of the Federal Republic of Germany.

The parties in the main action, the German company RUWA, as vendor, and the Italian company Estasis Saloti, as purchaser, had on 31 October 1969 concluded a sales contract in Milan on the vendor's letter-head, on the back of which were printed the general conditions of sale laid down by the company. There was no mention in the contract of those conditions and no reference to them; it stated that the purchaser was placing an order with the vendor for the 'machines offered, in accordance with your letter of 18 September 1967'. In fact, the letter of 18

September was sent with seven offers, dated 11 September, each of which referred to the general conditions of sale printed at the back of the letter, but there was no corresponding reference in the letter.

Subsequently the purchaser refused to take delivery of the machines and the vendor brought proceedings against it before the German court designated in the jurisdiction clause contained in the general conditions of sale. The court, applying Articles 1341 and 1342 of the Italian civil code, which require specific acceptance in writing of printed clauses excluding jurisdiction, upheld the objection of lack of jurisdiction raised by the purchaser. The appeal court held that it was bound by paragraph 38 of the German code of civil procedure in determining the validity or otherwise of the assignment of jurisdiction relied upon by the vendor, and recognized the German court as having jurisdiction in the matter.

In further appeal proceedings, the Bundesgerichtshof referred the following questions for a ruling by the Court of Justice pursuant to Article 3 of the Protocol of 3 June 1971 on the interpretation of the Convention of 27 September 1968.

(1) Does an agreement assigning jurisdiction, which is included among general conditions of sale printed on the back of a contract signed by both parties, fulfil the requirement of writing under the first paragraph of Article 17 of the Convention?

(2) In particular, is the requirement of writing under the first paragraph of Article 17 of the Convention fulfilled if the parties expressly refer in the

[heavily obscured text]

## The general question of the choice between an independent interpretation of the Convention and reference to the substantive law applicable in accordance with the private international law of the court before which the matter is brought — to which this question was drawn by the Court of Justice in its judgment in *Industrie Tessili v Dunlop* — also arises in the context of the agreement providing for the assignment of jurisdiction.

[heavily obscured text]

## ESTASIS SALOTTI v RUWA

of the form to be observed, for the agreement of which the clause forms part. In other words, Article 17 does not make it plain that lay down conditions required to produce the procedural effect of assigning jurisdiction. In the second place, it is clearly important that there should be uniform treatment, in all the Member States, of private agreements assigning jurisdiction; this purpose would not be served if reference were made to this or that substantive law applicable to the form of instruments according to the private international law of each Member State. For this reason Article 17 of the Brussels Convention must be interpreted independently of national law.

3. The wording of Article 17 of the Brussels Convention closely resembles that of Article 3 (2) of the Germano-Belgian Convention of 30 June 1958, which came into force on 27 January 1961, an article which was in turn based on the rule in Article 2 of the Hague Convention of 15 April 1958 on the jurisdiction of the selected forum in international sales of goods.

As emphasized in the Jenard report on the Brussels Convention, insistence on writing was intended to ensure legal certainty. This means that what was required was clear proof that the parties were *ad idem* on the clause specifying the court having jurisdiction so as to avoid those uncertainties and conflicting views on the existence and terms of the contract in question which might arise if the principle were accepted that there should be no requirement whatever as to form.

Again according to the Jenard report, the provision in Article 17 ought to make it possible to enforce those requirements without creating such unnecessary formalities as to impede business practices. In fact, the authors of the Convention tried to ensure that, in the interests of trade, legal formalities should be rapid and flexible in operation, especially by enabling the contracting

1845

1846

parties to make a valid, even though oral, agreement on the assignment of jurisdiction, provided that it is 'confirmed in writing.' The procedure for confirmation is not specified in clear terms and may make interpretation somewhat difficult, especially when there is confirmation by only one of the parties but this goes beyond the ambit of the present case. I shall have occasion to return to this point, in my opinion in Case 25/76.

The central issue raised by the present case is a different one; it is that of clauses for jurisdiction by consent drawn up in advance, in writing, to its own benefit by one of the contracting parties, and in most cases pre-printed on blanks or forms used for contracts or offers of contracts. We know that, in some cases, to avoid the possibility of those clauses being accepted by the other party without his being fully aware of the extent of his commitment, national regulations prescribe what might be called more substantial requirements as to form: not only must there be writing, a requirement which is obviously fulfilled when the clause has been drawn up, in advance, by a specified party in writing, but also a specified acceptance in writing. The Convention does not contain a provision of this kind. Moreover, the reservation laying down an agreement conferring jurisdiction shall be valid with respect to a person domiciled in that State only if that person has expressly and specifically so agreed (second paragraph of Article 1 of the Protocol annexed to the Convention) shows that specific acceptance in writing is not necessarily required. This, again, is probably the result of anxiety not to obstruct business practice with requirements of form which might appear unnecessarily restrictive. But the Jenard report, quoting the Germano-Belgian Convention of 1958, contains a very significant reference to this subject, in a sentence stating that the object is to

'render ineffective clauses in contracts which are liable to escape notice'. And it adds: 'Account will, therefore, be taken of such clauses only when they are subject of an agreement, which assumes the parties to be ad idem. According to the passage on printed matter, clauses which appear on invoices used for correspondence or invoices which have not been accepted by the party against whom they are to be applied will be of no effect.

There can be no doubt that, since they refer to 'clauses which are liable to escape notice' the passages quoted refer to the clauses in advance by implication, to clauses pre-determined by one of the parties.

In my opinion, the principle embodied in the Jenard report can be described as follows, although the contracting party who did not participate in laying down the clauses in advance has the opportunity to acquaint himself with them (by reading, for example, what is printed at the back of a form), this does not suffice; there must be proof of his consensus, that the parties are ad idem, merely knowing or being in a position to know the clauses which the other party has drafted for his own benefit. I have no doubt that this principle is a fair one: not only accords with the general principle, on which Article 17 is based, that the weaker party should be protected contract, then in order to prevent the purchaser from having that clause set up against him without his being aware of it at the time when the contract is signed and, accordingly, to ensure that the

In practice, this possibility is especially likely to exist where the pre-determined clauses are not contained in the text of the contract; I have already quoted the example which, incidentally, applies in the present case, of clauses printed on the back of the sheet on which the contract is written. In a case of that kind the contract might contain a reference to the clauses but use of this technique creates further difficulty, and reference no attempt to give here

In the light of the general considerations set out above, I can now consider the two questions submitted to the Bundesgerichtshof.

...

It is not possible to state with certainty whether an indirect reference to an assignment clause fulfils or does not fulfil the requirements of Article 17. It is a question for determination in each individual case whether the reference is made in sufficiently clear terms and is such a way as to meet objectively the requirement of certainty which the rule in question is intended to enforce.

In order, therefore, that the question put by the Bundesgerichtshof may be answered correctly, it is necessary to go more closely into the circumstances in which its question is based.

The letter of 18 September 1969, which accompanied the seven offers of sale and which referred to in the contract of sale, the following 31 October, did not in fact include any reference to the general conditions of sale which appeared in the back of the individual offers but merely

1847

referred to the offers. These in turn referred to at the back of each offer. Beginning, therefore, with the obligations undertaken, there is a series of three references; by the letter to the offers of sale, and by the offer to the general conditions of sale. And it must be borne in mind that the assignment clause was only one of the general conditions, that is to say, it was not particularly prominent.

Can such an indirect reference be regarded as sufficient to satisfy the requirements of form laid down in the first paragraph of Article 17?

If the point were to be decided by applying the municipal law of the States which subscribed to the Convention the answer might differ according to the national legal system involved. There can be no doubt that the assignment would not have been validly effected under Italian law because Article 1341, quoted above, of the Civil Code lays down that the general conditions of contract determined in advance by one of the parties cannot be set up against the other party unless it is the subject of a specific agreement in writing. It seems likely that the situation would be the same under French law as under Italian law. In fact, Article 48 of the new Code of Civil Procedure, which came into force on 1 January 1976, provides that any clause derogating from the rules of territorial jurisdiction shall be deemed not to be in writing unless it has been the subject of agreement between persons who have all

contracted in their capacity as traders and [...] unless it has been set out in *very d*[...] *terms* in the obligations undertaken[...] the party against whom it is be[...] invoked.

On the other hand, the position German law may enable the assignm[ent] clause to be invoked in pursuance [...] paragraph 38 of the Code of Ci[vil] Procedure, as interpreted in the prese[nt] case by the Oberlandesgericht K[...] whose decision is being contested [...] proceedings before the court whi[ch] submitted the present questions.

I do not propose to comment on th[...] question in respect of cases in which [the] contract of sale is entered into in th[...] context of continuous busin[ess] transactions between two undertaking[s] in the scope of which the application [of] a clause assigning jurisdiction [...] customary; this does not appear to app[ly] in the present case. In my view, [the] method of reference so complex and b[y] its nature, generally so indirect as th[...] revealed by the circumstances underlying the question referred by the Bundesgerichtshof cannot be regarded a[s] sufficient to meet the requirements o[f] form laid down in the first paragraph o[f] Article 17 of the Brussels Convention. [It] is in fact incapable of satisfying th[e] requirement of certainty in the purporte[d] agreement between the party which ha[s] laid down the general provisions of sal[e] in advance and the party against whom[...] the clause assigning jurisdiction [is] invoked.

6. My recommendation is therefore that the Court should reply in th[e] following terms to the two questions which has been submitted by th[e] Bundesgerichtshof.

(i) The requirement of confirmation in writing laid down in the firs[t] paragraph of Article 17 of the Convention of 27 September 1968 o[n] jurisdiction and the enforcement of judgments in civil and commercial matters is not fulfilled if the clause relating to jurisdiction by consent i[s] included in the conditions printed on the back of a contract signed by both parties unless there is a clear reference to those conditions in the body of the contract;

Nor are the requirements of Article 71 sufficiently met by a reference in the contract to a prior document which, without itself containing the text of the general conditions of sale, which include the assignment clause, and without including a reference to that clause, does no more than refer to another document which contains a reference to the conditions of sale appearing on the back thereof.

JUDGMENT OF ... 1976[1]
14 DECEMBER 1976[1]

# Galeries Segoura SPRL
## v Rahim Bonakdarian

(preliminary ruling requested by the Bundesgerichtshof)

'Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Article 17
(jurisdiction by consent)'

### Case 25/76

## Summary

1. *Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments — Conferment of jurisdiction by consent — Effect — Validity — Requirements — Strict construction — consensus between parties*
(*Convention of 27 September 1968, Article 17*)

2. *Convention of 27 September 1968 — Jurisdiction — Conferment of jurisdiction by consent — Form — Orally concluded contract — Vendor's confirmation in writing — Notification of general conditions of sale — Clause conferring jurisdiction — Need for acceptance in writing by the purchaser — Oral agreement within the framework of a continuing trading relationship — Implied acceptance of the clause conferring jurisdiction*
(*Convention of 27 September 1968, Article 17*)

1. The way in which Article 17 of the Convention of 27 September 1968 is to be applied in the light of the effect of the conferment of jurisdiction by consent, which is to exclude both the jurisdiction determined by the general principle laid down in Article 2 and the special jurisdictions provided for in Articles 5 and 6 of the Convention, in view of the consequences that such an option may have on the position of the parties to the action, the requirements set out in Article 17 governing jurisdiction must be strictly construed. By making such validity subject to the existence of an 'agreement' between the parties, Article 17 imposes upon the court before which the matter is brought the duty of examining, first, whether the clause conferring jurisdiction upon it was in fact the subject of a consensus between the parties, which must be clearly and precisely demonstrated, the purpose of the formal requirements imposed by Article 17 being to ensure that the consensus between the parties is in fact established.

[1 — Language of the Case: German.]

# JUDGMENT

## Facts

2. In the case of an orally concluded contract, the requirements of the first paragraph of Article 17 of the Convention of 27 September 1968 as to form are satisfied only if the vendor's confirmation in writing accompanied by notification of the general conditions of sale has been accepted in writing by the purchaser. The fact that the purchaser does not raise any objections against a confirmation issued unilaterally by the other party does not amount to acceptance on his part of the clause conferring jurisdiction, unless the oral agreement comes within the framework of a continuing trading relationship between the parties which is based on the general conditions of one of them, and those conditions contain a clause conferring jurisdiction.

In Case 25/76,

Reference to the Court under Article 1 of the Protocol of 3 June 1971 on the Interpretation by the Court of Justice of the Convention of 27 September 1968 on jurisdiction and the enforcement of Judgments in Civil and Commercial Matters by the Bundesgerichtshof in the action pending before that court between

GALERIES SEGOURA, a limited partnership having its registered office in Brussels,

and

RAHIM BONAKDARIAN, an import-export company, having its registered office in Hamburg.

for a preliminary ruling on the interpretation of the first paragraph of Article 17 of the Convention of 27 September 1968,

THE COURT

composed of: H. Kutscher, President, A.M. Donner and P. Pescatore, Presidents of Chambers, J. Mertens de Wilmars, M. Sørensen, Lord Mackenzie Stuart and A. O'Keeffe, Judges,

Advocate-General: F. Capotorti
Registrar: A. Van Houtte

gives the following

facts of the case, the course of the procedure and the observations submitted pursuant to the Protocol of 3 June 1971 on the Interpretation by the Court of Justice of the Convention of 27 September 1968 on Jurisdiction and the enforcement of Judgments in Civil and Commercial Matters may be summarized as follows:

— Facts and written procedure

On 14 September 1971 in the free port of Hamburg, the limited partnership Galeries Segoura (hereinafter referred to as Segoura) by an oral contract purchased a batch of oriental carpets at the total price of US $ 28 262·59 from the company Rahim Bonakdarian, (hereinafter referred to as Bonakdarian).

...the same date, 14 September 1971, in... part-payment of the purchase price, Bonakdarian and Brothers, Iran, ex-warehouse Hamburg free port, customs and taxes unpaid, as seen and transit... (there followed the description of the goods).

...ject to the following conditions we have sold and delivered to you on behalf of our Iranian supplier, Firma Hussein Bonakdarian... gave to Bonakdarian three bills of exchange for a total of US $ 15 000. On its side, Segoura received two documents described as 'confirmation of order and invoice', which begin with the following paragraph:

...nakdarian's 'Sales, Delivery and Payment Condition' printed on the reverse of this confirmation of order contained *inter alia* the following clause 10:

All disputes are to be decided exclusively by the Hamburg courts in accordance with the provisions of law applicable in the Federal Republic of Germany.

By formal notices of 7 June, 17 July and 1 November 1972, Bonakdarian sought unsuccessfully to obtain payment of the balance, and on 7 February 1973 brought an action before the Landgericht Hamburg. By a judgment in default delivered on 16 May 1973, this court ordered Segoura to pay to Bonakdarian the sum DM 45 998·45, with interest thereon at 9% from 16 November 1972.

On 13 July 1973 Segoura entered an objection against this judgment.

By a judgment of 21 December 1973, the Landgericht Hamburg annulled the judgment in default of 16 May and declared that it had no jurisdiction, on the ground that the parties did not conclude any agreement conferring jurisdiction within the meaning of the first paragraph of Article 17 of the Convention of 27 September 1968 on the jurisdiction and the enforcement of Judgments in Civil and Commercial Matters, which provides:

If the parties, one or more of whom is domiciled in a Contracting State, have, by agreement in writing or by an oral agreement confirmed in writing, agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.

1854

After an application for rectification of this judgment, submitted on 27 December 1973, was rejected by the Landgericht Hamburg by an order of 22 January 1974, Bonakdarian appealed, on 24 January 1974, to the Hanseatisches Oberlandesgericht.

By a judgment of 28 May 1974, rectified by an order of 29 July 1974, this latter court quashed the judgment of the Landgericht, stated that the Landgericht did have jurisdiction and remitted the case to that court.

Segura appealed on a point of law to the Bundesgerichtshof. The 8th Civil Chamber of the Bundesgerichtshof considered that the case raised questions of interpretation of the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 and accordingly, by an order of 18 February 1976, it decided, pursuant to Article 2 (1) and Article 3 (1) of the Protocol of 3 June 1971 on the interpretation of the Convention of 27 September 1968, to stay the proceedings until the Court of Justice had given a preliminary ruling on the following questions:

1. Are the requirements of Article 17 of the Convention satisfied if, at the oral conclusion of a contract of sale, a vendor has stated that he wishes to rely on his general conditions of sale and if he subsequently confirms the contract in writing to the purchaser and annexes to this confirmation his general conditions of sale which contain a clause conferring jurisdiction?

2. Are the requirements of Article 17 of the Convention satisfied if, in dealings between merchants, a vendor, after the oral conclusion of a contract of sale, confirms in writing to the purchaser the conclusion of the contract subject to his general conditions of sale and annexes to this document, which include a clause conferring jurisdiction and if the purchaser does not challenge the written confirmation?

In accordance with Article 5 (1) of the Protocol of 3 June 1971 and with Article 20 of the Protocol on the Statute of the Court of Justice of the EEC, written observations were submitted on 17 May 1976 by the Commission of the European Communities, on 24 May by the Bonakdarian, the respondent to the appeal, and on 25 May by the Galeries Segura, the appellant.

Upon hearing the report of the Judge-Rapporteur and the views of the Advocate-General, the Court decided to open the oral procedure without any preparatory inquiry.

II — Written observations submitted to the Court

The appellant, Galeries Segura, alludes to the origins of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in Civil and Commercial Matters, and submits that the purpose is to ensure the free movement of judgments, equal treatment for the nationals of all the Member States, regardless of their nationality. The Convention is also directed towards protecting the rights of the defendant in proceedings pending in the State in which judgment is to be given. Article 17 of the Convention contains a uniform basic rule concerning the conferring of jurisdiction, which demands application in a uniform manner. Its terms are identical to those of the rule contained in the Convention on Enforcement between Germany and Belgium, which was itself based on Article 2 of the Hague Convention of 15 April 1958 on the jurisdiction of the Contractual Forum in matters relating to the International Sale of Goods.

The first concern of the authors of the 1968 Convention was not to impose

commercial practice, yet at the same ... to neutralize the effects of clauses ... porting to confer jurisdiction, in ... tacts which might pass unnoticed. ... clauses are therefore to be taken ... consideration only if they are the ... ject of an agreement, which implies, ... consent of all the parties. In the ... sence of legal certainty, such ... agreement is moreover required to be in ... writing or confirmed in writing by the ... party to the contract.

The fact that a clause purporting to ... confer jurisdiction has been included in ... general conditions of sale and that a ... contracting party refers to it at the time ... the contract is concluded does not ... itself satisfy the requirement for ... confirmation in writing laid down in the ... first paragraph of Article 17 of the ... Convention of 1968.

... Convention is directed towards ... venting the surreptitious insertion in ... contract of clauses conferring ... jurisdiction. Therefore an agreement ... conferring jurisdiction cannot be validly ... concluded merely by reference to general ... conditions of sale. Express reference to ... such clause conferring jurisdiction which ... contained therein is a mandatory ... requirement.

to confirm in writing the clause which operates against him.

The first of the questions referred to the Court should therefore be answered in the following terms:

The requirements of Article 17 of the Convention are not satisfied if, at the oral conclusion of a contract of sale, a vendor has stated that he wishes to rely on his general conditions of sale and if he subsequently confirms the contract in writing to the purchaser and annexes to this confirmation his general conditions of sale which contain a clause conferring jurisdiction.

(b) Mere reference to general business conditions of sale does not of itself fulfil the protective aim of Article 17 of the Convention. There must be an express reference to the agreement conferring jurisdiction to be concluded.

Moreover, the surreptitious insertion of an agreement conferring jurisdiction should come from the contracting party against whom such agreement operates. Furthermore, it is not consonant either with the spirit or with the letter of Article 17 to equate silence in the face of a commercial letter of confirmation with a positive declaration, namely confirmation. In regard to agreements conferring jurisdiction, Article 17 of the Convention contains a uniform basic rule, which calls for uniform interpretation and which must be construed strictly. Comparison with the law of the Member States, in particular, Article 1341 of the Italian Civil Code requires lends support to this view. Thus Article express agreement conferring jurisdiction.

Therefore the second question should receive the following answer:

The requirements of Article 17 of the Convention are not satisfied if, in dealings between merchants, a vendor, after the oral conclusion of a contract of

1855

sale, confirms in writing to the purchaser the conclusion of the contract subject to his general conditions of sale and annexes to this document his general conditions of sale which include a clause conferring jurisdiction and if the purchaser does not challenge this written confirmation.

The respondent, Rahim Bonakdarian, takes the view that both of the questions referred to the Court should be answered in the affirmative.

(a) The first paragraph of Article 17 of the Convention of 27 September 1968 acknowledges both agreements in writing conferring jurisdiction and oral agreements confirmed in writing.

Agreement in writing should be taken to mean a document signed by both parties or their representatives in their own hand. Confirmation in writing of an oral agreement is something different from an agreement in writing, in particular, it an agreement in writing... be signed by both parties. In the case of an agreement conferring jurisdiction entered into orally, it is enough if one of the parties confirms in writing and the other accepts such confirmation without challenging it, thus acknowledging that the confirmation accords with the oral agreement. Thus in the first paragraph of Article 17 of the Convention the view is taken that, in the interest of enabling legal relations to be entered into easily and more quickly, a 'half requirement of written form' suffices.

A similar rule is laid down in Article 3 (1) (2) of the Convention between Germany and Belgium of 30 June 1958. Under that provision an oral agreement confirmed in writing is an agreement confirmed orally and confirmed in writing to one or the other of the parties by the other, provided that the former party does not challenge that confirmation.

The oral negotiations on a contract frequently concern only the essential points of it. As regards the other details of the contract, not dealt with expressly, the parties frequently refer to their general business conditions. When one of the parties makes it clear that it is his intention to incorporate his general conditions of sale into the contract, the other contracting party is able to object to his doing so. Such a refusal could be expressed during the oral negotiations or expressed when the other party annexes his general conditions of sale to the confirmation in writing of the contract concluded orally. If the other contracting party does not make clear his disagreement on receiving the document declaring the general conditions of sale to be applicable, but clearly indicating that he sees no objection to the application of those contractual clauses.

(b) In business dealings between merchants, it is the general rule for one of the parties to require the contract to be based on his general conditions of sale. The principle of free movement of goods within the Community implies that trading operations should be able to be carried out rapidly, without hindrance and without excessive formality contrary to practical needs. The first paragraph of Article 17 of the Convention is intended to take this into account. For this reason at least between merchants and under normal circumstances, silence on the part of the recipient of a letter of confirmation should be interpreted as acceptance of the contents of the letter by the recipient. Silence amounts to acceptance.

A merchant carrying out international transactions is aware that the question the court which is to have jurisdiction in case any disputes should arise frequently governed by the conditions of sale of the contracting party. Thus in the interest of clarity and of certainty in commercial dealings, when a letter of confirmation is sent to him by the other contracting party inter alia confirming jurisdiction, he should

[redacted]

In the present case, the contract of sale was first of all concluded orally; this oral contract was also related to the general conditions of sale of the vendor, who had questioningly stated, at the conclusion of the contract, that he wished to rely on his general conditions of sale. As these conditions contain a clause conferring jurisdiction, that clause also constitutes a part of the orally-concluded contract of sale.

(b) The second of the questions differs from the first in that it lays stress upon the fact that the contracting parties are merchants and that the purchaser does not challenge the written confirmation of the contract. On the other hand, it does not state whether, at the time of the oral contract of sale, the vendor has pointed out that he proposed to make the contract subject to his general conditions of sale. This point is however decisive: it is necessary in order to assume that the orally-concluded contract did not contain any clause conferring jurisdiction in those circumstances, the requirements of Article 17 concerning agreements conferring jurisdiction are not satisfied. The contents of the confirmation in writing would be the same as those of the orally-concluded contract; if not, the document would not constitute a confirmation and one of the contracting

immediately challenge that confirmation as soon as he receives the letter. A response coming after a delay is effective.

The principle according to which, in commercial matters, the conduct of the parties to a contract must be assessed in accordance with the criteria of good faith applies also in Community law and in particular to agreements within the meaning of Article 17. In German commercial law, the lack of a response to a commercial letter of confirmation amounts to agreement, unless the contents of the confirmation involve such significant differences in relation to what was agreed orally that the recipient cannot reasonably expect them. The rule that silence amounts to acquiescence is of particular importance. It applies particularly if the contents of the letter of confirmation are not of such a kind as to surprise the recipient, which is particularly true of clauses conferring jurisdiction.

[redacted]

the Commission of the European Communities points out that Article 17 of the Convention of 27 September 1968 has two essential purposes: to ensure legal certainty and to avoid excessive formality.

In the light of these two purposes, the first of the questions referred by the national court should be answered in the affirmative.

(b) The orally concluded contract of sale was confirmed in writing and the general conditions of sale, containing a clause conferring jurisdiction, were annexed to that confirmation in writing. The requirements laid down in Article 17 of the Convention as to the form of the contract are therefore satisfied, provided that the purchaser did not challenge the written confirmation of the contract. In these circumstances, it cannot be claimed that the clause conferring jurisdiction was added to the contract without the purchaser's knowledge. In such case the purchaser to make the agreement conferring jurisdiction subject to any stricter conditions would be to insist upon a degree of formality incompatible with commercial practice.

of sale, it is of little importance whether the purchaser was actually aware of them, in particular if the clause conferring jurisdiction; in any event, he could easily have acquainted himself with them and it must be borne in mind that the insertion in general conditions of sale of a clause conferring jurisdiction is quite usual.

JUDGMENT OF 14. 12. 1976 — CASE 25/76

parties would be exposed to the risk of learning of the existence of a clause conferring jurisdiction only at the time of receiving what purported to be the confirmation in writing. Under Article 17, agreements conferring jurisdiction imply a true consensus between the contracting parties. Such is not the case in the situation contemplated by the second of the questions referred by the Bundesgerichtshof.

However it must be asked whether different considerations might not apply if the two contracting parties are merchants. Under the law of certain Member States, in particular of the Federal Republic of Germany, the absence of any response to a commercial confirmation as acquiescence. The contract counts as written which is considered as accepted if the recipient of the confirmation in writing does not immediately challenge it, as he is bound to do by virtue of the rules of good faith. However, this method of making a contract is not provided for by Article 17 of the Convention, which contemplates only two forms of agreement, an agreement in writing or an oral agreement confirmed in writing, but does not provide any special rules for merchants.

(c) The questions referred by the Bundesgerichtshof should be answered in the following terms:

1858

By an order of 18 February 1976, received at the Court Registry on 11 March 1976, the Bundesgerichtshof referred to the Court of Justice, pursuant to the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments,

Protocol of 3 June 1971 on the Interpretation of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments,

## Law

1. The requirements of Article 17 of the Convention of 27 September 1968 are satisfied if, at the oral conclusion of a contract of sale, a vendor has stated that he wishes to rely on his general conditions of sale and if he subsequently confirms the contract to the purchaser and annexes to this confirmation his general conditions of sale which contain a clause conferring jurisdiction.

2. On the other hand, the requirements of Article 17 are not satisfied, even in dealings between merchants, if the vendor, after the oral conclusion of the contract of sale, confirms in writing to the purchaser the conclusion of the contract subject to his general conditions of sale and annexes to his document which include a clause conferring jurisdiction, even if the purchaser does not challenge this written confirmation.

III — Oral procedure

The respondent, Bonakdarian, represented by Oliver C. Brändel, Advocate at the Bundesgerichtshof in Karlsruhe, and the Commission of the European Communities, represented by its Legal Adviser, Rolf Wägenbaur, presented oral argument at the hearing on 13 October 1976.

The Advocate-General delivered his opinion at the hearing on 17 November 1976.

...vil and Commercial Matters (hereinafter referred to as 'the Convention'), ... questions concerning the interpretation of Article 17 of the said Convention.

...ppears from the order making the reference that at the present stage the ...tion, which was brought before the Bundesgerichtshof by way of appeal on ...point of law, concerns the jurisdiction of the Landgericht Hamburg to hear ...action brought by a trading undertaking established within the area of its ...jurisdiction against a trading company having its registered office in Brussels, ...payment of the balance of the price of a batch of carpets bought in ...Hamburg by the Brussels firm.

...e contract was concluded orally between the parties, and the vendor ...rformed his side of it on the same day in consideration of a part-payment ...ade by the purchaser.

...r handing over the goods, the vendor delivered to the purchaser a ...document described as 'Confirmation of order and invoice', which stated that ...e sale and the delivery had taken place 'subject to the conditions stated on ...e reverse'.

...e 'Conditions of Sale, Delivery and Payment' printed on the reverse of this ...ocument contained inter alia a clause stipulating that all disputes were to ... decided exclusively by the Hamburg courts.

...this document was not confirmed by the purchaser.

...fter the purchaser had received formal notice to pay the balance of the ...urchase price, the vendor brought an action before the Landgericht ...Hamburg which, by a judgment in default delivered on 16 May 1973, ordered ... purchaser to pay the balance with interest thereon for delay.

...the purchaser's entering an objection, the Landgericht, by a judgment of ... December 1973, withdrew its first judgment and declared that it had no ...jurisdiction, on the ground that the parties had not concluded any agreement ...conferring jurisdiction within the meaning of Article 17 of the Convention.

... vendor brought an appeal before the Hanseatisches Oberlandesgericht ...which quashed the decision of the Landgericht and remitted the case to that ...urt, holding that an agreement conferring jurisdiction had been validly ...ncluded between the parties under Article 17 of the Convention.

1859

1860

4   An appeal on a point of law by the purchaser against this judgment is present before the Bundesgerichtshof.

In this connexion, the Bundesgerichtshof has referred to the Court the questions concerning the interpretation of the first paragraph of Article...

5   The interpretation of Article 17 of the Convention in general

The first paragraph of Article 17 of the Convention provides:

'If the parties, one or more of whom is domiciled in a Contracting State, have by agreement in writing or by an oral agreement confirmed in writing, agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connexion with a particular legal relationship, that court or those courts shall have exclusive jurisdiction.'

6   The way in which that provision is to be applied must be interpreted in the light of the effect of the conferment of jurisdiction by consent, which is to exclude both the jurisdiction determined by the general principle laid down in Article 2 and the special jurisdictions provided for in Articles 5 and 6 of the Convention.

In view of the consequences that such an option may have on the position of the parties to the action, the requirements set out in Article 17 governing the validity of clauses conferring jurisdiction must be strictly construed.

By making such validity subject to the existence of an 'agreement' between the parties, Article 17 imposes upon the court before which the matter is brought the duty of examining, first, whether the clause conferring jurisdiction upon it was in fact the subject of a consensus between the parties which must be clearly and precisely demonstrated.

The purpose of the formal requirements imposed by Article 17 is to ensure that the consensus between the parties is in fact established.

The questions referred to the Court by the Bundesgerichtshof must be examined in the light of these considerations.

... the questions referred by the Bundesgerichtshof

... the first question is whether the requirements of Article 17 of the Convention are satisfied if, at the oral conclusion of a contract of sale, a vendor has stated that he wishes to rely on his general conditions of sale and he subsequently confirms the contract in writing to the purchaser and annexes to this confirmation his general conditions of sale which contain a clause conferring jurisdiction.

... accordance with the foregoing general considerations, it cannot be assumed that one of the parties waives the advantage of the provisions of the Convention conferring jurisdiction.

... even if, in an orally concluded contract, the purchaser agrees to abide by the vendor's general conditions, he is not for that reason to be deemed to have agreed to any clause conferring jurisdiction which might appear in those general conditions.

... follows that a confirmation in writing of the contract by the vendor, accompanied by the text of his general conditions, is without effect, as regards a clause conferring jurisdiction which it might contain, unless the purchaser agrees to it in writing.

... second question then asks whether Article 17 of the Convention applies in dealings between merchants, a vendor, after the oral conclusion of a contract, confirms in writing to the purchaser the conclusion of the contract subject to his general conditions of sale and annexes to this document his conditions of sale which include a clause conferring jurisdiction and if the purchaser does not challenge this written confirmation.

... emerges from a comparison of the wording of the two questions and from the explanations given during the proceedings before the Court that the second of the two questions concerns the hypothetical situation of a sale being concluded without any reference being made at all to the existence of general conditions of sale.

... such a case, it is patent that a clause conferring jurisdiction which might be included in those general conditions did not form part of the subject-matter of the contract concluded orally between the parties.

JUDGMENT OF 14. 12. 1976 — CASE 25/76

Therefore subsequent notification of general conditions containing such clause is not capable of altering the terms agreed between the parties, except if those conditions are expressly accepted in writing by the purchaser.

11 It follows from the foregoing, in both of the alternative cases suggested by the Bundesgerichtshof, that a unilateral declaration in writing such as the one the present case is not sufficient to constitute an agreement on jurisdiction consent.

However, it would be otherwise where an oral agreement forms part of a continuing trading relationship between the parties, provided also that it is established that the dealings taken as a whole are governed by the general conditions of the party giving the confirmation, and these conditions contain a clause conferring jurisdiction.

12 It is therefore possible to give a single answer to the two questions referred the Court as follows: in the case of an orally concluded contract, the requirements of the first paragraph of Article 17 as to form are satisfied only if the vendor's confirmation in writing accompanied by notification of the general conditions of sale has been accepted in writing by the purchaser.

Indeed, in such a context, it would be contrary to good faith for the recipient of the confirmation to deny the existence of a jurisdiction conferred by consent, even if he had given no acceptance in writing.

13 The fact that the purchaser does not raise any objections against confirmation issued unilaterally by the other party does not amount to acceptance on his part of the clause conferring jurisdiction, unless the oral agreement comes within the framework of a continuing trading relationship between the parties which is based on the general conditions of one of them, and those conditions contain a clause conferring jurisdiction.

Costs

The costs incurred by the Commission of the European Communities, which has submitted observations to the Court, are not recoverable.

1862

---

... these proceedings are, in so far as the parties to the main action are concerned, in the nature of a step in the action pending before the Bundesgerichtshof, the decision as to costs is a matter for that court.

On those grounds,

THE COURT,

in answer to the questions referred to it by the Bundesgerichtshof by order of 4 February 1976, hereby rules:

In the case of an orally concluded contract, the requirements of the first paragraph of Article 17 of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters as to form are satisfied only if the vendor's confirmation in writing accompanied by notification of the general conditions of sale has been accepted in writing by the purchaser.

The fact that the purchaser does not raise any objections against a confirmation issued unilaterally by the other party does not amount to acceptance on his part of the clause conferring jurisdiction unless the oral agreement comes within the framework of a continuing trading relationship between the parties which is based on the general conditions of one of them, and those conditions contain a clause conferring jurisdiction.

Kutscher        Donner          Pescatore

Mertens de Wilmars      Sørensen        Mackenzie Stuart        O'Keeffe

Delivered in open court in Luxembourg on 14 December 1976.

Van Houtte              H. Kutscher
Registrar               President

1863

## OPINION OF MR ADVOCATE-GENERAL CAPOTORTI DELIVERED ON 17 NOVEMBER 1976 [1]

*Mr President,*
*Members of the Court,*

1. This case, like Case 24/76, is concerned with the interpretation of Article 17 of the Brussels Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters; here too, therefore, we have to consider the requirements which need to be satisfied by an agreement assigning jurisdiction (which, in the present case, is invoked by the vendor against the purchaser). But, in contrast to Case 24/76, the questions referred by the German Bundesgerichtshof for a preliminary ruling on this occasion are concerned with the case of an oral contract. The issues raised thereby are concerned both with the conditions necessary for an oral agreement assigning jurisdiction to be deemed to exist and with the way in which that agreement is, as required by Article 17, to be confirmed in writing for it to be recognized as valid.

A contract of sale was orally entered into on 14 September 1971 between Bonakdarian, whose registered office is in Hamburg, the vendor, and Segoura, whose registered office is in Brussels, the purchaser. At the same time the purchaser made a payment on account. On the same day, it received the goods which were the subject of the contract together with a document serving as a 'confirmation letter and invoice' which made an express reference to the general conditions of sale, delivery and payment printed on the back. Those conditions included a clause conferring jurisdiction to the Hamburg court exclusive jurisdiction to decide any dispute which might arise. This evoked no comment from the purchaser.

A dispute subsequently arose concerning payment of the outstanding amount and the German court of first instance at first ordered Segoura in its absence to pay a sum equivalent to the outstanding amount, together with interest but later, following an objection, cancelled the judgment and ruled that it had no jurisdiction because there had been no agreement for jurisdiction by consent within the meaning of the first paragraph of Article 17 of the Brussels Convention of 27 September 1968. The court declared that, in the absence of any evidence proving that the assignment clause had been the subject of an agreement, there was no such agreement. With regard to the contention of the purchaser that the consent of the purchaser... evidenced by the absence of any objection after it had received the invoice letter referring to the general conditions of sale, the court observed that, in those circumstances, the invoice letter, which referred for the first time to the clause assigning jurisdiction amounted at most to a contractual offer amending the original contract, and that in any case, there was a total absence of the written acceptance required by Article 17.

[...]

The appeal court, which held that the reference to the general conditions of sale contained in the invoices sent to the purchaser constituted confirmation of an oral agreement which also covered the general conditions of sale, including the clause assigning jurisdiction. Accordingly, to the appeal court confirming, the mation, which was not disputed, was sufficient to satisfy the relevant requirements as to form laid down in Article 17.

A different view was, however, taken by [...]

difference between the two courts dealing with the substance in their appraisal of the facts and concerning their agreement confirmed in writing. [...] explain why the purchaser [...] decided against the judgment of the [...] court has submitted two separate questions on the interpretation of Article 17, relating to two separate sets of circumstances, the first concerning the oral conclusion of a contract of sale, the second appearing to be [...] in accordance with the different [...] The questions are as follows:

[...] the requirements of Article 17 of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters satisfied if, at the oral conclusion of a contract of sale, a vendor has stated that he wishes to rely on his general conditions of sale and if he subsequently confirms the contract in writing to the purchaser and annexes to this confirmation his general conditions of sale which contain a clause assigning jurisdiction?

[...] Are the requirements of the said article satisfied if, in dealings between merchants, a vendor, after the conclusion of a contract of sale, confirms in writing to the purchaser the conclusion of the contract subject to his general conditions of sale and annexes to this document his conditions of sale which include a clause assigning jurisdiction and if the purchaser does not challenge this confirmatory letter?

Under Article 17 an oral agreement assigning jurisdiction by consent is, with a view to expediting trade, a valid means of conferring jurisdiction on the selected court but, out of consideration for the protection of the weaker party, such an agreement has effect only if it is

followed by confirmation in writing (the article cited requires in terms an oral agreement confirmed in writing). Such confirmation must obviously be by the party for whom it is claimed. Furthermore, especially when required, the clause assigning jurisdiction is one of a set of general conditions pre-determined by one of the parties, particular care must be taken to ensure that confirmation is effected in such a way as to leave no doubt concerning the agreement of the other party to the assignment of jurisdiction.

At this juncture there arises the issue of confirmation forthcoming from one only of the parties. The Jenard report, which was presented on the Brussels Convention, stated that the wording of Article 17 is 'very similar to that of the Germano-Belgian Convention, which is in turn based on the Hague Convention of 15 April 1958 on selected jurisdiction in connexion with international sales of goods. As regards the effectiveness of oral agreements assigning jurisdiction the Germano-Belgian Convention requires confirmation in writing which has not been disputed' (Article 3 (2)) and the Hague Convention in writing by one of the parties or by a broker without having been contested (Article 2), both of them, of course, with specific reference to the designation of the court which is to have jurisdiction. The Jenard report adds that since the clause conferring jurisdiction presupposes a genuine agreement between the parties, the court may not necessarily regard a writing made by the party invoking the clause assigning jurisdiction as proof of an oral agreement.

In the light of these considerations, it is, in my opinion, clearly impossible to justify so strict a view with regard to the requirements for confirmation as that suggested by Segoura, the effect of which would be to wholly and absolutely to rule out any possibility of valid confirmation being supplied by the party which has pre-determined the clause assigning

1 — Translated from the Italian.

jurisdiction. The wording of Article 17 does not appear to require this, nor would it be necessary for the protection of the party against whom the assignment of jurisdiction is being invoked because the letter still retains the right, after receiving the letter of confirmation, to challenge anything stated therein which relates to the agreement on assignment.

The essential purpose of confirmation in writing of an oral agreement assigning jurisdiction is to express the oral clause in words which are objectively certain, and to define its precise terms as they affect the parties and the selected court which, under the clause, is assigned jurisdiction in disputes arising in connexion with a specific legal relationship. The same purpose can be achieved even when the written document containing the confirmation is supplied by the party which pre-determined the assignment clause provided that, having regard to the previous and subsequent conduct of the two parties to the agreement, this is done in such a way as to amount to objective verification of the agreement reached on the clause reduced to writing in the 'confirmation'.

Apart, therefore, from the case of a bilateral confirmation which obviously presents no difficulty, it is possible to distinguish two separate examples of written confirmation given by one party only in the context of general conditions, including assignment of jurisdiction, pre-determined in its own interests by one of the contracting parties. In the first example, confirmation is given by the party which did not pre-determine the general conditions and to whom the clause is disadvantageous. Even if such confirmation refers to the general conditions as a whole it can be regarded as sufficient to give effect to the assignment clause. The second example occurs when confirmation is forthcoming from the party which has pre-determined the general conditions. It is clear that, in

this case, there must be a stricter approach; [...] the parties concentrate their [...] mention on the essential points of [...] writing must record [...] mention on the essential requirements [...] conditions but, in particular, the [...] agreement regarding the [...] considering the general conditions, [...] which, therefore, the purchaser really [...] becomes aware only when it receives the [...] letter from the vendor confirming the [...] unnoticed or has simply not been [...] mentioned in a comprehensive reference [...] to the general conditions of contract, must, of course, be borne in mind that the abovementioned rules of the Conventions all provide for written confirmation of an oral agreement assigning jurisdiction; it is therefore the conclusion of that agreement which must be proved. And, as is usual, the weaker party must have played its part in the conclusion of such agreement not only by being aware of the assignment clause but also by being willing to accept it.

3. In the light of the foregoing considerations, I come now to consider the case, set out in the first question, where, at the time of the oral conclusion of a contract of sale, the vendor did not more than make a unilateral and very general declaration of his intention to contract on the basis of the general conditions laid down in advance by one of the parties. In such circumstances it is not inconceivable that a jurisdiction clause be regarded as having been incorporated in the agreement, although there has never been any direct mention of it?

It will be noted that the case in question is very different from that in which a comprehensive reference to conditions of sale laid down in advance by the vendor is included in the text of a written contract on the back of which those conditions, including the clause referring to them, cannot constitute confirmation within the meaning of Article 17 because its essential premise is seeking, namely prior agreement on the assignment of jurisdiction. Such a letter acquaint himself with the clause before concluding the contract.

On the other hand, when an oral contract is entered into it is, as the vendor itself agrees in its observations

[...] present case, reasonable to assume [...] developed up to this point invalidated by [...] the objection that it goes beyond [...] consideration of the formal requirements [...] Convention by Article 17 of the [...] Convention since it breaches [...] question of the conditions required for [...] jurisdiction to be valid. In fact, the [...] questions submitted by the national [...] court are concerned with the extent to [...] which particular circumstances meet the [...] requirements (all the requirements laid [...] down by Article 17, and the 'sufficiency' [...] of particular conduct for the purposes of [...] that article. Article 17 must accordingly [...] be viewed as a whole and it is clear that, [...] even before laying down specific [...] requirements as to form, its purpose is to [...] ensure that the parties have concluded an [...] agreement (or agreed on a clause) which [...] is to be seised of disputes which [...] have arisen or are liable to arise out of a [...] given legal relationship. That is to say, [...] the rule in question also includes [...] conditions of substance, the first of [...] which is the existence of an agreement of [...] a certain type and which has a particular [...] purpose.

4. Nor is the view which I have [...] developed up to this point invalidated by [...] the objection that it goes beyond [...]

In this connexion, the question legitimately arises whether the substantive aspects of the agreement assigning jurisdiction are to be deduced from Article 17, interpreted by itself, or whether these aspects ought not rather to be left for determination under the law of the different States. The issue is similar to that described in my opinion in Case 24/76 regarding the form of the agreement in question and, in particular, the possibility that the meaning of the words 'in writing' should be interpreted in accordance with the law applicable in the various States. And the answer in this case must follow the same lines: in so far as such requirements, whether relating to substance or to form, have been laid down by the Convention as conditions precedent for the formalities required by the Convention to be fulfilled, an independent interpretation must be

1868

found on the basis of the logic and wording of the Convention. All this is, of course, without prejudice to national requirements in other respects, whether of form or of substance, which do not come within the ambit of the Convention rules subject to Community interpretation.

The close connection between the question of confirmation in writing of an oral agreement assigning jurisdiction and that of the existence of such an agreement is abundantly clear. To distinguish between the existence of an oral agreement and its confirmation by regarding the first as exclusively subject to national law and, accordingly, to different legal rules and case-law, while the other was governed by a single legal system would be liable to create serious discrepancies in the application of Article 17 within the contracting states. I may add that, if the requirements for the definition of an agreement were beyond the scope of the Convention, the appraisal by this Court of the formal requirement of confirmation in writing might prove too restrictive or too liberal, according to the standpoint of the particular national legal system which is regarded as having

6.  It is accordingly my opinion that the Court should reply to the questions of the Bundesgerichtshof by ruling that the requirements of Article 17 of the Brussels Convention of 27 September 1968 are not satisfied if, during the oral conclusion of a contract of sale, the vendor indicates that he wishes to rely on the general conditions of sale laid down by himself and does no more than make a general reference to those conditions without specifically mentioning the assignment of jurisdiction and subsequently sends to the purchaser written confirmation of the contract to which are annexed his general conditions, including a clause assigning jurisdiction.

The reply must be the same even if, after the conclusion between merchants of an oral contract of sale, the vendor confirms the contract in writing and simultaneously, for the first time states that the contract is to be regarded subject to the general conditions of sale — which include a clause assigning jurisdiction — laid down by the vendor himself and attached to the writing and the purchaser does not indicate his dissent.

jurisdiction to verify the existence of the assignment clause. This would produce a situation contrary to the principle of uniformity which the Convention seeks to establish.

5.  Consideration of the second question submitted by the national court does not, at this juncture, call for much comment. As this Court is aware, the difference between the case stated in the first question and that in the second question is the following: in the first, the vendor's statement that he intends to apply his own general conditions to the contract is assumed to have been made at the time when the contract was orally concluded; in the second, the declaration is assumed to have been made in writing only after the oral conclusion of the contract without protest on the part of the purchaser. In these circumstances, it seems clear that when, during the negotiations which lead to the oral contract of sale, there is not even any reference to the general conditions including the assignment clause, the consensus of wills on the assignment of jurisdiction without which there cannot be any 'confirmation' within the meaning of Article 17 is absolutely lacking.

1569

## STATUTORY INSTRUMENTS

## 2001 No. 544

## FINANCIAL SERVICES AND MARKETS

## The Financial Services and Markets Act 2000 (Regulated Activities) Order 2001

*Approved by both Houses of Parliament*

| | |
|---|---|
| *Made - - - - -* | *26th February 2001* |
| *Laid before Parliament* | *27th February 2001* |

*Coming into force in accordance with article 2*

## ARRANGEMENT OF ORDER

### PART I

### GENERAL

1. Citation
2. Commencement
3. Interpretation

### PART II

### SPECIFIED ACTIVITIES

#### CHAPTER I

*General*

4. Specified activities: general

#### CHAPTER II

#### ACCEPTING DEPOSITS

*The activity*

5. Accepting deposits

*Exclusions*

6. Sums paid by certain persons
7. Sums received by solicitors etc.
8. Sums received by persons authorised to deal etc.

SCHEDULE 1                              Article 3(1)

CONTRACTS OF INSURANCE

PART I

CONTRACTS OF GENERAL INSURANCE

**Accident**

1.  Contracts of insurance providing fixed pecuniary benefits or benefits in the nature of indemnity (or a combination of both) against risks of the person insured or, in the case of a contract made by virtue of section 140, 140A or 140B of the Local Government Act 1972(a) (or, in Scotland, section 86(1) of the Local Government (Scotland) Act 1973(b)), a person for whose benefit the contract is made—

    (a) sustaining injury as the result of an accident or of an accident of a specified class; or

    (b) dying as a result of an accident or of an accident of a specified class; or

    (c) becoming incapacitated in consequence of disease or of disease of a specified class,

including contracts relating to industrial injury and occupational disease but excluding contracts falling within paragraph 2 of Part I of, or paragraph IV of Part II of, this Schedule.

**Sickness**

2.  Contracts of insurance providing fixed pecuniary benefits or benefits in the nature of indemnity (or a combination of both) against risks of loss to the persons insured attributable to sickness or infirmity but excluding contracts falling within paragraph IV of Part II of this Schedule.

**Land vehicles**

3.  Contracts of insurance against loss of or damage to vehicles used on land, including motor vehicles but excluding railway rolling stock.

**Railway rolling stock**

4.  Contract of insurance against loss of or damage to railway rolling stock.

**Aircraft**

5.  Contracts of insurance upon aircraft or upon the machinery, tackle, furniture or equipment of aircraft.

**Ships**

6.  Contracts of insurance upon vessels used on the sea or on inland water, or upon the machinery,  tackle, furniture or equipment of such vessels.

**Goods in transit**

7.  Contracts of insurance against loss of or damage to merchandise, baggage and all other goods in transit, irrespective of the form of transport.

**Fire and natural forces**

8.  Contracts of insurance against loss of or damage to property (other than property to which paragraphs 3 to 7 relate) due to fire, explosion, storm, natural forces other than storm, nuclear energy or land subsidence.

**Damage to property**

9.  Contracts of insurance against loss of or damage to property (other than property to which paragraphs 3 to 7 relate) due to hail or frost or any other event (such as theft) other than those mentioned in paragraph 8.

---

(a) S.I. 1999/2725, amended by S.I. 2000/1797.

(b) 1972 c. 70. Section 140 was amended by the Local Government (Miscellaneous Provisions) Act 1982 (c. 30), s. 39(1) and Sch. 7, Part XVI; by the Insurance Companies Act 1982 (c. 50), Sch. 5, para. 13; and by the London Regional Transport Act 1984 (c. 32), Sch. 7. Section 140A was inserted by s. 39(2) of the Local Government (Miscellaneous Provisions) Act 1982 (c. 30), and amended by the Planning (Consequential Provisions) Act 1990 (c. 10), Sch. 2, para. 28, and by the Environment Act 1995 (c. 25), Sch. 24. Section 140B was inserted by s. 39(2) of the Local Government (Miscellaneous Provisions) Act 1982, and amended by the Local Government Act 1985 (c. 51), Sch. 17, and by the Local Government (Wales) Act 1994 (c. 19), Sch. 15, para. 31.

**Motor vehicle liability**

10.  Contracts of insurance against damage arising out of or in connection with the use of motor vehicles on land, including third-party risks and carrier's liability.

**Aircraft liability**

11.  Contracts of insurance against damage arising out of or in connection with the use of aircraft, including third-party risks and carrier's liability.

**Liability of ships**

12.  Contracts of insurance against damage arising out of or in connection with the use of vessels on the sea or on inland water, including third party risks and carrier's liability.



**General liability**

13.  Contracts of insurance against risks of the persons insured incurring liabilities to third parties, the risks in question not being risks to which paragraph 10, 11 or 12 relates.

**Credit**

14.  Contracts of insurance against risks of loss to the persons insured arising from the insolvency of debtors of theirs or from the failure (otherwise than through insolvency) of debtors of theirs to pay their debts when due.

**Suretyship**

15.—(1)  Contracts of insurance against the risks of loss to the persons insured arising from their having to perform contracts of guarantee entered into by them.

(2)  Fidelity bonds, performance bonds, administration bonds, bail bonds or customs bonds or similar contracts of guarantee, where these are—

   (a) effected or carried out by a person not carrying on a banking business;

   (b) not effected merely incidentally to some other business carried on by the person effecting them; and

   (c) effected in return for the payment of one or more premiums.

**Miscellaneous financial loss**

16.  Contracts of insurance against any of the following risks, namely—

   (a) risks of loss to the persons insured attributable to interruptions of the carrying on of business carried on by them or to reduction of the scope of business so carried on;

   (b) risks of loss to the persons insured attributable to their incurring unforeseen expense (other than loss such as is covered by contracts falling within paragraph 18);

   (c) risks which do not fall within sub-paragraph (a) or (b) and which are not of a kind such that contracts of insurance against them fall within any other provision of this Schedule.

**Legal expenses**

17.  Contracts of insurance against risks of loss to the persons insured attributable to their incurring legal expenses (including costs of litigation).

**Assistance**

18.  Contracts of insurance providing either or both of the following benefits, namely—

   (a) assistance (whether in cash or in kind) for persons who get into difficulties while travelling, while away from home or while away from their permanent residence; or

   (b) assistance (whether in cash or in kind) for persons who get into difficulties otherwise than as mentioned in sub-paragraph (a).

## PART II

### CONTRACTS OF LONG-TERM INSURANCE

**Life and annuity**

1.  Contracts of insurance on human life or contracts to pay annuities on human life, but excluding (in each case) contracts within paragraph III.

6833

---
## STATUTORY INSTRUMENTS
---

## 2001 No. 2635

## FINANCIAL SERVICES AND MARKETS

## The Financial Services and Markets Act 2000 (Law Applicable to Contracts of Insurance) Regulations 2001

| | |
|---|---|
| *Made - - - - -* | *19th July 2001* |
| *Laid before Parliament* | *20th July 2001* |
| *Coming into force* | *in accordance with regulation 1* |

The Treasury, in exercise of the powers conferred on them by sections 424(3), 417(1)(a) and 428(3) of the Financial Services and Markets Act 2000(b), hereby make the following Regulations:

### PART I

*General*

**Citation and commencement**

1. These Regulations may be cited as the Financial Services and Markets Act 2000 (Law Applicable to Contracts of Insurance) Regulations 2001 and come into force on the day on which section 19 of the Act comes into force.

**Interpretation**

2.—(1) In these Regulations—

"the Act" means the Financial Services and Markets Act 2000;

"the 1990 Act" means the Contracts (Applicable Law) Act 1990(c);

"applicable law", in relation to a contract of insurance, means the law that is applicable to that contract;

"contract of general insurance" and "contract of long-term insurance" have the meanings given by the Regulated Activities Order;

"EEA State of the commitment" means, in relation to a contract of long-term insurance entered into on a date—

    (a) if the policyholder is an individual, the EEA State in which he resides on that date; or

    (b) otherwise, the EEA State in which the establishment of the policyholder to which the contract relates is situated on that date;

"establishment", in relation to a person ("A"), means—

    (a) A's head office;

    (b) any of A's agencies;

    (c) any of A's branches; or

---

(a) See the definition of "prescribed".
(b) 2000 c. 8.
(c) 1990 c. 36.

6834                    FINANCIAL SERVICES AND MARKETS

(d) any permanent presence of A in an EEA State, which need not take the form of a branch or agency and which may consist of an office managed by A's staff or by a person who is independent of A but has permanent authority to act for A as if he were an agency;

"large risk" has the meaning given by Article 5(d) of the first non-life insurance directive and includes risks specified by paragraph (iii) of that definition insured by professional associations, joint ventures or temporary groups;

"mandatory rules" means the rules from which the law allows no derogation by way of contract; 

"the Regulated Activities Order" means the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001(a).

(2) References to the EEA State where the risk covered by a contract of insurance is situated are to— 

(a) if the contract relates to buildings or to buildings and their contents (in so far as the contents are covered by the same contract of insurance), the EEA State in which the property is situated;

(b) if the contract relates to vehicles of any type, the EEA State of registration; 

(c) if the contract covers travel or holidays risks and has a duration of four months or less, the EEA State in which the policyholder entered into the contract;

(d) in any other case—

(i) if the policyholder is an individual, the EEA State in which he resides on the date the contract is entered into;

(ii) otherwise, the EEA State in which the establishment of the policyholder to which the contract relates is situated on that date.

(3) References to the country in which a person resides are to—

(a) if he is an individual, the country in which he has his habitual residence;

(b) in any other case, the country in which he has his central administration.

(4) Where an EEA State (including the United Kingdom) includes several territorial units, each of which has its own laws concerning contractual obligations, each unit is to be considered as a separate state for the purposes of identifying the applicable law under these Regulations.

**Scope of these Regulations**

**3.**—(1) These Regulations do not apply to contracts of reinsurance.

(2) These Regulations apply to contracts of insurance which are entered into by friendly societies as follows—

(a) Part II applies to a contract of insurance entered into by a friendly society to which section 37(3) of the Friendly Societies Act 1992(b) applies;

(b) Part III applies to a contract of insurance entered into by a friendly society to which section 37(2) of that Act applies; and

(c) Part II applies to any other contract of insurance entered into by a friendly society which covers a risk situated in an EEA State with the following modifications—

(i) paragraph (1) of regulation 4 does not apply;

(ii) regulation 4 applies only where the policyholder is an individual; and

(iii) regulation 7 applies as if for the words "the 1990 Act is deemed to apply" in each case there were substituted the words "the general rules of private international law of that part of the United Kingdom concerning contractual obligations apply".

(a) S.I. 2001/544.
(b) 1992 c. 40.

## PART II

*Contracts of General Insurance*

**Applicable law**



4.—(1) This Part applies to a contract of general insurance which covers risks situated in an EEA State.

(2) If the policyholder resides in the EEA State in which the risk is situated, the applicable law is the law of that EEA State unless, if such a choice is permitted under the law of that EEA State, the parties to the contract choose the law of another country.

(3) If the policyholder does not reside in the EEA State in which the risk is situated, the parties to the contract may choose as the applicable law either—

    (a) the law of the EEA State in which the risk is situated; or

    (b) the law of the country in which the policyholder resides.

(4) If the policyholder carries on a business (including a trade or profession) and the contract covers two or more risks relating to that business which are situated in different EEA States, the freedom of the parties to choose the applicable law conferred by this regulation extends to the law of any of those EEA States and of the country in which the policyholder resides.

(5) If any of the EEA States referred to in paragraph (3) or (4) grant greater freedom of choice of the applicable law, the parties to the contract may take advantage of that freedom.

(6) Notwithstanding paragraphs (2) to (4), if the risks covered by the contract are limited to events occurring in one EEA State other than the EEA State in which the risk is situated, the parties may choose the law of the former EEA State as the applicable law. 

(7) Notwithstanding paragraphs (2) to (4), if the risk covered by the contract is a large risk the parties may choose any law as the applicable law. 

(8) Where the foregoing provisions of this regulation allow the parties to the contract to choose the applicable law and if no choice has been made, or no choice has been made which satisfies the requirement set out in regulation 6(1), the applicable law is the law of the country, from amongst those considered in the relevant paragraph ("the relevant countries"), which is most closely connected with the contract; however, where a severable part of the contract has a closer connection with another relevant country, the law applicable to that part is, by way of exception, the law of that relevant country.

(9) For the purposes of paragraph (8), the contract is rebuttably presumed to be most closely connected with the EEA State in which the risk is situated.

**Mandatory rules**

5.—(1) Nothing in regulation 4 restricts the application of the mandatory rules of any part of the United Kingdom, irrespective of the applicable law of the contract. 

(2) If the parties to the contract choose the applicable law under regulation 4 and if all the other elements relevant to the situation at the time when the parties make their choice are connected with one EEA State only, the application of the mandatory rules of that EEA State is not prejudiced.

**Choice of law**

6.—(1) Any choice made by the parties under regulation 4 must be expressed or demonstrated with reasonable certainty by the terms of the contract or the circumstances of the case. 

(2) Where the parties to the contract may choose the applicable law under regulation 4, and where the risk to which the contract relates is covered by Community co-insurance (within the meaning of Council Directive 78/473/EEC on the coordination of laws, regulations and administrative provisions relating to Community co-insurance)(a)), co-insurers other than the leading insurer (within the meaning of that Directive) are not to be treated as parties to the contract.

---

(a) OJ L 151, 7.6.78, p.25.

6836                    FINANCIAL SERVICES AND MARKETS

**The 1990 Act**

7.—(1) Subject to the preceding provisions of this Part, the 1990 Act is to be treated as applying to the contract for the purposes of determining the applicable law.

(2) In determining whether the mandatory rules of another EEA State should be applied in accordance with regulation 5(2) where the parties have chosen the law of a part of the United Kingdom as the applicable law, the 1990 Act is to be treated as applying to the contract.

(3) In determining what freedom of choice the parties have under the law of a part of the United Kingdom, the 1990 Act is to be treated as applying to the contract.


PART III

*Contracts of Long-Term Insurance*


**Applicable law**

8.—(1) This Part applies to a contract of long-term insurance if—
    (a) where the policyholder is an individual, he resides in an EEA State;
    (b) otherwise, the establishment of the policyholder to which the contract relates is situated in an EEA State.

(2) The applicable law is the law of the EEA State of the commitment unless, if such a choice is permitted under the law of that EEA State, the parties choose the law of another country.

(3) If the policyholder is an individual and resides in one EEA State but is a national or citizen of another, the parties to the contract may choose the law of the EEA State of which he is a national or citizen as the applicable law.


**Mandatory rules**

9. Nothing in regulation 8 affects the application of the mandatory rules of any part of the United Kingdom, irrespective of the applicable law of the contract.


**The 1990 Act**

10.—(1) Subject to the preceding provisions of this Part, the 1990 Act is to be treated as applying to the contract for the purposes of determining the applicable law.

(2) In determining what freedom of choice the parties have under the law of a part of the United Kingdom, the 1990 Act is to be treated as applying to the contract.

*Tony McNulty*
*Graham Stringer*
Two of the Lords Commissioners
of Her Majesty's Treasury

19th July 2001

SI 2001/2635 ·                                    6837

## EXPLANATORY NOTE

*(This note if not part of the Regulations)*

be treated as

be applied in
of the United
contract.

These Regulations specify the law that applies to contracts of insurance, the effecting or carrying out of which constitutes a regulated activity within the meaning of the Financial Services and Markets Act 2000 ("the Act").

a part of the

Regulation 3 specifies the scope of the Regulations and makes certain modifications to the application of the Regulations to friendly societies which are not covered by the insurance directives (within the meaning of Schedule 3 to the Act).

Regulation 4 specifies the applicable law for contracts of general insurance (as defined by the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 ("the Regulated Activities Order") (S.I. 2001/544)) which cover risks in an EEA State.

Regulation 6 makes provision as to how the parties' choice of law must be expressed and specifies that where the risk is covered by Community co-insurance, as defined by Council Directive 78/473/EEC on the coordination of laws, regulations and administrative provisions relating to Community co-insurance (OJ L 151, 7.6.78, p.25) the leading insurer is to be treated as the only insurer.

tract relates is

such a choice
other country.

is a national or
tate of which he

Regulation 8 specifies the applicable law for contracts of long-term insurance (as defined by the Regulated Activities Order) where the policyholder has his habitual residence in an EEA State or the establishment of the policyholder to which the contract relates is in an EEA State. The applicable law is the law of that EEA State unless the law of that State or these Regulations permits the parties to choose a different law.

In circumstances specified by regulations 5 and 8, mandatory rules apply to a contract of insurance regardless of the applicable law.

f any part of the

Where these Regulations apply and regulation 4 or 8 does not specify the applicable law, the Contracts (Applicable Law) Act 1990 is to be treated as applying for the purpose of determining the applicable law. That Act is also to be treated as applying for the purpose of determining what freedom of choice the parties have under the law of a part of the United Kingdom and, in the case of contracts of general insurance, what mandatory rules of other EEA States apply.

to be treated as

of a part of the

*Tony McNulty*
*Graham Stringer*
s Commissioners
esty's Treasury

Act, shall forthwith enter the particulars set forth in the notice in the Marriage Notice Book kept in terms of the Marriage Notice (Scotland) Act, 1878, and shall on the same day post or put up in a conspicuous and accessible place on the door or outer wall of his office a public notice of the intended marriage, in the form as nearly as may be set forth in the Schedule B. annexed to the said last-mentioned Act, but stating, in addition to the particulars therein set out, the nationality of the parties to the intended marriage, and shall keep the same so posted or put up for seven consecutive days thereafter.

### B.—Provisions as to Objections.

3.—(*a*) Any person may enter with the registrar an objection against the granting of the certificate signed by him or on his behalf, and stating his residence and the grounds of his objection.

(*b*) The registrar shall refer any objection to the Registrar-General, who shall decide whether it ought to obstruct the granting of the certificate or not, and shall instruct the registrar accordingly, and the instructions so given shall be carried out by the registrar.

(*c*) The objection shall cease to operate—

(i) if withdrawn by the person entering it ; or

(ii) if it is decided by the Registrar General that it ought not to obstruct the granting of the certificate.

# CHAPTER 41.

An Act to codify the Law relating to Marine Insurance.
[21st December 1906.]

BE it enacted by the King's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows :

### Marine Insurance.

Marine insurance defined.

**1.** A contract of marine insurance is a contract whereby the insurer undertakes to indemnify the assured, in manner and to the extent thereby agreed, against marine losses, that is to say, the losses incident to marine adventure.

Mixed sea and land risks.

**2.**—(1) A contract of marine insurance may, by its express terms, or by usage of trade, be extended so as to protect the assured against losses on inland waters or on any land risk which may be incidental to any sea voyage.

(2) Where a ship in course of building, or the launch of a ship, or any adventure analogous to a marine adventure, is covered by a policy in the form of a marine policy, the provisions of this Act, in so far as applicable, shall apply thereto ; but, except as by this section provided, nothing in this Act shall alter or affect any rule of law applicable to any contract of insurance other than a contract of marine insurance as by this Act defined.

know matters of common notoriety or knowledge, and matters which an insurer in the ordinary course of his business, as such, ought to know ;

(c) Any circumstance as to which information is waived by the insurer ;

(d) Any circumstance which it is superfluous to disclose by reason of any express or implied warranty.

(4) Whether any particular circumstance, which is not disclosed, be material or not is, in each case, a question of fact.

(5) The term "circumstance" includes any communication made to, or information received by, the assured.

**Disclosure by agent effecting insurance.**

**19.** Subject to the provisions of the preceding section as to circumstances which need not be disclosed, where an insurance is effected for the assured by an agent, the agent must disclose to the insurer—

(a) Every material circumstance which is known to himself, and an agent to insure is deemed to know every circumstance which in the ordinary course of business ought to be known by, or to have been communicated to, him ; and

(b) Every material circumstance which the assured is bound to disclose, unless it come to his knowledge too late to communicate it to the agent.

**Representations pending negotiation of contract.**

**20.**—(1) Every material representation made by the assured or his agent to the insurer during the negotiations for the contract, and before the contract is concluded, must be true. If it be untrue the insurer may avoid the contract.

(2) A representation is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk.

(3) A representation may be either a representation as to a matter of fact, or as to a matter of expectation or belief.

(4) A representation as to a matter of fact is true, if it be substantially correct, that is to say, if the difference between what is represented and what is actually correct would not be considered material by a prudent insurer.

(5) A representation as to a matter of expectation or belief is true if it be made in good faith.

(6) A representation may be withdrawn or corrected before the contract is concluded.

(7) Whether a particular representation be material or not is, in each case, a question of fact.

**When contract is deemed to be concluded.**

**21.** A contract of marine insurance is deemed to be concluded when the proposal of the assured is accepted by the insurer, whether the policy be then issued or not ; and, for the purpose of showing when the proposal was accepted, reference may be made to the slip or covering note or other customary memorandum of the contract, although it be unstamped.

## Tʜᴇ Pᴏʟɪᴄʏ.

**22.** Subject to the provisions of any statute, a contract of marine insurance is inadmissible in evidence unless it is embodied in a marine policy in accordance with this Act. The policy may be executed and issued either at the time when the contract is concluded, or afterwards. <span style="float:right">Contract must be embodied in policy.</span>

**23.** A marine policy must specify— <span style="float:right">What policy must specify.</span>
(1) The name of the assured, or of some person who effects the insurance on his behalf :
(2) The subject-matter insured and the risk insured against :
(3) The voyage, or period of time, or both, as the case may be, covered by the insurance :
(4) The sum or sums insured :
(5) The name or names of the insurers.

**24.**—(1) A marine policy must be signed by or on behalf of the insurer, provided that in the case of a corporation the corporate seal may be sufficient, but nothing in this section shall be construed as requiring the subscription of a corporation to be under seal. <span style="float:right">Signature of insurer.</span>

(2) Where a policy is subscribed by or on behalf of two or more insurers, each subscription, unless the contrary be expressed, constitutes a distinct contract with the assured.

**25.**—(1) Where the contract is to insure the subject-matter "at and from," or from one place to another or others, the policy is called a "voyage policy," and where the contract is to insure the subject-matter for a definite period of time the policy is called a "time policy." A contract for both voyage and time may be included in the same policy. <span style="float:right">Voyage and time policies.</span>

(2) Subject to the provisions of section eleven of the Finance Act, 1901, a time policy which is made for any time exceeding twelve months is invalid. <span style="float:right">1 Edw. 7. c. 7.</span>

**26.**—(1) The subject-matter insured must be designated in a marine policy with reasonable certainty. <span style="float:right">Designation of subject-matter</span>

(2) The nature and extent of the interest of the assured in the subject-matter insured need not be specified in the policy.

(3) Where the policy designates the subject-matter insured in general terms, it shall be construed to apply to the interest intended by the assured to be covered.

(4) In the application of this section regard shall be had to any usage regulating the designation of the subject-matter insured.

**27.**—(1) A policy may be either valued or unvalued. <span style="float:right">Valued policy.</span>

(2) A valued policy is a policy which specifies the agreed value of the subject-matter insured.

(3) Subject to the provisions of this Act, and in the absence of fraud, the value fixed by the policy is, as between the insurer and assured, conclusive of the insurable value of the subject intended to be insured, whether the loss be total or partial.

**10**



Financial Services Authority

# Fairness of terms in consumer contracts

## Statement of Good Practice

May 2005

# Contents

| | | |
|---|---|---|
| 1 | Introduction | 3 |
| | (a) Scope | 3 |
| | (b) Status | 5 |
| 2 | The Regulations | 7 |
| 3 | Commentary on the Regulations | 9 |
| | (a) Reducing the risk of unfairness | 9 |
| | (i) 'Valid reason' | 10 |
| | (ii) 'Notice' | 11 |
| | (iii) 'Free to dissolve the contract' | 12 |
| | (iv) 'All the circumstances attending the conclusion of the contract' | 12 |
| | (v) 'All the other terms of the contract' | 13 |
| 4 | Good practice applied to specific types of contract | 14 |
| | (a) Variation of interest rates | 14 |
| | (i) The Regulations | 14 |
| | (ii) Notification | 15 |
| | (iii) Withdrawal | 16 |
| | (b) Variation of long term insurance premiums | 17 |
| | (i) Valid reasons | 17 |
| | (ii) Notification | 18 |
| | (iii) Withdrawal | 19 |

© The Financial Services Authority 2005

# 1 Introduction

1.1   This Statement[1] sets out the FSA's views on how firms may approach drafting fair variation clauses in their standard form consumer contracts. The need for firms to act fairly is central to an efficient retail financial services market and to the strengthening of consumers' confidence in it.

1.2   A variation clause gives a firm power to impose a level of change which the consumer has not explicitly agreed to in advance and which does not require the consumer's agreement at the time any change is made. As such, it directly affects the balance of power between the firm and the consumer with the risk that it weighs too far in favour of the firm.

## (a) Scope

1.3   This Statement is addressed only to firms authorised and regulated by the FSA in relation to products and services that are within the FSA's regulatory scope as set out in the Regulated Activities Order[2]. It will also be of interest to firms' professional advisers. It is particularly relevant for banks, building societies, residential mortgage lenders, insurers and friendly societies. It is also relevant to intermediaries.

1.4   This Statement takes into account the particular nature of financial services markets, the products firms sell and their consumers. It also takes into account the protection provided by the financial services regulatory system and industry self regulation[3].

---

1   This Statement is available on the FSA's website as a stand-alone document and can be found at http://www.fsa.gov.uk/pubs/other/good_practice.pdf. In addition to this we will (by mid-July) incorporate it into our web pages dealing with the Regulations so that firms will be able to see how this Statement and our work under the Regulations fit together.

2   Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 SI 2001/544 (as amended)

3   For example, through the Banking Code (March 2005) and the ABI Advice on Non-investment Protection Policies with Reviewable Premiums and Practical Aspects of Unfair Contract Terms, published by the Association of British Insurers on 19 May 2005 as a consultation document.

1.5    The Unfair Terms in Consumer Contracts Regulations (the Regulations)[4] apply to standard form contract terms which have not been individually negotiated with consumers. 'Consumer' is defined in the Regulations as '*any natural person who, in contracts covered by these Regulations, is acting for purposes which are outside his trade, business or profession*'. The Regulations apply to contracts entered into since 1 July 1995 and make unfair terms unenforceable against the consumer. The Regulations implement the Council Directive[5] on unfair terms in consumer contracts which is a consumer protection measure.

1.6    Firms' also have an obligation to act fairly under the Financial Services and Markets Act 2000 (FSMA) and through our own Principles for Businesses[6] (the Principles) which underpin the work that we are doing with firms as part of our *Treating Customers Fairly* initiative.

1.7    Principle 6 requires a firm to '*pay due regard to the interests of its customers and treat them fairly*' and Principle 7 requires a firm to '*pay due regard to the information needs of its customers and communicate information to them in a way which is clear, fair and not misleading*'. Taken together, Principles 6 and 7 reflect the forerunner SIB Principle[7] that a firm '*should observe high standards of integrity and fair dealing*'.

1.8    There is an overlap between the Regulations and the Principles. The Principles, however, apply to the way that contract terms are used in practice, not just the way they are drafted, so a firm must not use an unfair term (or fair term) unfairly in practice. The Principles also apply to a 'core term' which is not subject to review under the Regulations.

1.9    A core term of a contract is not generally reviewable for fairness under the Regulations, provided it is written in '*plain, intelligible language*' (Regulation 7). Core terms are generally those which define the main subject matter of the contract (such as the goods or services to be supplied) or which relate to the adequacy of the price or remuneration as against the goods or services supplied. Ultimately whether a term is a core term is a matter for the Courts. However, in our view, neither an interest rate variation clause nor a premium review clause is a core term within the meaning of the Regulations because each relates to varying the price rather than to setting the initial price. While the price of a product or service is not something that the FSA would

---

4    The Unfair Terms in Consumer Contracts Regulations SI 1999/2083 which revoked and replaced the Unfair Terms in Consumers Contract Regulations SI/1994/3159 which came into force on 1 July 1995. The 1994 Regulations were drawn to insurance and investment firms' attention by the Personal Investment Authority in Regulatory Update 11, issued on 11 June 1994. The 1999 Regulations were amended by the Unfair Terms in Consumer Contracts (Amendment) Regulations SI 2001/1186 which added the FSA to the list of Qualifying Bodies.

5    Council Directive 93/13/EEC.

6    The Principles were effective from 1 December 2001 when FSMA came into force.

7    Made by the Securities and Investments Board and applying to members of the Personal Investment Authority with effect from 30 April 1990.

4    Fairness of terms in consumer contracts: Statement of Good Practice

normally address[8], as we are not an economic regulator, we will consider whether firms have met their wider obligations to treat consumers fairly with regard to the way in which price variation clauses are operated.

1.10    If we think a term is fair under the Regulations, then we will not challenge it under the Regulations. However, firms may consider issues arising under the Regulations along with their wider obligations to treat customers fairly. We expect firms not to rely on narrow and technical interpretations of the Regulations to seek to justify a contract term that may be, in the wider context, unfair and in which context it may be open to challenge.

1.11    Subscribers to the Banking Code will wish to consider this Statement alongside relevant provisions in the Code. The Code commits its subscribers to act *'fairly and reasonably'* in all dealings with consumers by meeting all the commitments and standards it sets down. Fairness is described by the Code guidance to include consideration of all relevant legislation, including the Regulations. Sponsors of the Code have agreed to review its provisions in light of the views expressed and the good practice indicated in this Statement. Where appropriate and in accordance with the established process for Code revision, amendments will be made to the Personal Banking Code.

## (b) Status

1.12    This Statement is not Handbook text and does not constitute general guidance on rules under FSMA. We do not, at this stage, propose any consequential changes to the Handbook. It reflects statutory obligations that have existed under the Regulations since 1995[9] and existing regulatory obligations rather than adding to them. It is not, of itself, enforceable against firms but we would expect to have regard to it in exercising our powers under the Regulations[10].

1.13    If a firm has been observing any previous regulatory guidelines about the Regulations, then we would have regard to any representations made to us, when we consider exercising our powers under the Regulations, that the firm's contract terms were fair in the light of those guidelines.

---

8    However, where applicable, we would remind firms of MCOB 12 which prevents a firm from levying excessive charges (which includes interest).

9    Where a contract, which was entered into before the Regulations came into force, is still in force and contains terms that would be unfair if the Regulations applied to them, firms must operate the contract fairly and may, in doing so, have regard to how they treat consumers with fair terms in post 1995 contracts.

10    As a Qualifying Body (enforcement authority) under the Regulations, the FSA may, for example, consider a complaint that a particular variation clause is unfair and take action, such as seeking an injunction against the firm. The Regulations provide that the FSA's functions shall be treated as functions under the FSMA. The FSA Handbook Enforcement manual (Chapter 20) sets out our approach to the use of our powers under the Regulations, including dealing with firms and taking enforcement action.

1.14   In publishing a Statement in this form, we are giving ourselves flexibility to keep the text up to date in light of experience and relevant case law. Detailed rules are not necessarily the answer to raising standards because they tend to set a single standard[11] and may not give firms the flexibility they need to deliver fairness to their consumers. This Statement gives firms an indication, rather than an instruction, as to how they may avoid the risk of terms which are unfair. This Statement sits alongside the industry's own good practice in interpreting and applying the Regulations in a way which is consistent with the Principles (and Handbook rules) and *Treating Customers Fairly*.

---

11   As we said in Treating Customers Fairly – Progress and Next Steps Report, July 2004.

6   Fairness of terms in consumer contracts: Statement of Good Practice

# 2 The Regulations

2.1 The overarching test of fairness is in Regulation 5 and provides that a term will be unfair if: *'contrary to the requirement of good faith, it causes a significant imbalance in the parties' rights and obligations arising under the contract, to the detriment of the consumer'*[12].

2.2 Regulation 6 provides that the fairness of a contract term *'shall be assessed, taking into account the nature of the goods or services for which the contract was concluded and by referring, at the time of conclusion of the contract, to all the circumstances attending the conclusion of the contract and to all the other terms of the contract or of another contract on which it is dependent'*.

2.3 Regulation 7 states that a firm *'shall ensure that any written term of a contract is expressed in plain, intelligible language'* and *'if there is doubt about the meaning of a written term, the interpretation which is most favourable to the consumer shall prevail..'*

2.4 Schedule 2 to the Regulations sets out an *'indicative and non-exhaustive list of terms which may be regarded as unfair'*. An example in Schedule 2[13] of a term that may be unfair is one which enables the firm unilaterally to change the terms of the contract. Terms of this kind give firms significant power to alter their agreement with consumers by changing an element of the contract such as price, interest rate or insurance premium. In this Statement, we refer to such elements as 'contract variables'.

---

12  The House of Lords considered the meaning of this test in *Director-General of Fair Trading v First National Bank* [2001] All ER (D) 355. Lord Bingham said that the requirement of significant imbalance is met if a term is so weighted in favour of the supplier as to tilt the parties' rights and obligations under the contract significantly in its favour. He also said that the requirement of good faith is one of fair and open dealing. Openness requires that the term should be expressed fully, clearly and legibly, containing no pitfalls or traps. Fair dealing requires that a supplier should not, whether deliberately or unconsciously, take advantage of the consumer's necessity, indigence, lack of experience, unfamiliarity with the subject matter of the contract, weak bargaining position or similar factors. In the same judgment, Lord Steyn said that *'any purely procedural or predominantly procedural interpretation of the requirement of good faith must be rejected'*.

13  Paragraph 1(j) of Schedule 2. There are other terms listed that firms may wish to have regard to in drafting terms that allow unilateral changes under a contract, for example, paragraphs (k) and (l).

2.5    Schedule 2 suggests that terms which enable a firm unilaterally to change contract variables are less likely to be unfair if:

(i)    the term enables the firm to change a contract variable only with a **valid reason which is specified in the contract**[14]; or

(ii)    the term permits a change in the rate of interest or other charges for financial services under the contract and there is a **valid reason (which is not specified in the contract)** for that change and the contract provides for the firm to give the consumer **notice at the earliest opportunity** thereafter (rather than in advance) and the consumer is **free to dissolve the contract** immediately[15]; or

(iii)    if, in a contract of indeterminate duration, the contract provides for the firm to give the consumer **reasonable notice in advance** of making the change and the consumer is **free to dissolve the contract**[16].

---

14    Paragraph 1(j) of Schedule 2
15    First sub-paragraph of 2(b) of Schedule 2
16    Second sub-paragraph of 2(b) of Schedule 2

# 3 Commentary on the Regulations

3.1    The Regulations apply generally across diverse business areas. They are written in general terms and, to a large extent, do not indicate how they are to be interpreted in any specific context. The terms listed in Schedule 2, are only *'indicative'* of what *'may be regarded as unfair'*. The Regulations do not define or explain what is meant by all the words and phrases used.

3.2    The interpretation of legislation is ultimately a matter for the Courts. However, given that the Regulations are generally worded and in the absence of specific case law addressing the issues, this commentary is intended to help firms interpret and apply the Regulations. It focuses on how firms might use the terms listed in Schedule 2 to assist them in reducing the risk that a particular variation term is unfair and how phrases such as *'valid reason'*, a consumer being *'free to dissolve the contract'* or *'all the circumstances attending the conclusion of the contract'* might be interpreted.

## (a) Reducing the risk of unfairness

3.3    In writing this commentary, we are conveying four key messages:

- Firms should take into account consumers' legitimate interests in relation to contracts over which they have had no influence but to which they will nonetheless be bound.

- Fairness is not contrary to the prudent management of the business but part of it.

- Dwelling on narrow technical arguments to justify a contract term that, in fact, may be unfair, risks future challenge.

- The fact that a variation clause does not offend any of the terms listed in Schedule 2 to the Regulations may not, of itself, remove the risk of unfairness. Firms need to assess whether a term is fair using the Regulations as a whole and in the context of the particular product or service.

3.4    The test of fairness includes the need for firms to take into account consumers' legitimate interests in the context of the inequality of bargaining power between a firm and its consumers. This is important, for example, to a firm in deciding on the extent of any discretion that it will reserve to itself at the time of drafting a standard form contract. If a firm retains extensive and/or open-ended discretion as to if, when and how it changes a contract variable, this may indicate a failure to take into account consumers' legitimate interests and so make the term(s) unfair.

3.5    We think that a term which provides that the firm may unilaterally change the wording of any other term in the contract which is found to be unfair, in order to remedy that unfairness, is not inherently unfair. However, in our view, any term of this kind which confers an unnecessarily broad discretion on the firm or could be used to the advantage of the firm, rather than the consumer, is likely to be unfair.

## (i) 'Valid reason'

3.6    Schedule 2 indicates that a variation clause is less likely to be regarded as unfair if it can only be made with a valid reason specified in the contract. However, fairness should be assessed in light of the Regulations as a whole and, for example, just specifying a valid reason in the contract may not go far enough to satisfying the test of fairness. It may also be necessary, for example, to provide for notice to consumers that the change has been, or will be, made. Particular attention to the requirements of fairness is necessary where other factors, such as the consumer being locked-in to a contract (see paragraphs 4.12-4.15 below), may be to the advantage of the firm rather than the consumer.

3.7    Ultimately, only a Court may decide what constitutes a 'valid reason'. However, a general indication of what we might consider to be a valid reason is one which allows a firm to change contract variables to respond proportionately to changes in general law or to the decisions of the Financial Ombudsman Service, to meet regulatory requirements or to reflect new industry guidance and codes of practice which are there to raise standards of consumer protection. Likewise, a valid reason may be one which allows a firm to respond proportionately to changes in the Bank of England base rate, other specified market rates or indices or tax rates or to reflect other legitimate cost increases or reductions associated with providing the particular product or service.

3.8     If a contract contains a clause which provides that the firm may change a contract variable, for example: 'for any reason we see fit', 'for any reason that we consider reasonable at the time of the change' or 'to cover unexpected costs', in our view that firm is not specifying a valid reason in the contract but is, instead, leaving its options open. We would expect a 'valid reason' to be, amongst other things, clearly and unambiguously defined.

3.9     The greater the number of valid reasons given in the contract then, potentially, the less plain and intelligible the variation clause may be.

3.10    We take the view that the Regulations are intended to operate in a free-market economy and do not constrain a firm from managing its business prudently. Therefore we would not intend to enforce the Regulations in a way which impedes the legitimate commercial judgements that firms make having regard to the overall well-being of their business and of all their consumers. However, the Regulations are designed to give effect to a Directive whose purpose is to protect consumers on the assumption that there tends to be an inequality of bargaining power between firms and their consumers. Prudence and fairness are not mutually exclusive factors. Firms will have to make careful judgements when writing their consumer contracts to achieve the right balance.

### (ii) *'Notice'*

3.11    The power to change a contract variable, especially price, is a sensitive one for consumers. This is not just because of any immediate financial impact but also because the change may lead to the consumer having to take substantive and difficult financial planning decisions for which there may have been little time to prepare. This underlines the value of firms giving their consumers notice of changes to contract variables.

3.12    Schedule 2 refers either to *'reasonable'* notice being given in advance of a change to a contract variable or to notice being given *'at the earliest opportunity'* after a change. What is sufficient to meet these requirements in practice will differ according to the particular product or service and the particular circumstances[17]. Firms may consider providing for notice when changes are made but also when consumers would expect a beneficial change but when one is not made. Firms may also consider whether their contractual notice periods give consumers sufficient time to review the impact of the change and determine whether they wish to respond to it.

---

[17]    With regard to any designated investment business, we would remind firms of COB 4.2.13R which requires a firm that has amended its contract without the consumer's consent, to give at least 10 business days' notice to the consumer before conducting any designated investment business with that consumer on any amended terms, unless it is impracticable in the circumstances to do so. There are also notice requirements in MCOB 7.

### (iii) 'Free to dissolve the contract'

3.13    Ultimately the meaning of being *'free to dissolve the contract'* is a matter for the Courts to decide. Our view is that, in the context of contracts for financial services, being *'free to dissolve the contract'* means that the consumer is able to withdraw from the contract without inhibition such as, for example, a requirement to make a payment or to give prior notice[18]. In our view, that is why the Regulations use the term 'free' rather than 'able' to dissolve the contract.

3.14    In the case of contracts intended to provide a benefit over a long period the ability of a consumer to dissolve the contract may not, in all instances, be the sole consideration when it comes to the wider fair treatment of consumers. Withdrawing from the contract may be particularly disadvantageous for some consumers. Firms should consider this in drafting contract terms. For example, in the case of some long term insurance contracts, the consumer may be technically free to dissolve but, in practice, may find it difficult to obtain alternative cover because of the need for fresh underwriting.

3.15    If a firm is aware that a contract variable, such as price or insurance premium, is likely to increase to such a level that it may become uneconomic or unaffordable for any particular class of consumers then it may be unfair to include a variation clause. Similarly, it may be unfair for a firm to include a variation clause if it intends, without fully informing the consumer, to adopt a low price strategy at the outset only to recover the cost of this low price strategy later.

### (iv) 'All the circumstances attending the conclusion of the contract'

3.16    In the case of financial services contracts, which can be complex, one of the *'circumstances attending the conclusion of the contract'* may be the consumer's relative lack of understanding of the financial system, how products work and the terminology used in relation to them. The Regulations require all terms to be written in *'plain, intelligible'* language and this gives consumers a better opportunity to understand the contract that they are entering into. However, a term that is plain and intelligible is not automatically a fair term and firms should comply with the Regulations as a whole.

3.17    If the contract is supported by product literature which is clear, fair and not misleading[19] then this may further help the consumer to understand how the product works. It also means that intermediaries will be better equipped to inform and advise their clients.

---

18    COB 6.12, about treating with profits policyholders fairly, relating to the application of market value reductions and the calculation of surrender values will have effect from 30 June and 31 December 2005 respectively.

19    COB 2.1.3R, COB 3.8.4, ICOB 2.2.3R and MCOB 2.2.6R.

12    Fairness of terms in consumer contracts: Statement of Good Practice

3.18    Changing a contract variable may benefit the firm or its consumers. If a firm were to draft its contracts so that a variation clause could only ever be used to its advantage and never to the advantage of its consumers, this is likely to be unfair. A term that only allows a change which is proportionate to the underlying reason for the change is more likely to be fair.

3.19    Another '*circumstance attending the conclusion of the contract*' may be where a firm has a contract with a third party (for example, a re-insurer). The terms of that contract may, to some extent, drive the terms of the firm's consumer contracts. This does not lessen the requirement for the firm's consumer contracts to be fair under the Regulations. For example, a reference in the consumer's contract to changes in reinsurance rates as a reason for an increase in price is only a valid reason if the corresponding terms in the reinsurance contract would be 'valid reasons' if they were written in the consumer contract and therefore assessed in light of the Regulations.

### (v) '*All the other terms of the contract*'

3.20    In assessing whether a variation term is fair, the Regulations require consideration of '*all the other terms of the contract*'. Terms in a contract for financial services which deserve particular consideration may, for example, be those requiring notice of the variation and any terms about if, when and how the consumer may dissolve the contract (such as a requirement for the consumer to pay a charge or give a specified period of notice before the contract is dissolved).

3.21    Where a term in a standard form consumer contract is unfair, the Regulations make it unenforceable against the consumer. If a firm attempts to rely on an unfair term it is at risk of challenge. Firms will wish to take into account the legal, reputational and operational risks of a Court finding a term to be unfair and then striking it out of the contract. In some cases, this could have prudential implications for the firm because a Court may not necessarily void the entire contract (so that the effect on the firm could be, for example, that the reviewable premium payable on a long term insurance contract becomes fixed).

3.22    In deciding whether to take enforcement action, for example whether to seek an injunction against a firm, the FSA will consider not only the contract term itself but also any undertakings from the firm about the way in which the contract is operated in practice. We will consider whether existing consumers are treated as fairly as new consumers whose contracts contain terms which are fair. It is possible that a Court may also take a pragmatic approach, rather than simply striking out the unfair term, but this would be a matter for the Court.

# 4 Good practice applied to specific types of contract

4.1    The following paragraphs set out what we consider to be good practice in the case of two specific types of contract – those with an interest rate variation clause or a premium review clause. They should be read in the context of the preceding part of this Statement.

4.2    The examples given in the following paragraphs are generic and serve only to illustrate a particular aspect of fairness. They are not product specific and are not intended to cover all types or variations of products.

## (a) Variation of interest rates

4.3    Interest rate clauses operate in a variety of ways. For example, they may provide for a fixed interest rate, a variable interest rate, a tracker rate (which varies in line with an external benchmark, such as the Bank of England base rate) or a rate which is fixed for a defined period at the end of which it will change to a variable rate.

4.4    In our view, the power to vary interest rates during the lifetime of a contract is not inherently unfair. Indeed, a variable rate may be the most attractive for many consumers. It may also give firms the flexibility they need to manage their business prudently and remain competitive. However, the contract terms should not be drafted in a way which allows the firm, in varying these rates, to take unfair advantage of the consumer. It is likely to contribute to the fairness of a term if it sets out if, when and how the interest rate may change.

### (i) The Regulations

4.5    Ultimately, whether a term is a core term is a matter for the Courts. In our view, an interest rate variation clause is not a core term within the meaning of the Regulations because it relates to varying the price, rather than setting the initial price. So, for example, where a contract provides for an interest rate to be fixed for a certain period, at the end of which it changes to a variable rate

or where a savings account provides for different fixed interest rates to apply depending on the amount maintained in the account and includes a power to alter the thresholds, then the drafting of the variation clause is, in our view, subject to the test of fairness. However, a term which provides for a fixed interest rate and no more would generally not be within the scope of the Regulations because the price has been set for the duration of the contract.

## (ii) Notification

4.6   Setting interest rates is a commercial, not a regulatory, decision. When firms design product literature they must ensure that any information about what the interest rate is and if, when and how it may change and how notification of any such change will be given is clear, fair and not misleading.

4.7   In the case of variable interest rate accounts, one of the factors in deciding whether rates are changed may be the Bank of England base rate or some other external index. With tracker accounts there is a strict correlation between the two but in other cases the link may be more implicit and a separate decision about if, when and how to pass interest rate changes on to consumers must be made by the firm. Variation clauses must be drafted in a way which is fair having regard to, amongst other things, the power to change rates and the power to decline to change rates, or to delay a change.

4.8   Interest rate variation terms should be plain and intelligible about whether they track an external rate or not. In addition, firms must ensure that product literature is clear, fair and not misleading, including as to whether the interest rate will track an external rate.

4.9   A tracker account contains a variation clause which provides for interest to be paid at a rate which follows, by a defined amount and within a defined period, Bank of England base rate or some other external index. In our view, such a variation clause is likely to be fair provided it has been drafted in 'plain, intelligible' language. Any product literature which describes the clause should do so in a way which is clear, fair and not misleading. So long as the clause governing the rate for a tracker account provides only for changes by the defined amount[20], it is likely to be fair. However, if a term of the contract for a tracker account allows the firm to change the relationship between the external rate and the rate applicable to the consumer, then that term will need closer consideration as to whether it is fair.

4.10  Terms which govern notifying consumers of interest rate changes should be fair. These terms also affect the fairness of interest rate variation terms. Whether a term is fair takes into account the respective costs and benefits of different forms of notification including, for example, personal notification. In our view,

---

20   However, where applicable, we would remind firms of MCOB 12 which prevents a firm from levying excessive charges (which includes interest).

personal notification is likely to contribute to fairness. Personal notification is likely to be less important in relation to a term which only allows changes to the interest rate which reflect changes in an external benchmark. There may be circumstances in which a term may fairly provide exceptions to the general position on notifying consumers personally. A different form of notification, for example in media and branch notices, may be appropriate, for example, for accounts which contain only a small amount of money. Subscribers will wish to refer to provisions of the Banking Code.

4.11    In deciding on how to notify consumers in practice, firms should consider all terms in the contract as well as any expectations that they may have created in product literature or other communications. It may be that, having considered the costs and benefits of giving personal notification, firms wish to specify a threshold (for example, by reference to the size of the change) below which they would not normally expect to give personal notification. Subscribers will wish to refer to provisions of the Banking Code.

### (iii) Withdrawal

4.12    A contract 'locks-in' a consumer where, in order to withdraw from the contract, the consumer is required to give advance notice and/or pay a cost and/or give up a benefit (such as accrued interest). Firms should take particular care to ensure that interest rate variation terms that apply to locked-in consumers are fair. It is likely to contribute to the fairness of an interest rate variation term in a contract for a locked-in consumer if there is some connection between interest rate changes that apply to locked-in consumers and those which apply to non locked-in consumers.

4.13    The constraints of a lock-in clause may weigh the balance of rights and obligations between a firm and its consumers in favour of the firm. Therefore, where a firm wishes to have flexibility to change a contract variable, such as the interest rate, it may consider drafting the contract to permit the change to be made only where any lock-in clause is not exercised. A term that provides that the consumer will be given advance notice of the change is more likely to be fair and it may not be necessary for the contract to specify one or more valid reasons for the change. However, in each case, fairness should be assessed in light of the Regulations as a whole.

4.14    A firm may wish to be able to change a contract variable and exercise the lock-in. In these circumstances, we are more likely to regard the variation term as fair where the change is made with a valid reason specified in the contract. However, as with all terms to which the Regulations apply, fairness should be assessed in light of the Regulations as a whole.

4.15    In all cases, there is a balance to be struck between the rights and obligations of the firm and the consumer under the contract. In exchange for the

16    Fairness of terms in consumer contracts: Statement of Good Practice

constraints of a lock-in clause, the consumer often benefits from other more attractive terms. Equally, there are financial and competition benefits to the firm from the certainty that contracts with lock-in terms give them. Firms must balance their interests with consumers' interests in drafting contract terms to ensure they are fair under the Regulations. Subscribers will wish to refer to provisions of the Banking Code.

## (b) Variation of long term insurance premiums

4.16    Where an insurance contract is intended to provide a benefit over a long period and is not subject to renewal (at which point fresh cover may be put in place as well as a new premium being set), a premium review clause gives a right to the firm to review and, if it believes it necessary, to change the price of the contract. The fairness of such clauses is considered here with particular reference to life and long term health insurance contracts such as critical illness, whole of life, permanent health insurance (otherwise known as income protection) and long term care.

4.17    Premiums may be calculated, in part, on assumptions relating to various contingencies. Where a premium is guaranteed, the risk that assumptions may change is retained by the firm but premiums are often higher to allow for the risk that those assumptions may change during the life of the contract, even though they may not. A reviewable premium generally provides for the risk of assumptions changing to be shared between the firm and the consumer. We recognise that without this sharing of risk, some products may not be commercially viable and consumers could be faced with less choice and less protection. However, care needs to be taken to ensure that premium review clauses are not significantly one-sided or that they may operate only to the benefit of the firm.

4.18    It may be unfair for a review clause to give the firm the opportunity, but not the obligation, to review premiums because this would allow the firm to only review premiums where the outcome would be to the firm's advantage. Where a contract contains a obligation for a firm to carry out a review then the firm must ensure that the review is carried out.

### (i) Valid reasons

4.19    A valid reason may be one that allows firms to review premiums in the light of changes in assumptions about the future, for example, assumptions relating to the expected future number and timing of claims. However, a valid reason is, for example and in our view, unlikely to be one which, in a pure protection contract, allows the firm to recoup its investment losses on the contract incurred up to the date of the review or one which gives it the discretion to increase profitability margins beyond those assumed at the outset of the

contract. Similarly, a valid reason is unlikely, in our view, to be one which allows the firm unfairly to target a particular group of policyholders for an increase in premium or one which seeks to cover losses/higher costs incurred elsewhere in the firm's business.

4.20    If a firm does not base its original pricing decisions on a carefully considered estimate of cost variables such as the cost of providing the benefits under the contract and expected investment returns over the long term, then, in our view, it may be unfair for the firm to include a premium review clause.

4.21    Similarly, if a contract has a low initial price consciously based on overly optimistic assumptions about investment performance it is, in our view, likely to be unfair for the firm to include a premium review clause.

4.22    In the case of contracts with an investment element, it is important for consumers to understand what they are paying for[21]. The premium should be described in a way that is clear, fair and not misleading. It will be made up of various amounts, for example an amount in respect of the protection afforded by the product (the risk charge) and management and/or investment fund charges. A fair term is unlikely to be one which, for example, allows management and/or fund charges to be increased in order to disguise the fact that the cost of protection has increased but this cost has not actually been reflected in the risk charge.

## (ii) Notification

4.23    Notification terms must be fair. They can also affect the fairness of premium review clauses. Notification terms include terms which deal with: how consumers will be notified of an impending premium review; the time by which consumers can expect to be advised of the outcome of the review; and whether they will be told what their options are at that time[22].

4.24    It may be unfair for firms to alter premiums using a power that is only triggered when an assumption changes, if their records do not indicate what the initial assumptions were. Generally[23], if assumptions remain the same then it should not be necessary for a firm to change the risk based elements of the premium pursuant to a review clause.

---

21    We would remind firms of ICOB 4.2.15R and 5.5.14R about disclosure requirements for fees, premiums and other costs and ICOB 4.5 on excessive charges.

22    See also ICOB 5.3.24R which relates to mid term changes and applies to changes in premiums (unless the change conforms to a previously disclosed formula).

23    Unless a definite future change in premium was part of the design of the product and was made known to and accepted by consumers taking up the product.

18    Fairness of terms in consumer contracts: Statement of Good Practice

### (iii) Withdrawal

4.25    Where the consumer is not free to dissolve the contract, firms will wish to consider the impact this may have on the overall fairness of the contract. In addition, any terms concerning surrender must themselves be fair. Fairness suggests that where the product has a surrender value, the consumer should be able to withdraw from the contract without disproportionate cost and to claim the surrender value. However, withdrawal is, in many cases, just one of the options to be considered. In some cases the consumer may be technically free to dissolve but, in practice, may not be able to obtain alternative cover because of the need for fresh underwriting.

The Financial Services Authority
25 The North Colonnade  Canary Wharf  London E14 5HS
Telephone: +44 (0)20 7066 1000  Fax: +44 (0)20 7066 1099
Website: http://www.fsa.gov.uk
Registered as a Limited Company in England and Wales No. 1920623. Registered Office as above.



This edition includes summaries of recent FSA regulatory and policy developments and other matters emerging more generally from speeches and newsletters. The items below are intended to provide a high level summary of issues that are relevant to managing agents.

**Section 1 – Regulatory and Policy Developments (of interest generally)**

1.1    Co-operation arrangements between the FSA and Lloyd's

1.2    New FSA framework for recognising industry guidance

1.3    FSA process guide to decision making on Schemes of Arrangement for insurance firms

1.4    Good and poor practices in Key Features Documents

1.5    FSA consults on integrated regulatory reporting

1.6    FSA's updates to PPI progress

1.7    FSA case studies on the new Conduct of Business Sourcebook (COBS)

1.8    FSA publishes FAQs on communicating with clients, including financial promotion

**Section 2 – Other themes emerging from speeches and newsletters (for specific review)**

2.1    "Crime in the Financial Markets" – speech by Philip Robinson

2.2    Role of the Ombudsman under principles-based regulation

2.3    "FSA's regulatory approach in Europe and globally" – speech by Verena Ross

**Section 3 – Other areas of interest**

FSA Handbook Development Newsletter

Financial Ombudsman News

# 1    Regulatory and Policy Developments

## 1.1    Co-operation arrangements between the FSA and Lloyd's

The FSA and the Society of Lloyd's ("Lloyd's") have worked together to agree a revised co-operation agreement which revokes the previous co-operation arrangement of 2001. Both the FSA and Lloyd's have statutory responsibilities in relation to regulating the insurance business underwritten in the Lloyd's market. These arrangements aim to maintain an effective working relationship on authorisation, supervision, and enforcement matters in respect of firms and individuals operating within the Lloyd's market and to minimise duplication.

http://www.fsa.gov.uk/pubs/other/fsa_lloyds.pdf

## 1.2 FSA Policy Statement - New FSA framework for recognising industry guidance

The FSA has published a Policy Statement (PS) outlining a new framework for recognising Industry Guidance. The new framework is viewed as an important step in the move towards principles-based regulation. The FSA believes that Industry Guidance will give firms help and advice on ways of complying with FSA principles and high-level rules, in a way that should not only stimulate flexibility and innovation but also tailor the advice to different sectors.

Lloyd's Compliance and the LMA Regulatory Committee have discussed the potential impact of Industry Guidance on managing agents. Neither Lloyd's nor the LMA will seek accreditation for guidance without mutual agreement.

The FSA has set up a dedicated Industry Guidance web page, which will include all current confirmed Industry Guidance:

http://www.fsa.gov.uk/pages/About/What/industry_guidance/index.shtml

## 1.3 FSA process guide to decision making on Schemes of Arrangement for insurance firms

The FSA has published a guide that outlines how it engages with Schemes of Arrangement (Schemes), in particular its process for reviewing Schemes proposed by regulated firms and the criteria it uses in that assessment. The guide covers both solvent and insolvent Schemes.

Schemes are governed by the Companies Act rather than the Financial Services and Markets Act 2000 (FSMA). However, the FSA's Principles for Businesses are relevant to regulated firms that propose Schemes (particularly Principles 6, 7 and 11). For example, if a firm is proposing to implement a Scheme, it must inform the FSA (Principle 11). These Principles are relevant to how Schemes are constructed and implemented and form the basis of the FSA's evaluation of Schemes. The FSA reviews all Schemes to reduce the risk to its objectives of maintaining confidence in the financial system and securing the appropriate degree of protection for consumers. Although this is not a formal consultation, the FSA welcomes views on the decision criteria set out in this guide.

http://www.fsa.gov.uk/pages/Library/Other_publications/Miscellaneous/2007/schemes_arrangement.shtml

## 1.4 FSA's good and poor practices in Key Features Documents

The FSA has published a document which details good and poor practices in Key Features Documents (KFDs) after a review of over 200 KFDs drawn from a cross-section of products from large and small firms. The review was carried out against a set of criteria aimed at ensuring compliance with:

- FSA Principle 7, which states that a firm must pay due regard to the information needs of its clients, and communicate information to them in a way which is clear, fair and not misleading;
- FSA Conduct of Business (COB) rules;
- FSA Treating Customers Fairly (TCF) Outcome 3, which states that customers should be provided with clear information and be kept appropriately informed before, during and after the point of sale; and

- accepted good practice for clear design and language.

The FSA has identified the main areas of concern as explanations of risk, charges, use of jargon and more general information about the product and its aims.

*Good practice.* The FSA considers that, in terms of good practice, a consumer should be able to readily locate the KFD in the pre-sales pack and understand its purpose. As such, a KFD should be prominently titled; appear as a separate item and not part of any other literature; not repeat the terms and conditions; and clearly state the document's importance, purpose, context and what a consumer should do with it. The text of the KFD should also be in short distinct paragraphs and in a clear font in an easily readable size.

The FSA will continue its ongoing supervision of firms and engage with firms' senior management to find out how far they are delivering on their TCF target outcomes. The FSA requires firms to make improvements to their KFDs over the course of the next year and to explicitly link this work to the TCF December 2008 deadline. A review of the latest versions of some of the FSA's original sample of KFDs will be carried out by November 2008. The FSA intends to repeat the original review in its entirety by the end of 2010 to coincide with its post implementation review of COBS.

http://www.fsa.gov.uk/pubs/other/key_features.pdf

## 1.5 FSA consults on integrated regulatory reporting

The FSA has published a consultation paper entitled "Integrated Regulatory Reporting (IRR): Changes to reporting requirements affecting most firms". The FSA says it is proposing to make it easier for firms to complete both the Complaints Return and the Retail Mediation Activities Return (RMAR) by simplifying and shortening them.

These proposals are likely to impact managing agents who submit a Complaints return under the requirements set out in the Dispute Resolution: Complaints (DISP) Sourcebook and firms that undertake insurance mediation activity. These proposals are consistent with the FSA's "Better Regulation" initiative.

These revised reporting requirements will be introduced in July 2008 at the same time as the FSA's new strategic electronic reporting system. From October 2008 the new system will replace the current tactical regulatory reporting, part of the FSA's 'Firms Online' which is used by firms to submit their Complaints Return and RMAR.

http://www.fsa.gov.uk/pubs/cp/cp07_17.pdf

## 1.6 FSA's thematic update on the sale of Payment Protection Insurance (PPI)

The FSA has published a thematic update and consumer research paper relating to the sale of Payment Protection Insurance (PPI) which contains the FSA's interim findings from its third phase of work to review PPI selling standards. The review assessed whether firms had made improvements in five key areas. The findings show improvements in some areas, but also that many firms are still failing to treat their customers fairly. The FSA expects firms operating in the PPI market to meet the FSA's Principles and Rules, in particular Principle 6 which relates to Treating Customers Fairly (TCF) and the Insurance Conduct of Business Rules (ICOB). As part of its third phase of

work the FSA has visited 150 firms across the market and commissioned an external party to mystery shop unsecured loan providers.

The FSA states that as firms have been given due warning of their obligations to treat customers fairly, both generally and on PPI in particular, it will now seek to impose higher fines for firms in the PPI market where standards fall below required levels. It will also consider using a range of other enforcement penalties, where appropriate, including the variation or cancellation of a firm's permission to sell PPI and the suspension of its sales forces.

http://www.fsa.gov.uk/pubs/other/ppi_thematic_update.pdf

### 1.7   FSA case studies on the New Conduct of Business Sourcebook

The FSA has developed a series of case studies on the new Conduct of Business Sourcebook (COBS) - these are designed to help firms understand the implications of the new COBS rules and principles-based regulation. They do not constitute individual or general guidance.  The case studies are designed to show how the FSA's financial promotion rules for investment products and services might operate in practice (they are not intended to be copied as examples of good practice). The FSA also answers some of the questions that it would expect firms to ask themselves when designing promotions.

http://www.fsa.gov.uk/Pages/Doing/Regulated/newcob/help/index.shtml

### 1.8   FSA publishes FAQs on communicating with clients, including financial promotion

The FSA has published a set of answers to frequently asked questions relating to communications with retail clients under the new Conduct of Business Sourcebook (COBS), including financial promotions. A copy of the FAQs is available at the link provided below.

http://www.fsa.gov.uk/pages/Doing/Regulated/newcob/comms2.shtml

## 2   Other themes emerging from speeches and newsletters

### 2.1   "Crime in the Financial Markets" – speech by Philip Robinson
(FSA Financial Crime & Intelligence Division Director)

The key points included:

- FSA's financial crime objective has a broad scope – not only fraud and money-laundering (including terrorist financing) but also market misconduct and other crimes;
- Focus _is_ on firms' risk management systems and controls.  Regulated persons:
  - need to be aware of the risk of their business being used in connection with financial crime;
  - should take appropriate measures to prevent financial crime, facilitate its detection and monitor its incidence; and
  - should devote adequate resources to addressing the financial crime risks they face.
- FSA has six financial crime outcomes that they assess they need to achieve in order to successfully reduce crime in the financial markets.
- Combating market abuse is one of the FSA's top priorities.

http://www.fsa.gov.uk/pages/Library/Communication/Speeches/2007/0905_pr.shtml

## 2.2 Role of the Ombudsman under principles-based regulation

The speech by Clive Briault, Managing Director, FSA Retail Markets, covered:

- current market turbulence – outlining the causes behind the current difficulties in the UK banking market;
- the role of the FSA, its statutory objectives, and the distinct roles of regulator, Financial Ombudsman Service and Financial Services Compensation Scheme in the UK financial services market;
- how the FSA and the Ombudsman work together in practice; and
- the FSA's move towards a more principles-based approach to regulation and the essential role of the Ombudsman in this context.

Mr. Briault referred to the role of the Ombudsman under principles-based regulation. He recognised that some firms are concerned that principles-based regulation will create more uncertainty about their obligations to consumers, and the chance that the Ombudsman may interpret high-level rules and principles differently from the FSA. However, Mr. Briault emphasised that the vast number of cases considered by the Ombudsman relate to disputes of fact or the application of general legal principles. He believes that this is unlikely to change as a result of the move towards more principles-based regulation.

http://www.fsa.gov.uk/pages/Library/Communication/Speeches/2007/0928_cb.shtml

## 2.3 "FSA's regulatory approach in Europe and globally" – speech by Verena Ross (Director, FSA Strategy and Risk)

The speech addressed the concerns of some firms that legislative developments in Europe could impede the FSA's move to more principles-based regulation (MPBR). The FSA's view is that European Community Law is not incompatible with MPBR. Directives should be high level and outcome focused, leaving the FSA with sufficient scope to establish how to achieve the objective. The FSA is of the view that regulatory convergence (one of the aims of the Lamfalussy framework) can only be defined meaningfully in terms of outcomes. In summary the FSA:

- supports the Lamfalussy process and believes that there should be a shift of focus from Level 2 to Level 3 work;
- is not convinced of the need for radical reform of the EU regulatory architecture, since it could be premature at this time and potentially entail more costs than benefits; and
- welcomes the recent developments in the EU/US dialogue and looks forward to engaging further with the SEC and Commission on matters of mutual reliance in order to facilitate cross-border business.

http://www.fsa.gov.uk/pages/Library/Communication/Speeches/2007/0913_vr.shtml

## 3   Other areas of possible interest

This newsletter aims to summarise information relevant to managing agents. The links below refer to regulatory information that is relevant to the insurance industry as a whole rather than being directly relevant to managing agents. They are included for interest.

FSA Handbook Development Newsletter

http://www.fsa.gov.uk/pubs/handbook/hb90.pdf

Financial Ombudsman News

http://www.financial-ombudsman.org.uk/publications/ombudsman.htm

If you have any questions on anything in this bulletin please contact:

Michelle Everitt    Deputy Head of Compliance         020 7327 5936 or

michelle.everitt@lloyds.com

This publication is intended for Lloyd's managing agents only and must not be passed to third parties without the prior consent of Lloyd's. This publication is for general information purposes only and should not be regarded as a substitute for obtaining professional advice. Whilst all care has been taken to ensure the accuracy of the information Lloyd's does not accept any responsibility for any errors or omissions. Lloyd's does not accept any liability for any loss to any person acting or refraining from action as the result of, but not limited to, any statement, fact, figure, expression of opinion or belief contained in the publication.

# Statutory Instrument 1999 No. 2083

## The Unfair Terms in Consumer Contracts Regulations 1999

© Crown Copyright 1999

Statutory Instruments printed from this website are printed under the superintendence and authority of the Controller of HMSO being the Queen's Printer of Acts of Parliament.

The legislation contained on this web site is subject to Crown Copyright protection. It may be reproduced free of charge provided that it is reproduced accurately and that the source and copyright status of the material is made evident to users.

It should be noted that the right to reproduce the text of Statutory Instruments does not extend to the Queen's Printer imprints which should be removed from any copies of the Statutory Instrument which are issued or made available to the public. This includes reproduction of the Statutory Instrument on the Internet and on intranet sites. The Royal Arms may be reproduced only where they are an integral part of the original document.

The text of this Internet version of the Statutory Instrument which is published by the Queen's Printer of Acts of Parliament has been prepared to reflect the text as it was Made. A print version is also available and is published by The Stationery Office Limited as the **The Unfair Terms in Consumer Contracts Regulations 1999** , ISBN 0 11 082990 5. The print version may be purchased by clicking here. Braille copies of this Statutory Instrument can also be purchased at the same price as the print edition by contacting TSO Customer Services on 0870 600 5522 or e-mail:customer.services@tso.co.uk.

Further information about the publication of legislation on this website can be found by referring to the Frequently Asked Questions.

To ensure fast access over slow connections, large documents have been segmented into "chunks". Where you see a "continue" button at the bottom of the page of text, this indicates that there is another chunk of text available.

---

### STATUTORY INSTRUMENTS

**1999 No. 2083**

# CONSUMER PROTECTION

## The Unfair Terms in Consumer Contracts Regulations 1999

| | |
|---|---|
| *Made* | *22nd July 1999* |
| *Laid before Parliament* | *22nd July 1999* |
| *Coming into force* | *1st October 1999* |

Whereas the Secretary of State is a Minister designated[1] for the purposes of section 2(2) of the European Communities Act 1972[2] in relation to measures relating to consumer protection:

Now, the Secretary of State, in exercise of the powers conferred upon him by section 2(2) of that Act, hereby makes the following Regulations:-

**Citation and commencement**
   **1.** These Regulations may be cited as the Unfair Terms in Consumer Contracts Regulations 1999 and shall come into force on 1st October 1999.

**Revocation**
   **2.** The Unfair Terms in Consumer Contracts Regulations 1994[3] are hereby revoked.

**Interpretation**
   **3.** - (1) {t2} In these Regulations-

   "the Community" means the European Community;

   "consumer" means any natural person who, in contracts covered by these Regulations, is acting for purposes which are outside his trade, business or profession;

   "court" in relation to England and Wales and Northern Ireland means a county court or the High Court, and in relation to Scotland, the Sheriff or the Court of Session;

   "Director" means the Director General of Fair Trading;

   "EEA Agreement" means the Agreement on the European Economic Area signed at Oporto on 2nd May 1992 as adjusted by the protocol signed at Brussels on 17th March 1993[4];

   "Member State" means a State which is a contracting party to the EEA Agreement;

   "notified" means notified in writing;

"qualifying body" means a person specified in Schedule 1;

"seller or supplier" means any natural or legal person who, in contracts covered by these Regulations, is acting for purposes relating to his trade, business or profession, whether publicly owned or privately owned;

"unfair terms" means the contractual terms referred to in regulation 5.

(2) In the application of these Regulations to Scotland for references to an "injunction" or an "interim injunction" there shall be substituted references to an "interdict" or "interim interdict" respectively.

### Terms to which these Regulations apply

4. - (1) These Regulations apply in relation to unfair terms in contracts concluded between a seller or a supplier and a consumer.

(2) These Regulations do not apply to contractual terms which reflect-

(a) mandatory statutory or regulatory provisions (including such provisions under the law of any Member State or in Community legislation having effect in the United Kingdom without further enactment);

(b) the provisions or principles of international conventions to which the Member States or the Community are party.

### Unfair Terms

5. - (1) A contractual term which has not been individually negotiated shall be regarded as unfair if, contrary to the requirement of good faith, it causes a significant imbalance in the parties' rights and obligations arising under the contract, to the detriment of the consumer.

(2) A term shall always be regarded as not having been individually negotiated where it has been drafted in advance and the consumer has therefore not been able to influence the substance of the term.

(3) Notwithstanding that a specific term or certain aspects of it in a contract has been individually negotiated, these Regulations shall apply to the rest of a contract if an overall assessment of it indicates that it is a pre-formulated standard contract.

(4) It shall be for any seller or supplier who claims that a term was individually negotiated to show that it was.

(5) Schedule 2 to these Regulations contains an indicative and non-exhaustive list of the terms which may be regarded as unfair.

### Assessment of unfair terms

6. - (1) Without prejudice to regulation 12, the unfairness of a contractual term shall be assessed, taking into account the nature of the goods or services for which the contract was concluded and by referring, at the time of conclusion of the contract, to all the circumstances attending the conclusion of the contract and to

all the other terms of the contract or of another contract on which it is dependent.

(2) In so far as it is in plain intelligible language, the assessment of fairness of a term shall not relate-

(a) to the definition of the main subject matter of the contract, or

(b) to the adequacy of the price or remuneration, as against the goods or services supplied in exchange.

**Written contracts**
7. - (1) A seller or supplier shall ensure that any written term of a contract is expressed in plain, intelligible language.

(2) If there is doubt about the meaning of a written term, the interpretation which is most favourable to the consumer shall prevail but this rule shall not apply in proceedings brought under regulation 12.

**Effect of unfair term**
8. - (1) An unfair term in a contract concluded with a consumer by a seller or supplier shall not be binding on the consumer.

(2) The contract shall continue to bind the parties if it is capable of continuing in existence without the unfair term.

**Choice of law clauses**
9. These Regulations shall apply notwithstanding any contract term which applies or purports to apply the law of a non-Member State, if the contract has a close connection with the territory of the Member States.

**Complaints - consideration by Director**
10. - (1) It shall be the duty of the Director to consider any complaint made to him that any contract term drawn up for general use is unfair, unless-

(a) the complaint appears to the Director to be frivolous or vexatious; or

(b) a qualifying body has notified the Director that it agrees to consider the complaint.

(2) The Director shall give reasons for his decision to apply or not to apply, as the case may be, for an injunction under regulation 12 in relation to any complaint which these Regulations require him to consider.

(3) In deciding whether or not to apply for an injunction in respect of a term which the Director considers to be unfair, he may, if he considers it appropriate to do so, have regard to any undertakings given to him by or on behalf of any person as to the continued use of such a term in contracts concluded with consumers.

**Complaints - consideration by qualifying bodies**
11. - (1) If a qualifying body specified in Part One of Schedule 1 notifies the

Director that it agrees to consider a complaint that any contract term drawn up for general use is unfair, it shall be under a duty to consider that complaint.

(2) Regulation 10(2) and (3) shall apply to a qualifying body which is under a duty to consider a complaint as they apply to the Director.

**Injunctions to prevent continued use of unfair terms**
   **12.** - (1) The Director or, subject to paragraph (2), any qualifying body may apply for an injunction (including an interim injunction) against any person appearing to the Director or that body to be using, or recommending use of, an unfair term drawn up for general use in contracts concluded with consumers.

(2) A qualifying body may apply for an injunction only where-

   (a) it has notified the Director of its intention to apply at least fourteen days before the date on which the application is made, beginning with the date on which the notification was given; or

   (b) the Director consents to the application being made within a shorter period.

(3) The court on an application under this regulation may grant an injunction on such terms as it thinks fit.

(4) An injunction may relate not only to use of a particular contract term drawn up for general use but to any similar term, or a term having like effect, used or recommended for use by any person.

**Powers of the Director and qualifying bodies to obtain documents and information**
   **13.** - (1) The Director may exercise the power conferred by this regulation for the purpose of-

   (a) facilitating his consideration of a complaint that a contract term drawn up for general use is unfair; or

   (b) ascertaining whether a person has complied with an undertaking or court order as to the continued use, or recommendation for use, of a term in contracts concluded with consumers.

(2) A qualifying body specified in Part One of Schedule 1 may exercise the power conferred by this regulation for the purpose of-

   (a) facilitating its consideration of a complaint that a contract term drawn up for general use is unfair; or

   (b) ascertaining whether a person has complied with-

      (i) an undertaking given to it or to the court following an application by that body, or

(ii) a court order made on an application by that body,

as to the continued use, or recommendation for use, of a term in contracts concluded with consumers.

(3) The Director may require any person to supply to him, and a qualifying body specified in Part One of Schedule 1 may require any person to supply to it-

(a) a copy of any document which that person has used or recommended for use, at the time the notice referred to in paragraph (4) below is given, as a pre-formulated standard contract in dealings with consumers;

(b) information about the use, or recommendation for use, by that person of that document or any other such document in dealings with consumers.

(4) The power conferred by this regulation is to be exercised by a notice in writing which may-

(a) specify the way in which and the time within which it is to be complied with; and

(b) be varied or revoked by a subsequent notice.

(5) Nothing in this regulation compels a person to supply any document or information which he would be entitled to refuse to produce or give in civil proceedings before the court.

(6) If a person makes default in complying with a notice under this regulation, the court may, on the application of the Director or of the qualifying body, make such order as the court thinks fit for requiring the default to be made good, and any such order may provide that all the costs or expenses of and incidental to the application shall be borne by the person in default or by any officers of a company or other association who are responsible for its default.

**Notification of undertakings and orders to Director**
**14.** A qualifying body shall notify the Director-

(a) of any undertaking given to it by or on behalf of any person as to the continued use of a term which that body considers to be unfair in contracts concluded with consumers;

(b) of the outcome of any application made by it under regulation 12, and of the terms of any undertaking given to, or order made by, the court;

(c) of the outcome of any application made by it to enforce a previous order of the court.

**Publication, information and advice**
**15.** - (1) The Director shall arrange for the publication in such form and

manner as he considers appropriate, of-

(a) details of any undertaking or order notified to him under regulation 14;

(b) details of any undertaking given to him by or on behalf of any person as to the continued use of a term which the Director considers to be unfair in contracts concluded with consumers;

(c) details of any application made by him under regulation 12, and of the terms of any undertaking given to, or order made by, the court;

(d) details of any application made by the Director to enforce a previous order of the court.

(2) The Director shall inform any person on request whether a particular term to which these Regulations apply has been-

(a) the subject of an undertaking given to the Director or notified to him by a qualifying body; or

(b) the subject of an order of the court made upon application by him or notified to him by a qualifying body;

and shall give that person details of the undertaking or a copy of the order, as the case may be, together with a copy of any amendments which the person giving the undertaking has agreed to make to the term in question.

(3) The Director may arrange for the dissemination in such form and manner as he considers appropriate of such information and advice concerning the operation of these Regulations as may appear to him to be expedient to give to the public and to all persons likely to be affected by these Regulations.

*Kim Howells*
Parliamentary Under-Secretary of State for Competition and Consumer Affairs, Department of Trade and Industry.

22nd July 1999

SCHEDULE 1

Regulation 3

QUALIFYING BODIES

## PART ONE

**1.** The Data Protection Registrar.

**2.** The Director General of Electricity Supply.

**3.** The Director General of Gas Supply.

**4.** The Director General of Electricity Supply for Northern Ireland.

**5.** The Director General of Gas for Northern Ireland.

**6.** The Director General of Telecommunications.

**7.** The Director General of Water Services.

**8.** The Rail Regulator.

**9.** Every weights and measures authority in Great Britain.

**10.** The Department of Economic Development in Northern Ireland.


## PART TWO

**11.** Consumers' Association.


## SCHEDULE 2

Regulation 5(5)


## INDICATIVE AND NON-EXHAUSTIVE LIST OF TERMS WHICH MAY BE REGARDED AS UNFAIR

**1.** Terms which have the object or effect of-

(a) excluding or limiting the legal liability of a seller or supplier in the event of the death of a consumer or personal injury to the latter resulting from an act or omission of that seller or supplier;

(b) inappropriately excluding or limiting the legal rights of the consumer vis-à-vis the seller or supplier or another party in the event of total or partial non-performance or inadequate performance by the seller or supplier of any of the contractual obligations, including the option of offsetting a debt owed to the seller or supplier against any claim which the consumer may have against him;

(c) making an agreement binding on the consumer whereas provision of services by the seller or supplier is subject to a condition whose realisation depends on his own will alone;

(d) permitting the seller or supplier to retain sums paid by the consumer where the latter decides not to conclude or perform the contract, without providing for the consumer to receive compensation of an equivalent amount from the seller or supplier where the latter is the party cancelling the contract;

(e) requiring any consumer who fails to fulfil his obligation to pay a disproportionately high sum in compensation;

(f) authorising the seller or supplier to dissolve the contract on a discretionary basis where the same facility is not granted to the consumer, or permitting the seller or supplier to retain the sums paid for services not yet supplied by him where it is the seller or supplier himself who dissolves the contract;

(g) enabling the seller or supplier to terminate a contract of indeterminate duration without reasonable notice except where there are serious grounds for doing so;

(h) automatically extending a contract of fixed duration where the consumer does not indicate otherwise, when the deadline fixed for the consumer to express his desire not to extend the contract is unreasonably early;

(i) irrevocably binding the consumer to terms with which he had no real opportunity of becoming acquainted before the conclusion of the contract;

(j) enabling the seller or supplier to alter the terms of the contract unilaterally without a valid reason which is specified in the contract;

(k) enabling the seller or supplier to alter unilaterally without a valid reason any characteristics of the product or service to be provided;

(l) providing for the price of goods to be determined at the time of delivery or allowing a seller of goods or supplier of services to increase their price without in both cases giving the consumer the corresponding right to cancel the contract if the final price is too high in relation to the price agreed when the contract was concluded;

(m) giving the seller or supplier the right to determine whether the goods or services supplied are in conformity with the contract, or giving him the exclusive right to interpret any term of the contract;

(n) limiting the seller's or supplier's obligation to respect commitments undertaken by his agents or making his commitments subject to compliance with a particular formality;

(o) obliging the consumer to fulfil all his obligations where the seller or

supplier does not perform his;

(p) giving the seller or supplier the possibility of transferring his rights and obligations under the contract, where this may serve to reduce the guarantees for the consumer, without the latter's agreement;

(q) excluding or hindering the consumer's right to take legal action or exercise any other legal remedy, particularly by requiring the consumer to take disputes exclusively to arbitration not covered by legal provisions, unduly restricting the evidence available to him or imposing on him a burden of proof which, according to the applicable law, should lie with another party to the contract.

## 2. Scope of paragraphs 1(g), (j) and (l)

(a) Paragraph 1(g) is without hindrance to terms by which a supplier of financial services reserves the right to terminate unilaterally a contract of indeterminate duration without notice where there is a valid reason, provided that the supplier is required to inform the other contracting party or parties thereof immediately.

(b) Paragraph 1(j) is without hindrance to terms under which a supplier of financial services reserves the right to alter the rate of interest payable by the consumer or due to the latter, or the amount of other charges for financial services without notice where there is a valid reason, provided that the supplier is required to inform the other contracting party or parties thereof at the earliest opportunity and that the latter are free to dissolve the contract immediately.

Paragraph 1(j) is also without hindrance to terms under which a seller or supplier reserves the right to alter unilaterally the conditions of a contract of indeterminate duration, provided that he is required to inform the consumer with reasonable notice and that the consumer is free to dissolve the contract.

(c) Paragraphs 1(g), (j) and (l) do not apply to:

- transactions in transferable securities, financial instruments and other products or services where the price is linked to fluctuations in a stock exchange quotation or index or a financial market rate that the seller or supplier does not control;    - contracts for the purchase or sale of foreign currency, traveller's cheques or international money orders denominated in foreign currency;

(d) Paragraph 1(l) is without hindrance to price indexation clauses, where lawful, provided that the method by which prices vary is explicitly described.

---

## EXPLANATORY NOTE

*(This note is not part of the Regulations)*

These Regulations revoke and replace the Unfair Terms in Consumer Contracts Regulations 1994 (S.I. 1994/3159) which came into force on 1st July 1995.

Those Regulations implemented Council Directive 93/13/EEC on unfair terms in consumer contracts (O.J. No. L95, 21.4.93, p. 29). Regulations 3 to 9 of these Regulations re-enact regulations 2 to 7 of the 1994 Regulations with modifications to reflect more closely the wording of the Directive.

The Regulations apply, with certain exceptions, to unfair terms in contracts concluded between a consumer and a seller or supplier (regulation 4). The Regulations provide that an unfair term is one which has not been individually negotiated and which, contrary to the requirement of good faith, causes a significant imbalance in the parties' rights and obligations under the contract to the detriment of the consumer (regulation 5). Schedule 2 contains an indicative list of terms which may be regarded as unfair.

The assessment of unfairness will take into account all the circumstances attending the conclusion of the contract. However, the assessment is not to relate to the definition of the main subject matter of the contract or the adequacy of the price or remuneration as against the goods or services supplied in exchange as long as the terms concerned are in plain, intelligible language (regulation 6). Unfair contract terms are not binding on the consumer (regulation 8).

The Regulations maintain the obligation on the Director General of Fair Trading (contained in the 1994 Regulations) to consider any complaint made to him about the fairness of any contract term drawn up for general use. He may, if he considers it appropriate to do so, seek an injunction to prevent the continued use of that term or of a term having like effect (regulations 10 and 12).

The Regulations provide for the first time that a qualifying body named in Schedule 1 (statutory regulators, trading standards departments and Consumers' Association) may also apply for an injunction to prevent the continued use of an unfair contract term provided it has notified the Director General of its intention at least 14 days before the application is made (unless the Director General consents to a shorter period) (regulation 12). A qualifying body named in Part One of Schedule 1 (public bodies) shall be under a duty to consider a complaint if it has told the Director General that it will do so (regulation 11).

The Regulations provide a new power for the Director General and the public qualifying bodies to require traders to produce copies of their standard contracts, and give information about their use, in order to facilitate investigation of complaints and ensure compliance with undertakings or court orders (regulation 13).

Qualifying bodies must notify the Director General of undertakings given to them about the continued use of an unfair term and of the outcome of any court proceedings (regulation 14). The Director General is given the power to arrange

for the publication of this information in such form and manner as he considers appropriate and to offer information and advice about the operation of these Regulations (regulation 15). In addition the Director General will supply enquirers about particular standard terms with details of any relevant undertakings and court orders.

A Regulatory Impact Assessment of the costs and benefits which will result from these Regulations has been prepared by the Department of Trade and Industry and is available from Consumer Affairs Directorate, Department of Trade and Industry, Room 407, 1 Victoria Street, London SW1H 0ET (Telephone 0171 215 0341). Copies have been placed in the libraries of both Houses of Parliament.

---

*Notes:*

[1] S.I. 1993/2661.back

[2] 1972 c. 68.back

[3] S.I. 1994/3159.back

[4] Protocol 47 and certain Annexes to the EEA Agreement were amended by Decision No. 7/94 of the EEA Joint Committee which came into force on 1st July 1994, (O.J. No. L160, 28.6.94, p. 1). Council Directive 93/13/EEC was added to Annex XIX to the Agreement by Annex 17 to the said Decision No. 7/94.back

---

ISBN 0 11 082990 5

---

Other UK SIs | Home | National Assembly for Wales Statutory Instruments | Scottish Statutory Instruments | Statutory Rules of Northern Ireland | Her Majesty's Stationery Office

---

*We welcome your comments on this site*          © Crown copyright 1999          *Prepared 30 July 1999*