UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

CAVLAM BUSINESS LTD. and JEAN MAURICE
BERGERON,

08 CV 2225 (JGK)

                    Plaintiffs,

          -against-

DECLARATION OF
JOHN PASSMORE
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                    Defendant.

------------------------------------------------------------------------x

     I, John Passmore, declare under penalty of perjury, in accordance with 28 U.S.C. § 1746,

as follows:

     1.     I am a barrister in full-time independent practice in England and Wales. I am a

member of the Chambers of Nigel Jones QC, at Hardwicke Building, New Square, Lincoln's Inn,

London WC2A 3SB.  I obtained the degree of Bachelor of Laws (Honors) from the University of

Bristol, England, in 1991. I was called to the Bar of England and Wales in 1992. I am a member

of Lincoln's Inn.

     2.     I have been an examiner and lecturer of commercial law at the College of Law.  I

am a member of COMBAR, the Commercial Bar Association, and the London Common Law

and Commercial Barristers' Association.

     3.     My practice consists entirely of commercial work in the fields of shipping,

insurance and financial services. My work is international in nature, and involves issues of both

jurisdiction and applicable law in private international law.  I am regularly asked to give expert

evidence on English law relating to shipping and insurance in foreign litigation and arbitrations.

4.    The defendant, Underwriters, has asked me to submit an expert opinion on issues of jurisdiction and applicable law arising from the sinking of the M/Y AMIRA. I submit this affidavit pursuant to Underwriters' request.

5.    Based on my familiarity with the history of this matter, a review of the documents, discussions with representatives of the Underwriters, and a review of the plaintiffs' Opposition to the present motion and its supporting affidavits, I have concluded that by virtue of (1) the contract having been made in England, and/or being governed by English law, and/or containing an English jurisdiction clause (2) England being the "proper place" to bring the claim and (3) it not being unjust to require the assureds to litigate in England, in any Part 11 application by the assureds, the English court should dismiss the application and order that the English court has jurisdiction and should exercise its jurisdiction.

6.    Accordingly, as explained more fully below, I believe the London High Court should reject the plaintiffs' threatened challenge to its jurisdiction and resolve this dispute on its merits.

**Incorporation of the Forum Selection Clause**

7.    It must be said at the outset that, in English law, it is unclear whether a jurisdiction clause which satisfies Article 23 of Council Regulation (EC) 44/2001 ("the Brussels Regulation"), requiring that such a clause be in writing, must also satisfy English common law principles of incorporation. The European Court of Justice regularly insists that the formalities required by Article 23 are themselves a full and sufficient guarantee of the existence of consent or consensus: see *MSG v Les Gravieres Rhenanes* [1997] ECR I-911.  However, English courts regularly indicate that there is some continuing role for the English law of incorporation (see, for example, *LAFI v Meridien Animal Health* [2000] 2 Lloyd's Rep 51). In any event, for the

2

reasons set forth below, it is my opinion that incorporation of the forum selection clause in the February 20, 2004 renewal quotation is consistent with both the Brussels Regulation and English common law.

8.    On February 20, 2004, the Underwriters, via Yachtsure (now known as Underwriters Risk Services), sent a written renewal quotation to the plaintiffs' insurance brokers, International Marine Insurance Services ("IMIS"), specifying the terms pursuant to which they were willing to renew the policy on the M/Y AMIRA. The renewal quotation prominently contained a forum selection clause, calling for the resolution of all disputes in the courts of England.

9.    IMIS has acknowledged, as noted in its affidavit submitted in support of plaintiffs' Opposition, receiving the February 20 renewal quotation. IMIS will be regarded as having had actual knowledge of the plain terms of the renewal quotation, including the forum selection clause.

10.    On March 5, 2004, IMIS, in its role as the plaintiffs' insurance agent, sent an e-mail to Yachtsure requesting renewal of the M/Y AMIRA policy. By this action, IMIS (on behalf of the plaintiffs) accepted the terms of the February 20 renewal quotation, including its prominent forum selection clause.

11.    On this analysis, under principles of English and European law, the forum selection clause contained in the February 20 renewal quotation was incorporated into the concluded policy.

12.    IMIS' March 5, 2004 email to Yachtsure requesting renewal of the M/Y AMIRA policy can only have been a request for renewal on the terms quoted in the February 20, 2004 renewal quotation, and the terms quoted included the jurisdiction clause. The premium paid by

3

the plaintiffs was the amount set out in the quotation; the price for a product with exclusive English jurisdiction.

13.    The forum selection clause satisfies Article 23 of the Brussels Regulation because the clause is "in writing or evidenced in writing." Because the clause was evidenced in writing, by virtue of the quotation dated February 20, 2004, it is enforceable (subject to *forum conveniens*, considered below).

**Enforceability of the Forum Selection Clause**

14.    To be enforceable against Bergeron, as opposed to Cavlam Business Ltd. ("Cavlam"), the forum selection clause must be fair under the Unfair Terms in Consumer Contracts Regulations 1999 ("Unfair Terms Regulations").

15.    The Unfair Terms Regulations have no application in respect of Cavlam Business Ltd. As against Cavlam Business Ltd, because the clause was incorporated into the policy and satisfies Article 23 of the Brussels Regulations, it is enforceable.

16.    Assuming the M/Y AMIRA was never chartered, then Bergeron was a consumer within the meaning of the Unfair Terms Regulations. The forum selection clause was a non-core term, so on the assumption that it was not individually negotiated, it is subject to the fairness test.

17.    A term is regarded as unfair if, contrary to the requirement of good faith, it causes a significant imbalance in the parties' rights and obligations arising under the contract, to the detriment of the consumer. According to paragraph 6(1) of the Regulations, the unfairness of a term is assessed by referring to all the circumstances attending the conclusion of the contract, as known at that time. One of the effects of paragraph 6(1) is that a relevant consideration in ascertaining fairness is "reality of consent".

18.    There are very few decisions on the application of the fairness test. In *First National Bank* [2002] 1 AC 481, Lord Bingham said: "The requirement of good faith in this

4

context is one of fair and open dealing. Openness requires that the terms should be expressed fully, clearly and legibly, containing no concealed pitfalls or traps. Appropriate prominence should be given to terms which might operate disadvantageously to the customer. Fair dealing requires that a supplier should not, whether deliberately or unconsciously, take advantage of the consumer's necessity, indigence, lack of experience, unfamiliarity with the subject matter of the contract, weak bargaining position or any other factor listed in or analogous to those listed in Schedule 2 to the [1994] Regulations. Good faith ... looks to good standards of commercial morality and practice."

19.    The factors in Schedule 2 of the 1994 Regulations remain relevant under the 1999 Regulations: the strength of the bargaining positions of the parties; whether the consumer had an inducement to agree the term, whether the services were supplied to the special order of the consumer, and the extent to which the supplier has dealt fairly and equitably with the consumer.

20.    Schedule 2 to the 1999 Regulations contains an indicative list of terms which may be regarded as unfair (the so-called "grey list"). Sub-paragraph (q) of Schedule 2 refers to terms which "have the object or effect of ... excluding or hindering the consumer's right to take legal action". It was decided in *Standard Bank v Apostolakis* (No. 2) [2001] 1 Lloyd's Rep Bank 240 that this category of terms includes national jurisdiction clauses. In that case, a jurisdiction clause was held to be unfair.

21.    Here, I believe that the forum selection clause satisfies the fairness test. The clause requires both underwriters and the assureds to sue in England: it is even-handed (unlike the clause in *Standard Bank*). A jurisdiction clause does not, in itself, cause any imbalance in the parties' rights or obligations arising under the contract: it only determines the forum in which the parties' rights and obligations may be exercised and enforced. The clause was very plainly

5

stated: its meaning was obvious to anyone who read it. It was expressed fully, clearly and legibly (again, unlike the clause in *Standard Bank*): it contained no pitfalls or traps.

22.    On the question of reality of consent, appropriate prominence was given to the clause: on page one of the quotation there was a prominent reference to the terms on page two, where the forum selection clause was printed. Another factor in Underwriters' favour is that they dealt with the assureds' professional agent, IMIS. In my view, as a matter of English law, Underwriters were entitled to assume that IMIS, and the assureds, would appreciate the meaning and significance of such a plainly stated clause.

23.    In my view, in the absence of exceptional circumstances which point to unfairness, where the consumer deals with the supplier by way of an agent, the supplier is entitled to rely on notice to the agent (here, IMIS) as notice to the consumer (here, Bergeron). It appears that it is suggested by Bergeron that he should not be bound by the forum selection clause because he personally did not see it. As a matter of English law, in the context of fairness under the Unfair Terms Regulations, such a suggestion is wrong.

24.    In my opinion, the forum selection clause will be found to be fair, and therefore enforceable.

**Jurisdiction of the English Court**

25.    In granting permission to serve proceedings out of the jurisdiction, the English court has already decided, on an *ex parte* basis, that it has jurisdiction in relation to this matter and these assureds, but that decision may be subject to challenge.

26.    In the pending action in London, plaintiffs have threatened an application under CPR Part 11 challenging the court's jurisdiction. In the event of such an application, in order to maintain the English court's jurisdiction it will be necessary to show (1) that the claim falls

within one or more of the grounds listed in CPR rule 6.20 (2) that England is the proper place in which to bring the claim and (3) that it is not unjust to require the defendants to litigate in England. It must also be shown that there is a serious issue to be tried on the merits. These requirements are readily met.

27.    The relevant grounds listed in rule 6.20 are: (5)(a) a claim in respect of a contract where the contract was made within the jurisdiction; (5)(b) a claim in respect of a contract where the contract is governed by English law; and (5)(c) a claim in respect of a contract which contains a term to the effect that the English court shall have jurisdiction to determine any claim in respect of the contract. These elements are discussed in turn below.

28.    **Made within the jurisdiction.** Where acceptance is by e-mail, as was IMIS' March 5, 2004 acceptance of the February 20 renewal quotation, the contract is made at the place where the e-mail is received and read: the acceptance e-mail was received and read in England by Yachtsure.

29.    **Governed by English law.** Regulation 2 of SI 2001/2635 provides that, in an insurance contract relating to a "vehicle of any type", the risk is situated in the EEA state of registration. The generally accepted view is that the state of registration also determines whether the risk is situated in an EEA state at all. It seems that the vessel was registered in the British Virgin Islands. The risk was therefore not situated in an EEA state. It follows that the Rome Convention, rather than SI 2001/2635, is the instrument which by which the applicable law of the contract is determined.

30.    Applying the Rome Convention, the forum selection clause is evidence of an implied choice of English law. Moreover, according to Article 4, the applicable law is the law of the country where the party who is to effect the performance which is characteristic of the

7

contract (here, the Underwriters), had, at the time of the conclusion of the contract, its principal

place of business, unless it appears from the circumstances as a whole that the contract is more

closely connected with another country.  The applicable law is therefore English law, unless it

appears from the circumstances as a whole that the contract is more closely connected with

another country.  As discussed below, England is far more connected to this contract, and the

present dispute, than is the United States.

31.     **Contains a jurisdiction clause.** This is the issue discussed above.

32.     **England as the proper place to bring the claim.**  The next issue is whether

England is the proper place in which to bring the claim.  This issue is governed by the landmark

decision in *The Spiliada* [1987] AC 460. Ultimately, the issue involves a consideration of the

interests of the parties and the interests of justice. *Spiliada* considerations are usually put under

five main headings: (1) personal connections of the parties to particular countries (2) factual

connections between the events and particular countries (3) applicable law (4) any *lis alibi*

*pendens* (5) the relevance of any non-parties to the litigation (for example, other parties to any

relevant contract), and the overall shape of the litigation.  These considerations, individually and

in their totality, point to the conclusion that this claim properly belongs in the courts of England.

33.     **Personal connections.** Bergeron is based in the Bahamas, Cavlam in the British

Virgin Islands, and Underwriters in England.  There is therefore a strong connection between the

Underwriters and their chosen forum, England.

34.     **Factual connections.** The vessel sank, and has remained, in Venezuela. It seems

there might be evidence from fact witnesses who are based in Venezuela, Trinidad and Tobago,

Canada and/or Italy. The location of experts is of little relevance: they can travel.  As the

contract was made in England with English insurers, England has a factual connection with the

dispute.

35.     **Applicable law.**  A court will be presumed to apply its own law better than a foreign court will. But an express choice of English law does not *necessarily* show that England is the proper place. All the circumstances are taken into account. Where English law is the applicable law by virtue of Article 4 of the Rome Convention, as it is here, other circumstances may point to a country other than England being the proper country for a suit to be brought. However, decisions in insurance cases show that where insurance is written on the London market, it is very often decided that England is the proper place for the claim (see *CGU v Szabo* [2002] 1 All ER (Comm) 83). This is largely because English courts are regarded as the natural forum for disputes about English law of insurance, including legal issues to do with insurance contract formation. The position is no different where (as here) the wording was designed for U.S. assureds.

36.     ***Lis alibi pendens.*** In my opinion, an English court will not decline to exercise jurisdiction because of the pendency of the later-filed United States action, particularly since there is absolutely no connection between the factual issues in dispute, the parties, witnesses, or evidence and New York.

37.     **Non-parties, and overall shape of the litigation.** The only relevant non-party is IMIS, based in Maryland. This is a neutral factor, because it does not make either New York or London clearly and distinctly more appropriate than the other.

38.     The last issue is whether it is unjust to require the defendants to litigate in England.  Plaintiffs have not suggested any factor that establishes that it would be unjust to requirement them to defend the action in London.  Differences in procedure, such as the non-availability of depositions, are generally regarded as irrelevant.  The availability of security for

costs is similarly irrelevant. Although Bergeron has been coy about the significance of punitive

damages in his choice of forum, in a *forum conveniens* analysis differences in types and

measures of damages are irrelevant, principally because it is the interests of both parties which

are taken into account.

39.     In conclusion, England is clearly and distinctly more appropriate than New York,

and is therefore the proper place in which to bring the claim. For the reasons given above, I

believe that the London High Court should reject the plaintiffs' threatened challenge to its

jurisdiction.

I declare, under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on the 30 day of July, 2008.


_____

JOHN PASSMORE

19927\1\2082224.2

## Judgment of the Court (Sixth Chamber) of 20 February 1997.
[1997] ECR I-911

EU: Case C-106/95

Celex No. 695J0106

European Union Case Law

COURT OF JUSTICE

Judgment of the Court (Sixth Chamber) of 20 February 1997. Mainschiffahrts-Genossenschaft eG (**MSG**) v Les Gravieres Rhenanes SARL. Reference for a preliminary ruling: Bundesgerichtshof - Germany. Brussels Convention - Agreement on the place of performance of the obligation in question - Agreement conferring jurisdiction. Case C-106/95.

European Court Reports 1997 page I-00911

© ELLIS Publications.
© European Communities.

Text outline
Text
Index
Year (Dates)
References
Bibliographic Information

Text

1 Convention on Jurisdiction and the Enforcement of Judgments - Prorogation of jurisdiction - Agreement conferring jurisdiction - Conditions as to form - Agreement concluded in a form according with practices in international trade or commerce - Concept - Contract concluded orally - Clause included in a commercial letter of confirmation and in invoices paid - Unchallenged - Validity of the clause - Conditions
(Convention of 27 September 1968, Art. 17, as amended by the 1978 Accession Convention)
2 Convention on Jurisdiction and the Enforcement of Judgments - Special jurisdiction - Court for the place of performance of the contractual obligation - Oral agreement between the parties on a place other than that of actual performance with the sole purpose of establishing that the courts of a particular place have jurisdiction - Inapplicability of Article 5(1) - Applicability of the conditions as to form for agreements conferring jurisdiction
(Convention of 27 September 1968, Arts 5(1) and 17)
SUMMARY

3 The third hypothesis in the second sentence of the first paragraph of Article 17 of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters must be interpreted as meaning that, under a contract concluded orally in international trade or commerce, an agreement conferring jurisdiction will be deemed to have been validly concluded under that provision by virtue of the fact that one party to the contract did not react to a commercial letter of confirmation sent to it by the other party to the contract or repeatedly paid invoices without objection where those documents contained a pre-printed reference to the courts having jurisdiction, provided that such conduct is consistent with a practice in force in the field of international trade or commerce in which the parties in question operate and the latter are aware or ought to have been aware of the practice in question.

In this regard, a practice exists in a branch of international trade or commerce in particular where a particular course of conduct is generally followed by contracting parties operating in that branch when they conclude contracts of a particular type. The fact that the contracting parties were aware of that practice is made out in particular where they had previously had trade or commercial relations between themselves or with other parties operating in the branch of trade or commerce in question or where, in that branch, a particular course of conduct is generally and regularly followed when concluding a certain type of contract, with the result that it may be regarded as being a consolidated practice.

4 The Convention must be interpreted as meaning that an oral agreement on the place of performance which is designed not to determine the place where the person liable is actually to perform the obligations incumbent upon him, but solely to establish that the courts for a particular place have jurisdiction, is not governed by Article 5(1) of the Convention, but by Article 17, and is valid only if the requirements set out therein are complied with. Whilst the parties are free to agree on a place of performance for contractual obligations which differs from that which would be determined under the law applicable to the contract, without having to comply with specific conditions as to form, they are nevertheless not entitled, having regard to the system established by the Convention, to designate, with the sole aim of specifying the courts having jurisdiction, a place of performance having no real connection with the reality of the contract at which the obligations arising under the contract could not be performed in accordance with the terms of the contract.

ISSUE 1

In Case C-106/95,

REFERENCE to the Court by the Bundesgerichtshof under the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters, for a preliminary ruling in the proceedings pending before that court between

Mainschiffahrts-Genossenschaft eG (MSG)

and

Les Gravieres Rhenanes SARL

on the interpretation of Article 5(1) and the third hypothesis mentioned in the second sentence of the first paragraph of Article 17 of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters (OJ 1978 L 304, p. 36), as amended by the Convention of 9 October 1978 on the accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland (OJ 1978 L 304, p. 1 amended version of the Convention at p. 77),

THE COURT

(Sixth Chamber),

composed of: J.L. Murray, President of the Fourth Chamber, acting for the President of the Sixth Chamber, C.N. Kakouris (Rapporteur), P.J.G. Kapteyn, G. Hirsch and H. Ragnemalm, Judges,

Advocate General: G. Tesauro,

Registrar: L. Hewlett, Administrator,

after considering the written observations submitted on behalf of:

- Mainschiffahrts-Genossenschaft eG (MSG), by Thor von Waldstein, Rechtsanwalt, Mannheim,

- Les Gravieres Rhenanes SARL, by Fink von Waldstein, Rechtsanwalt, Mannheim,

- the German Government, by Jorg Pirrung, Ministerialrat in the Federal Ministry of Justice, acting as Agent,

- the Commission of the European Communities, by Pieter van Nuffel, of its Legal Service, acting as Agent, assisted by Hans-Jurgen Rabe, Rechtsanwalt, Hamburg,

having regard to the Report for the Hearing,

after hearing the oral observations of Mainschiffahrts-Genossenschaft eG (MSG), represented by Thor von Waldstein Les Gravieres Rhenanes SARL, represented by Fink von Waldstein the Greek Government, represented by Vasileios Kontolaimos, Assistant Legal Adviser in the State Legal Department, acting as Agent, and the Commission, represented by Hans-Jurgen Rabe, at the hearing on 4 July 1996,

after hearing the Opinion of the Advocate General at the sitting on 26 September 1996,

gives the following

Judgment

GROUNDS

1 By order of 6 March 1995, received at the Court on 31 March 1995, the Bundesgerichtshof (Federal Court of Justice) referred to the Court for a preliminary ruling under the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters (OJ 1978 L 304, p. 36), as amended by the Convention of 9 October 1978 on the accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland (OJ 1978 L 304, p. 1 amended version of the Convention at p. 77 hereinafter .the Convention'), two questions on the interpretation of Article 5(1) and the third hypothesis mentioned in the second sentence of the first paragraph of Article 17 of the Convention.

2 The questions arose in proceedings between Mainschiffahrts-Genossenschaft eG (MSG) (.MSG'), an inland-waterway transport cooperative based at Wurzburg (Germany), and Les Gravieres Rhenanes SARL (.Gravieres Rhenanes'), whose registered office is in France, concerning compensation for damage caused to an inland-waterway vessel which MSG owned and had chartered to Gravieres Rhenanes by a time charter concluded orally between the parties.

3 According to the case-file, that vessel operated a shuttle service on the Rhine between 1 June 1989 and 10 February 1991, chiefly carrying shipments of gravel. With some exceptions, the places of loading were all located in France, whilst the cargo was invariably unloaded in France. According to MSG, the handling equipment used by Gravieres Rhenanes to unload the cargo damaged its vessel. The main proceedings are for the sum of DM 197 284, namely the difference between the amount paid by Gravieres Rhenanes' insurers and the amount claimed by MSG.

4 MSG brought an action before the Schiffahrtsgericht (Maritime Court) Wurzburg, taking the view that the third hypothesis mentioned in the second sentence of the first paragraph of Article 17 of the Convention entitled it to do so on the ground that the parties had validly designated Wurzburg, MSG's principal place of business, as the place of performance and the Wurzburg

courts as having jurisdiction.

5 The first and second sentences of the first paragraph of Article 17 of the Convention provide as follows:

.If the parties, one or more of whom is domiciled in a Contracting State, have agreed that a court or the courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction. Such an agreement conferring jurisdiction shall be either in writing or evidenced in writing or, in international trade or commerce, in a form which accords with practices in that trade or commerce of which the parties are or ought to have been aware.'

6 It appears from the order for reference that, when the contractual negotiations had been completed, MSG sent Gravieres Rhenanes a commercial letter of confirmation containing the following pre-printed statement:

.The place of performance is Wurzburg and the courts for that place have exclusive jurisdiction.'

Moreover, MSG's invoices also mentioned that forum directly and by reference to the conditions of the bill of lading. Gravieres Rhenanes did not challenge the commercial letter of confirmation and paid all invoices without objection. The Schiffahrtsgericht Wurzburg declared the action admissible.

7 On an appeal brought by Gravieres Rhenanes, the Oberlandesgericht (Higher Regional Court) Nurnberg rejected the application as inadmissible on the ground that there was no international jurisdiction. MSG appealed on a point of law to the Bundesgerichtshof.

8 The Bundesgerichtshof found, in the first place, that the jurisdiction of the French courts was borne out by the general rule set forth in the first paragraph of Article 2 of the Convention (place of the defendant's domicile), by Article 5(3) (place where the harmful event occurred) and likewise by Article 5(1) (place of performance of the obligation in question). The contractual obligations arising under the contract of carriage had to be performed in France and MSG was under an obligation to present the vessel at Gravieres Rhenanes' principal place of business, which was in France. In the Bundesgerichtshof's view, this case affords two possible approaches by which the jurisdiction of the French courts might be ousted in favour of the international jurisdiction of the German courts.

9 In the first place, Wurzburg might be regarded as the place of performance within the meaning of Article 5(1) of the Convention, on the ground that it was identified as such by the parties' oral agreement. The Bundesgerichtshof observes that in this case the agreement was .abstract'. It characterizes an agreement on the place of performance as abstract where it does not set out to designate the place where the person liable has to perform his obligations, but only to determine the courts having jurisdiction, without complying with the requirements as to form set out in Article 17 of the Convention. The only aim of such an agreement, therefore, is to disguise an agreement conferring jurisdiction. In this case, the contractual obligations had to be performed in any event in France, where in all cases the place of unloading was located.

10 Whilst stressing that, under the applicable German law, the agreement at issue on the place of performance was validly concluded, the Bundesgerichtshof has doubts about whether such .abstract' agreements are valid under the Convention in so far as they involve a risk of abuse, that is to say, circumvention of the rules as to form set out in Article 17 of the Convention.

11 Secondly, in the event that an .abstract' agreement on the place of performance is regarded as invalid, the Bundesgerichtshof considers that the German courts might have jurisdiction in this case by virtue of the third hypothesis mentioned in the second sentence of the first

paragraph of Article 17 of the Convention.

12 In those circumstances, the Bundesgerichtshof stayed proceedings and referred the following questions to the Court for a preliminary ruling:

.1. Is an oral agreement on the place of performance (Brussels Convention, Article 5) to be recognized even if it is not intended to fix the place at which the person liable has to perform the obligations incumbent on him, but is intended solely to establish - informally - that the courts for a particular place are to have jurisdiction (a so-called 'abstract' agreement on the place of performance)?

2. In the event that the Court of Justice should answer Question 1 in the negative:

(a) Can an agreement conferring jurisdiction in international trade or commerce in accordance with the third hypothesis mentioned in the second sentence of the first paragraph of Article 17 of the 1978 version of the Brussels Convention also be concluded by one party's not contradicting a commercial letter of confirmation containing a pre-printed reference to the courts of the consignors' place of business having sole jurisdiction or must there have been in every case prior consensus with regard to the content of the letter of confirmation?

(b) Is it sufficient in order for there to be an agreement conferring jurisdiction within the meaning of the aforesaid provision if the invoices sent by one party all contain a reference to the courts of the carrier's place of business having sole jurisdiction and to the conditions of the bill of lading used by the carrier which also stipulate the courts of the same place as having jurisdiction, and the other party invariably paid the invoices without objecting, or is prior consensus also required in this respect?'

The second question

13 By its second question, which, being concerned with exclusive jurisdiction, may conveniently be considered first, the national court essentially asks whether, under a contract concluded orally, an agreement conferring jurisdiction may be deemed to have been concluded in international trade or commerce in the form required by the third hypothesis mentioned in the second sentence of the first paragraph of Article 17 of the Convention simply by virtue of the fact that one party to the contract did not react to a commercial letter of confirmation sent to him by the other party to the contract or repeatedly paid invoices without objection where those documents contained a pre-printed reference to the courts having jurisdiction, or whether there should in any event be prior consensus on the part of the persons concerned, only written confirmation of the agreement being unnecessary.

14 It should be observed in this regard that, according to the Court's case-law, the requirements laid down by Article 17 of the Convention must be strictly interpreted in so far as that article excludes both jurisdiction as determined by the general principle of the defendant's courts laid down in Article 2 and the special jurisdictions provided for in Articles 5 and 6 (see, to this effect, Case 24/76 Estasis Salotti [1976] ECR 1831, paragraph 7, and Case 25/76 Segoura [1976] ECR 1851, paragraph 6).

15 The Court has further held with regard to the initial version of Article 17 that, by making the validity of a jurisdiction clause subject to the existence of an .agreement' between the parties, Article 17 imposes on the court before which the matter is brought the duty of examining, first, whether the clause conferring jurisdiction upon it was in fact the subject of consensus between the parties, which must be clearly and precisely demonstrated, and that the purpose of the requirements as to form imposed by Article 17 is to ensure that consensus between the parties is in fact established (Estasis Salotti, paragraph 7, and Segoura, paragraph 6).

16 However, in order to take account of the specific practices and requirements of international

trade, the aforementioned Accession Convention of 9 October 1978 added to the second sentence of the first paragraph of Article 17 of the Convention a third hypothesis providing that, in international trade or commerce, a jurisdiction clause may be validly concluded in a form which accords with practices in that trade or commerce of which the parties are or ought to have been aware.

17 Yet that relaxation incorporated in Article 17 by the 1978 Accession Convention does not mean that there is not necessarily any need for consensus between the parties on a jurisdiction clause, since it is still one of the aims of that provision to ensure that there is real consent on the part of the persons concerned. The weaker party to the contract should be protected by avoiding jurisdiction clauses incorporated in a contract by one party alone going unnoticed.

18 To take the view, however, that the relaxation thus introduced relates solely to the requirements as to form laid down by Article 17 by merely eliminating the need for a written form of consent would be tantamount to disregarding the requirements of non-formalism, simplicity and speed in international trade or commerce and to depriving that provision of a major part of its effectiveness.

19 Thus, in the light of the amendment made to Article 17 by the 1978 Accession Convention, consensus on the part of the contracting parties as to a jurisdiction clause is presumed to exist where commercial practices in the relevant branch of international trade or commerce exist in this regard of which the parties are or ought to have been aware.

20 It must therefore be considered that the fact that one of the parties to the contract did not react or remained silent in the face of a commercial letter of confirmation from the other party containing a pre-printed reference to the courts having jurisdiction and that one of the parties repeatedly paid without objection invoices issued by the other party containing a similar reference may be deemed to constitute consent to the jurisdiction clause in issue, provided that such conduct is consistent with a practice in force in the area of international trade or commerce in which the parties in question are operating and the parties are or ought to have been aware of that practice.

21 Whilst it is for the national court to determine whether the contract in question comes under the head of international trade or commerce and to find whether there was a practice in the branch of international trade or commerce in which the parties are operating and whether they were aware or are presumed to have been aware of that practice, the Court should nevertheless indicate the objective evidence which is needed in order to make such a determination.

22 It should first be considered that a contract concluded between two companies established in different Contracting States in a field such as navigation on the Rhine comes under the head of international trade or commerce.

23 Next, whether a practice exists must not be determined by reference to the law of one of the Contracting Parties. Furthermore, whether such a practice exists should not be determined in relation to international trade or commerce in general, but to the branch of trade or commerce in which the parties to the contract are operating. There is a practice in the branch of trade or commerce in question in particular where a particular course of conduct is generally and regularly followed by operators in that branch when concluding contracts of a particular type.

24 Lastly, actual or presumptive awareness of such practice on the part of the parties to a contract is made out where, in particular, they had previously had commercial or trade relations between themselves or with other parties operating in the sector in question or where, in that sector, a particular course of conduct is sufficiently well known because it is generally and regularly followed when a particular type of contract is concluded, with the result that it may be regarded as being a consolidated practice.

25 The answer to the second question must therefore be that the third hypothesis in the second sentence of the first paragraph of Article 17 of the Convention, as amended by the Accession Convention of 9 October 1978, must be interpreted as meaning that, under a contract concluded orally in international trade or commerce, an agreement conferring jurisdiction will be deemed to have been validly concluded under that provision by virtue of the fact that one party to the contract did not react to a commercial letter of confirmation sent to it by the other party to the contract or repeatedly paid invoices without objection where those documents contained a pre-printed reference to the courts having jurisdiction, provided that such conduct is consistent with a practice in force in the field of international trade or commerce in which the parties in question operate and the latter are aware or ought to have been aware of the practice in question. It is for the national court to determine whether such a practice exists and whether the parties to the contract were aware of it. A practice exists in a branch of international trade or commerce in particular where a particular course of conduct is generally followed by contracting parties operating in that branch when they conclude contracts of a particular type. The fact that the contracting parties were aware of that practice is made out in particular where they had previously had trade or commercial relations between themselves or with other parties operating in the branch of trade or commerce in question or where, in that branch, a particular course of conduct is generally and regularly followed when concluding a certain type of contract, with the result that it may be regarded as being a consolidated practice.

The first question

26 The first question has to be answered in case the national court concludes that there is in this case no practice in the branch of trade or commerce in question of which the parties were or ought to have been aware and that, as a result, a jurisdiction clause was not validly concluded.

27 By this question, the national court essentially asks whether an oral agreement on the place of performance, which is designed not to determine the place where the person liable is actually to perform the obligations incumbent upon him, but solely to establish that the courts for a particular place have jurisdiction, is valid under Article 5(1) of the Convention.

28 Article 5(1) of the Convention provides as follows:

.A person domiciled in a Contracting State may, in another Contracting State, be sued:

1. in matters relating to a contract, in the courts for the place of the performance of the obligation in question.'

29 According to the case-law of the Court, jurisdiction derogating from the general rule that the defendant's courts should have jurisdiction was introduced by Article 5(1) in view of the existence in certain well-defined cases of a particularly close relationship between a dispute and the court which may be called upon to take cognizance of the matter, with a view to the effective organization of the proceedings (Case 12/76 Tessili v Dunlop [1976] ECR 1473, paragraph 13).

30 Moreover, the Court has also held that the place of performance of a contractual obligation may also be fixed by agreement between the parties and that, if the parties to the contract are permitted by the applicable law, subject to the conditions imposed thereby, to specify the place of performance without satisfying any special condition of form, an agreement on the place of performance of the obligation is sufficient to found jurisdiction in that place within the meaning of Article 5(1) of the Convention (Case 56/79 Zelger v Salinitri [1980] ECR 89, paragraph 5).

31 It should be noted, however, that whilst the parties are free to agree on a place of performance for contractual obligations which differs from that which would be determined under the law applicable to the contract, without having to comply with specific conditions as to form, they are nevertheless not entitled, having regard to the system established by the Convention, to designate, with the sole aim of specifying the courts having jurisdiction, a place of

performance having no real connection with the reality of the contract at which the obligations arising under the contract could not be performed in accordance with the terms of the contract.

32 This approach is based, in the first place, on the terms of Article 5(1) of the Convention, which confers jurisdiction on the courts for the place .of performance' of the contractual obligation on which the claim is based. Consequently, that provision has in mind the place of actual performance of the obligation as the jurisdictional criterion by reason of its direct connection with the courts on which it confers jurisdiction.

33 Secondly, it should be considered that to specify a place of performance which has no actual connection with the real subject-matter of the contract becomes fictitious and has as its sole purpose the determination of the place of the courts having jurisdiction. Such agreements conferring jurisdiction are governed by Article 17 of the Convention and are therefore subject to specific requirements as to form.

34 Thus, where there is such an agreement, there is not only no direct connection between the dispute and the courts called upon to determine it, but there is also circumvention of Article 17, which, whilst providing for exclusive jurisdiction by dispensing with any objective connection between the relationship in dispute and the court designated (Zelger v Salinitri, paragraph 4), requires, for that very reason, compliance with the strict requirements as to form which it sets out.

35 The answer to the national court's first question must therefore be that the Convention must be interpreted as meaning that an oral agreement on the place of performance which is designed not to determine the place where the person liable is actually to perform the obligations incumbent upon him, but solely to establish that the courts for a particular place have jurisdiction, is not governed by Article 5(1) of the Convention, but by Article 17, and is valid only if the requirements set out therein are complied with.

COSTS

Costs

36 The costs incurred by the German and Greek Governments and the Commission of the European Communities, which have submitted observations to the Court, are not recoverable. Since these proceedings are, for the parties to the main proceedings, a step in the proceedings pending before the national court, the decision on costs is a matter for that court.

RULING

On those grounds,

THE COURT

(Sixth Chamber),

in answer to the questions referred to it by the Bundesgerichtshof by order of 6 March 1995, hereby rules:

1. The third hypothesis in the second sentence of the first paragraph of Article 17 of the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters, as amended by the Convention of 9 October 1978 on the accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland, must be interpreted as meaning that, under a contract concluded orally in international trade or commerce, an agreement conferring jurisdiction will be deemed to have been validly concluded under that provision by virtue of the fact that one party to the contract did not react to a

commercial letter of confirmation sent to it by the other party to the contract or repeatedly paid invoices without objection where those documents contained a pre-printed reference to the courts having jurisdiction, provided that such conduct is consistent with a practice in force in the field of international trade or commerce in which the parties in question operate and the latter are aware or ought to have been aware of the practice in question. It is for the national court to determine whether such a practice exists and whether the parties to the contract were aware of it. A practice exists in a branch of international trade or commerce in particular where a particular course of conduct is generally followed by contracting parties operating in that branch when they conclude contracts of a particular type. The fact that the contracting parties were aware of that practice is made out in particular where they had previously had trade or commercial relations between themselves or with other parties operating in the branch of trade or commerce in question or where, in that branch, a particular course of conduct is generally and regularly followed when concluding a certain type of contract, with the result that it may be regarded as being a consolidated practice.

2. The Convention of 27 September 1968 must be interpreted as meaning that an oral agreement on the place of performance which is designed not to determine the place where the person liable is actually to perform the obligations incumbent upon him, but solely to establish that the courts for a particular place have jurisdiction, is not governed by Article 5(1) of the Convention, but by Article 17, and is valid only if the requirements set out therein are complied with.

Index

Subject
Brussels Convention of 27 September 1968; Jurisdiction

Year (Dates)

Date of judgment
1997/02/20

Date lodged
1995/03/31

Date overview
of document: 20/02/1997
of application: 31/03/1995

References

Celex number
695J0106

Case citations
Agreement [468A0927(01)]-A05PT1 N 1 12 27 - 35
Agreement [468A0927(01)]-A17 N 33 - 35
Agreement [468A0927(01)]-A17L1 N 1 5 12 - 25
Agreement [478A1009(01)] N 1 16 - 19 25
Case 56/79 [679J0056]-N04 N 34
Case 56/79 [679J0056]-N05 N 30
Case 25/76 [676J0025]-N06 N 14 15
Case 24/76 [676J0024]-N07 N 14 15
Case 12/76 [676J0012]-N13 N 29

Acts cited in ruling

Interprets Agreement [468A0927(01)] -A05PT1

Interprets Agreement [468A0927(01)] -A17L1

Bibliographic Information

Authoring institution
Court of Justice
Basic treaty
European Economic Community

Legal instrument
Judgment
ECJ

Document type
Judgment

Type of procedure
Reference for a preliminary ruling
Authentic language
German
Mainschiffahrts-Genossenschaft eG (MSG) v Les Gravieres Rhenanes SARL.
Brussels Convention - Agreement on the place of performance of the obligation in question -
Agreement conferring jurisdiction.
Demande de decision prejudicielle: Bundesgerichtshof - Allemagne.
Case C-106/95.

Plaintiff
Mainschiffahrts-Genossenschaft eG (MSG)

Defendant
Les Gravieres Rhenanes SARL
Observations
Federal Republic of Germany
Greece
Commission
Member States
Institutions
Judge
Kakouris
Advocate-General
Tesauro
National Court
*A7* Amtsgericht Wurzburg, Urteil vom 20/11/92 (14 C 3592/91)
*A8* Schiffahrtsobergericht Nurnberg, Urteil vom 27/01/94 (8 U 3905/92)
*A9* Bundesgerichtshof, Vorlagebeschluß vom 06/03/95 (II ZR 37/94)
- Die deutsche Rechtsprechung auf dem Gebiete des Internationalen Privatrechts im Jahre 1995
no 143
- Europaische Zeitschrift fur Wirtschaftsrecht 1995 p.714-716
- Europaisches Wirtschafts- & Steuerrecht - EWS 1995 p.170-172
- Juristenzeitung 1995 p.204*-205*
- Monatsschrift fur deutsches Recht 1995 p.518-519
- Recht der internationalen Wirtschaft 1995 p.410-413

- Wertpapier-Mitteilungen 1995 p.859-862
- Zeitschrift fur Wirtschaftsrecht 1995 A 29-30 no 77
- Neue juristische Wochenschrift 1996 p.872 p.3296
- Praxis des internationalen Privat- und Verfahrensrechts 1996 p.264-266
- Europaische Zeitschrift fur Wirtschaftsrecht 1998 p.736
- International Litigation Procedure 1996 p.535-543
NOTES
- Schack, Haimo: Praxis des internationalen Privat- und Verfahrensrechts 1996 p.247-249
*P1* Bundesgerichtshof, Urteil vom 16/06/97 (II ZR 37/94)
- Der Betrieb 1997 p.VIII
- Der Betrieb 1997 p.2533
- Europaisches Wirtschafts- & Steuerrecht - EWS 1997 p.322
- Juristenzeitung 1997 p.341
- Monatsschrift fur deutsches Recht 1997 p.874-875
- Recht der internationalen Wirtschaft 1997 p.871-872
- Wertpapier-Mitteilungen 1997 p.1552-1553
- Zeitschrift fur Wirtschaftsrecht 1997 p.A63
- NJW-Rechtsprechungs-Report Zivilrecht 1998 p.755
- Praxis des internationalen Privat- und Verfahrensrechts 1999 p.34-35
NOTES
- Goette, Wulf: Internationales Steuerrecht 1997 p.480
- Kubis, Sebastian: Praxis des internationalen Privat- und Verfahrensrechts 1999 p.10-14
Nationality
Federal Republic of Germany
Commentary
Schlosser, Peter: Entscheidungen zum Wirtschaftsrecht 1997 p.359-360
Van Haersolte-Van Hof, J.J.: Forumkeuze of plaats van uitvoering?, Nederlands tijdschrift voor Europees recht 1997 p.79-80
Klauer, Stefan: St. Galler Europarechtsbriefe 1997 p.260-262
Holl, Volker H.: Recht der internationalen Wirtschaft 1997 p.418-419
Foglia, Raffaele
Saggio, Antonio: Forma delle clausole attributive della competenza, Il Corriere giuridico 1997 p.463-465
Huet, Andre: Journal du droit international 1997 p.625-634
X: Revue de jurisprudence de droit des affaires 1997 p.664-665
Hartley, Trevor: Article 17 of the Brussels Convention: Jurisdiction Agreements, European Law Review 1997 p.360-363
Koch, Harald: Juristenzeitung 1997 p.841-843
Maseda Rodriguez, Javier: Algunas consideraciones respecto de los articulos 5.1 y 17 del Convenio de Bruselas de 27 de septiembre de 1968, La ley - Union Europea 1997 no 4296 p.12-14
Vlas, P.: Art. 17 EEX - 'abstracte' aanwijzing van de plaats van uitvoering - mondeling overeengekomen forumkeuze - gebruik in de internationale handel, TVVS ondernemingsrecht en rechtspersonen 1997 p.223-224
Gaudemet-Tallon, Helene: Revue critique de droit international prive 1997 p.572-577
Pellis, L.Th.L.G.: MSG, de aanwijzing van een bevoegde rechter, Advocatenblad 1997 p.1129-1130
Mereu, Claudio: Journal des tribunaux 1997 p.408-409
X: Giustizia civile 1997 I p.2042-2043
Wautelet, Patrick: The Columbia Journal of European Law 1997 p.465-473
Queirolo, Ilaria: La forma degli accordi sul foro nella Convenzione di Bruxelles del 1968: una recente pronuncia della Corte di giustizia, Rivista di diritto internazionale privato e processuale 1997 p.601-614
Huber, Peter: Zeitschrift fur Zivilprozeß International 1997 p.168-181
Rodriguez Benot, Andres: Revista española de Derecho Internacional 1997 p.211-215
Koppenol-Laforce, M.E.: Forumkeuze; internationale handel, gebruik, het niet-bestaan van de

overeenkomst, Nederlands tijdschrift voor burgerlijk recht 1998 p.50-51

Koppenol-Laforce, M.E.: Plaats van uitvoering en rechterlijke bevoegdheid, Nederlands tijdschrift voor burgerlijk recht 1998 p.45-48

Jungk, Antje: Bundesrechtsanwaltskammer - Mitteilungen 1998 p.14-15

Volken, Paul: Schweizerische Zeitschrift fur internationales und europaisches Recht 1998 p.128-129

Watte, Nadine: La designation du lieu du for et du lieu d'execution de l'obligation, Revue de droit commercial belge 1998 p.380-382

Vlas, P.: Nederlandse jurisprudentie
Uitspraken in burgerlijke en strafzaken 1998 no 565

Phillips, Stephen: Abstract jurisdiction agreements and the Brussels Convention, International Trade Law Quarterly 1998 p.57-60

Foti, A.: Koinodikion 1998 p.104-108

Kubis, Sebastian: Gerichtspflicht durch Schweigen? - Prorogation, Erfullungsortsvereinbarung und internationale Handelsbrauche, Praxis des internationalen Privat- und Verfahrensrechts 1999 p.10-14

Vlas, P.: The EEC Convention on jurisdiction and judgments, Netherlands International Law Review 1999 p.100-102

Tagaras, Haris: Cahiers de droit europeen 1999 p.190-201

Schlosser, Peter: Rechtszersplitterung durch internationales Einheitsrecht?, Festschrift fur Dieter Medicus zum 70. Geburtstag 1999 p.543-554

Publication reference
European Court reports 1997 Page I-00911

**2000 WL 491507**
Lafi Office and International Business SL v. Meriden Animal Health · · ·
High Court of Justice Cambridge District Registry
Wednesday 22 March 2000

**Lafi** Office and International Business SL v. Meriden Animal Health Limited
Case No: 1999 L 90127

High Court of Justice Cambridge District Registry

DR (Cambridge)
Wednesday 22 March 2000

**JUDGMENT**

**Introduction**

This is a claim brought by the Claimant Lafi Office And International Business S.L. (LOIB) against the Defendant Meriden Animal Health Limited (Meriden) for 18,036,036m pesetas in respect of the supply of a chemical called Clostanel 10% oral solution (the chemical) delivered to Meriden in February and March 1998. The chemical is used in the treatment of liver fluke in sheep and lambs. LOIB is domiciled in Spain. Meriden is domiciled in England and is in the business of the sale and supply of veterinary health products.

Proceedings were started in England by a Claim Form issued and served on 10th August 1999. On 29th July 1999 Meriden had issued a Petition to the Spanish Court at Mataro Barcelona requesting that Court to certify that Meriden's Petition should be joined to criminal and civil proceedings which had commenced in that Court in February 1998. Meriden now seeks to persuade the English Court, on a number of grounds, that the English proceedings, brought by LOIB for the price of the goods sold, should be stayed pending the outcome of the Spanish proceedings.

**The Facts**

**(i) The Contract**

LOIB, is alleged to carry on business, inter alia, in the sale and supply of the chemical. A company called Laboratorios Lafi SAL (LAFI) is alleged by LOIB to be the manufacturer of the chemical (para. 1.1 of the Amended Particulars of Claim) allegedly with the knowledge and consent of Meriden. This is disputed. Meriden allege that it at all times believed that it was contracting with LAFI. It argues that it was deliberately misled by the principals of LOIB, who were at the material time also officers of LAFI, into believing that LOIB was merely a division of LAFI and not a separate company. That will be one of the issues in any trial of this matter. The sale was the subject of a purchase order dated 2 March 1998 No 1304 from Meriden addressed to LOIB. Payment terms were 60 days from date of collection. Delivery terms were "Ex works Lafi". LOIB was required by Meriden to "supply certificates of analysis showing batch numbers and other details. Delivery was to be in 2 batches, the first by 10 March latest and the second by 20 March latest. On the back of that order were printed Meriden's "General Terms and Conditions of Purchase". The order was accepted by LOIB who in due course supplied the chemical. LOIB's invoices Nos 98027 and 98028 related to the 2 batches and recited Meriden's order number and other contractual terms. Notwithstanding that acceptance Meriden dispute that their own conditions attached to the order. The significance of that dispute is the existence of a choice of law and jurisdiction clause within those conditions in the following terms:--
"This order shall be construed in all respects in accordance with English Law and the Seller hereby submits to the non-exclusive jurisdiction of the English courts."
After the initial batch of the chemical Meriden agreed to supply the raw material for the remainder of the order and as a result the rest of the chemical was to be supplied at a reduced price.

Two consignments of the product were allegedly collected by Meriden from LOIB in March 1998. Meriden has failed to pay for those consignments. Messrs Eversheds, solicitors for LOIB, wrote letters before action to Meriden on 15 July 1998 and 29 January 1999 but no payment was forthcoming and hence LOIB has brought this action to recover the sum they allege is due and owing.

**Facts (2) The English Proceedings**

The English proceedings were commenced by issue of a Claim Form on the 10 August 1999 out of the Cambridge District Registry of the High Court. In their Acknowledgment of Service dated 17 August 1999 Meriden ticked the box notifying LOIB of their intention to contest jurisdiction. Meriden's application to stay the proceedings, which is now before me, was issued on 8 September 1999.

Meriden seek an order from this court staying the action on the grounds:--

(i) This Court has no jurisdiction to deal with the case;

(ii) Alternatively, if it has jurisdiction, in the Court's discretion it should not exercise that jurisdiction;

(iii) Alternatively, the court should await the decision of the current proceedings in Spain and in the meantime grant extension of time for serving and filing service of the defence.

Meriden submits that were the matter to proceed in the English Courts at this time they would have a number of genuine defences to the action. These include:--

A. Meriden contracted with a party other than the Claimant ("LOIB"), that party being LAFI;

B. LOIB is estopped from denying that the contract was with LAFI, LOIB having (mis)used the licences, get-up, name etc, of LAFI in order to obtain the business of Meriden;

C. The contract with Meriden was obtained by misrepresentation (including fraudulent misrepresentation) and/or under a mistake by Meriden as to the identify of the seller which was known to LOIB, and if the contract is avoided, then LOIB ought not to be entitled to recover monies from Meriden;

D. The Directors of LOIB have been conducting an unauthorised laboratory without the required permissions of the relevant Spanish authority. The production itself (and the sale of the product) is illegal and LOIB is thus seeking to enforce an illegal contract;

E. Meriden would have (and will assert if required) a counterclaim for substantial damages (being a defence also by way of set-off) arising out of:

i) sums to be paid out to those to whom the product was sold on by Meriden, to compensate for the poor quality of the products;

ii) LOIB's late delivery of the product causing Meriden to incur additional cost;

iii) substantial damage caused to Meriden's business and loss of profits (including the loss of the business of the United Nations, who were the end user of this consignment of the product);

iv) direct expenses incurred in trying to try to sort out the repercussions of the position;

F. Given that the product actually sold was not produced at an authorised laboratory, it may be necessary to recall products sold on. To that extent the consideration provided by LOIB will have partly failed (and may well have failed entirely).

Miss Jane Louise de Lozey, a solicitor with Eversheds, has filed a witness statement on behalf of LOIB. LOIB deny the allegations being made by Meriden. This is not the time for the issues which arise in this action to be determined and I merely note that Meriden appear to have raised arguable defences based on the material which is before me. Nothing that I say in the course of this judgment should be taken to be pre-judging any of these issues which will need to be determined by evidence, tested in the appropriate way, at trial. Similarly nothing said in this judgment is intended to pre-judge any of the matters which will require to be determined by the Spanish courts.

Mr Michael Baxendale, an assistant solicitor with Messrs Blakemores (solicitors for Meriden), has filed 3 witness statements in support of this application. In his first statement Mr Baxendale said:

"5. A further ground for defending this action is that the Claimant has been under investigation by the Spanish Police and/or Revenue/Customs Authorities on the ground that it was trading without the appropriate Licence to supply products such as "Closantel", which is a medicinal product intended for animal use. Essentially, the allegation is that the Claimant was operating an

illegal business masquerading under the guise of being merely a division of the said company, Laboratorios Lafi SAL.

6. The criminal proceedings which are presently on foot in the Spanish Courts have been the forum within which interested parties have had the opportunity under Spanish Law to make their appearance in order to state an intention to proceed in the future with regard to civil claims. In this context, the company under the guise of which it is alleged that the Claimant was masquerading, namely Laboratorios Lafi SAL, has stated its intention to present a civil complaint as has also the Defendant to this action by its Spanish Director, Mr Fermando (sic) Mirapeix.

7. It is the procedure before the Courts in Spain that the civil charges are pursued subsequent to the criminal charges and indeed at the present time the substantial evidence which would be required in connection with the civil claim is being used for the criminal proceedings and is retained by the court.

8. The substance matter of the civil proceedings to be heard in the Spanish Courts subsequent to the criminal proceedings is of course entirely material to the Defences which will be raised in this case. It is material, because it will go firstly, to the question of the confusion in identify between the Claimant to these proceedings, LOIB, and Lafi and, secondly, because it will deal with the question of fraud/misrepresentation and/or illegality of any contract which might otherwise be deemed to exist between the Defendant and the Claimant.

9. It will be the Defendant's intention in the civil proceedings before the Spanish Court to allege that if and insofar as there is any contractual arrangement with the Claimant, LOIB, it was induced by fraud and/or misrepresentation of Miss Ana Castellanos, who set up the Organisation "LOIB" and further that any such Contract/dealings were illegal."

If the proceedings are not stayed then Mr Jeremy Callman, Counsel for Meriden, argues that this will have a number of practical effects. These can be summarised as:--

(i) Duplication of time and expense by litigating in Spain and England;

(ii) Need to call in English proceedings evidence of Spanish criminal law;

(iii) Danger of inconsistent decisions between the Spanish and English courts;

(iv) It would be disproportionate and a misuse of Court time, contrary to the overriding objective, to undertaking a trial of the issues in England in advance of the trial in Spain;

(v) Possible clash of hearings with witnesses giving evidence at both hearings.

## Facts (3) The Spanish Proceedings

I did not have any formal Spanish law evidence before me. Since the monetary claim in this case is very modest the parties very properly did not want to incur the additional expense of instructing independent Spanish lawyers. Both parties agreed that I could have regard to the judgment of Mance J. in Gruppo Torras v Al Sabah [1995] 1 Ll Rep 374 to assist me to understand the nature of the Spanish proceedings with which I am concerned. At p. 421 Mance J. said:--

"Spanish law provides for a civil action ("acción") to be brought as part of criminal proceedings. Such an acción may in due course lead to a civil judgment, although (subject to a few exceptions) only in the event of a conviction. The establishing of civil liability in criminal proceedings is facilitated by Article 19 of the Spanish Criminal Code whereby:

"Every person criminally responsible for a crime or misdemeanour is also civilly responsible."

Article 100 of the Spanish Procedural Law states:

"All offences and misdemeanours engender a criminal action (acción) for the punishment of the culprit and may also engender a civil action (acción) for restitution and compensation for damages arising from the punishable act" ...

Criminal proceedings may be commenced in Spain in three different ways: (i) By querella or complaint, in which the complainant, whether he be the Public Prosecutor or, as here, a private person, is a party, (ii) By denuncia or denunciation to the Court in which case the person making the denunciation is not a party and need play no further part -- it appears that such proceedings will be pursued by the Public Prosecutor who may go on to prepare a querella -- and (iii) though in practice rarely, by a Court of its own motion. Both the first two methods are subject to the "filter" of admission (admisión a trámite): c.f. Gimeno Sendra, The Querella. A requirement of admission applies in civil proceedings as well as in proceedings begun by querella. In the context

of criminal proceedings, it involves the Spanish court considering not only the formal regularity of the proceedings but also whether the facts stated in the querella constitute an offence known to law. If (and only if) admitted, the proceedings go ahead with the investigatory stage under the authority of the investigating Judge. The investigation Judge has a file in which one section is for matters relating to civil responsibility. The facts investigated may be relevant to both the criminal and civil liability. The investigating Judge is not limited in his investigations to any facts set out, or indeed to any accused identified, in the querella. The investigatory stage concludes when the investigating Judge takes a decision whether the facts disclose any potential criminal offences against any particular individual which should go to trial. If the investigating Judge decides that there are matters justifying a criminal trial, the file passes to a different Judge and the matter enters a new phase, in which the first step is the preparation of a provisional qualification (calificación provisional) (or in lesser cases, an escrito de acusación) in which the parties set out, provisionally, the charges for trial. Oral evdience is then taken, leading to a final qualification which states the charges finally and without departing substantially from those mentioned in the provisional qualification unless there are exceptional circumstances. Thereafter the trial Judge gives his verdict".

Mance J. concluded that a civil acción within the criminal proceedings can properly be said to exist under Spanish law when the querella is filed by the civil Claimant and expressly purports to make a civil claim. I also note while passing, that the Learned Judge in that case took the view that an acción brought in this way may constitute a relevant action for the purposes of Articles 21 and 22 of the Brussels Convention . Mance J. then went on to consider at what stage the Spanish proceedings could be considered to be "definitively pending". I shall come back to consider that matter when I turn to the issues which arise under the Brussels Convention. Suffice it to say at this stage that Mance J. was of the view that the action in Spain is not definitively pending, merely because the complaint or querella is filed with the Court.

In February 1998, as a result of an accusation made by Mr Roberto Crivilles, a partner in and a director of LAFI, criminal proceedings were commenced in Mataro in Spain against various individuals from LOIB (namely, Mr Falcó de Robert and Ms Llauger) and LAFI (namely, Mr Guillermo Monteagudo Maciás and Mrs Francisca Liarte Navarro). The substance of the allegations concern the alleged wrong doing of shareholders in LAFI against other shareholders in the company itself and, secondly, an offence regarding the breach of certain intellectual property rights. LOIB itself is not a party to these proceedings. The "Plaintiffs" in the Mataro proceedings are the Public Prosecutor (to protect the "public" interest) and various employees of LAFI who were joined because of their private interest in the proceedings. At this stage, Meriden was not a party to these proceedings.

Meriden's first complaint or querella (in fact translated as a petition) to the Spanish Court was made on 29th July 1999 prior to the issue of the claim form in this action (10th August 1999). The document was lodged by the lawyer acting for Meriden who declared (and I quote from that document in translation):--

"That from the matters recorded in proceedings and declared and ratified by its legal representative in Spain, Mr Ramir Ferran Mirapeix, MERIDEN ANIMAL HEALTH LIMITED, has suffered damages both economically and commercially due to the action of all of the accused, Ana Maba Castellanos Llauger, Juan Antonio Ruiz-Falcó Robert, Guillermo Monteagudo Macias and Francisca Liarte Navarro, and that the said accused, in addition to being precisely perpetrators of company offences and of an offence against industrial property, could also be allegedly perpetrators of an offence of fraud committed against my principal, in having deceived it and caused important economic damages, making it believe that its commissions and orders were produced in a laboratory with a due and mandatory administrative authorisations, when in reality they were forwarded to a secret laboratory which lacked the slightest level of control and supervision.

That as a consequence of the matters already declared and in occupying the position of injured party, by means of the present petition, I request that I be recorded as having appeared and stood as private prosecution in the present proceedings, exercising all of the civil and penal actions which may be proper in law, in accordance with article 110 of the Criminal Procedure Code, reserving the right to request the execution of proceedings addressed to the total clarification of the facts.

By virtue thereof,

I REQUEST THE COURT to record this petition as having been submitted and myself as having appeared in the present proceedings and stood as private prosecution in this representation, in order to exercise all of the actions, both civil and penal which may be proper in law .... I REQUEST THE COURT that it resolve in approval.

In Mataró on 23 July 1999".

That petition came before the Spanish Court on 2nd September 1999. Again I quote from the document in translation issued by the Spanish Court on that day:--

"ACTION: In Mataró on second of September nineteen ninety nine. To place on public record that on this date I inform His Honour of the petitions of 29 July 1999 and 2 September 1999 submitted by the barrister ... in representation of Meriden ... of which I inform His Honour, which I certify.

ORDER OF THE SUBSTITUTE MAGISTRATE

MR JAVIER MAULEON ALVAREZ DE LINERA, in Mataró on second September nineteen ninety nine.

Account rendered: the above mentioned petitions are to be attached to their causative proceedings and the barrister ... is recorded as having appeared in representation of the Mercantile Company of British nationality (Meriden ...) as the injured party.

In view of the petition of the second of this month, the requested certificate is issued by the secretary.

His Honour so orders and signs. I certify.

ACTION: The order is to be carried out forthwith. I certify.

The complaint was duly certified and despite an appeal is to proceed. There is a hearing fixed in Spain for the 10th April 2000 to appoint a Court expert.

It can be seen from the extract quoted above from the Gruppo Torras case that there are several steps which need to be taken before the offences are identified and the relevant defendants charged. At the present time it is not possible to know which, if any of the potential defendants will be charged nor to what those charges will relate. Interviews took place in the context of the criminal proceedings in Spain with both Ana Castellanos and Juan Ruiz-Falco and both were asked questions about the supply of chemicals to Meriden. Thus while the original criminal complaint does refer to the Meriden contract it is clear that the Spanish authorities are investigating the matter.

The likely timetable of the criminal proceedings is that they will be completed in about 2 years or maybe a little less. If the criminal proceedings result in charges being laid, and one or more of the defendants are convicted, the Spanish Court will then proceed to consider the civil claims. If one of the "claimants" in the civil proceedings can show that it, or they, have suffered loss caused by the criminal offences which have been proved then it is open to the Spanish Court to compensate those losers. Some documents which may be important for the civil trials are presently in the hands of the Spanish criminal court.

It is alleged by Meriden that those civil actions will cover the same ground as the defences being raised in this action. It will be apparent from what I have said that whether that is in fact the case will depend on whether the prospective defendants are (i) charged and (ii) convicted of an offence (iii) which has caused loss and (iv) that those defendant(s) are liable to compensate Meriden. As I have said LOIB, the Claimant in this matter before the English Court, is not a party to the Spanish proceedings.

Before turning to the law and legal arguments I should record the fact that in correspondence between the parties prior to the commencement of these proceedings Meriden made certain assertions about the Spanish proceedings. On 17th July 1998 Meriden wrote to Messrs Evershed acting for LOIB and said:--

"Your client is being charged in the criminal court for manufacturing products under brand names registered by third parties without authorisation.

...

Our lawyers in Spain are suing LOIB's directors in respect of this deception (a reference to the allegation that the chemical was produced in a clandestine laboratory by LOIB and not, as it should have been, by Lafi)"

Neither of those statements was correct. LOIB were not a party to the criminal proceedings and

no civil proceedings against LOIB directors had been commenced.

On 21st May 1999 Meriden again wrote to Messrs Eversheds, who were pressing for payment on behalf of their clients:

"There is under process in Spain criminal action against LOIB for fraud and related offences.

...

Separate to, but linked to the criminal court action, is a civil action by Meriden on LOIB in the Spanish courts for losses both direct and consequential as a result of the activities of LOIB."

As I have said LOIB was not, and is not, a party to the criminal proceedings. More important there was no civil action against LOIB in the civil courts in May 1989. Since LOIB are not a party to the criminal proceedings there is in fact no purely civil action against LOIB in Spain even today. In so far as Meriden were referring to their complaint in the criminal proceedings that was still 2 months away at the time this letter was written.

It appears that Meriden has paid over some money in respect of the chemical to LAFI. In fact on 31st March 1998 the principals of LOIB wrote to Meriden asking it not to pay LAFI but to pay LOIB. It may be that this will give rise to issues and arguments at the trial of this matter but I do not need to decide those at this time.

With that summary of the facts I now turn to the legal issues which have been raised before me.

## The legal issues

(i) Do Meriden's terms and conditions apply to the contract?

(ii) Do the provisions of Art 17 of the 1982 Brussels Convention give exclusive jurisdiction to the English Court?

(iii) Does the penultimate paragraph of Article 17 affect that jurisdiction?

(iv) Does Article 2 of the Convention give the English Court jurisdiction?

(v) Does Article 21 of the Convention require the English Court to stay the proceedings?

(vi) Should the Court stay the proceedings under Article 22 of the Convention?

(vii) Does section 49 of the Civil Jurisdiction and Judgments Acts 1982 give the Court power to stay the proceedings?

(viii) Should the Court stay the proceedings on the grounds of forum non conveniens?

(ix) Is the Court empowered to adjourn or stay the proceedings as part of its case management powers? Should the Court stay the proceedings in the exercise of its case management powers?

## (i) Do Meriden's terms and conditions apply to the contract?

Meriden's terms and conditions were set out on the reverse of the order which I have referred to above. It is correct to say that there was no reference to those terms and conditions on the front of the order. There is no doubt, in my judgment, that the reason for Meriden putting their terms and conditions on the reverse of the order was to make those terms and conditions terms of the contract. The order was accepted by LOIB and in accepting that order that company referred to the order number and to certain other terms which appeared on the face of the order. LOIB thereafter acted upon that order and supplied the chemical which Meriden accepted.

The idea that these terms and conditions did not form part of the contract appears to have been something of an afterthought. The point was not dealt with in evidence and only saw the light of day in Counsel's Skeleton Argument. It was not suggested that I should apply anything other than English Law to determine whether the terms and conditions of contract were incorporated. I was referred to various authorities including <u>Credit Suisse Financial Products v Société General 1996 5 Bank LR 220</u>at 224; <u>Estafis Salotti v Ruwa Polstereimaschinen GmbH 1976 ECR 1831</u> at 1841-2 and to <u>Chitty on Contracts</u>28th edition, paragraph 12-014. Neither those authorities nor the extract from Chitty assist Meriden in their argument.

A contracting party who is sent terms and conditions by the other contracting party sometimes argues that those terms and conditions were not sufficiently brought to its attention to be incorporated into the contract. It is also sometimes argued that that other contracting party has not consented to the terms and conditions which it has been sent. No such argument can be raised by a party who has itself sent the terms and conditions which it wished to have included as part of the contract. Had LOIB in this case not accepted the order, or had it not accepted part

of that order, there might be some argument as to whether the terms and conditions were to be incorporated. No such argument is available to Meriden here. In my judgment, Meriden's terms and conditions were incorporated into the contract. It follows, therefore that the jurisdiction clause formed part of the contract between the parties which, I repeat was in these terms: "This order shall be construed in all respects in accordance with English Law and the Seller hereby submits to the non-exclusive jurisdiction of the English Courts."

### (ii) Do the provisions of Article 17 of the 1982 Brussels Convention give exclusive jurisdiction to the English Court?

By Section 2(1) of the Civil Jurisdiction and Judgments Act 1982, the Brussels Conventionhas the force of law in the United Kingdom.
Article 17 of the Brussels Convention , so far as material, is in the following terms:
"If the parties, one or more of whom is domiciled in a Contracting State, have agreed that a Court or the Courts of a Contracting State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that Court or those Courts shall have exclusive jurisdiction.
...
If an agreement conferring jurisdiction was concluded for the benefit of only one of the parties, that party shall retain the right to bring proceedings in any other court which has jurisdiction by virtue of this Convention.
In the case of Continental Bank v Aekos SA 1994 1 WLR 588 at 596, Steyn L.J. said this about Article 17:
"Article 17 has mandatory effect. When Article 17 applies it follows that the jurisdiction agreement prorogates (confers) jurisdiction on the Courts of the Contracting State chosen by the parties, and that jurisdiction agreement deprives the Courts of other Contracting States of jurisdiction. Indeed, it is the duty of the Courts of other Contracting States of their own motion to consider whether Article 17 applies and to decline jurisdiction if it does: Schlosser Report (Official Journal 1979 No C.59, page 81, paragraph 22). There is no discretionary power *in the Convention itself* to override the conclusive effect of an exclusive jurisdiction agreement which conforms with the requirements of Article 17. It follows that if Article 17 applies its provisions take precedence over the provisions of Articles 21 and 22."
It was argued by Mr Callman on behalf of Meriden that Article 17 does not apply in this case because the clause in the contract was not an exclusive jurisdiction clause but a non-exclusive jurisdiction clause. It is to be noted that for Article 17 to apply the parties merely have to have agreed that the Courts of the Contracting State are to have jurisdiction. It is not a requirement that the parties should have agreed that the Courts of a Contracting State should have exclusive jurisdiction. The argument now advanced on several occasions before the English Courts is that that Article, by providing that the Courts shall have exclusive jurisdiction when the Article applies, is effectively turning non-exclusive jurisdiction clauses into exclusive jurisdiction clauses. In my judgment, it is no longer open to litigants to advance such an argument before a court of first instance. The position has now been reached where this point has been considered on at least five occasions by very experienced judges and the answer has been the same in each case. Even if I were minded to depart from those eminent Judges, which I am not, I would not do so. It should now be left to the Court of Appeal to reach any different conclusion.
The first reported case in which this argument was considered was Kurz v Stella Musical Veranstaltungs GmbH [1992] Ch. 196. In that case there was a non-exclusive submission to the jurisdiction of the English Courts. At page 203 Hoffmann J. said:
"Both parties are domiciled in Contracting States and they have agreed, with the formality required by the second sentence, that the Courts for the Contracting State, namely, England, are to have jurisdiction over disputes arising out of the subscription agreement. But Miss Dohmann says that that is not good enough, because the jurisdiction of the English Court is said to be "non-exclusive" and the effect of Article 17 is to make the jurisdiction of the chosen courts exclusive. It follows in her submissions that unless the Court is willing to say that a jurisdiction expressly stated to be non-exclusive has by force of statute become exclusive, a non-exclusive choice does not qualify for validity under Article 17 at all. Miss Dohmann says that this is in

accordance with the general policy of the Convention, which is to ensure that among the Contracting States there is a single jurisdiction for the resolution of all disputes. Nor is there anything unusual about apparently overriding the intention in this way: for example, the second sentence of Article 17 means that the intention of the parties will inevitably be ignored unless expressed in the prescribed form.

This argument, in my judgment, misinterprets what Article 17 means when it says that the chosen or "prorogated" jurisdiction is to be *exclusive*. It does not mean "unique", that the parties are limited to choosing a single jurisdiction. It means only that their choice, whatever it is, shall (subject to the exceptions made in the fifth sentence) have effect to the exclusion of the jurisdictions which would otherwise be imposed on the parties by the earlier articles of the Convention. Once the parties have availed themselves of Article 17, by the prescribed method, jurisdiction becomes a question of the intention of the parties. But (subject always to the fifth sentence) the Article does not limit their choice or the language in which it can be expressed. Nor does it prevent them from including in their choice, expressly or by implication, Courts which would otherwise have had jurisdiction under the convention. Jurisdiction thus conferred is still based exclusively on the intention of the parties rather than imposed by the general law and is therefore within the terms of Article 17."

The Learned Judge then considered the case of Meeth v Glacetal (Case 23/78 ) [1978] 3 ECR 2133 and continued:

"But the important principles are, first, that Article 17 should be interpreted to give effect to the intention of the parties, and secondly, that the parties may if they choose confer jurisdiction on two or more Courts and their choice may include or exclude Courts which would otherwise have had jurisdiction under the earlier Articles of the Convention."

That case was followed by the judgment of Mr Justice Waller in I.P. Metal v Ruote O.Z. FpA [1993] 2 Ll Rep 60 where the Learned Judge in that case adopted Mr Justice Hoffmann's dicta at p 67. The matter was considered by Mr Justice Potter in the case of Gamlestaden Plc v Casa de Suecia SA [1994] 1 Ll Rep 433. Counsel in that cases sought to persuade the Learned Judge that Mr Justice Hoffmann was wrong to reject the argument, but without success. The matter came before Mr Justice Moore-Bick last year in the case of Mercury Communications Ltd v Communication Telesystems International [1999] 2 AER 33. At page 37 Counsel reserved the right to argue the point in another Court but did not seek to persuade Mr Justice Moore-Bick to depart from Mr Justice Hoffmann's decision. Just for good measure, the dicta of Mr Justice Hoffmann was cited with approval by Mr Justice Rix in the case of Hough v P&O Containers Ltd [1999] QB 834 at page 843.

The Learned authors of Dicey and Morris The Conflict of Laws 13th edition at paragraph 12-107 refer to the common sense of the approach adopted by the English court and point out that the Article is shortly to be amended to take account of non-exclusive jurisdiction clauses.

Subject to the application of the penultimate paragraph of Article 17 quoted above, in my judgment the provisions of Article 17 give this Court exclusive jurisdiction over this dispute. But even if that is not the case, it seems to me that the non-exclusive jurisdiction clause in this contract is sufficient to retain the exclusive jurisdiction of this Court when challenged in the way that Meriden seeks to do before me. If I am right, and Article 17 applies, the effect of that clause is mandatory and it would mean that any other court should decline jurisdiction. It would also mean that this Court has no discretionary power to override the mandatory effect of that Article. The Court of Appealauthority of Continental Bank v Aeokos Compania Naviera SA [1994] 1 WLR 588cited above makes it clear that Article 17 takes precedence over Articles 21 and 22. Thus, if I am right in my conclusion, and subject to the penultimate paragraph in Article 17, then Articles 21 and 22 cannot assist Meriden.

## (iii) Does the penultimate paragraph of Article 17 affect that jurisdiction?

The argument put forward by Mr Callman on behalf of Meriden is that the jurisdiction clause was concluded for the benefit of Meriden since it required the Seller, LOIB, to submit to the non-exclusive jurisdiction of the English Courts. The clause therefore expressly states the name of the party for whose benefit the clause was agreed and gave Meriden a wider choice of court than they would otherwise have had. The clause therefore falls within the words used in the judgment

of the European Court in the case of Anterist v Credit Lyonnais [1986] ECR 1951 see paragraph 15 at page 1962. Mr Goodall points to paragraph 16 of that judgment at page 1963 in these terms:

"The designation of a Court or the Courts of the Contracting States in which one of the parties is domiciled is not sufficient in itself, having regard to the wide variety of reasons which may have led to the choice of such a clause, to support the conclusion that the common intention of the parties was to confer an advantage on that party."

However, the clause in the Anterist case was in these terms:

"The Court within whose jurisdiction that branch is situated shall have exclusive jurisdiction to adjudicate upon all matters concerning the performance of this agreement, irrespective of who is the Defendant".

In my judgment, what the European Court was saying in that case was that merely stating which Court both parties would bring their proceedings is not enough in itself to determine the intention of the parties. In this case, there is a specific reference to the seller, LOIB, submitting to the non-exclusive jurisdiction of the English Courts thus conferring a benefit on Meriden that they could sue LOIB in the English Court which would be an advantage over having to sue LOIB in their court of domicile. It is of course ironic in this case that LOIB have chosen to bring proceedings in the English Court, where Meriden are domiciled, and in accordance with the jurisdiction clause and yet it is Meriden who takes exception to this jurisdiction. Nevertheless, I am satisfied, for what it is worth, that this is a jurisdiction clause which is for the benefit of one of the parties and therefore preserves the right of Meriden to bring proceedings in another Court. If I am right about that, that deprives the first part of Article 17 of its mandatory consequences and, all other things being equal, would permit Meriden to bring proceedings in Spain. What that part of the Article does not do is determine that the English Court should not retain jurisdiction. It does mean that Meriden does not fall at the first hurdle.

### (iv) Does Article 2 of the Convention give the English Court jurisdiction?

Article 2 of the Convention (so far as relevant) is in the following terms:

"Subject to the provisions of this Convention, persons domiciled in a Contracting State shall, whatever their nationality, be sued in the Courts of that State".

But for the jurisdiction clause in this case, had Meriden wished to start proceedings against LOIB it was required to bring those proceedings in Spain by reason of Article 2 of the Convention. Article 5, which is discretionary, would also give the Spanish Court jurisdiction on the basis that the characteristic performance of the contract was to be in Spain. However, so far as LOIB is concerned, once it had decided to bring proceedings against Meriden, it seems to me that it never had any choice but to bring the proceedings in England. It was required to do that by the jurisdiction clause and by Article 17 of the Convention and so the English Court has jurisdiction as it would also have had by Article 2 of the Convention. However in my judgment since I have held under Article 17 that the jurisdiction clause was for the benefit of Meriden, if Meriden can bring themselves within Articles 21 or 22, then neither Article 2 nor Article 17 will defeat their application for a stay.

### (v) Does Article 21 of the Convention require the English Court to stay the proceedings?

Article 21 is in the following terms:

"Where proceedings involving the same cause of action and between the same parties are brought in the Courts of different Contracting States, any Court other than the Court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the Court first seised is established. Where the jurisdiction of the Court first seised is established, any Court other than the Court first seised shall decline jurisdiction in favour of that Court."

Mr Goodall has advanced an argument before me, in a gentle fashion, that the proceedings in Spain are not in reality civil proceedings at all and therefore there are no proceedings in a different Contracting State. In the light of the Gruppo Torras judgment and in the absence of any expert evidence, that is a difficult submission to make as Mr Goodall realised. I am prepared to

assume that the proceedings in Spain are civil proceedings and are therefore capable of being such proceedings within the terms of Articles 21 and 22. In the light of my decision in this case, it is unnecessary for me to finally decide that matter.

To bring himself within the terms of Article 21, Mr Callman has to overcome three difficulties. First he has to prove that the Spanish Court was the Court first seised. Second, he has to show that the proceedings in Spain involved the same cause of action and finally he has to prove that the same parties are involved in each set of proceedings. In my judgment he fails at every stage. The Court "first seised" is the one before which the requirements for the proceedings to become "definitively pending" are first fulfilled, see <u>Siegfried Zelger v Sebastiano Salinitri [1984] ECR 2397 (ECJ)</u>. This requirement is to be determined in accordance with the national law of each of the Courts concerned. The question which I have to determine, as a matter of Spanish Law, is therefore at what date was Meriden's complaint before the Spanish Court definitively pending? It was argued on behalf of Meriden that the action became definitively pending when the complaint in Spain was first submitted on 29 July 1999. Reliance was placed on the fact that thereafter the matter was being dealt with internally by the Court. Quite apart from the judgment of Mance J in Gruppo Torras which I have set out above, it seems to me that until such time as the complaint of Meriden had been before the Judge, it was not "accepted". It appears to me that the petition to the Spanish Court is a request to that court to "be recorded as having appeared", a request which the Court can either accept or reject. In my judgment, it is clear from the Court Order of 2 September 1999, that prior to the Court being fully seised of this matter it was necessary for the Court to "accept" Meriden's complaint which, once accepted, became parasitic upon the criminal proceedings. Doing the best I can on the material before me I am satisfied that that "action" was not definitively pending, under Spanish Law, until at the earliest 2 September 1999 when it was "accepted" by the Spanish Court. That view is supported by the judgment of Mance J in the Gruppo Torras case. I am therefore satisfied that the Spanish Court was not the Court first seised of this matter. Whether the action by Meriden was in fact definitively pending as early as 2 September 1999, I do not need to decide.

The next problem that Meriden faces is that the Claimant in the action before the English Court is not a party to the Spanish proceedings. It has been held by the European Court of Justice in the case of The Tatry [1994] ECR 1-5439 that the correct test to apply in deciding whether a cause of action is between the same parties is to see whether the parties to the two actions are identical -- see page 1-5473 paragraph 33. In this case, it is perfectly apparent that that test is not complied with.

It was urged upon me that I should look upon the principals of the company LOIB as being in effect the same as LOIB. I was urged to remove the corporate veil. That would involve making findings of fact, and forming a view, on the conduct of those principals at this interlocutory stage. That would be a wholly inappropriate thing for me to do. I therefore conclude that the Spanish proceedings are not between the same parties as the proceedings before this court.

Neither are the Spanish proceedings in relation to the same cause of action. There is no claim by LOIB for the price of the chemical. There is no claim for a declaration by Meriden of non-liability in relation to that sale. The European Court in the case of <u>Gubisch Machinenfabrik KG v Giulio Palumbo [1987] ECR 4861</u> held that two actions relating to the same contractual relationship, one seeking to enforce the contract and the other being an action for recission were effectively the same cause of action. However, that is not this case. The case of The Tatry [1994] ECR 1-5439 is to the same effect (see page 1-5476 paragraph 45). Indeed, at the present time there is no specific claim being made by Meriden in the Spanish proceedings relating, in terms, to the specific contract. It follows that the English action does not involve the same cause of action as the Spanish proceedings. This Court cannot therefore decline jurisdiction under Article 21.

### (vi) Should the Court stay the proceedings under Article 22 of the Convention?

Article 22 of the Convention is in the following terms:

"Where related actions are brought in the Courts of different Contracting States, any Court other than the Court first seised may, while the actions are pending at first instance, stay its proceedings.

A Court other than the Court first seised may also, on the application of one of the parties, decline jurisdiction if the law of that Court permits the consolidation of related actions and the court first seised has jurisdiction over both actions.

For the purposes of this article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings."

It will be apparent from what I have already said that this Court has no jurisdiction to stay these proceedings under Article 22 because I have decided that the English Court was the Court first seised. However, it is also clear in my judgment that the action in England and the action in Spain are not related actions.

On a purely common sense approach, the English action is for the price of goods sold and delivered. The Spanish proceedings on the other hand are parasitic upon criminal proceedings and are essentially for compensation in relation to damage caused by the allegedly fraudulent conduct of certain named individuals. On that approach, the actions are quite obviously not related. Furthermore, these actions could not be heard together. The "civil proceedings" in Spain have no independent existence of their own and are therefore not capable of being heard with other civil proceedings. That, again, is fatal to their being related actions. The House of Lords in the case of Sarrio SA v Kuwait Investment Authority [1999] 1 AC 32 has considered the meaning of related actions. In the speech of Lord Saville at page 41, he said:

"I am of the view that there should be a broad common sense approach to the question whether the actions in question are related, bearing in mind the objective of the article, applying the simple wide test set out in Article 22 and refraining from an over-sophisticated analysis of the matter."

While it may be that the Spanish Court will have to consider certain issues which will also become relevant in the English proceedings, it can never be expedient for the two proceedings to be heard together.

A similar conclusion was reached in the case of Haji-Ionnou & Ors v Frangos & Ors [1999] 2 Ll 337 at 352 where Lord Bingham said:

"On the other hand, we agree with the Judge that the fact that this claim in Greece is tacked on as an appendage to criminal proceedings makes the application of Article 22 wholly inappropriate and the Action should not be stayed on that ground".

For all these reasons, Article 22 has no application in this case.

### (vii) & (viii) Does Section 49 of the Civil Jurisdiction and Judgments Acts 1982 give the Court power to stay the proceedings and should the Court stay the proceedings on the grounds of forum non conveniens?

Section 49 of the Civil Jurisdiction and Judgments Act 1982 is in the following terms:

"Nothing in this Act shall prevent any Court in the United Kingdom from staying, sisting, striking out or dismissing any proceedings before it, on the ground of *forum non conveniens* or otherwise, where to do so is not inconsistent with the 1968 Convention or, as the case may be, the Lugano Convention."

The Court of Appeal considered the relation of section 49 and the Brussels Convention in the case of In Re Harrods (Buenos Aires) Ltd [1992] Ch 72. At page 93, Dillon LJ said:

"Against that background Section 49 of the Act of 1982 provides that nothing in the Act shall prevent any court in the United Kingdom from staying, sisting, striking out or dismissing any proceedings before it on the ground of forum non conveniens or otherwise where to do so is not inconsistent with the Convention. It is implicit in that Section in my judgment, that the Court cannot stay or strike out any proceedings on the ground of forum non conveniens when to do so would be inconsistent with the Convention, and that covers all cases where the Defendant in proceedings in England is domiciled in England and the conflict of jurisdiction is between the jurisdiction of the English Court and the jurisdiction of the Courts of some other Contracting State. The crucial question in the present case is whether the English Court can stay, strike out or dismiss proceedings on the grounds of forum non conveniens, where the Defendant in the English proceedings is domiciled in England, but the conflict of jurisdiction is between the jurisdiction of the English Court and the jurisdiction of the Courts of a state which is not a

Contracting State, no other Contracting State being involved."

The Jenard Report 1979 OJ C No C59 at page 15 states:

"Moreover, the purpose of the Convention is also, by establishing common rules of jurisdiction, to achieve in relations between the Six and in the field which it was required to cover, a genuine legal systematization which will ensure the greatest possible degree of legal certainty. To this end, the rules of jurisdiction codified in Title II determine which State's Courts are most appropriate to assume jurisdiction, taking into account all relevant matters; the approach here adopted means that the nationality of the parties is no longer of importance".

That report was cited by Mr Justice Hirst in Aiglon v Gaushan [1993] 1 Ll Rep 164 at page 175. Hirst J went on to decide that it was not open to a party to invoke the forum non conveniens doctrine where the Convention applied.

Dicey and Morris 13th ed. Paragrapg 12-015 is to like effect:--

"... the predominant view is that where the Conventions confer jurisdiction on the Courts of the United Kingdom, there is no question of a discretion to stay the proceedings in favour of the courts of another Contracting State (or to enjoin the proceedings commenced in another Contracting State) except in accordance with the specific rules relating to pending actions in Articles 21 to 23 of each Convention."

In volume of *Halsbury's Laws of England* vol 8 (4th ed reissue) paragraph 1090 the Learned authors deal with the inter-relationship between forum non conveniens and the Convention:

"The doctrine of forum non conveniens does not apply as between the contracting states to the Conventions. The Court may not, therefore, apply that doctrine as a general procedural principle in order to order a stay of proceedings on the grounds that the natural forum is a Court in another Contracting State to one of the Conventions".

Since I am satisfied that it would be wrong for the Court to stay these proceedings either under the Act or on the basis of forum non conveniens, it is unnecessary for me to deal with this matter at any length. Where the Court is dealing with two parties who are signatories to the Brussels Convention, then it is to the Convention that the Court must look in deciding which Court should have jurisdiction. In this case, the Court first seised of the matter was the English Court. English Law applies to the contract. The Defendant to the English proceedings is domiciled in England. The Spanish proceedings are at a very preliminary stage and on one basis, it would be right to say that the civil proceedings have not even started. I say that on the basis that the criminal proceedings have to be concluded prior to the civil part of that action commencing. The Claimant in the English proceedings is not a party to the Spanish proceedings. If there are charges laid against the directors and officers of the LOIB in Spain they may or may not be found guilty of those charges. In my judgment, it would be wholly wrong for this Court to exercise any power that it had either under section 49 or on the basis of *forum non conveniens*.

While the jurisdiction clause in this contract has, as I have determined, given the right of Meriden to sue LOIB in Spain, that does not detract in any way from LOIB's right to sue Meriden in England. Since I have held that LOIB started their action against Meriden in England prior to any action being commenced by Meriden in Spain, it is not open to me, in my judgment, to stay these proceedings in favour of the Spanish proceedings under the Convention. Insofar as it is necessary for me to decide this matter I do not believe that the Court has power to use Section 49 or the forum non conveniens principles in this case.

**(ix) Is the Court empowered to adjourn or stay the proceedings as part of its case management powers and should the Court stay the proceedings in the exercise of its case management powers?**

Mr Goodall for LOIB argued that the Court had no jurisdiction to order either a permanent or a temporary stay, by using the Court's management powers, in circumstances where that stay would be inconsistent with the Brussels Convention. He argued that part 3 of the CPR cannot have the effect of a stay being granted on the grounds of jurisdiction if such a stay has been refused under the Brussels Convention. He argues that if Meriden has failed under Articles 21 and 22 it would be wholly inconsistent for the Court then to grant a stay using its case management powers. He accepts that the Court must be able to manage the case but he argues that it must not do that if it has the effect of flying in the face of the Convention.

Mr Callman argues that the Court has power under CPR part 3 3.1(2)(f) and/or (m) to stay these proceedings. He referred me to a number of cases which were not cases to which the Brussels Convention applied. I do not find those authorities to be helpful in deciding this matter. Mr Callman urges the Court to stay these proceedings since otherwise the English Court will have to determine questions of Spanish Law in relation to the legality of LOIB's operation in Spain. He says the English court is unsuited to deal with those issues. There is a risk of inconsistent decisions. Many of the witnesses are in Spain. Much of the evidence is in Spain. He argues that it is uneconomic to have two sets of proceedings running together. Apart from the expense, there is the inconvenience. There will be a need for evidence to be translated. There will be a duplication of time and resources. To stay the proceedings here would not be inconsistent with the Convention if the Court accepts that it would be procedurally convenient to take that course. Quite apart from whether the Court has the power to order a stay of the proceedings, on grounds that run contrary to the Brussels Convention, I am quite satisfied that this Court should not grant a stay if it would undermine the jurisdictional regime established by the Convention. The Convention provides certainty for the Contracting States as to which Court has jurisdiction to decide the cases which come before it. If a Contracting State uses its case management powers either to circumvent the provisions of the Convention or to make orders which conflict with those provisions the certainty of the regime which has been established will be eroded. This does not provide a difficulty for this Court in managing the cases which come before it. Thus, by way of example, in appropriate circumstances if a party needs further time to obtain documents from another Contracting State, the Court has power to extend a litigant's time to obtain such documents. The Court will want to be satisfied that such an application is not seeking to undermine the obligation of the English Court to proceed to hear the case as the Court first seised of the matter. No such situation has arisen in this case at this time.

I was referred to the case of Turner v. Grovit [1999] 3 AER 616 as an example of a case where the English Court was prepared to intervene to stop foreign proceedings where the Brussels Convention applied. I do not believe that case assists Meriden here. The Court of Appeal held that the English Court had inherent jurisdiction to prevent abuses and where appropriate to act where an action was started in another Contracting State in bad faith. The Court also decided that it was the Court first seised of that matter. That was a very different case to the one before me.

The stay that is sought in this case by Meriden is to enable the Spanish Court to reach a conclusion in the proceedings before it prior to this Court proceeding. I do not believe that any such stay is open to the English Court nor do I believe that it would be appropriate. It would conflict with the jurisdictional regime of the Convention. It would deprive LOIB of their right to bring proceedings in this country, a forum which is appropriate for such an action both under the contract and under the Brussels Convention. It would delay for an indeterminate time any decision in LOIB's action for the price of the chemical it has supplied to Meriden. I say that because there is no such claim in Spain. The Spanish criminal proceedings may not move even to the stage of charges being laid let alone convictions which are a pre-requisite for any civil remedy to be obtained. The mere fact that there are parallel criminal proceedings under way gives no right to a defendant for a stay even if the criminal proceedings were in this country (see Guinness v. Saunders The Times 18.12.88; Jefferson v. Bhatcha [1979] 1 WLR 898; In Re DPR Futures [1989] 1 WLR 778 at 790).

Meriden want the stay in the hope that the principals of LOIB are convicted in Spain so that those convictions can be prayed in aid in this Court. I do not believe, in all the circumstances of this case, that such a stay would be appropriate.

For all these reasons in my judgment the English Court has jurisdiction to hear this case. It would be inappropriate for the Court to grant a stay for any of the reasons advanced by Meriden. I will therefore hear any submissions on the appropriate directions to be made for the future management of this case. Hopefully they can be agreed between the parties. I will hear any arguments on those directions, and on the costs of this application, on handing down this judgment.

It merely remains for me to thank counsel for their written and oral arguments which have greatly assisted me in grappling with the various issues that arose.

Crown Copyright.



# THE UNITED KINGDOM PARLIAMENT

What's onCommitteesBills and LegislationJudicial Work
You are here: Business > Lords Publications > Judgment Index > Judgment

Session 2001- 02
Publications on the Internet
Judgments

**House of Lords**

# Judgments - Director General of Fair Trading V First National Bank

## HOUSE OF LORDS

Lord Bingham of Cornhill Lord Steyn Lord Hope of Craighead Lord Millett Lord Rodger of Earlsferry

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT

## IN THE CAUSE

*THE DIRECTOR GENERAL OF FAIR TRADING*

*(ORIGINAL RESPONDENT AND CROSS-APPELLANT)*

*v*

*FIRST NATIONAL BANK PLC*

*(ORIGINAL APPELLANTS AND CROSS-RESPONDENTS)*

**ON 25 OCTOBER 2001**

**[2001] UKHL 52**

**LORD BINGHAM OF CORNHILL**

My Lords,

   1. First National Bank plc ("the bank") is licensed to carry on consumer credit business. It is a major lender in the market and has lent large sums to borrowers under credit agreements regulated under the Consumer Credit Act 1974. Such agreements are made on its printed form which contains a number of standard terms. The Director General of Fair Trading ("the Director"), in exercising powers conferred on him by regulation 8 of the Unfair Terms in Consumer Contracts Regulations 1994 (SI 1994/3159) ("the regulations"), sought an injunction to restrain use of or reliance on one such standard term on the ground that it was unfair. The bank resisted the Director's application on two grounds. The first, rejected by Evans-Lombe J at first instance ([2000] 1 WLR 98) and the Court of Appeal (Peter Gibson, Waller and Buxton L JJ) ([2000] QB 672), was that the fairness provisions of the regulations did not apply to the term in question. The second, accepted by the judge but partially rejected by the Court of Appeal, was that the term in question was not unfair. In this appeal to the House the bank again relies on both these arguments. The Director seeks to uphold the decision of the Court of Appeal but contends that the term was more fundamentally unfair than the Court of Appeal held it to be. Thus there are two broad questions before the House:

(1)  Do the fairness provisions of the regulations apply to the term in question?

(2)  If so, is the term unfair and, if it is, on what ground?

2. By its standard form of regulated credit agreement the bank agrees to make a sum of money available to the borrower for a specified period in consideration of the borrower's agreement to repay that sum by specified instalments on specified dates with interest at a specified rate. Condition 4 of the bank's standard form provided that:

> "The rate of interest will be charged on a day to day basis on the outstanding balance and will be debited to the Customer's account monthly in arrears . . ."

and provided that the rate of interest might be varied. Condition 8 of the agreement was in these terms:

> "Time is of the essence for making all repayments to FNB as they fall due. If any repayment instalment is unpaid for more than 7 days after it became due, FNB may serve a notice on the Customer requiring payment before a specified date not less than 7 days later. If the repayment instalment is not paid in full by that date, FNB will be entitled to demand payment of the balance on the Customer's account and interest then outstanding together with all reasonable legal and other costs charges and expenses claimed or incurred by FNB in trying to obtain the repayment of the unpaid instalment of such balance and interest. *Interest on the amount which becomes payable shall be charged in accordance with Condition 4, at the rate stated in paragraph D overleaf (subject to variation) until payment after as well as before any judgement (such obligation to be independent of and not to merge with the judgement)."*

Emphasis has been added to the last sentence of this condition, since it is to that sentence alone that the Director's objection relates. I shall refer to this sentence as "the term".

3. The bank's stipulation that interest shall be charged until payment after as well as before any judgment, such obligation to be independent of and not to merge with the judgment, is readily explicable. At any rate since *In re Sneyd; Ex p Fewings* (1883) 25 Ch D 338, not challenged but accepted without demur by the House of Lords in *Economic Life Assurance Society v Usborne* [1902] AC 147, the understanding of lawyers in England has been as accurately summarised by the Court of Appeal at p 682 of the judgment under appeal:

> "It is trite law in England that once a judgment is obtained under a loan agreement for a principal sum and judgment is entered, the contract merges in the judgment and the principal becomes owed under the judgment and not under the contract. If under the contract interest on any principal sum is due, absent special provisions the contract is considered ancillary to the covenant to pay the principal, with the result that if judgment is obtained for the principal, the covenant to pay interest merges in the judgment. Parties to a contract may agree that a covenant to pay interest will not merge in any judgment for the principal sum due, and in that event interest may be charged under the contract on the principal sum due even after judgment for that sum."

4. To ensure that they were able to recover not only the full sum of principal outstanding but also any interest accruing on that sum after judgment as well as before, it became the practice for lenders to include in their credit agreements a term to the effect of the term here in issue. If such a provision had not been included, a lender seeking to enforce a loan agreement against a borrower in the High Court would suffer prejudice only to the extent that the statutory rate of interest on judgment debts at the material time is lower than the contractual interest rate, because the High Court has, since 1838, had power to award statutory interest on a judgment debt until payment.

5. But a lender seeking to enforce a regulated credit agreement is in a different position. He is obliged by section 141 of the 1974 Act to sue in the county court. Until the Lord Chancellor, exercising his power under section 74 of the County Courts Act 1984, made the County Courts (Interest on Judgment Debts) Order 1991 (SI 1991/1184), the county court lacked power to award statutory interest on any judgment debt and, when such a general power was conferred by the order, judgments given in proceedings to recover money due under agreements regulated by the 1974 Act were expressly excluded from its scope. It was further provided in the order:

> "3   Where under the terms of the relevant judgment payment of a judgment

debt -

>    (a) is not required to be made until a specified date, or

>    (b) is to be made by instalments,

interest shall not accrue under this Order -

>        (i) until that date, or

>        (ii) on the amount of any instalment, until it falls due,

as the case may be."

6. Thus a lender under a regulated credit agreement who obtains judgment against a defaulting borrower in the county court will be entitled to recover the principal outstanding at the date of judgment and interest accrued up to that date but will not be entitled to an order for statutory interest after that date, and even if the court had power to award statutory post-judgment interest it could not do so, in any case where an instalment order had been made, unless there had been a default in the due payment of any instalment. The lender may recover post-judgment interest only if he has the benefit of an independent covenant by the borrower entitling him to recover such interest. There is nothing to preclude inclusion of such a covenant in a regulated credit agreement, unless it falls foul of the fairness requirement in the regulations.

7. Section 71 of the County Courts Act 1984 conferred a general power on the county court, where any judgment was given or order made for payment of a money sum, to order that the money might be paid "by such instalments payable at such times as the court may fix". The 1974 Act also conferred on the county court three powers relevant for present purposes. First, the court was empowered to make a time order. Sections 129 and 130 of the Act, so far as relevant, provided:

"129.  (1)  If it appears to the court just to do so -

. . .

>    (c) in an action brought by a creditor or owner to enforce a regulated agreement or any security, or recover possession of any goods or land to which a regulated agreement relates,

the court may make an order under this section (a 'time order').

(2)  A time order shall provide for one or both of the following, as the court considers just -

>    (a) the payment by the debtor or hirer or any surety of any sum owed under a regulated agreement or a security by such instalments, payable at such times, as the court, having regard to the means of the debtor or hirer and any surety, considers reasonable;

. . .

"130.  (1)  Where in accordance with rules of court an offer to pay any sum by instalments is made by the debtor or hirer and accepted by the creditor or owner, the court may in accordance with rules of court make a time order under section 129(2) (a) giving effect to the offer without hearing evidence of means. . . ."

Secondly, section 136 provided:

> "136. The court may in an order made by it under this Act include such provision as it considers just for amending any agreement or security in consequence of a term of the order."

Thirdly, by sections 137, 138 and 139 of the Act the county court was given power to reopen credit agreements "so as to do justice between the parties" if it found a credit bargain to be "extortionate". A credit bargain was defined as extortionate if it

> "(a) requires the debtor or a relative of his to make payments (whether unconditionally, or on certain contingencies) which are grossly exorbitant, or
>
> (b) otherwise grossly contravenes ordinary principles of fair dealing."

In determining whether a credit bargain was extortionate regard was to be had to such evidence as might be adduced concerning interest rates prevailing at the time the bargain was made, a number of factors relating to the debtor and the circumstances of the transaction and "any other relevant considerations".

8. The provisions of the regulations directly at issue in these proceedings must be considered in more detail below. It should however be noted that the regulations were made to give effect in the United Kingdom to Council Directive 93/13/EEC (OJ 1993, L95, p 29) on unfair terms in consumer contracts ("the directive"). (They were superseded by further regulations in 1999, but these are to very much the same effect, do not govern this case and need not be further considered). It is common ground that the regulations should be construed so as to give effect to the directive, to which resort may properly be made for purposes of construction. Regulation 5, giving effect to article 6 of the directive, provides:

> "(1) An unfair term in a contract concluded with a consumer by a seller or supplier shall not be binding on the consumer.
>
> (2) The contract shall continue to bind the parties if it is capable of continuing in existence without the unfair term."

Thus the Director's challenge, although addressed only to the bank's use of and reliance on the term, if upheld, may well invalidate any similar term in any other regulated agreement made by any other lender with any borrower. The questions at issue are accordingly of general public importance.

*(1) The applicability of the regulations*

9. Regulation 3(2) of the regulations provides:

> "In so far as it is in plain, intelligible language, no assessment shall be made of the fairness of any term which -
>
> (a) defines the main subject matter of the contract, or
>
> (b) concerns the adequacy of the price or remuneration, as against the goods or services sold or supplied."

This gives effect, almost word for word, to article 4(2) of the directive, although some light may be shed on its meaning by the 19th recital to the directive:

> "Whereas, for the purposes of this Directive, assessment of unfair character shall not be made of terms which describe the main subject matter of the contract nor the quality/price ratio of the goods or services supplied; whereas the main subject matter of the contract and the price/quality ratio may nevertheless be taken into account in assessing the fairness of other terms;

whereas it follows, *inter alia*, that in insurance contracts, the terms which clearly define or circumscribe the insured risk and the insurer's liability shall not be subject to such assessment since these restrictions are taken into account in calculating the premium paid by the consumer;".

10. In reliance on regulation 3(2)(b) Lord Goodhart QC, on behalf of the bank, submitted that no assessment might be made of the fairness of the term because it concerns the adequacy of the bank's remuneration as against the services supplied, namely the loan of money. A bank's remuneration under a credit agreement is the receipt of interest. The term, by entitling the bank to post-judgment interest, concerns the quantum and thus the adequacy of that remuneration. This was the more obviously true if, as Lord Goodhart submitted, the merger rule as commonly understood is unsound. Where judgment is given for outstanding principal payable under a loan agreement and interest accrued up to the date of judgment, those claims (he accepted) are merged in the judgment. That is a conventional application of the principle of res judicata. But no claim for future interest has been the subject of adjudication by the court and such a claim cannot be barred as res judicata. The borrower's covenant to pay interest on any part of the principal loan outstanding thus survives such a judgment, and *In re Sneyd*, above, was wrong to lay down any contrary principle. Lord Goodhart adopted the observation of Templeman LJ in *Ealing London Borough Council v El Isaac* [1980] 1 WLR 932 at 937:

"I do not for myself understand how a debt payable with interest until actual repayment can be merged in a judgment without interest or with a different rate of interest payable thereafter."

11. To this submission Mr Crowe, representing the Director, gave two short answers. First, condition 8, of which the term forms part, is a default provision. Its purpose, and its only purpose, is to prescribe the consequences of a default by the borrower. It does not lay down the rate of interest which the bank is entitled to receive and the borrower bound to pay. It is an ancillary term, well outside the bounds of regulation 3(2)(b). Secondly, there is no merger "rule" but only a rule of construction. It is a question of construction of any given agreement whether the borrower's covenant to pay interest is or is not to be understood as intended to continue after judgment. But whatever the correct approach to merger, it is an irrelevance. Even if a bank's borrower's covenant to pay interest is ordinarily to be taken, as in Scotland (see *Bank of Scotland v Davis* 1982 SLT 20), to continue until the full sum of principal is repaid, after as before judgment, the term remains part of a default provision and not one falling within the provisions of regulation 3(2)(b).

12. In agreement with the judge and the Court of Appeal, I do not accept the bank's submission on this issue. The regulations, as Professor Sir Guenter Treitel QC has aptly observed (*The Law of Contract*, 10th ed, 1999, p 248) "are not intended to operate as a mechanism of quality or price control" and regulation 3(2) is of "crucial importance in recognising the parties' freedom of contract with respect to the essential features of their bargain" (*ibid*, at p 249). But there is an important "distinction between the term or terms which express the substance of the bargain and 'incidental' (if important) terms which surround them" (*Chitty on Contracts*, 28th ed, 1999, "Unfair Terms in Consumer Contracts", p 747, para 15-025). The object of the regulations and the directive is to protect consumers against the inclusion of unfair and prejudicial terms in standard-form contracts into which they enter, and that object would plainly be frustrated if regulation 3(2)(b) were so broadly interpreted as to cover any terms other than those falling squarely within it. In my opinion the term, as part of a provision prescribing the consequences of default, plainly does not fall within it. It does not concern the adequacy of the interest earned by the bank as its remuneration but is designed to ensure that the bank's entitlement to interest does not come to an end on the entry of judgment. I do not think the bank's argument on merger advances its case. It appears that some judges in the past have been readier than I would be to infer that a borrower's covenant to pay interest was not intended to extend beyond the entry of judgment. But even if a borrower's obligation were ordinarily understood to extend beyond judgment even in the absence of an independent covenant, it would not alter my view of the term as an ancillary provision and not one concerned with the adequacy of the bank's remuneration as against the services supplied. It is therefore necessary to address the second question.

*(2)  Unfairness*

13. Regulation 4 of the regulations is entitled "Unfair terms" and provides:

"(1)  In these Regulations, subject to paragraphs (2) and (3) below, 'unfair term' means any term which contrary to the requirement of good faith causes a significant imbalance in the parties' rights and obligations under the contract to the detriment of the consumer.

(2)  An assessment of the unfair nature of a term shall be made taking into account the nature of the goods or services for which the contract was concluded and referring, as at the time of the conclusion of the contract, to all circumstances attending the conclusion of the contract and to all the other terms of the contract or of another contract on which it is dependent.

(3)  In determining whether a term satisfies the requirement of good faith, regard shall be had in particular to the matters specified in Schedule 2 to these Regulations.

(4)  Schedule 3 to these Regulations contains an indicative and non-exhaustive list of the terms which may be regarded as unfair."

Schedule 2 to the regulations provides:

"In making an assessment of good faith, regard shall be had in particular to:

(a) the strength of the bargaining positions of the parties;

(b) whether the consumer had an inducement to agree to the term;

(c) whether the goods or services were sold or supplied to the special order of the consumer, and

(d) the extent to which the seller or supplier has dealt fairly and equitably with the consumer."

Each of (a), (b) and (c) also appear in Schedule 2 to the Unfair Contract Terms Act 1977 among the guidelines for application of the reasonableness test laid down by that statute, suggesting that some similarity of approach in applying the two tests may be appropriate. In a case such as the present, where the fairness of a term is challenged in the absence of any individual consumer, little attention need be paid to (b) and (c). It may however be assumed that any borrower is in a much weaker bargaining position than a large bank contracting on its own standard form. (d) applies a general test of fair and equitable dealing between supplier and consumer. Schedule 3 contains a list of indicative and illustrative terms which may because of their object or effect be regarded as unfair. Examples are terms which have the object or effect of "(e) requiring any consumer who fails to fulfil his obligation to pay a disproportionately high sum in compensation;", "(i) irrevocably binding the consumer to terms with which he had no real opportunity of becoming acquainted before the conclusion of the contract;", or "(k) enabling the seller or supplier to alter unilaterally without a valid reason any characteristics of the product or service to be provided". It is not suggested that the term falls within any specific entry in the list. It is common ground that fairness must be judged as at the date the contract is made, although account may properly be taken of the likely effect of any term which is then agreed and said to be unfair.

14. The 15th and 16th recitals to the directive are relevant. They provide:

"Whereas it is necessary to fix in a general way the criteria for assessing the unfair character of contract terms;

Whereas the assessment, according to the general criteria chosen, of the unfair character of terms, in particular in sale or supply activities of a public nature providing collective services which take account of solidarity among users, must be supplemented by a means of making an overall evaluation of the different interests involved; whereas this constitutes the requirement of good faith; whereas, in making an assessment of good faith, particular regard shall be had to the strength of the bargaining positions of the parties, whether the consumer had an inducement to agree to the term and whether the goods or services were sold or supplied to the special order of the consumer; whereas the requirement of good faith may be satisfied by the seller or supplier where he deals fairly and equitably with the other party whose legitimate interests he has to take into account;".

Article 3(1) of the directive is the counterpart of regulation 4(1), and is in terms which are for present purposes indistinguishable. The directive has no annex to the effect of Schedule 2 to the regulations, but has an annex in terms identical to those of Schedule 3.

15. The trial judge first asked himself whether the term was inherently unfair and concluded that it was not because a borrower, to whom the effect of the term had been fully explained, would not have regarded it as unfair that he would be obliged, in the event of his default, to pay interest on the full sum owed to the lender until complete repayment, even if the court permitted him to pay by instalments extending over a substantial period ([2000] 1 WLR 98 at 108C-H). The judge then considered whether the term was unfair because a defaulting borrower would not expect to bear an interest charge over and above any instalments ordered by the court, and whether the term deprived the consumer of a benefit or advantage which he might reasonably expect to receive. The judge resolved these issues in favour of the bank (pp 108-111), observing (at p 111H) that

> "if the provisions of sections 129 and 136 of the Act of 1974 are correctly used by the courts the inclusion of the provisions of clause 8 need not operate to impose on a borrower post judgment interest where it would not be appropriate and just to do so."

16. The Court of Appeal differed from the judge on the question of unfairness. In the judgment of the court it was said ([2000] QB 672 at 688):

> "In our judgment the relevant term is unfair within the meaning of the Regulations of 1994 to the extent that it enables the bank to obtain judgment against a debtor under a regulated agreement and an instalment order under section 71 of the Act of 1984 without the court considering whether to make a time order, or, if it does and makes a time order, whether also to make an order under section 136 to reduce the contractual interest rate. The bank, with its strong bargaining position as against the relatively weak position of the consumer, has not adequately considered the consumer's interests in this respect. In our view the relevant term in that respect does create unfair surprise and so does not satisfy the test of good faith; it does cause a significant imbalance in the rights and obligations of the parties by allowing the bank to obtain interest after judgment in circumstances when it would not obtain interest under the Act of 1984 and the Order of 1991, and no specific benefit to compensate the borrower is provided; and it operates to the detriment of that consumer who has to pay the interest."

The Court of Appeal did not grant an injunction but instead accepted undertakings offered by the bank (subject to appeal) which would bring to the borrower's attention the powers of the court under sections 129 and 136 of the 1974 Act and ensure that a claim to post judgment contractual interest would not be enforced by the bank after the court had made an instalment order unless the court's attention had previously been drawn to its powers under sections 129 and 136 and it had considered whether to exercise those powers.

17. The test laid down by regulation 4(1), deriving as it does from article 3(1) of the directive, has understandably attracted much discussion in academic and professional circles and helpful submissions were made to the House on it. It is plain from the recitals to the directive that one of its objectives was partially to harmonise the law in this important field among all member states of the European Union. The member states have no common concept of fairness or good faith, and the directive does not purport to state the law of any single member state. It lays down a test to be applied, whatever their pre-existing law, by all member states. If the meaning of the test were doubtful, or vulnerable to the possibility of differing interpretations in differing member states, it might be desirable or necessary to seek a ruling from the European Court of Justice on its interpretation. But the language used in expressing the test, so far as applicable in this case, is in my opinion clear and not reasonably capable of differing interpretations. A term falling within the scope of the regulations is unfair if it causes a significant imbalance in the parties' rights and obligations under the contract to the detriment of the consumer in a manner or to an extent which is contrary to the requirement of good faith. The requirement of significant imbalance is met if a term is so weighted in favour of the supplier as to tilt the parties' rights and obligations under the contract significantly in his favour. This may be by the granting to the supplier of a beneficial option or discretion or power, or by the imposing on the consumer of a disadvantageous burden or risk or duty. The illustrative terms set out in Schedule 3 to the regulations provide very good examples of terms which may be regarded as unfair; whether a given term is or is not to be so regarded depends on whether it causes a significant imbalance in the parties' rights and obligations under the contract. This involves looking at the contract as a whole. But the imbalance must be to the detriment of the consumer; a significant imbalance to the detriment of the supplier, assumed to be the stronger party, is not a mischief which the regulations seek to address. The requirement of good faith in this context is one of fair and open dealing. Openness requires that the terms should be expressed fully, clearly and legibly, containing no concealed pitfalls or traps. Appropriate prominence should be given to terms which might operate disadvantageously to the customer. Fair dealing requires that a supplier should not, whether deliberately or unconsciously, take advantage of the consumer's necessity, indigence, lack of experience, unfamiliarity with the subject matter of the contract, weak bargaining position or any other factor listed in or analogous to those listed in Schedule 2 of the regulations. Good faith in this context is not an artificial or technical concept; nor, since Lord Mansfield was its champion, is it a concept wholly unfamiliar to British lawyers. It looks to good standards of commercial morality and practice. Regulation 4(1) lays down a composite test, covering both the making and the substance of the

contract, and must be applied bearing clearly in mind the objective which the regulations are designed to promote.

continue



What's onCommitteesBills and LegislationJudicial Work
You are here: <u>Business</u> > <u>Lords Publications</u> > <u>Judgment Index</u> > Judgment

# Judgments - Director General of Fair Trading V First National Bank

(back to preceding text)

18. In support of his contention that the term is unfair the Director adduced evidence of complaints made to him by a number of borrowers. Some of these disclose a very highly unsatisfactory state of affairs. In one case a husband and wife borrowed £3,000 plus £443.70 for insurance to finance improvements to their home. The principal was repayable over a five-year term by instalments of £84.89 plus £8.98 insurance. The borrowers fell into arrear and judgment was given for £3,953.11. The court ordered this sum to be paid by monthly instalments of £4.18, at which rate (it was calculated) the judgment debt would take 78 years to clear. Meanwhile, under the contract, interest would continue to accrue even if the instalments were fully and punctually paid. The bank's deponent described these borrowers as "a good example of customers who demonstrated an ability easily to pay the instalments for home improvements when the credit was granted but thereafter appeared to have undertaken many other financial commitments which seriously prejudiced their ability to pay" the bank. A financial statement prepared on these borrowers some months before the county court judgment is consistent with that assertion.

19. For the Director, reliance was placed on the provisions in the 1991 order which denied the court power to order payment of statutory interest on money judgments given under regulated agreements and precluded entitlement to interest in any case where payment by instalments had been ordered and the instalments had been fully and punctually paid. It was argued that the term was unfair because it denied the borrower the protection which those provisions afforded. It was argued, in the alternative, that the term was unfair for the more limited reason upheld by the Court of Appeal.

20. In judging the fairness of the term it is necessary to consider the position of typical parties when the contract is made. The borrower wants to borrow a sum of money, often quite a modest sum, often for purposes of improving his home. He discloses an income sufficient to finance repayment by instalments over the contract term. If he cannot do that, the bank will be unwilling to lend. The essential bargain is that the bank will make funds available to the borrower which the borrower will repay, over a period, with interest. Neither party could suppose that the bank would willingly forgo any part of its principal or interest. If the bank thought that outcome at all likely, it would not lend. If there were any room for doubt about the borrower's obligation to repay the principal in full with interest, that obligation is very clearly and unambiguously expressed in the conditions of contract. There is nothing unbalanced or detrimental to the consumer in that obligation; the absence of such a term would unbalance the contract to the detriment of the lender.

21. It seems clear, as the judge pointed out ([2000] 1 WLR 98 at 111) that a secured lender who does not obtain a money judgment but instead proceeds for possession and sale under the mortgage may obtain interest at the contract rate provided for in the mortgage down to the date when he is actually repaid, and in my opinion there is nothing unbalanced or detrimental to the consumer in that result either.

22. Should it then be said that the provisions of the 1991 order render the term unfair, providing as it does for a continuing obligation to pay interest after judgment notwithstanding the payment of instalments by the borrower in accordance with a court order? It is, I think, pertinent that the 1974 Act, which laid down a number of stipulations with which regulated agreements must comply, did not prohibit terms providing for post-judgment interest even though it required claims to enforce regulated agreements to be brought in the county court which could not at the time award statutory interest in any circumstances. The 1974 Act was passed to protect consumers and such a prohibition would no doubt have been enacted had it been recognised as a necessary or desirable form of protection. The Crowther Committee, on whose report (Cmnd. 4596, March 1971) the Act was based, did not recommend such a prohibition; indeed, it contemplated the recovery of contractual interest: see paragraphs 5.4.3, 6.6.33, 6.6.44(iv) and 6.7.16). It is also pertinent that judgments based on regulated agreements appear to have been excluded from the scope of the county court's power to award statutory interest in response to observations of Lord Donaldson of Lymington MR in *Forward Trust Ltd v Whymark* [1990] 2 QB 670 at 681: but that was a case based on a flat rate agreement, in which the judgment in default would include a sum for future interest not yet accrued, in contrast with a simple rate agreement of the present kind (see [2000] 1 WLR 98 at 110-111; [2000] QB 672 at 679); the logic underpinning exclusion of statutory interest in the one case would not apply, at any rate with the same force, in the other. It is understandable that when a court is exercising a statutory power to order payment by instalments it should not also be empowered to order payment of statutory interest if the instalments are duly paid, but the term is directed to the recovery of contractual and not statutory interest. I do not think that the term can be stigmatised as unfair on the ground that it violates or undermines a statutory regime enacted for the protection of consumers.

23. It is of course foreseeable that a borrower, no matter how honourable and realistic his intentions when entering into a credit agreement, may fall on hard times and find himself unable to honour his obligations. The bank's standard conditions recognise that possibility by providing for the contingency of default. The 1974 Act even more fully recognises that possibility, by providing for time orders to be made and providing that when a time order is made the terms of the underlying agreement may also be amended. These provisions are clearly framed for the relief not of the borrower who, having the means to meet his contractual obligations, chooses not

to do so, but for the relief of those who cannot pay or cannot pay without more time. Properly applied, these provisions enable the undeserving borrower to be distinguished from the deserving and for the contractual obligations of the deserving to be re-drawn in terms which reasonably reflect such ability, if any, as he may then have to repay within a reasonable period. Where problems arise in practice, it appears to be because borrowers do not know of the effect of sections 129 and 136; neither the procedure for giving notice of default to the borrower nor the prescribed county court forms draw attention to them; and judgments will routinely be entered in the county court without the court considering whether to exercise its power under the sections.

24. I have no hesitation in accepting the proposition, inherent in the Director's submissions, that this situation is unacceptable. I have much greater difficulty in deciding whether the difficulties derive, as the Court of Appeal concluded, from the unfairness of the term or from the absence of procedural safeguards for the consumer at the stage of default. When the contract is made, default is a foreseeable contingency, not an expected outcome. It is not customary, even in consumer contracts, for notice to be given to the consumer of statutory reliefs open to him if he defaults. The 1974 Act does not require that notice of the effect of sections 129 and 136 be given. The evidence contains examples of clauses used by over 30 other lenders providing for the payment of interest after judgment, and none alerts the borrower to these potential grounds of relief. Regulation 4 is directed to the unfairness of a contract term, not the use which a supplier may make of a term which is in itself fair. It is readily understandable that a borrower may be disagreeably surprised if he finds that his contractual interest obligation continues to mount despite his duly paying the instalments ordered by the court, but it appears that the bank seeks to prevent that surprise by sending what is described in the evidence as a standard form of letter:

"You need only pay the amount ordered by the Court under the terms of the judgment but you should be aware that under the terms of the agreement interest continues to accrue on your account.

It is therefore in your interest to increase the instalment paid as soon as possible otherwise a much greater balance than the judgment debt may quickly build up."

On balance, I do not consider that the term can properly be said to cause a significant imbalance in the parties' rights and obligations under the contract to the detriment of the consumer in a manner or to an extent which is contrary to the requirement of good faith.

25. I do not think that the issues raised in this appeal raise any question on which the House requires a ruling from the European Court of Justice to enable it to give judgment and I would not accordingly order a reference to be made.

26. For the reasons I have given, and those given by each of my noble and learned friends, I would allow the bank's appeal with costs in the House and the Court of Appeal and restore the order of the judge.

27. In conclusion, I would add a footnote on sections 129 and 136 of the 1974 Act. In the course of argument the House was referred to the decision of the Court of Appeal in *Southern and District Finance plc v Barnes and Barnes* and two related appeals reported at [1995] CCLR 62. The effect and interaction of sections 129 and 136 were there considered.

28. Of section 129 the court said (at p 68):

"When a time order is made, it should normally be made for a stipulated period on account of temporary financial difficulty. If, despite the giving of time, the debtor is unlikely to be able to resume repayment of the total indebtedness by at least the amount of the contractual instalments, no time order should be made. In such circumstances it will be more equitable to allow the regulated agreement to be enforced."

I would in general agree that time orders extending over very long periods of time are usually better avoided. But I note that the court dismissed an appeal against a judge who had rescheduled payments over a period of 15 years ("Though the judge's methods were robust and his reasoning economical, his instincts were sound and his order just": p 71), and the broad language of section 129 should be so construed as to permit the county court to make such order as seems to it just in all the circumstances.

29. Of section 136 the court said (at p 68):

"The court may include in a time order any amendment of the agreement, which it considers just to both parties, and which is a consequence of a term of the order . . ."

In the case already referred to the judge had ordered that no additional interest should be payable beyond that which had already accrued, and the Court of Appeal upheld his decision. It was right to do so: provided the amendment is a consequence of a term of the time order, the court should be ready to include in a time order any provision amending the agreement which it considers just to both parties.

**LORD STEYN**

My Lords,

30. This is the first occasion on which the House has had the opportunity to examine an important branch of consumer law. It is therefore appropriate to consider the framework in which the questions before the House must be considered.

31. As between the directive and the domestic implementing regulations, the former is the dominant text. Fortunately, the 1994 Regulations, and even more so the 1999 Regulations, appear to have implemented the directive in domestic law in a manner which ought not to cause serious difficulty. The purpose of the directive is twofold, viz the promotion of fair standard contract forms to improve the functioning of the European market place and the protection of consumers throughout the European Community. The directive is aimed at contracts of adhesion, viz "take it or leave it" contracts. It treats consumers as presumptively weaker parties and therefore fit for protection from abuses by stronger contracting parties. This is an objective which must throughout guide the interpretation of the directive as well as the implementing regulations. If contracting parties were able to avoid the application of the directive and regulations by exclusionary stipulations the regulatory scheme would be ineffective. The conclusion that the directive and regulations are mandatory is inescapable.

32. The directive is not an altogether harmonious text. It reflects the pragmatic compromises which were necessary to arrive at practical solutions between member states with divergent legal systems. But, despite some inelegance and untidiness in the text, the general principle that the construction must be adopted which promotes the effectiveness and practical value of the system ought to overcome difficulties. And the concepts of the directive must be given autonomous meanings so that there will be uniform application of the directive so far as is possible.

33. The directive made provision for a dual system of *ex casu* challenges and pre-emptive or collective challenges by appropriate bodies: see article 7. This system was domestically enacted in the 1994 Regulations, with the Director General of Fair Trading as the administering official to investigate and take action on complaints: see regulation 8. The 1999 Regulations extended the system of enforcement by including other bodies as qualified to undertake pre-emptive challenges. The system of pre-emptive challenges is a more effective way of preventing the continuing use of unfair terms and changing contracting practice than *ex casu* actions: see Susan Bright, "Winning the battle against unfair contract terms", (2000) 20 Legal Studies 331, 333-338. It is, however, to be noted that in a pre-emptive challenge there is not a direct *lis* between the consumer and the other contracting party. The directive and the Regulations do not always distinguish between the two situations. This point is illustrated by the emphasis in article 4.1 of the directive and regulation 4(2) on the relevance of particular circumstances affecting a contractual relationship. The directive and regulations must be made to work sensibly and effectively and this can only be done by taking into account the effects of contemplated or typical relationships between the contracting parties. Inevitably, the primary focus of such a pre-emptive challenge is on issues of substantive unfairness.

34. Under the Regulations, a term in a standard form contract that is unfair is not binding on the consumer. But certain provisions, sometimes called core terms, have been excepted from the regulatory regime. Regulation 3(2) so provides:

> "In so far as it is in plain, intelligible language, no assessment shall be made of the fairness of any term which - (a) defines the main subject matter of the contract, or (b) concerns the adequacy of the price or remuneration, as against the goods or services sold or supplied."

Clause 8 of the contract, the only provision in dispute, is a default provision. It prescribes remedies which only become available to the lender upon the default of the consumer. For this reason the escape route of regulation 3(2) is not available to the bank. So far as the description of terms covered by regulation 3(2) as core terms is helpful at all, I would say that clause 8 of the contract is a subsidiary term. In any event, article 3(2) must be given a restrictive interpretation. Unless that is done article 3(2)(a) will enable the main purpose of the scheme to be frustrated by endless formalistic arguments as to whether a provision is a definitional or an exclusionary provision. Similarly, article 3(2)(b) dealing with "the adequacy of the price of remuneration" must be given a restrictive interpretation. After all, in a broad sense all terms of the contract are in some way related to the price or remuneration. That is not what is intended. Even price escalation clauses have been treated by the Director as subject to the fairness provision: see Susan Bright, loc. cit., at pp 345 and 349. It would be a gaping hole in the system if such clauses were not subject to the fairness requirement. For these further reasons I would reject the argument of the bank that regulation 3(2), and in particular 3(2)(b), take clause 8 outside the scope of the regulations.

35. Given these conclusions the attack on the merger principle mounted by the bank was misplaced. In any event, I am not willing to uphold criticism by the bank of the well tried and tested principle of merger. I would therefore reject the bank's submissions under this heading.

36. It is now necessary to refer to the provisions which prescribe how it should be determined whether a term is unfair. Implementing article 3(1) of the directive regulation 4(1) provides:

> "'unfair term' means any term which contrary to the requirement of good faith causes a significant imbalance in the parties' rights and obligations under the contract to the detriment of the consumer."

There are three independent requirements. But the element of detriment to the consumer may not add much. But it serves to make clear that the directive is aimed at significant imbalance against the consumer, rather than the seller or supplier. The twin requirements of good faith and significant imbalance will in practice be determinative. Schedule 2 to the Regulations, which explains the concept of good faith, provides that regard must be had, amongst other things, to the extent to which the seller or supplier has dealt fairly and equitably with the consumer. It is an objective criterion. Good faith imports, as Lord Bingham has observed in his

opinion, the notion of open and fair dealing: see also *Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433. And helpfully the commentary to the 2000 edition of Principles of European Contract Law, prepared by the Commission of European Contract Law, explains that the purpose of the provision of good faith and fair dealing is "to enforce community standards of fairness and reasonableness in commercial transactions": at 113; *A fortiori* that is true of consumer transactions. Schedule 3 to the Regulations (which corresponds to the Annex to the directive) is best regarded as a check list of terms which must be regarded as potentially vulnerable. The examples given in Schedule 3 convincingly demonstrate that the argument of the bank that good faith is predominantly concerned with procedural defects in negotiating procedures cannot be sustained. Any purely procedural or even predominantly procedural interpretation of the requirement of good faith must be rejected.

37. That brings me to the element of significant imbalance. It has been pointed out by Hugh Collins that the test "of a significant imbalance of the obligations obviously directs attention to the substantive unfairness of the contract": "Good Faith in European Contract Law," (1994), 14 Oxford Journal of Legal Studies 229, 249. It is however, also right to say that there is a large area of overlap between the concepts of good faith and significant imbalance.

38. It is now necessary to turn to the application of these requirements to the facts of the present case. The point is a relatively narrow one. I agree that the starting point is that a lender ought to be able to recover interest at the contractual rate until the date of payment, and this applies both before and after judgment. On the other hand, counsel for the Director advanced a contrary argument. Adopting the test of asking what the position of a consumer is in the contract under consideration with or without clause 8, he said that the consumer is in a significantly worse position than he would have been if there had been no such provision. Certainly, the consumer is worse off. The difficulty facing counsel, however, is that this disadvantage to the consumer appears to be the consequence not of clause 8 but of the County Courts (Interest on Judgment Debts) Order 1991. Under this Order no statutory interest is payable on a county court judgment given in proceedings to recover money due under a regulated agreement: see regulation 2. Counsel said that for policy reasons it was decided that in such a case no interest may be recovered after judgment. He said that it is not open to the House to criticise directly or indirectly this legal context. In these circumstances he submitted that it is not legitimate for a court to conclude that fairness requires that a lender must be able to insist on a stipulation designed to avoid the statutory regime under the 1991 Order. Initially I was inclined to uphold this policy argument. On reflection, however, I have been persuaded that this argument cannot prevail in circumstances where the legislature has neither expressly nor by necessary implication barred a stipulation that interest may continue to accrue after judgment until payment in full.

39. For these reasons as well as the reasons given by Lord Bingham I agree that clause 8 is not unfair and I would also make the order which Lord Bingham proposes.

**LORD HOPE OF CRAIGHEAD**

My Lords,

40. I have had the advantage of reading in draft the speech of my noble and learned friend Lord Bingham of Cornhill. I agree with it, and for reasons which he has given I too would allow the appeal. I also agree with my noble and learned friend Lord Millett that the real source of the problem revealed by this case remains to be tackled. It is with that point particularly in mind that I wish to add these observations.

41. The term to which the Director has taken objection is to be found in the last sentence of condition 8 of the bank's standard form. It seeks to do three things. Firstly, it provides that interest on the amount which becomes payable under that condition is to be payable in accordance with condition 4. Second, it provides that interest is to be payable on that amount until payment after as well as before any judgment. Third, it makes it clear that the obligation to pay interest is to be independent of and not to merge with the judgment. The amount on which the interest is to be charged is described in the preceding sentence. It consists of (a) the balance on the customer's account, (b) interest outstanding at the specified date and (c) other costs, charges and expenses incurred in trying to obtain the repayment of the unpaid instalment of such balance and interest. Mr Crowe for the Director made it clear that no objection was taken to the provision in the first part of the sentence that interest was to be payable on that amount. He accepted that this part of the sentence cannot be regarded as unfair. The contractual term which he says is unfair is to be found in the other parts of the sentence, which provide that interest on the amount referred to in the first part of it is to be payable after as well as before any judgment and that the obligation to do so is to be independent of and not to merge with the judgment.

42. Regulation 3(2)(b) of the Unfair Terms in Consumer Contracts Regulations 1994 provides that no assessment is to be made of the fairness of any term which concerns the adequacy of the price or remuneration as against the goods or services supplied. This is the provision on which Lord Goodhart QC relied when he said that the fairness provisions did not apply in this case. But it seems to me to be plain that the last sentence of condition 8 is not concerned with the adequacy of the remuneration which the bank is to receive for making its money available to the borrower.

43. As the nineteenth recital to the Council Directive 93/13/EEC indicates, regulation 3(2) applies only to terms which describe the main subject matter of the contract or are directly related to the adequacy of the price charged for the goods or services. The last sentence of condition 8 is concerned with neither of these two things. The obligation to pay interest on the outstanding balance is set out in condition 4. It is there that the provisions are to be found that concern the adequacy of the price charged for the loan. Condition 8 is a default provision. The last sentence of it is designed to enable interest to be recovered on the whole of the amount due on default. That amount includes legal and other costs, charges and expenses, so it is not confined to the outstanding balance due by the borrower. I do not think that it can be said to be directly related to the price charged for the loan or to its adequacy. It is concerned instead with the consequences of the borrower's breach of contract. It sets out what is to happen if he fails to make the repayments to the bank as they fall due. I agree that regulation 3(2)(b) does not apply to it, and that its fairness as defined in regulation 4(1) of the 1994 Regulations must be assessed.

44. The primary reason which the Director has given for maintaining that the term is unfair is the uncertainty, confusion and hardship which has been shown to result from the bank's practice of claiming contractual interest from its borrowers after judgment has been given for the principal. Particular unfairness is said to arise where an order is made to pay the debt by instalments, whether under section 71 of the County Courts Act 1984 or a time order under section 129 of the 1974 Act, and where no consideration has been given to making an order under section 136 of the 1974 Act to amend the agreement so as to prevent the accrual of contractual interest on instalments which are paid when they fall due. The fact that it is commonplace for no consideration to be given to the use of section 136 when payment by instalments is being ordered is not in dispute. So it is not surprising that borrowers, on finding that they are liable for further amounts in addition to the instalments provided for in judgments obtained against them by the bank, have complained to the Director.

45. I am not persuaded that, despite these consequences, the term is unfair. The meaning to be given to the word "unfair" in this context is laid down in regulation 4(1) of the 1994 Regulations. Guidance as to how the words used in that paragraph are to be understood is to be found in the sixteenth recital to the directive. The recital explains what "constitutes the requirement of good faith". It states that an assessment of the unfair character of unfair terms must be supplemented by an overall evaluation of the different interests involved. Regulation 4(2) indicates the wide range of circumstances to be taken into account in the assessment. It provides that the assessment is to be done as at the time of the conclusion of the contract. But an appreciation of how the term will affect each party when the contract is put into effect must clearly form part of the exercise. It has been pointed out that there are considerable differences between the legal systems of the member states as to how extensive and how powerful the penetration has been of the principle of good faith and fair dealing: *Lando and Beale, Principles of European Contract Law, Parts I and II* (Combined and Revised, 2000), p 116. But in the present context there is no need to explore this topic in any depth. The directive provides all the guidance that it needed as to its application.

46. Following this approach it does not seem to me that there is a significant imbalance to the detriment of the borrower in the stipulation that the interest which is payable in terms of the first part of the last sentence is to be charged after as well as before any judgment and that this obligation is not to merge in the judgment. The primary obligation in condition 4 is to pay interest on the outstanding balance due to the bank. The plain fact is that, in the event of a default by the borrower, the bank will not have recovered all of its money until the entire balance on the borrower's account has been paid. The main purpose of the last sentence is to ensure that the borrower does not enjoy the benefit of the outstanding balance after judgment without fulfilling the corresponding obligation which he has undertaken to pay interest on it as provided for in the contract. While the working out of that purpose may give rise to uncertainty in practice, the term itself does not seem to me to be unfair.

continue previous

**2001 WL 949790**
Standard Bank London Limited v. Dimitrios Apostolakis, Styliani ···
High Court of Justice Queens Bench Division Commercial Court
Friday 9th February, 2001

Standard Bank London Limited v. Dimitrios **Apostolakis,** Styliani **Apostolakis**
No. 1999 Folio 1259

High Court of Justice Queens Bench Division Commercial Court

QBD (Comm)

Before: The Honourable Mr Justice Steel

Friday 9th February, 2001

**Representation**

Mr. C Hollander Q.C. appeared on behalf of the Claimant.
Mr R Bartlett appeared on behalf of the Defendants.

**JUDGMENT**

**Introduction**

**1.** On the 27 [th] August 1997 the defendants, who are married and are both resident in Greece, entered into a written agreement with the claimant entitled "Terms and Conditions for Foreign Exchange in Precious Metals Margin Trading" which agreement incorporated the claimant's standard terms of business. Pursuant to the agreement the defendants had by 13 [th] March 1998 entered into twenty-eight transactions of which some twelve remained open. The transactions were by way of forward purchases of ECU's for Greek drachma. On that day the drachma was devalued. The defendants had earlier deposited US $1.1 million with the claimants (SBL) and this margin was applied by SBL in settlement of the amount said to be owed by the defendants on the close out of the remaining positions.
**2.** Upon 18 [th] December 1998 the defendants started proceedings against the claimant in Athens asserting that the claimant's conduct was unlawful, arbitrary and in breach of contract. Shortly before service of those proceedings in December 1999, the claimant commenced proceedings in this jurisdiction seeking an injunction restraining the defendants from continuing with the proceedings, which they instituted before the multi-member first instance court in Athens. The basis of this latter claim was that the defendants had agreed to submit any claims under the relevant contract to the exclusive jurisdiction of the English court.
**3.** In response to these proceedings the defendants raised four issues:--
a. On a proper construction of the agreement, there was no exclusive jurisdiction clause and thus Article 17 of the Brussels Convention was inapplicable.
b. The agreement was a consumer contract within the meaning of Article 13 of the Brussels Convention .
c. The agreement was preceded by advertising and/or specific invitation addressed to the defendants and thus, as the defendants took the steps necessary for the conclusion of the agreement in the state of their domicile, by virtue of Articles 13, 14 and 15 of the Brussels Convention , the defendants are entitled to bring proceedings against the claimants in Greece.
d. The jurisdiction agreement was an unfair contract term pursuant to the Unfair Terms in Consumer Contract Regulations 1994 and/or 1999.

**4.** The first two of these issues have been determined by Longmore J in a judgment handed down on the 19 [th] January 2000. He held (although his order is subject to appeal):--
a. On a proper construction of the agreement, there was an exclusive jurisdiction clause that

Article 17 of the Brussels Convention was thus applicable;
b. However, the agreement was a consumer contract within the meaning of Article 13 of the Brussels Convention (and the Regulations).
It follows that the two further issues c and d now arise for a decision.

## Dramatis Personae

**5.** Standard Bank London Limited ("SBL"), the claimant, is the wholly owned subsidiary of Standard Bank Investment Corporation Limited of South Africa. It constitutes the merchant banking arm of the group. It has both a foreign exchange desk and a money market desk. On 21st March 1997 the claimant entered into an Introducing Agreement with Eurofinance S.A. ("EF") whereby EF were to introduce to SBL clients who might wish to enter into foreign exchange transactions.
**6.** EF was a Greek firm of financial brokers based in Athens. The chairman was Mr Panagiotis Konstantatos. He gave evidence at the trial on behalf of the claimant. Another partner in EF was Mr Kalliopi Kalkopoulos. Mr Kalkopoulos also worked for an insurance and investment group called Inter American. A colleague of his at Inter American was Mr Alexandros Mitzirikis. The defendants were investment clients of Mr Mitzirikis.
**7.** The first defendant is a Greek engineer and property developer and the second defendant is his wife, who is a Greek law lawyer, practising in family law. In July 1997 Mr Mitzirikis introduced the first defendant to Mr Konstantatos. Both defendants gave evidence and Mr Mitzirikis was also called on their behalf.

## Summary of Background

**8.** Mr Apostolakis and his wife were well off. Between them they had substantial deposits in foreign exchange mainly with Citibank in London and with BCI in Geneva. Their overall portfolio was undoubtedly conservative, with other investments being primarily in bonds and mutual funds.
**9.** Mr Mitzirikis advised the defendants from time to time on their financial affairs and was anxious to encourage them to place part of their portfolio on a more speculative basis. He had in mind that something in the region of 20% of their liquid assets should be repositioned in this way. No doubt as a result of his contact with Mr Kalkopoulos, Mr Mitzirikis learnt of the potential for more speculative financial products that might be available through the offices of EF and accordingly he arranged for Mr Konstantatos to meet Mr Apostolakis in the latter's office.
**10.** In his evidence Mr Konstantatos described how EF was contracted as an introducer of business not only to the claimants, but also to two other financial institutions, IFX (foreign exchange brokers in London) and Commerz Bank based in Geneva. One of the more popular packages made available by these institutions centred on the difference between the interest rate payable on the ECU and the rate payable on the Greek Drachma. The investor would borrow ECUs at the lower rates of interest to buy therewith drachma's for deposit. The primary risk associated with this procedure was any devaluation of the Drachma. Mr Konstantatos described that he had a number of clients who had made such an investment through IFX and a few with Commerz Bank.
**11.** There was some dispute about even the date of the initial meeting between Mr Konstantatos and Mr Apostalakis. There was an even greater difference of recollection as to what took place at this initial meeting. Since the resolution of that factual dispute is of considerable significance in the context of the issues that I have to decide, it is desirable that I set out the competing accounts in some detail. But for the moment I will merely set the scene by describing the broad nature of the competing versions of the story.
**12.** It was Mr Konstantatos' recollection that the initial meeting was relatively short and introductory in form, that no documents relating to SBL were handed over and that it was only over a series of subsequent meetings, during which Mr Konstantatos described the kind of financial packages that might be available from not merely SBL but also Commerz Bank and IXL, that eventually Mr Apostolakis plumped for SBL.
**13.** In contrast the account of Mr Apostolakis supported by MrMitzirikis was to the effect that the

first meeting was the only one of substance, that only the financial products available from SBL were discussed and that all the relevant documentation was duly handed over to Mr Apostalakis at that stage.

**Introducing Agreement**

**14.** On being signed up as an "introducer" by the claimant, EF was furnished with various documents. So far as general documentation was concerned, EF was provided with copies of the "Report and Accounts" for the claimant group for the financial year 1996, together with copies of a brochure entitled "Directory of Services". It was common ground that the first defendant was indeed provided with copies of these documents, albeit there was some controversy as to when. EF was also provided with blank forms of contract for execution following the introduction of a new customer. These forms included the following:
a. A standard letter containing the "terms of business" for conduct of investment by the claimants. This contained an English exclusive jurisdiction clause.
b. A standard form document containing the "Terms and conditions of foreign exchange and precious metals margin trading" which included a non-exclusive English jurisdiction clause.
c. A "Power of Attorney and Indemnity".
d. A "Communications Indemnity Agreement".
All these four documents were for execution by the introduced client. (There was a further form entitled "Client Questionnaire" which was intended for completion by EF on the instruction of the introduced client.)
**15.** Again there was some dispute as to the stage at which copies of these forms of agreement were handed down to the defendants, but what is not in issue is that on 27th August 1997 the relevant forms were duly executed by the defendants and were then forwarded to the claimants by Mr Konstantatos under cover of a letter which read: "Please be advised for the documents of a new account in the name of E. & S. Apostolakis".
**16.** Accompanying these forms was a completed Client Questionnaire. This contained the various entries by way of indication of the defendants' wealth as follows:
a. "What is your approximate gross annual income from employment or pensions?" In respect of which the box "£250,000/£ 500,000" was ticked.
b. "What is your gross annual income from all investments including deposits?"
In respect of which the box "more than £100,000" was ticked.
c. "What is the approximate value of your assets (including savings) but excluding the value of your home?"
Answer "£3 million".
4. "How much do you invest each year?"
Answer "£400,000".
As I have already indicated, this document was not signed by the first defendant, but it was stamped and signed by Mr Konstantatos on behalf of EF, the entries being based on information furnished by the first defendant.
**17.** On receipt of the documents in London, a "credit application" was prepared, setting out some of the details referred to above. The application appears to have been prepared (and recommended) by Mr Patrick Chalmers and initialled by three other members of the Bank on 29 [th] August. There is however a later initialled endorsement dated 7th September to the effect that the maximum term should be three months.
**18.** On the 10th September Mr Chalmers wrote a memorandum to the following effect:
"Apostolakis is keen to start trading soon through Eurofinance Athens. He is aware that his account is on hold for the moment, as we are not in a position to classify him as an expert for SFA purposes. He has said that he would like to send us a signed declaration along the following lines to give us the comfort we need: he has traded FX before with Citibank assets on an unmargined basis. He is aware of the risks involved in margined trading and that the entire amount of his deposit could be at risk. He has traded in other financial markets (Greek and International Bonds and Equities). He is prepared to operate through Eurofinance Athens and has signed a Power of Attorney to that effect. He would not hold a bank responsible for losses incurred on trading decisions made by him or Eurofinance on his behalf. Is there anything else

we need to include?"

**19.** This memorandum was addressed to another member of the bank, Craig Greaves-Lord. I believe it to be common ground that the proposed form of declaration was in fact the work of Mr Konstantatos. The very next day, September 11th, Mr Konstantatos forwarded to Mr Chalmers "the additional document you requested". This was in the form of a letter signed by Mr Apostolakis broadly following the lines of the proposal contained in the earlier memorandum:--
"Dear Sirs, I take this opportunity to inform you that my previous experience in foreign exchange is with Citibank Athens, involving physical trading without the use of leverage and I am totally aware of the risks and rewards involved using leverage in the foreign exchange market.
My areas of experience also involves private banking, meaning physical trading in Greek and International bonds and also Greek and International equities through individual hands and/or mutual funds. Taking the above into consideration, I am happy for Eurofinance S.A to manage my account and enter trades for my account and risk."

**20.** The initial margin call as foreshadowed in the questionnaire was for the US $500,000, which was duly deposited on 15th September 1997. By 30th October 1997 a total of twenty-eight positions had already been opened on behalf of the defendant. Some sixteen had been closed, but twelve remained open to a total of 6.1 million ECU. However by this date the forward exchange rate as between Drachma ECU of 322 was already materially lower than the actual rate. In the result the claimants sought an additional margin payment of $600,000 failing which they threatened that they would close out the defendants' remaining positions. The defendants made the appropriate arrangements and the additional margin requirement was remitted on 4th November.

**21.** However on Sunday 15th March 1998 the Bank of Greece announced a devaluation of the Drachma and the following day the claimants closed out the remaining open positions at a rate of 352, a decision that is challenged by the defendants. As already recorded, proceedings were instituted on the defendants' behalf in the first instance court in Athens on 18th December 1998.

**22.** The only other document of materiality is a letter dated 12th November 1999 written shortly after the institution of the present English proceedings. The letter was signed by Mr Konstantatos, although apparently drafted by the legal representatives of the claimant in accord with their understanding of his instructions. The relevant part of the letter reads as follows:
"I am aware of legal proceedings, which refer to the role of Eurofinance in introducing Dimitrios and Stiliani Apostolakis to Standard Bank London Ltd (SBL). At all relevant times, I was a director of Eurofinance, representing Mr and Mrs Apostolakis in their relationship with SBL.
I would like to make a number of points in relation to the background of the proceedings as follows:
1. I have known Mr and Mrs Apostolakis for a number of years. Mr Apostolakis is a well-known civil engineer involved in real estate development and Mrs Apostolakis is an experienced Greek lawyer, practising in Athens.
2. Prior to entering into a relationship with SBL, Mr Apostolakis was experienced in Foreign Exchange trading and he understood the risks associated with leveraged transactions. Mr and Mrs Apostolakis had relationships with a number of Greek and foreign banks and conducted foreign exchange and other business with them. These other banks included Citibank Athens, Alpha Credit Bank and BCI (Suisse) in Zurich, Switzerland. I have also repeatedly have explained to him the dangers of the GRD market and specifically the danger of devaluation which is exactly what happened. I had many conversations with Mr and Mrs Apostolakis regarding the proposed transactions with SBL. They stated that they fully understood the nature of the proposed transactions including the risks of loss. This is reinforced by a letter which Mr Apostolakis sent to you confirming that he had experience in trading foreign exchange and fully understood the risks and regards in using leverage in the foreign exchange market.
3. Eurofinance did not advertise nor represent SBL's business in any way in Greece. At the request of Mr and Mrs Apostolakis I informed them about the execution services provided by various banks and finance institutions, including SBL.

4. On 27 August 1997, Mr and Mrs Apostolakis attended at my office to sign the SBL documentation. I presented them with the documentation and went through it with them. They stated that they understood the language. Their command of English is excellent ...

## Mr Konstantatos' Evidence

**23.** In seeking to reconstruct the manner in which Mr and Mrs Apostolakis became clients, Mr Konstantatos made reference to his diary for 1997. This had an entry for Mr Mitzirikis on the 25th July, an entry for Mr Apostolakis on 29th July, an entry for the 30th July of "prepare Apostolakis" and a further reference to Mr Apostolakis on the 1 st August. The only other reference to Mr Apostolakis was on the 27 th August being the date on which the various contractual documents were signed. Against this background Mr Konstantatos contended that he had met with Mr Mitzirikis alone on the 25 th July. At that meeting, Mr Mitzirikis had informed him that he had a client who was interested to meet Mr Konstantatos in order to discuss the possibility of entering into a transaction of the kind described above. Based on his diary entries, he considered that he met up with both Mr Apostolakis and Mr Mitzirikis on the 29 th July.

**24.** In his statement Mr Konstantatos described the joint meeting in the following way: "After initial introductions Mr Apostolakis mentioned that Mr Mitzirikis had talked to him about the type of foreign exchange trades referred to above, and asked me to elaborate upon the current situation in relation to the Greek drachma and to explain in more detail about such trades. At the end of the meeting, Apostolakis said he wished to continue our discussions and was clearly very interested in engaging in the foreign exchange trades. I left him with copies of certain articles from the Greek Financial Press in relation to such trades."

**25.** In his oral evidence he put greater emphasis on the meeting having been entirely introductory and by way of "acquaintance. He rejected the proposition that the initial meeting with Mr Apostolakis descended to detail with specific discussion of financial products of the claimants, let alone that he had recommended that Mr Apostolakis should invest in any such product. He denied that he ever suggested to Mr Apostolakis that EF were "representatives" of the claimant. He also denied that the claimant's directory of services or balance sheet, or any copies of the draft form of contract, were handed over at the meeting.

**26.** The only document that he accepted had been handed over at the time of the meeting on the 29 th July was a business card, which Mr Konstantatos recollected it, simply had EF's address and telephone number on it. He accepted that at some earlier stage there had been a business card that carried the name of both the claimant and Commerz Bank as well. But it was his evidence that the claimant, having heard about it, called upon him to cease using it. He had, he said, obeyed that instruction, and no such card had been furnished to Mr Apostolakis.

**27.** Again relying upon his diary, Mr Konstantatos thought that there was a further meeting with Mr Apostolakis on the 1 st August. He suggested that the reference to "prepare" on the 30 th July was consistent with him having prepared copies of the relevant contracts for presentation to Mr Apostolakis at that second meeting. But it was also his evidence that he had discussed with Mr Apostolakis the possibility of investing in the other two institutions with whom EF had a relationship and only thereafter, in response to Mr Apostolakis' request for further information about the claimant, did he furnished their annual report and directory of services.

**28.** The sequence of these events remained unclear. Furthermore Mr Konstantatos in his statement asserted that " *I met and spoke with Apostolakis several times over the next month or so* ". Consistent with this Mr Konstantatos was not minded to accept that there had been no meetings or even telephone conversations in the period between the 2 nd and 25 th August inclusive. However, it emerged from Mr Apostolakis' diary (which was produced just before the trial) that Mr Apostolakis was on holiday out of Athens during this period (and indeed in Egypt as from the 15 th August).

**29.** A further oddity arose from Mr Konstantatos' second witness statement. Having been

reminded of the discovery in the files of EF of some translations of the relevant forms, he suggested that copies of the translations had been delivered to the first defendant at some stage prior " *to his departure on holiday which I recall was some two or three weeks after my first meeting with Mr Apostolakis on the 29 [th] July* ". This at least was consistent with the date of formal certification of the translations on the 11 [th] August. But when faced with the difficulty of reconciling his account with Mr Apostalakis' holiday arrangements, Mr Konstantatos could only assert that there would have been no point in obtaining the translations if he had not in fact given copies to the defendants.

**Mr Apostalakis' Evidence**

**30.** Both the broad outline and the detail of Mr Apostolakis' recollection of the discussion between himself and Mr Konstantatos in July and August of 1997 were very different. He agreed that it was Mitzirikis who introduced him to Mr Konstantatos. Mr Mitzirikis had been anxious that Mr Konstantatos should describe to Mr Apostolakis the nature of a financial package, which he felt, would be of interest. The meeting, as he remembered it, took place on the 25th July at his office with both Mr Mitzirikis and Mr Konstantatos present. His recollection was that Mr Konstantatos described the principles of margin or leverage trading in a simple way and elaborated on how advantage might be taken of the difference between the interest rate payable on ECU as compared with the interest rate payable on Drachma. He asserted that Mr Konstantatos gave him firm advice that the existing exchange rate between the Drachma and ECU would be maintained for a minimum of one year.

**31.** He also asserted that Mr Konstantatos said in terms that his company, EF, represented SBL in Greece. By way of apparent confirmation of that Mr Apostolakis said that Mr Konstantatos gave him a business card on which was printed the name of SBL and that thereafter during the course of the discussions handed over publicity material with reference to SBL. Indeed Mr Apostolakis' recollection was that no other bank but SBL was mentioned during the course of this meeting that lasted something like one and a half-hours. At the end of the meeting Mr Apostolakis said that Mr Konstantatos left the standard forms of contract with him inviting Mr Apostolakis and his wife to sign them. Mr Apostolakis also said that since the forms were written in English, he then asked Mr Konstantatos to arrange for translation to be made available which Mr Konstantatos agreed to do.

**32.** In short, far from being an introductory form of meeting over a short period of time, it was Mr Apostolakis' evidence that it was in effect the only substantive meeting between Mr Konstantatos and Mr Apostolakis, albeit there may have been subsequent telephone conversations. His office diary confirmed that the office was closed between the 2nd and 20th August and thus that no meeting took place there in that period. His own diary confirmed that he was on holiday until the 25th . On his return he said that Mr Konstantatos telephoned him and urged him to sign the forms that he had been given on the grounds that it was particularly important to take advantage of the market situation at that time.

**33.** Mr Apostolakis and his wife duly signed the forms on 27th August without any further discussion with Mr Konstantatos and then handed them over. Mr Apostolakis contended that at no stage were any translations of the relevant documents afforded to him. As regards the letter of the 11th September, which was drafted by Mr Konstantatos and executed by Mr Apostolakis, Mr Apostolakis was minded to suggest that he only signed because he was assured by Mr Konstantatos that it was in a standard form. He had not understood it as he did not speak English and having now understood what it said, felt that it misrepresented his appreciation of the nature of the risks involved in the proposed transaction.

**34.** Mr Mitzirikis' evidence was broadly corroborative of that of Mr Apostolakis. Mrs Apostolakis was also called to give evidence but, having not been involved in any of the discussions, was obviously unable to assist in the resolution of the issues between the parties.

**Discussion**

**35.** I turn now to consider which of these two starkly different accounts is to be preferred. While some of the detail may be misrecollected, I unhesitatingly prefer the account of Mr Apostolakis

for the following principal reasons.

a. There is always a danger in drawing any inference from the demeanour of a witness, particularly when his evidence is given through an interpreter. But I have to say that, whilst Mr Apostolakis appeared to give his evidence in a responsive and straightforward way, Mr Konstantatos left me with distinct impression that, despite understanding English well and thus having the benefit in effect of the question being put twice, was minded to disengage himself from making a direct and coherent response when any difficulties were put to him. Put bluntly, I approach the evidence of Mr Konstantatos with some caution.

b. It seemed to me that a significant pointer to the proper resolution of the issues was the question of the presentation and content of the visiting card by Mr Konstantatos. As already recorded Mr Konstantatos was minded to accept that he did hand over a visiting card, but asserted that it was a plain card with EF's address and telephone number without any reference to SBL. During the course of the trial, a photocopy of the visiting card as given to Mr Apostolakis was unearthed. (I believe it had been found in files of Mr Apostolakis' Greek lawyer.) This did indeed have upon it the logo and the name of the claimants. It is fair to say that it also had the logo and the name of Commerz Bank Switzerland Limited. Nonetheless, not only was Mr Apostolakis' recollection largely substantiated but the document is entirely consistent with the impression that Mr Apostolakis said he got to the effect that EF were acting as representatives of SBL. This was an understandable impression which no doubt SBL were anxious to suppress, given their instruction to Mr Konstantatos to destroy the visiting cards when it was discovered he had been using them.

c. The picture that emerged from the contemporary diaries of the principal witnesses also afforded some considerable support for Mr Apostolakis' version of events. In the first place they certainly confirm that the initial meeting at Mr Apostolakis' office did indeed take place on 25 th July. Secondly, they undermine to some considerable extent the picture that Mr Konstantatos sought to paint of a series of meetings and other contacts stretching over the period between the initial meeting and the time when the contracts were signed in August, not least because they confirm that Mr Apostolakis' office was closed as from 2nd August and that he was on holiday until 25th, only two days before the contracts were signed.

d. There was another feature of the diaries which was of some significance. There is a notation in Greek in Mr Apostolakis' diary for the 28th July that roughly translates as ' *Ecu/Drachma 1 year steady* ". Whilst this may have been a concept derived from a conversation over the telephone post the 25th July meeting, nonetheless it strongly supports Mr Apostolakis' account of the extent to which Mr Konstantatos was giving strong encouragement to Mr Apostolakis about the medium term steadiness in the rate of exchange between the two currencies and thus, as Mr Apostolakis understood it, on the financial benefits to be derived from the scheme which Mr Konstantatos was recommending. Indeed it also somewhat undermines something that was put at the forefront of the claimant's case namely that Mr Apostolakis could not conceivably have been naïve enough to believe that the exchange rates would remain steady. The entry clearly demonstrates that Mr Konstantatos managed to be totally convincing on this very topic.

e. Mr Apostolakis' evidence was to the effect that the meeting on 25th July focussed entirely upon products of SBL. Whether or not products of any other bank were ever mentioned, Mr Apostolakis maintained that Mr Konstantatos recommended investment in an SBL product. Mr Konstantatos in his statement was at pains to assert that he had not made any recommendation about SBL and had left it to Mr Apostolakis to make a choice between the range of products and banks being put before him. In fact he was forced to retract that suggestion in the course of his oral evidence for two reasons. First, in a witness statement prepared by the claimant's solicitor for the purpose of an earlier application for default judgment made in January 2000, he records being instructed by Mr Konstantatos that he had indeed recommended the claimant. Furthermore this admission was repeated in points of reply filed in March 2000. Accordingly I am unable to accept the revised story on this topic as set out in Mr Konstantos' statement of May 2000. Moreover it is not easy to reconcile such a recommendation being made in the context of the version of the discussions between Mr Apostolakis and Mr Konostantatos put forward by Mr Konstantatos.

f. The next feature of the case that is worthy of examination is the extent and timing of the provision of the other documents to the defendants, apart from the tendering of the visiting card.

Mr Konstantatos had it that no documents were provided to Mr Apostolakis at the initial meeting but that at some later stage the Directory of Service and Accounts were provided and at some yet further stage the draft forms of agreement were furnished. I have already referred to some of the difficulties of accounting for the delivery of documents when there were so few opportunities in fact for meetings between the parties following the initial meeting on the 25th July. Moreover, the entry in Mr Konstantatos' diary for the 30th July to the effect that he was "preparing" papers for the Apostolakis' suggests to me that the contractual documents referred to above had indeed been furnished before that time and that what Mr Konstantatos was preparing as a consequence of the discussions he had with Mr Apostolakis was in particular a completed form of questionnaire. It is difficult to see in what respect any other document needed to be "prepared" since they were all in standard and un-amendable form (with the possible exception of the schedule to the margin trading agreement).

g. Any confidence in Mr Konstantatos' version of events is further undermined by the fact that in the points of reply the claimants specifically denied that the directory of services were supplied prior to the conclusion of the agreement. The pleading goes on to assert that Mr Konstantatos supplied this document at the very earliest at the time of the execution of the terms of business. '*He did not intend the defendants to read the documents at that time and they did not do so. It was intended for subsequent reading* ." This was wholly unsupported by anything Mr Konstantatos said in his statement or in his oral evidence. To the contrary his statement suggests that this document was furnished to Mr Apostolakis at a very early stage in the discussions. (It perhaps also indicates a degree of sensitivity as to the significance of the provision of such a document to Mr Apostolakis in the context of the issues of law arising in this case).

h. There is the strange position vis-à-vis the translations. As already stated they only emerged at a late stage just prior to the trial. Mr Konstantatos in his second witness statement identified a time for the provision of these translations to Mr Apostolakis that was very difficult to reconcile with Mr Apostolakis' holiday arrangements that August. But even more problematical from Mr Konstantatos' point of view is the emphasis that he placed in his first witness statement on the time that he spent time running through each document, explaining it purpose, during the course of his meetings with Mr Apostolakis. This is entirely in accord with Mr Apostolakis' version of events that no translations were furnished. It is wholly inconsistent with the provision of translations, let alone translations that only came into existence in the middle of August.

i. The suggestion that translations were provided at any stage whatsoever is further undermined by the letter, which Mr Konstantatos signed in November 1999. Its contents are highly damaging to his credibility. It contained the suggestion that he had gone through the documentation with Mr and Mrs Apostolakis, that Mr and Mrs Apostolakis never expressed any reservations about signing the documents and that "their command of English is excellent". In fact there was no possibility of Mr Konstantatos running through the documents in August (and if he had done late in the month, he would have made use of the translations which were by then available). So far as the 27th August was concerned, the documents had already been signed by the defendants before Mr Konstantatos ever arrived to collect them. There was no question of any explanations being furnished to Mrs Apostolakis because Mr Konstantatos never met her. Finally, the wholly untruthful assertion that the Apostolakis' understood English well is of course only consistent with the fact that no translations were furnished at any stage.

**36.** For all those reasons I prefer the evidence of Mr Apostolakis and Mr Mitzirikis as to the broad timetable and content of events from 25th July onwards. In brief I find as follows:

a. The initial meeting took place on 25th July 2000. At that meeting Mr Konstantatos did represent that he acted on behalf of the claimant and made no mention of any other bank from which investment products were available.

b. He made a detailed presentation at the first meeting as to the manner in which advantage could be taken of the disparity between the interest rates on the ECU and the Drachma.

c. At the first meeting he extracted sufficient information from Mr Apostalakis to complete the questionnaire.

d. He did assure Mr Apostolakis that it was both his opinion, and the conventional opinion in the

market, that the Drachma would not be devalued within the short or medium term.

e. Accordingly he strongly recommended to Mr Apostolakis that he make an investment with SBL.

f. He sought to give further support to the merit of the claimant organisation by presenting the Directory of Services and Accounts to Mr Apostolakis.

g. By the content of his advice and the provision of the documentation including a visiting card it was intended by Mr Konstantatos to convey, and was perceived by Mr Apostolakis as confirming, that EF acted in some representative capacity on behalf of SBL.

h. Mr Apostolakis asked for translations of the contract forms and none were ever furnished to him.


## Section 4 of the Brussels Convention

**37.** Mr Justice Longmore has already decided the threshold question that both for the purposes of Article 13 of the Brussels Convention , and for the purposes of the unfair terms in consumer Contracts Regulations 1994 (and 1999), the defendants were, in entering into their contracts with the claimants, doing so for purposes which were outside their trade business or profession. Nonetheless in order to rely upon Article 14 which would enable them, despite the exclusive jurisdiction clause, to bring proceedings against the claimants in Greece and which would prohibit the claimant from instituting proceedings against them outside Greece, it is necessary for them to satisfy another threshold requirement of Article 13 namely that " *in the state of the consumer's domicile, the conclusion of contract was proceeded by a specific invitation addressed to him or by advertising* ".

**38.** This is virgin territory so far as authorities are concerned within this jurisdiction. The Schlosser Report only provides some very modest guidance as to the construction of this party of the convention. Having observed that consumer contracts are " *subject to the special provisions only if there is a sufficiently strong connection with the place where the consumer is domiciled* ", the report refers the reader for further assistance on the meaning of "a specific invitation" or "advertising" to the Giuliano and Lagarde Report then being prepared for the purposes of the Rome Convention .

**39.** Only relevant passage in this latter report reads as follows:--

"The first indent relates to situations where the trader has taken steps to market his goods or services in the country where the consumer resides. It is intended to cover inter alia mail order and doorstep selling. Thus the trader must have done certain acts such as advertising in the press, or on radio or television, or in the cinema or by catalogues aimed specifically at that country, or he must have made business proposals individually through a middle man or by canvassing. If, for example a German makes a contract in response to an advertisement published by a French company in a German publication, a contract is covered by the special rule. If, on the other hand, the German replies to an advertisement in an American publication, even if they are sold in Germany, the rule does not apply unless the advertisement appeared in special editions of the publication intended for European countries. In the latter case the seller would have made a special advertisement intended for the country of the purchaser."


**40.** It seems to me that the words specific invitation should not be accorded anything other than a natural and common sense meaning bearing in mind that the provisions of the Convention must of course be given uniform application in all Convention countries. It is also clear that the Convention does not adopt the simple route of excluding all consumer contracts. Accordingly the exceptions must not be interpreted in such a manner as to extend them beyond the cases envisaged: see Benincasa -v- Dentalkit Srl [1997] ECR 1-3767 .

**41.** Bearing that in mind, and with the guidance of the authoritative commentaries referred to above, I have come to the conclusion that the defendants have made good their case that the conclusion of the contract was "preceded by a specific invitation addressed to them". My primary reasons are as follows:--

(a) EF had been appointed by the claimant as an "introducer". Although the agreement made it plain as between the parties that EF were not hereby made agents of SBL, the reality was that EF's role was to identify, engage and introduce specific clients.

(b) EF duly presented the defendants with a business plan or package available from the claimants, indicating both by word and documentation that EF represented SBL.

(c) EF recommended the package and recommended the claimants as promoters of it without reference to any alternative source.

(d) It follows that these proposals were to all outward appearances marketed in Greece by the claimants through Eurofinance or, to put it another way, the claimant's business proposals "were made by a middleman to the defendants".

(e) The proposals were made individually to the defendants: the fact that the defendants made the initial approach to EF is irrelevant.


## Unfair Terms Regulations

**42.** In summary, it seems to me that any fair perception of the facts viewed overall results in the case having a strong connection with Greece and falling well within the embrace of the Article 13. This conclusion makes it strictly unnecessary to consider the second issue as to whether the jurisdiction clause falls foul of the regulations as an unfair term. The matter would only be material if I was wrong as to the applicability of Article 13 and 14. I will however express my preliminary views upon the point.

**43.** The regulations define an unfair term as meaning " *any term which contrary to the requirement of good faith causes a significant imbalance in the parties rights and obligations under the contract to the detriment of the consumer* ." The regulations go on in Schedule 2 to give guidance as to the matter in which the existence or otherwise of good faith should be assessed as follows:

In making an assessment of good faith, regard should be had to:

(a) the strength of the bargaining positions of the parties;

(b) whether the consumer has an inducement to agree the term;

(c) whether the goods or services were sold or supplied to the special order of the consumer and;

(d) the extent to which the seller or supplier had dealt fairly and equitably with the consumer".


**44.** Schedule 3 of the regulations goes on to give some illustrations of the kind of terms which might be regarded as unfair. The only one with potential reference to the jurisdiction clause in issue here is (q):

"excluding or hindering the consumer's rights to take legal action or exercise any other legal remedy, particularly by requiring the consumer to take disputes exclusively to arbitration not covered by legal provisions, unduly restricting the evidence available to him or imposing on him a burden or proof which according to the applicable law should lie with another party to the contract."


**45.** The claimants' contention what that, since for the purposes of this argument Article 13 and 14 had no application, it could not be said that to require the defendants to being proceedings in England was contrary to good faith firstly because the contract was subject to English law, and secondly because in the event that the jurisdiction clause was struck down the provisions of Article 2 and 5 of the Convention would require the defendants to institute proceedings against the claimants in the claimants' domicile namely England.

**46.** The defendants' response was to pray-in-aid a passage from Professor Beale's contribution to **Beatson & Friedman: Good Faith and Fault in Contract Law (1995) at p.245** cited with approval by the Court of Appeal in Director General of Fair Trading v. First National Bank plc [2000] 2 WLR 1353 **at p.1365** :

I suspect that good faith has a double operation. First, it has a procedural aspect. It will require the supplier to consider the consumer's interests. However, a clause which might be unfair if it came as a surprise may be upheld if the business took steps to bring it to the consumer's attention and to explain it. Secondly, it has a substantive content: some clauses may cause such an imbalance that they should always be treated as unfair.

**47.** Against that background, the defendants submit that jurisdiction clauses of the kind provided for in the present case are prima facie unfair by reason of the imbalance of convenience between the parties, bearing in mind that it is the potential for unfairness rather than the actual unfairness in the particular case that matters. The degree of imbalance and consequent unfairness, it was suggested, was exaggerated in the present case by the alternate jurisdictions made available to the claimant but not to the defendants. Whilst in some case the unfairness might be overcome by careful explanation of its meaning and effect, in the present case no explanation, let alone a translation, was made.

**48.** As regards the general objection, the defendants relied upon the decision in Oceano Groupo Editorial SA -v- Rocio Murciano Quintero (C-240/98) . In the context of a small domestic dispute, the European Court stated as follows:

"22: A term of this kind, the purpose of which is to confer jurisdiction in respect of all disputes arising under the contract on the court in the territorial jurisdiction of which the seller or supplier has its principle place of business, obliges the consumer to submit to the exclusive jurisdiction of a court which may be a long way from its domicile. This may make it difficult for him to enter an appearance. In a case of disputes concerning limited amounts of money the costs relating to consumers entering an appearance could be a deterrent and cause him to forego any legal remedy or defence. Such a term thus falls within the category ofterms which have the object of effect of excluding or hindering the consumer's rights to take legal action, a category referred to in sub-paragraph q of paragraph 1 of the annex to the directive.

23. By contrast the term enables the seller or supplier to deal with all the litigation relating to his trade, business or profession in the courts in the jurisdiction of which he has his principal place of business. This makes it easier for the seller or supplier to arrange to enter an appearance and makes it less onerous for him to do so.

24. It follows that where a jurisdiction clause is included, without being individually negotiated, in a contract between a consumer and a seller or supplier within the meaning of the directive and where it confers exclusive jurisdiction on a court in the territorial jurisdiction of which the seller or supplier has its principal place of business, it must be regarded as unfair within the meaning of Article 3 of the directive in so far as it causes, contrary to the requirement of good faith, a significant imbalance in the party's rights and obligations arising out of the contract, to the detriment of the consumer."

**49.** The concerns of cost and convenience are enhanced in the present case, so the defendants contend, by the potential impact of the jurisdiction clauses as construed by Longmore J. to the effect that, while the defendants can only sue the claimant in England, the claimant at its option can sue the defendants in England, in any country where the defendants have assets or indeed in any other country where the defendants would be amenable to suit.

**50.** It is further submitted on behalf of the defendants that he present case provided a good example of potentially confusing sets of jurisdiction clauses calling for translation and careful explanation. On my findings of fact, such was not forthcoming.

**51.** I accept the defendants' submissions. I recognise that in terms of a consumer contract the arrangements into which the defendants entered must be at the "business" end of the scale given the size of the investments made. Nonetheless the purpose of the regulations is to protect consumers and it is into that category that they fall. The present proceedings alone demonstrate the potential cost and inconvenience of being bound to this jurisdiction, all conducted in a language that they do not speak. I conclude that the imbalance, which has taken the defendants by surprise, is contrary to good faith and, accordingly, that the jurisdiction clause is not binding.

Crown Copyright.

**Spiliada Maritime Corporation Appellants v. Cansulex Ltd Respondents**
House of Lords
1986 July 7, 8, 9; Nov. 19

***460 Spiliada** Maritime Corporation Appellants v. Cansulex Ltd Respondents
[1986] 3 W.L.R. 972

House of Lords

HL

Lord Keith of Kinkel, Lord Templeman, Lord Griffiths, Lord Mackay of Clashfern,
and Lord Goff of Chieveley

1986 July 7, 8, 9; Nov. 19

Practice--Writ--Application to set aside--Shipowners bringing action in England alleging damage
to vessel caused by shipping wet sulphur cargo-- Shippers carrying on business in British
Columbia--Whether case suitable for service out of jurisdiction--Relevance of claim being time
barred in British Columbia--R.S.C., Ord. 11, r. 4(2)

Ships' Names--Spiliada

In 1980 a Liberian owned vessel was chartered to carry a cargo of bulk sulphur from Vancouver,
British Columbia, to Indian ports. The shipowners alleged that the cargo was wet when loaded
and as a result caused severe corrosion to the vessel. They obtained leave ex parte to serve
proceedings on the shippers in Vancouver or elsewhere in Canada on the ground that it was an an
action to recover damages for breach of a contract governed by English law. The shippers issued
a summons under R.S.C., Ord. 12, r. 8, asking that the ex parte order be discharged on the
ground, inter alia, that the case had not been shown to be "a proper one for service out of the
jurisdiction" under R.S.C., Ord. 11, r. 4(2) [FN1]. At the hearing of the application Staughton J.,
who had already started to hear the trial of a similar action for damages involving the same
shippers in respect of another ship, the *Cambridgeshire* considered, inter alia, the availability of
witnesses, potential multiplicity of proceedings and the fact that the accumulated experience of
counsel and solicitors derived from their participation in the *Cambridgeshire* action would lead to
savings of time and money. He dismissed the application.

FN1 R.S.C., Ord. 11, r. 4(2): "No such leave shall be granted unless it shall be made sufficiently
to appear to the court that the case is a proper one for service out of the jurisdiction under this
Order."

On the shippers' appeal, the Court of Appeal held that it was impossible to conclude that the
factors considered by the judge, when taken together, showed that the English court was
distinctly more suitable for the ends of justice, and that a further factor, not considered by
Staughton J., that if the present proceedings were set aside the shipowners would be faced with
a defence of limitation in British Columbia, was a neutral factor. The Court of Appeal allowed the
appeal and set aside the writ.
On appeal by the shipowners:-
Held, allowing the appeal, that in order to determine whether a case was a proper one for service
out of the jurisdiction under R.S.C., Ord. 11, r. 4(2) the court had, as in applications for a stay of
proceedings founded on the ground of forum non ***461** conveniens where the action was as of
right by service on a defendant within the jurisdiction, to identify in which forum the case could
most suitably be tried for the interests of all the parties and for the ends of justice; that,
accordingly, the judge having identified the correct test and considered the relevant factors,
including the advantages of efficiency, expedition and economy in bringing the action in England
following the *Cambridgeshire* action, the Court of Appeal had had no grounds for interfering with

the exercise of his discretion (post, pp. 464F, G, 465G - 466A, 480F-G, 484E-F, 485F - 486B).
Dictum of Lord Kinnear in Sim v. Robinow (1892) 19 R. 665 applied.
Ilyssia Compania Naviera S.A. v. Bamaodah [1985] 1 Lloyd's Rep. 107, C.A. approved.
MacShannon v. Rockware Glass Ltd. [1978] A.C. 795, H.L.(E.) considered.
Dicta of Lord Diplock and Lord Wilberforce in Amin Rasheed Shipping Corporation v. Kuwait
Insurance Co. [1984] A.C. 50, 65, 72, H.L.(E.) and of Stephenson L.J. in Aratra Potato Co. Ltd.
v. Egyptian Navigation Co. (The El Amria) [1981] 2 Lloyd's Rep. 119, 129, C.A. explained.
Per curiam. Had the point arisen, the shipowners had not acted unreasonably in failing to
commence proceedings in British Columbia before the expiry of the limitation period there. Had
the judge erred in the exercise of his discretion, the proceedings would only have been set aside
on condition that the shippers waived their right to rely on the time bar in British Columbia (post,
pp. 464F, 465G - 466A, 487G - 488A).
Per Lord Templeman. The solution of disputes about the relative merits of trial in England and
trial abroad is preeminently a matter for the trial judge, before whom submissions should be
measured in hours not days. An appeal should be rare and the appellate court should be slow to
interfere (post, p. 465E-G).
Decision of the Court of Appeal [1985] 2 Lloyd's Rep. 116 reversed.

The following cases are referred to in the opinion of Lord Goff of Chieveley:
Abidin Daver, The [1984] A.C. 398; [1984] 2 W.L.R. 196; [1984] 1 All E.R. 470; [1984] 1 Lloyd's
Rep. 339, H.L.(E.).
Amin Rasheed Shipping Corporation v. Kuwait Insurance Co. [1984] A.C. 50; [1983] 3 W.L.R.
241; [1983] 2 All E.R. 884, H.L.(E.).
Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria) [1981] 2 Lloyd's Rep. 119, C.A..
Atlantic Star, The [1973] Q.B. 364; [1972] 3 W.L.R. 746; [1972] 3 All E.R. 705, C.A.; [1974]
A.C. 436; [1973] 2 W.L.R. 795; [1973] 2 All E.R. 175, H.L. (E.).
Blue Wave, The [1982] 1 Lloyd's Rep. 151
Britannia Steamship Insurance Association Ltd. v. Ausonia Assicurazioni S.p.A. [1984] 2 Lloyd's
Rep. 98, C.A..
B.P. Exploration Co. (Libya) Ltd. v. Hunt [1976] 1 W.L.R. 788; [1976] 3 All E.R. 879
Clements v. Macaulay (1866) 4 Macph. 583
Credit Chimique v. James Scott Engineering Group Ltd. 1982 S.L.T. 131
European Asian Bank A.G. v. Punjab and Sind Bank [1982] 2 Lloyd's Rep. 356, C.A..
*462 Hadmor Productions Ltd. v. Hamilton [1983] 1 A.C. 191; [1982] 2 W.L.R. 322; [1982] 1
All E.R. 1042, H.L.(E.).
Hagen, The [1908] P. 189, C.A..
Ilyssia Compania Naviera S.A. v. Bamaodah [1985] 1 Lloyd's Rep. 107, C.A..
Longworth v. Hope (1865) 3 Macph. 1049
MacShannon v. Rockware Glass Ltd. [1978] A.C. 795; [1978] 2 W.L.R. 362; [1978] 1 All E.R.
625, H.L.(E.).
Sim v. Robinow (1892) 19 R. 665
Société du Gaz de Paris v. Société Anonyme de Navigation "Les Armateurs Français," 1926 S.C.
13, H.L.(Sc.).
Société Génerale de Paris v. Dreyfus Brothers (1885) 29 Ch.D 239
Trendtex Trading Corporation v. Credit Suisse [1982] A.C. 679; [1981] 3 W.L.R. 766; [1981] 3
All E.R. 520, H.L.(E.).
Tyne Improvement Commissioners v. Armement Anversois S/A (The Brabo) [1949] A.C. 326;
[1949] 1 All E.R. 294, H.L.(E.).
Tyne Improvement Commissioners v. Armement Anversois S/A (The Brabo)
Union Industrielle et Maritime v. Petrosul International Ltd. (The Roseline) (unreported), 23
March 1984
The following additional cases were cited in argument:
Adolf Warski, The [1976] 1 Lloyd's Rep. 107; [1976] 2 Lloyd's Rep. 241, C.A..
Bruce (W.) Ltd. v. J. Strong [1951] 2 K.B. 447; [1951] 1 All E.R. 1021; [1951] 2 Lloyd's Rep. 5,
C.A..
Cantieri Navali Riuniti S.p.A. v. N.V. Omne Justitia [1985] 2 Lloyd's Rep. 428, C.A..

Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143, H.L.(E.).
Indian Fortune, The [1985] 1 Lloyd's Rep. 344
Maharani Woollen Mills Co. v. Anchor Line (1927) 29 Ll.L.Rep. 169, C.A..
Media, The (1931) 41 Ll.L.Rep. 80.
Shiloh Spinners Ltd. v. Harding [1973] A.C. 691; [1973] 2 W.L.R. 28; [1973] 1 All E.R. 90, H.L.(E.).
Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803; [1978] 1 Lloyd's Rep. 1, H.L.(E.).
Ward v. James [1966] 1 Q.B. 273; [1965] 2 W.L.R. 455; [1965] 1 All E.R. 563; [1965] 1 Lloyd's Rep. 145, C.A..

Appeal from the Court of Appeal.
This was an appeal by the plaintiffs, Spiliada Maritime Corporation, by leave of the House of Lords from an order of the Court of Appeal [1985] 2 Lloyd's Rep. 116 (Neill and Oliver L.JJ.) allowing an appeal from the order of Staughton J. of 16 November 1984 whereby he had dismissed the application of the defendants, Cansulex Ltd., under R.S.C., Ord. 12, r. 8 to set aside service of proceedings upon them in British Columbia, and alternatively for a stay of the proceedings, and whereby he accordingly refused to discharge the ex parte order of Neill J. on 10 October 1983 giving leave to the plaintiffs to serve proceedings upon the defendants pursuant to R.S.C., Ord. 11, r. 1(1)(f)(iii).
The facts are set out in the opinion of Lord Goff of Chieveley.
*463 *Kenneth Rokison Q.C.* and *Nicholas Legh-Jones* for the plaintiffs. The trial judge applied the correct test as to whether the case was a proper one for service out of the jurisdiction. He exercised his discretion in accordance with that test and therefore the Court of Appeal ought not to have intervened and substituted its own discretion: see Amin Rasheed Shipping Corporation v. Kuwait Insurance Co. [1984] A.C. 50, 65-68, *per* Lord Diplock. The way in which Lord Diplock's speech has been interpreted in Britannia Steamship Insurance Association Ltd. v. Ausonia Assicurazioni S.p.A. [1984] 2 Lloyd's Rep. 98 and Ilyssia Compania Naviera S.A. v. Bamaodah [1985] 1 Lloyd's Rep. 107 is correct - that the list of relevant factors is not exhaustive and the court has to carry out a balancing act of all the factors. [Reference was also made to Cantieri Navali Riuniti S.p.A. v. N.V. Omne Justitia [1985] 2 Lloyd's Rep. 428]. The Court of Appeal was only entitled to intervene and interfere with the judge's discretion in the circumstances set out by Lord Brandon of Oakbrook in The Abidin Daver [1984] A.C. 398, 420, namely where (1) the judge had misdirected himself with regard to the principles in accordance with which his discretion had to be exercised; (2) the judge, in exercising his discretion, had taken into account matters which he ought not to have done or failed to take into account matters which he ought to have done; or (3) his decision was plainly wrong. Further, in Shiloh Spinners Ltd. v. Harding [1973] A.C. 691, 728, Lord Simon of Glaisdale commented that the fact that the appellate court would give different weight to the various considerations assessed by the first instance court was not a reason to interfere. The judge had not only applied the correct test, but he had taken into account all relevant matters and cannot be said to have been "plainly wrong." Indeed, the judge was in the best position to weigh the relevant factors and in the particular the relevance and importance of the fact that the *Cambridgeshire* action had been fully prepared and fought in London (although it subsequently settled in the course of the trial). In the event that such circumstances were satisfied in the present case so that the Court of Appeal was entitled to consider the matter afresh and substitute its own discretion, then the fact that the defendants could rely on a time bar in British Columbia was not, as the Court of Appeal suggested, a neutral factor, but a powerful one which ought to have been weighed in the balance in the plaintiffs' favour. See Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557; The Adolf Warski [1976] 1 Lloyd's Rep. 107, 110; [1976] 2 Lloyd's Rep. 241; The Blue Wave [1982] 1 Lloyd's Rep. 151 and Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria) [1981] 2 Lloyd's Rep. 119.
*Robert Alexander Q.C.* and *Peter Goldsmith* for the defendants. The correct test to be applied is that of Lord Diplock in Amin Rasheed [1984] A.C. 50, 68: "The exorbitance of the jurisdiction sought to be invoked ... is an important factor to be placed in the balance against granting leave. It is a factor that is capable of being outweighed if the would-be plaintiff can satisfy the English

court that justice either could not be obtained by him in the alternative forum; or could only be obtained at excessive cost, delay or inconvenience." That passage provides an exhaustive list of the circumstances in which a plaintiff can *464 satisfy the burden upon him of showing that the case is a proper one for service out of the jurisdiction. The plaintiffs in the present case could not satisfy that burden. [Reference was made to MacShannon v. Rockware Glass Ltd. [1978] A.C. 795 as to the weight to be applied to a preference for representation by lawyers in one jurisdiction rather than another; and to Ward v. James [1966] 1 Q.B. 273, 293, as illustrating the correct approach to whether an appellate court may interfere with the exercise of discretion by a trial judge.] In the present case the Court of Appeal was right to review the exercise of the judge's discretion: [Detailed reference was made to the judgments and factual material]. The Court of Appeal was also right to hold that the time-bar point was a neutral factor: see: Maharani Woollen Mills Co. v. Anchor Line (1927) 29 Ll.L.Rep. 169; W. Bruce Ltd. v. J. Strong [1951] 2 K.B. 447; The Media (1931) 41 Ll.L.Rep. 80 and The Indian Fortune [1985] 1 Lloyd's Rep. 344. The existence of a time-bar was only given significance in The Blue Wave [1982] 1 Lloyd's Rep. 151 - a case which turned very much on its facts.

*Rokison Q.C.* in reply. In determining whether a case is a proper one for service out of the jurisdiction, one starts with the balancing exercise, and only at a later stage does one move on to the considerations set out by Lord Diplock in the passage relied upon by the defendants at [1984] A.C. 50, 68, There, Lord Diplock was merely illustrating by reference to examples the way a plaintiff seeking to invoke the English jurisdiction could satisfy the burden placed upon him. There is no difference between that speech and that of Lord Wilberforce at p. 72. It is one and the same test - correctly applied in the Britannia case [1984] 2 Lloyd's Rep. 98 and the Ilyssia case [1985] 1 Lloyd's Rep. 107. The present is not a case where one can say that there is a natural forum. On the time-bar point, all the cases relied upon by the defendants were cases with an "exclusive jurisdiction" clause and where the same time-bar applied abroad as in England. They are not, therefore, of assistance.

Their Lordships took time for consideration. 19 November. LORD KEITH OF KINKEL.
MY Lords, I have had the benefit of reading in draft the speech to be delivered by my noble and learned friend Lord Goff of Chieveley. I agree with it and for the reasons he gives would allow the appeal and restore the order of Staughton J.

LORD TEMPLEMAN.

MY Lords, in these proceedings parties to a dispute have chosen to litigate in order to determine where they shall litigate. The principles which the courts of this country should apply are comprehensively reviewed and closely analysed in the speech of my noble and learned friend Lord Goff of Chieveley. Where the plaintiff is entitled to commence his action in this country, the court, applying the doctrine of forum non conveniens will only stay the action if the defendant satisfies the court that some other forum is more appropriate. Where the plaintiff can only commence his action with leave, the court, applying the doctrine of forum conveniens will only grant leave if the *465 plaintiff satisfies the court that England is the most appropriate forum to try the action. But whatever reasons may be advanced in favour of a foreign forum, the plaintiff will be allowed to pursue an action which the English court has jurisdiction to entertain if it would be unjust to the plaintiff to confine him to remedies elsewhere.

In the present case, a vessel managed partly in Greece and partly in England, flying the flag of Liberia and owned by a Liberian corporation is said to have been damaged by a cargo loaded by a British Columbia shipper and carried from Vancouver to India. Both sets of insurers are English. Similar litigation took place in Canada concerning the vessel *Roseline*. Similar litigation took place in England over another vessel, the *Cambridgeshire*, after Staughton J. had refused to stay the action. If Staughton J. had good reason to try the *Cambridgeshire*, it is difficult to see that he had bad reason for trying the *Spiliada*.

The factors which the court is entitled to take into account in considering whether one forum is more appropriate are legion. The authorities do not, perhaps cannot, give any clear guidance as to how these factors are to be weighed in any particular case. Any dispute over the appropriate forum is complicated by the fact that each party is seeking an advantage and may be influenced

by considerations which are not apparent to the judge or considerations which are not relevant for his purpose. In the present case, for example, it is reasonably clear that Cansulex prefer the outcome of the *Roseline* proceedings in Canada to the outcome of the *Cambridgeshire* proceedings in England and prefer the limitation period in British Columbia to the limitation period in England. The shipowners and their insurers hold other views. There may be other matters which naturally and inevitably help to produce in a good many cases conflicting evidence and optimistic and gloomy assessments of expense, delay and inconvenience. Domicile and residence and place of incident are not always decisive.

In the result, it seems to me that the solution of disputes about the relative merits of trial in England and trial abroad is pre-eminently a matter for the trial judge. Commercial court judges are very experienced in these matters. In nearly every case evidence is on affidavit by witnesses of acknowledged probity. I hope that in future the judge will be allowed to study the evidence and refresh his memory of the speech of my noble and learned friend Lord Goff of Chieveley in this case in the quiet of his room without expense to the parties; that he will not be referred to other decisions on other facts; and that submissions will be measured in hours and not days. An appeal should be rare and the appellate court should be slow to interfere. I agree with my noble and learned friend Lord Goff of Chieveley that there were no grounds for interference in the present case and that the appeal should be allowed.

LORD GRIFFITHS.

My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Templeman and Lord Goff of Chieveley. For the reasons they give I would allow the appeal.

**\*466** LORD MACKAY OF CLASHFERN.

My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Templeman and Lord Goff of Chieveley. I agree with them and for the reasons which they give I would allow the appeal.

LORD GOFF OF CHIEVELEY.

My Lords, there is before your Lordships an appeal, brought by leave of your Lordships' House, against a decision of the Court of Appeal [1985] 2 Lloyd's Rep. 116 (Oliver and Neill L.JJ.) whereby they reversed a decision of Staughton J. in which he refused an application by the respondents, Cansulex Ltd., to set aside leave granted ex parte to the appellants, Spiliada Maritime Corporation, to serve proceedings on the respondents outside the jurisdiction. The effect of the decision of the Court of Appeal was, therefore, to set aside the leave so granted and the proceedings served on the respondents pursuant to that leave.

*(1) The facts of the case*

As this appeal is concerned with an interlocutory application, I must, like the courts below, take the facts from the affidavit evidence filed on behalf of the parties. The appellants (whom I shall refer to as "the shipowners") claim to be (and can, for the purposes of this appeal, be accepted as being) the owners of a bulk carrier, of about 20,000 tonnes deadweight, called *Spiliada*. The shipowners are a Liberian Corporation, and their vessel flies the Liberian flag; but their managers are in Greece, though some part of the management takes place in England. The respondents (whom I shall refer to as "Cansulex ") carry on business in British Columbia as exporters of sulphur. The shipowners chartered their vessel to an Indian company called Minerals & Metals Trading Corporation of India Ltd. (whom I shall refer to as "M.M.T.C.") under a voyage charter dated 6 November 1980, for the carriage of a cargo of sulphur from Vancouver to Indian ports. The charterparty contained a London arbitration clause. Pursuant to that charterparty, the vessel proceeded to Vancouver and there loaded a cargo of sulphur between 18 and 25 November 1980. The sulphur was loaded on board the vessel by order of Cansulex, who were f.o.b. sellers

of the sulphur to M.M.T.C. Bills of lading were then issued to, and accepted by, Cansulex. The bills were shipped bills, Cansulex being named as shippers in the bills. Clause 21 on the reverse of the bills of lading provided that, subject to certain clauses which are for present purposes immaterial, the bills of lading "no matter where issued, shall be construed and governed by English law, and as if the vessel sailed under the British flag." The bills were signed by agents for and by authority of the master. The cargo was discharged at ports in India between 29 December 1980 and 6 February 1981.

It has been alleged by the shipowners that the cargo of sulphur so loaded on the vessel was wet when loaded and as a result caused severe corrosion and pitting to the holds and tank tops of the vessel. The shipowners have claimed damages from Cansulex in respect of the damage so caused. The shipowners rely upon the age of the ship at the *467* time of the voyage (she was then three years old) and the condition of the holds before and after the voyage. The shipowners have advanced their claim against Cansulex as shippers under the contract of carriage contained in or evidenced by the bills of lading to which I have already referred, basing their claim on article 4, rule 6, of the Hague Rules (contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels, 25 August 1924) incorporated into the bills, and on a warranty implied by English law that dangerous cargo will not be shipped without warning. Arbitration proceedings have also been commenced by the shipowners against M.M.T.C. in London under the arbitration clause in the voyage charter. It is open to M.M.T.C. to bring arbitration proceedings in London against Cansulex under the sale contract between them, by virtue of the London arbitration clause in that contract. Leave was obtained by the shipowners to issue and serve a writ upon Cansulex outside the jurisdiction on a ground contained in the then R.S.C., Ord. 11, r. 1(1)(f)(iii), viz. that the action was brought to recover damages in respect of breach of a contract which was by its terms governed by English law.

Cansulex then applied for an order to set aside such leave and all subsequent proceedings. The application came before Staughton J. on 26 October 1984. The hearing of the application took place while there was proceeding before Staughton J. a very similar action, in which Cansulex were also defendants. That action concerned a ship called the *Cambridgeshire*, owned by an English company, Bibby Bulk Carriers Ltd. In it, the owners claimed damages for damage alleged to have been caused to their vessel by a cargo of sulphur loaded on her at Vancouver in November and December 1980, for carriage to South Africa and Mozambique. The defendants in the action were the charterers of the ship, Cobelfret NV, and three shippers - Cansulex, Petrosul International Ltd., and Canadian Superior Oil Ltd. In that action, Cansulex (supported by Petrosul International Ltd., another Canadian company) who had been served with proceedings outside the jurisdiction on the same ground as in the present case, applied in September 1982 for the leave to serve proceedings upon them outside the jurisdiction, and all subsequent proceedings, to be set aside. Staughton J. heard that application and dismissed it, holding that there was a good arguable case that the Canadian companies were parties to a contract governed by English law, and that the case was a proper one for service out of the jurisdiction. There was no appeal from that decision. The trial of the *Cambridgeshire* action started on 15 October 1984, again before Staughton J. He recorded in his judgment in the present case that there were no less than 15 counsel engaged in the *Cambridgeshire* action; that each was equipped with 75 files; and that the then estimate for the length of the trial was six months.

There has been another set of proceedings concerning damage to a vessel alleged to have been caused by a wet sulphur cargo shipped at Vancouver, Union Industrielle et Maritime v. Petrosul International Ltd. (unreported), 23 March 1984. This concerned a ship called the Roseline. The matter came before a Canadian Federal Court in March 1984, the *468* defendant being Petrosul International Ltd. The owners of the *Roseline* claimed a declaration that a contract existed between them and Petrosul under which disputes were to be referred to arbitration in Paris. The contract was said to have been contained in or evidenced by a bill of lading, in which Petrosul were named as shippers. Reed J. upheld a contention by Petrosul that they were not a party to any contract with the owners, or at least not a party to any contract containing an arbitration clause; her conclusion was reached on the basis that the bill of lading, in the hands of Petrosul, "partook of the nature of a receipt or a document of title," and that use for this purpose did not make the document a contractual one so far as Petrosul were concerned. There is doubt whether a similar conclusion would be reached in English law; Staughton J. was told that there was an

unreported decision of Mustill J. to the contrary effect. However, Staughton J. held, and it is now accepted by Cansulex, that in the present case there is a good arguable case that Cansulex were parties to the bill of lading contract, and so parties to a contract governed by English law.

It is right that I should record that the judge was told that there were other disputes concerning similar damage to ships alleged to have been caused by sulphur loaded at Vancouver; but he knew no more about them.

*(2) The decision of Staughton J.*

The judge approached the application of Cansulex in the present case as follows. Having concluded that there was a good arguable case that the shipowners and Cansulex were parties to a contract governed by English law, he then proceeded to consider whether the case had been shown to be, as a matter of discretion, a proper case for service out of the jurisdiction. He referred first to the decision of this House in Amin Rasheed Shipping Corporation v. Kuwait Insurance Co. [1984] A.C. 50, and in particular to certain passages (which I will quote later) from the speeches in that case of Lord Diplock, at p. 65, and Lord Wilberforce, at p. 72, and to a suggested conflict between those two passages; but, following a decision of the Court of Appeal in Ilyssia Compania Naviera S.A. v. Bamaodah [1985] 1 Lloyd's Rep. 107, he concluded that the suggested conflict was more apparent than real, and that the appropriate test for him to apply was that, if the English court is shown to be distinctly more suitable for the ends of justice, then the case is a proper one for service out of the jurisdiction. He then said:

"In considering the exercise of discretion I must, of course, assume that the *Spiliada* action will come to trial eventually, either in England or in Canada. In fact, that seems to me improbable. After the *Cambridgeshire* proceedings have reached a final conclusion, with vast expenditure of money, time and effort, I think it very likely that the parties to the *Spiliada* dispute will have little appetite for litigation, and will reach a compromise. Cansulex feature as defendants in both actions, and are presently represented by the same solicitors and counsel in both. The plaintiff shipowners are, of course, different in the two actions, but they too are represented by ***469*** the same solicitors and counsel, and it may be that they are supported by the same insurers. So I suspect that what I am in fact deciding is not where the *Spiliada* action will ultimately be tried, but whether a settlement will be reached against the background of litigation pending in England or of litigation pending in Canada. Nevertheless, it is the prospect of a trial which provides the sanction to induce a settlement, and in my judgment I must decide this application on the assumption that a trial there will be."

This was, so far as the *Cambridgeshire* action was concerned, a prescient observation. For, on 18 January 1985, the parties to that action settled their differences. Furthermore his thought that "it may be that [the shipowners] are supported by the same insurers" was one which would certainly have occurred to other experienced commercial practitioners, and the judge's tentative inference that both the *Cambridgeshire* and the *Spiliada* were entered in the same P. and I. club was confirmed before your Lordships; indeed the solicitors acting for the owners in both cases have commenced proceedings against a number of Canadian sulphur exporters, including Cansulex, on behalf of various shipowners all entered in the same P. & I. club.

The judge then turned to consider the various factors which were said to influence the choice between an English and Canadian court. I need not list them all. The most important were (1) availability of witnesses, (2) multiplicity of proceedings, and (3) a matter which was regarded as crucial by the judge, which I will call the *Cambridgeshire* factor and which relates to preparation for very substantial proceedings.

On availability of witnesses, the judge had this to say:

"Apart from those matters, I now have, after listening to the opening speech in the *Cambridgeshire* trial for 15 days, a somewhat clearer picture of what the relative importance of the issues is likely to be. The principal or most important events in the case occurred in Vancouver, but many events of significance occurred in many other places. The most important witnesses of fact will be from Cansulex and various other concerns in Vancouver, and the ship's officers. But there are likely to be a great many witnesses from other places. In the *Cambridgeshire* applications I concluded that, in terms of witness/hours, events in Vancouver were likely to loom largest at the trial. I am no longer convinced that that was right, even

leaving out of account the expert evidence. Certainly, there will be a very substantial body of evidence dealing with events which did not take place in Vancouver. As to the expert witnesses, I am told that all but one of them in the *Cambridgeshire* are English. But, as I then said, experts can travel, or be replaced by other experts.

"It is true that the *Cambridgeshire* plaintiffs are an English company and the ship is British, whereas the *Spiliada* plaintiffs are Liberian; so is their ship; and their managers are in Greece, although some part of the management takes place in England. That means that the *Spiliada* action has much less connection with England, but it does not give it any greater connection with *470* Vancouver. It is also true that two witnesses in the *Cambridgeshire* action decline to come to England to give evidence, so that their evidence will have to be taken on commission in North America. Nevertheless, I reach the clear conclusion that Vancouver is not overall a more suitable place for trial than England in terms of the convenience of witnesses. Indeed, if one assumes that the parties will wish to have the same experts as in the *Cambridgeshire*, I would say that England is shown to be more suitable."

I should interpolate that the judge was not right in thinking that all but one of the experts in the *Cambridgeshire* action were English; in fact, two of the defendants' experts came from England and four from elsewhere (one from Canada, one from the United States, and two from Europe - from Scandinavia and Greece). This was drawn to the judge's attention at the end of his judgment. The judge then stated that he did not however regard this difference as significant - no doubt he had it in mind that all the owners' experts were from England.

Next, turning to the question of multiplicity of proceedings, he referred to the facts that Cansulex wished to join their insurers and possibly others as third parties, which they could only do in Canada, and that the shipowners wished to join M.M.T.C. as co-defendants with Cansulex, which would obviously be a sensible course if it could be achieved. As to the former, he gave the same weight to it as he did in the *Cambridgeshire* application; as to the latter, he gave less, because, whereas the relevant charterers were joined as co-defendants in the *Cambridgeshire* action, in the present case (following, it appears, lobbying by both sides) he felt that he should regard the shipowners' objective of joining M.M.T.C. as problematical.

Turning to the *Cambridgeshire* factor, which he regarded as crucial, the judge had this to say: "But at the end of the day what seems to me important is this. Mr. Evans submits that Cansulex, having been put to the trouble and expense of bringing their witnesses and senior executives here once, should not have to bear the same burden again. Mr. Rokison replies that litigation is not like a football or cricket season, with one fixture at home and the other away. The trouble with such an attractive analogy or metaphor is that it tends to take one's eye off the ball, so to speak. Indeed, if all other things were equal, I should be inclined to hold that even-handed justice *would* be served best if one action were tried here and the other in Canada. But all other things are far from equal. The plaintiff's solicitors have made all the dispositions and incurred all the expense for the trial of one action in England; they have engaged English counsel and educated them in the various topics upon which expert evidence will be called; they have engaged English expert witnesses; and they have assembled vast numbers of documents. They have also, no doubt, educated themselves upon the issues in the action. All that has been done on behalf of Cansulex as well, save that one of their expert witnesses is Canadian. If they now wish to start the process again in Canada, that is their choice Rut it seems to me that the additional *471* inconvenience and expense which would be thrust upon the plaintiffs if this action were tried in Canada far outweighs the burden which would fall upon Cansulex if they had to bring their witnesses and senior executives here a second time.

"There might have been an appeal from my decision on the *Cambridgeshire* applications, but there was not. I appreciate that there are a number of significant points of distinction between the two cases, including the principal ones that I have mentioned. It may then in a sense be hard on Cansulex if the decision reached on the *Cambridgeshire* applications should have the effect of determining their application in this case. But in my judgment it does, in the circumstances and for the reasons that I have mentioned. Overall it would be wasteful in the extreme of talent, effort and money if the parties to this case were to have to start again in Canada. The case is a proper one for service out of the jurisdiction."

On that basis, the judge decided not to accede to Cansulex's application. After he had prepared his judgment, evidence was placed before him on behalf of the shipowners with regard to the

relevant limitation period applicable in British Columbia. It transpired that that period was two years, and had expired by November 1982, long before the hearing of Cansulex's application before the judge. The shipowners sought to rely on this point, apparently on the basis that to send the case back to British Columbia would deprive them of a legitimate juridical advantage in this country. However the judge, having already concluded that the action should be tried here, irrespective of the time bar point, did not think it necessary to consider that matter.

*(3) The decision of the Court of Appeal*

In the Court of Appeal [1985] 2 Lloyd's Rep. 116, Neill L.J. (who delivered the first judgment) referred to the speech of Lord Diplock in Hadmor Productions Ltd. v. Hamilton [1983] 1 A.C. 191, 220 and both he and Oliver L.J. referred to the speech of my noble and learned friend Lord Brandon of Oakbrook in The Abidin Daver [1984] A.C. 398, 420, which state the limited grounds upon which an appellate court may interfere with the exercise of a trial judge's discretion. They also, like the judge, regarded themselves bound by the decision of the Court of Appeal in the Ilyssia case [1985] 1 Lloyd's Rep. 107 to regard the difference between the speeches of Lord Diplock and Lord Wilberforce in the Amin Rasheed case [1984] A.C. 50 as more apparent than real. Neill L.J. reviewed the judge's assessment of the various factors as follows. With regard to the availability of witnesses, he felt that, even on the judge's own analysis of the facts, the convenience of the parties and the witnesses probably tilted the scales towards British Columbia as the forum, but certainly did not show that an English court was "distinctly more suitable for the ends of justice." On multiplicity of proceedings, he saw force in the criticism of Mr. Goldsmith (counsel for Cansulex) that this was at most a neutral factor, and certainly did not bring the scales down heavily on the side of England. On the relevance of the *Cambridgeshire* factor, while rejecting Mr. Goldsmith's primary ***472*** submission that the *Cambridgeshire* litigation was wholly irrelevant, he considered that the judge attached far too much importance to it. He said [1985] 2 Lloyd's Rep. 116, 124:

"The fact that the London solicitors who are presently acting are firms of great eminence and the further fact that members of these firms have acquired detailed knowledge about the shipment of sulphur cargoes from Vancouver are pointers to trial in England but should not be regarded as of decisive importance if other factors tilt the balance the other way."

He held that it was impossible to conclude that the relevant factors, when taken together, showed that the English court was distinctly more suitable for the ends of justice. On this view of the case, it became necessary for him to consider the impact of the time bar in British Columbia. On that he adopted the view of Oliver L.J. that the existence of a time bar was a neutral factor. He therefore decided to allow the appeal.

Oliver L.J., like Neill L.J., accepted that they were bound to follow the decision of the Court of Appeal in the Ilyssia case, on the basis of which he thought it right to follow the view of Lord Wilberforce in the Amin Rasheed case; and he did not therefore accept the submission of Mr. Goldsmith for Cansulex that the judge had propounded the wrong test. He then considered the exercise of the judge's discretion. He reviewed the judge's assessment of the availability of witnesses in considerable detail; and pointed out that the judge had proceeded on an erroneous assumption that all the experts in the *Cambridgeshire* action were English. He went on to express the opinion that the supposed advantages of England as a forum were, in this respect, far less clear cut than the judge had appeared to have imagined. In his opinion, the highest that it could be put on the shipowners' side was that the factor of convenience of witnesses was neutral. He then considered the point of multiplicity of proceedings, and rejected criticism of the judge's approach because the point seemed to him to have played a neutral role in the judge's decision. Turning to the *Cambridgeshire* factor, he was very critical of the judge's approach. He summarised Mr. Goldsmith's principal criticism at [1985] 2 Lloyd's Rep. 116, 133:

"But what, Mr. Goldsmith asks forensically, does all that amount to beyond this, that the plaintiffs say, in effect, 'we wish, for the purposes of our own and because it is convenient to do so, to retain the services of particular legal advisers and experts who happen to be resident and practising in England. Therefore, our desire to retain English legal advisers makes England a more appropriate forum for the hearing of the dispute?'"

Oliver L.J. accepted that criticism as well-founded. He concluded that, in giving to the

*Cambridgeshire* action the decisive and conclusive weight that he did, the judge erred in principle.

Finally, Oliver L.J. considered the impact of the time bar in British Columbia. He came to the conclusion that the time bar was not of itself a factor which ought to carry the day. The difficulty in the way of the *473* shipowners' argument that, by sending the case to be tried in British Columbia, they would be deprived of a legitimate juridical advantage in that the action was not time-barred in England, was that what was one side's advantage must be another's disadvantage. This pointed, of course, to a time bar being regarded as a neutral factor. Even if, following the decision of Sheen J. in The Blue Wave [1982] 1 Lloyd's Rep. 151, it was to be treated as a factor on which the shipowners as plaintiffs could rely unless they had acted unreasonably in allowing the time bar to elapse in the relevant foreign jurisdiction, that could be of no benefit to the shipowners in the present case, because there was no evidence tendered on their behalf providing any satisfactory explanation why no steps were taken to ascertain what the law of British Columbia was. Furthermore, the factor of the time bar in British Columbia could not in any event be conclusive; because the evidence showed that it was open to the shipowners to sue Cansulex in the Federal Court in any province in Canada. Accordingly, in agreement with Neill L.J., he decided that the appeal of Cansulex should be allowed.

*(4) Submissions of counsel*

Before your Lordships, the shipowners submitted that the Court of Appeal, having accepted that the judge applied the correct test, went beyond their limited power of review of the exercise of the judge's discretion. The real reason for their intervention was that they disagreed with the weight attached by the judge to the *Cambridgeshire* factor and were then, it was submitted, over-astute to discover an error which would enable them to substitute their own discretion for his. For Cansulex, on the other hand, it was submitted that the Court of Appeal were fully entitled to interfere with the judge's exercise of his discretion, substantially for the reasons given by them; but it was further submitted that, in any event, both the judge and the Court of Appeal should have applied the more stringent test set out in the passage from Lord Diplock's speech in the Amin Rasheed case [1984] A.C. 50, 68, which, if correctly applied, should certainly have led to the same order as that made by the Court of Appeal.

In considering the submissions of counsel, for whose assistance I am most grateful, it is necessary to review the applicable principles. I say this for two particular reasons. First, since the courts below have been troubled by apparent differences between observations of Lord Diplock and Lord Wilberforce in the Amin Rasheed case, it is, I think, desirable that this House should now resolve those differences. Second, since the question of the relevance of a time bar has now arisen in a number of cases, including the present, it is desirable that this House should give further consideration to the relevance of what has been called a "legitimate personal or juridical advantage," with special reference to time bars. But, in any event, the law on this subject is still in a state of development; and it is perhaps opportune to review the position at this stage, and in particular to give further consideration to the relationship between cases where jurisdiction has been founded as of right by service of proceedings on the defendant within the jurisdiction, but the defendant seeks a stay of the proceedings on the ground of forum non conveniens, *474* and cases where the court is invited to exercise its discretion, under R.S.C., Ord. 11, to give leave for service on the defendant out of the jurisdiction.

*(5) The fundamental principle*

In cases where jurisdiction has been founded as of right, i.e. where in this country the defendant has been served with proceedings within the jurisdiction, the defendant may now apply to the court to exercise its discretion to stay the proceedings on the ground which is usually called forum non conveniens. That principle has for long been recognised in Scots law; but it is only been recognised comparatively recently in this country. In The Abidin Daver [1984] A.C. 398, 411, Lord Diplock stated that, on this point, English law and Scots law may now be regarded as indistinguishable. It is proper therefore to regard the classic statement of Lord Kinnear in Sim v. Robinow (1892) 19 R. 665 as expressing the principle now applicable in both jurisdictions. He

said, at p. 668:

"the plea can never be sustained unless the court is satisfied that there is some other tribunal, having competent jurisdiction, in which the case may be tried more suitably for the interests of all the parties and for the ends of justice."

For earlier statements of the principle, in similar terms, see Longworth v. Hope (1865) 3 Macph. 1049, 1053, *per* Lord President McNeill, and Clements v. Macaulay (1866) 4 Macph. 583, 592, *per* Lord Justice-Clerk Inglis; and for a later statement, also in similar terms, see <u>Société du Gaz de Paris v. Société Anonyme de Navigation "Les Armateurs Français," 1926 S.C.(H.L.) 13</u>, 22, *per* Lord Sumner.

I feel bound to say that I doubt whether the Latin tag forum non conveniens is apt to describe this principle. For the question is not one of convenience, but of the suitability or appropriateness of the relevant jurisdiction. However the Latin tag (sometimes expressed as forum non conveniens and sometimes as forum conveniens) is so widely used to describe the principle, not only in England and Scotland, but in other Commonwealth jurisdictions and in the United States, that it is probably sensible to retain it. But it is most important not to allow it to mislead us into thinking that the question at issue is one of "mere practical convenience." Such a suggestion was emphatically rejected by Lord Kinnear in Sim v. Robinow, 19 R. 665, 668, and by Lord Dunedin, Lord Shaw of Dunfermline and Lord Sumner in the <u>Société du Gaz case, 1926 S.C. (H.L.) 13</u>, 18, 19, and 22 respectively. Lord Dunedin, with reference to the expressions forum non competens and forum non conveniens, said, at p. 18:

"In my view, 'competent' is just as bad a translation for 'competens' as ' convenient' is for 'conveniens.' The proper translation for these Latin words, so far as this plea is concerned, is 'appropriate.'"

Lord Sumner referred to a phrase used by Lord Cowan in Clements v. Macaulay (1866) 4 Macph. 583, 594, viz. "more convenient and preferable for securing the ends of justice," and said, at p. 22: ***475**

"one cannot think of convenience apart from the convenience of the pursuer or the defender or the court, and the convenience of all these three, as the cases show, is of little, if any, importance. If you read it as 'more convenient, that is to say, preferable, for securing the ends of justice,' I think the true meaning of the doctrine is arrived at. The object, under the words 'forum non conveniens' is to find that *forum* which is the more suitable for the ends of justice, and is preferable because pursuit of the litigation in that *forum* is more likely to secure those ends."

In the light of these authoritative statements of the Scottish doctrine, I cannot help thinking that it is wiser to avoid use of the word "convenience " and to refer rather, as Lord Dunedin did, to the *appropriate* forum.

*(6) How the principle is applied in cases of stay of proceedings*

When the principle was first recognised in England, as it was (after a breakthrough in <u>The Atlantic Star [1974] A.C. 436</u>) in <u>MacShannon v. Rockware Glass Ltd. [1978] A.C. 795</u>, it cannot be said that the members of the Judicial Committee of this House spoke with one voice. This is not surprising; because the law on this topic was then in an early stage of a still continuing development. The leading speech was delivered by Lord Diplock. He put the matter as follows, at p. 812:

"In order to justify a stay two conditions must be satisfied, one positive and the other negative; (a) the defendant must satisfy the court that there is another forum to whose jurisdiction he is amenable in which justice can be done between the parties at substantially less inconvenience or expense, and (b) the stay must not deprive the plaintiff of a legitimate personal or juridical advantage which would be available to him if he invoked the jurisdiction of the English court."

This passage has been quoted on a number of occasions in later cases in your Lordships' House. Even so, I do not think that Lord Diplock himself would have regarded this passage as constituting an immutable statement of the law, but rather as a tentative statement at an early stage of a period of development. I say this for three reasons. First, Lord Diplock himself subsequently recognised that the mere existence of "a legitimate personal or juridical advantage" of the plaintiff in the English jurisdiction would not be decisive: see <u>The Abidin Daver [1984] A.C.</u>

398, 410, where he recognised that a balance must be struck. Second, Lord Diplock also subsequently recognised that no distinction is now to be drawn between Scottish and English law on this topic, and that it can now be said that English law has adopted the Scottish principle of forum non conveniens: see The Abidin Daver [1984] A.C. 398, 411. It is necessary therefore now to have regard to the Scottish authorities; and in this connection I refer in particular, not only to statements of the fundamental principle, but also to the decision of your Lordships' House in the Société du Gaz case, 1926 S.C.(H.L.) 13. Third, it is necessary to strike a note of caution regarding the prominence given *476 to "a legitimate personal or juridical advantage" of the plaintiff, having regard to the decision of your Lordships' House in Trendtex Trading Corporation v. Credit Suisse [1982] A.C. 679, in which your Lordships unanimously approved the decision of the trial judge to exercise his discretion to stay an action brought in this country where there existed another appropriate forum, i.e., Switzerland, for the trial of the action, even though by so doing he deprived the plaintiffs of an important advantage, viz. the more generous English procedure of discovery, in an action involving allegations of fraud against the defendants.

In my opinion, having regard to the authorities (including in particular the Scottish authorities), the law can at present be summarised as follows.

(a) The basic principle is that a stay will only be granted on the ground of forum non conveniens where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action, i.e. in which the case may be tried more suitably for the interests of all the parties and the ends of justice.

(b) As Lord Kinnear's formulation of the principle indicates, in general the burden of proof rests on the defendant to persuade the court to exercise its discretion to grant a stay (see, e.g., the Société du Gaz case, 1926 S.C. (H.L.) 13, 21, per Lord Sumner; and Anton, Private International Law (1967) p. 150). It is however of importance to remember that each party will seek to establish the existence of certain matters which will assist him in persuading the court to exercise its discretion in his favour, and that in respect of any such matter the evidential burden will rest on the party who asserts its existence. Furthermore, if the court is satisfied that there is another available forum which is prima facie the appropriate forum for the trial of the action, the burden will then shift to the plaintiff to show that there are special circumstances by reason of which justice requires that the trial should nevertheless take place in this country (see (f), below).

(c) The question being whether there is some other forum which is the appropriate forum for the trial of the action, it is pertinent to ask whether the fact that the plaintiff has, ex hypothesi, founded jurisdiction as of right in accordance with the law of this country, of itself gives the plaintiff an advantage in the sense that the English court will not lightly disturb jurisdiction so established. Such indeed appears to be the law in the United States, where "the court hesitates to disturb the plaintiff's choice of forum and will not do so unless the balance of factors is strongly in favor of the defendant,": see Scoles and Hay, Conflict of Laws (1982), p. 366, and cases there cited; and also in Canada, where it has been stated (see Castel, Conflict of Laws (1974), p. 282) that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." This is strong language. However, the United States and Canada are both federal states; and, where the choice is between competing jurisdictions within a federal state, it is readily understandable that a strong preference should be given to the forum chosen by the plaintiff upon which jurisdiction has been conferred *477 by the constitution of the country which includes both alternative jurisdictions.

A more neutral position was adopted by Lord Sumner in the Société du Gaz case, 1926 S.C.(H.L.) 13, 21, where he said:

"All that has been arrived at so far is that the burden of proof is upon the defender to maintain that plea. I cannot see that there is any presumption in favour of the pursuer."

However, I think it right to comment that that observation was made in the context of a case where jurisdiction had been founded by the pursuer by invoking the Scottish principle that, in actions in personam, exceptionally jurisdiction may be founded by arrest of the defender's goods within the Scottish jurisdiction. Furthermore, there are cases where no particular forum can be described as the natural forum for the trial of the action. Such cases are particularly likely to occur in commercial disputes, where there can be pointers to a number of different jurisdictions (see, e.g., European Asian Bank A.G. v. Punjab and Sind Bank [1982] 2 Lloyd's Rep. 356), or in

Admiralty, in the case of collisions on the high seas. I can see no reason why the English court should not refuse to grant a stay in such a case, where jurisdiction has been founded as of right. It is significant that, in all the leading English cases where a stay has been granted, there has been another clearly more appropriate forum - in The Atlantic Star [1974] A.C. 436 (Belgium); in MacShannon's case [1978] A.C. 795 (Scotland); in Trendtex [1982] A.C. 679 (Switzerland); and in the The Abidin Daver [1984] A.C. 398 (Turkey). In my opinion, the burden resting on the defendant is not just to show that England is not the natural or appropriate forum for the trial, but to establish that there is another available forum which is clearly or distinctly more appropriate than the English forum. In this way, proper regard is paid to the fact that jurisdiction has been founded in England as of right (see MacShannon's case [1978] A.C. 795, per Lord Salmon); and there is the further advantage that, on a subject where comity is of importance, it appears that there will be a broad consensus among major common law jurisdictions. I may add that if, in any case, the connection of the defendant with the English forum is a fragile one (for example, if he is served with proceedings during a short visit to this country), it should be all the easier for him to prove that there is another clearly more appropriate forum for the trial overseas.

(d) Since the question is whether there exists some other forum which is clearly more appropriate for the trial of the action, the court will look first to see what factors there are which point in the direction of another forum. These are the factors which Lord Diplock described, in MacShannon's case [1978] A.C. 795, 812, as indicating that justice can be done in the other forum at "substantially less inconvenience or expense." Having regard to the anxiety expressed in your Lordships' House in the Société du Gaz case, 1926 S.C. (H.L.) 13 concerning the use of the word "convenience" in this context, I respectfully consider that it may be more desirable, now that the English and Scottish principles are regarded as being the same, to adopt the expression used by my noble and learned friend, Lord Keith of Kinkel, in The Abidin *478 Daver [1984] A.C. 398, 415, when he referred to the "natural forum" as being "that with which the action had the most real and substantial connection." So it is for connecting factors in this sense that the court must first look; and these will include not only factors affecting convenience or expense (such as availability of witnesses), but also other factors such as the law governing the relevant transaction (as to which see Crédit Chimique v. James Scott Engineering Group Ltd., 1982 S.L.T. 131), and the places where the parties respectively reside or carry on business.

(e) If the court concludes at that stage that there is no other available forum which is clearly more appropriate for the trial of the action, it will ordinarily refuse a stay; see, e.g., the decision of the Court of Appeal in European Asian Bank A.G. v. Punjab and Sind Bank [1982] 2 Lloyd's Rep. 356. It is difficult to imagine circumstances where, in such a case, a stay may be granted.

(f) If however the court concludes at that stage that there is some other available forum which prima facie is clearly more appropriate for the trial of the action, it will ordinarily grant a stay unless there are circumstances by reason of which justice requires that a stay should nevertheless not be granted. In this inquiry, the court will consider all the circumstances of the case, including circumstances which go beyond those taken into account when considering connecting factors with other jurisdictions. One such factor can be the fact, if established objectively by cogent evidence, that the plaintiff will not obtain justice in the foreign jurisdiction; see the The Abidin Daver [1984] A.C. 398, 411, per Lord Diplock, a passage which now makes plain that, on this inquiry, the burden of proof shifts to the plaintiff. How far other advantages to the plaintiff in proceeding in this country may be relevant in this connection, I shall have to consider at a later stage.

*(7) How the principle is applied in cases where the court exercises its discretionary power under R.S.C., Ord. 11*

As I have already indicated, an apparent difference of view is to be found in the speeches of Lord Diplock and Lord Wilberforce in the Amin Rasheed case [1984] A.C. 50. In that case, Lord Diplock said, at pp. 65-66:
"the jurisdiction exercised by an English court over a foreign corporation which has no place of business in this country, as a result of granting leave under R.S.C., Ord. 11, r.1(1)(f) for service out of the jurisdiction of a writ on that corporation, is an exorbitant jurisdiction, i.e., it is one

which, under general English conflict rules, an English court would not recognise as possessed by any foreign court in the absence of some treaty providing for such recognition. Comity thus dictates that the judicial discretion to grant leave under this paragraph of <u>R.S.C., Ord. 11, r.1(1)</u> should be exercised with circumspection in cases where there exists an alternative forum, viz. the courts of the foreign country where the proposed defendant does carry on business, and whose jurisdiction would be recognised under English conflict rules."

Again, said, at p. 68: ***479***

"the onus under R.S.C., Ord. 11, r.4(2) of making it 'sufficient to appear to the court that the case is a proper one for service out of the jurisdiction under this Order' lies upon the would-be plaintiff. Refusal to grant leave in a case falling within rule 1(1)(f) does not deprive him of the opportunity of obtaining justice, because ex hypothesi there exists an alternative forum, the courts of the country where the proposed defendant has its place of business where the contract was made, which would be recognised by the English courts as having jurisdiction over the matter in dispute and whose judgment would be enforceable in England.

"The exorbitance of the jurisdiction sought to be invoked where reliance is based exclusively upon rule 1(1)(f)(iii) is an important factor to be placed in the balance against granting leave. It is a factor that is capable of being outweighed if the would-be plaintiff can satisfy the English court that justice either could not be obtained by him in the alternative forum; or could only be obtained at excessive cost, delay or inconvenience."

In contrast, Lord Wilberforce said, at p. 72:

"<u>R.S.C., Ord. 11, r. 1</u> merely states that, given one of the stated conditions, such service is permissible, and it is still necesssary for the plaintiff (in this case the appellant) to make it 'sufficiently to appear to the court that the case is a proper one for service out of the jurisdiction under this Order' (r.4(2)). The rule does not state the considerations by which the court is to decide whether the case is a proper one, and I do not think that we can get much assistance from cases where it is sought to stay an action started in this country, or to enjoin the bringing of proceedings abroad. The situations are different: compare the observations of Stephenson L.J. in <u>Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria) [1981] 2 Lloyd's Rep. 119</u>, 129. The intention must be to impose upon the plaintiff the burden of showing good reasons why service of a writ, calling for appearance before an English court, should, in the circumstances, be permitted upon a foreign defendant. In considering this question the court must take into account the nature of the dispute, the legal and practical issues involved, such questions as local knowledge, availability of witnesses and their evidence and expense."

In the Ilyssia case [1985] 1 Lloyd's Rep. 107, the Court of Appeal had to consider the apparent difference between the two approaches expressed by Lord Diplock and Lord Wilberforce. Ackner L.J. resolved the difference as follows, at p. 113:

"Mr. Gross submits that Lord Diplock's statement was intended to be an exhaustive one. When reliance is based exclusively upon r.1(1)(f)(iii), it is *only* capable of being outweighed if the would-be plaintiff can satisfy the English court that either justice cannot be obtained by him in the alternative forum or could only be obtained at excessive cost, delay or inconvenience. Like Staughton J., I do not accept that submission. As I read the speech in the context of ***480*** that case as a whole Lord Diplock was emphasising that where exclusive reliance is placed upon r.1(1)(f)(iii) then the burden of showing good reasons justifying service out of the jurisdiction is a particularly heavy one, and he illustrated this by the examples which he gave of situations which were capable of tipping the balance in favour of the granting of leave. Thus constructed, as the judge points out, there is no conflict between Lord Diplock's statement and that of Lord Wilberforce ... Lord Wilberforce there states that in order to decide whether the case is a proper one the court must take into account the nature of the dispute, the legal and practical issues involved, such questions as local knowledge, availability of witnesses and their evidence and expense."

May L.J. spoke in similar terms, at p. 118. The practical effect was, however, as is reflected in the judgment of Oliver L.J. [1985] 2 Lloyd's Rep. 116, 127, in the present case, that the statement of principle of Lord Wilberforce was accepted as being the applicable principle.

With that conclusion, I respectfully agree; but I wish to add some observations of my own. The first is this. Lord Wilberforce said that he did not think that we can get much assistance from cases where it is sought to stay an action started in this country, or to enjoin the bringing of

proceedings abroad; in this connection he referred to certain observations of Stephenson L.J. in Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria) [1981] 2 Lloyd's Rep. 119, 129. It is right to point out that, in the relevant passage in his judgment in that case, Stephenson L.J. was only expressing caution with regard to assimilating cases of a stay to enforce a foreign jurisdiction clause with cases of a stay on the principle of forum non conveniens under MacShannon's case [1985] A.C. 795. He was not addressing himself to the question of the applicable principles under R.S.C., Ord. 11, and, while sharing Lord Wilberforce's concern about help to be derived, in Order 11 cases, from cases where an injunction is sought to restrain proceedings abroad, I respectfully doubt whether similar concern should be expressed about help to be derived from cases of forum non conveniens. I cannot help remarking upon the fact that when Lord Wilberforce came, at the end of the passage from his speech which I have quoted, to state the applicable principle, his statement of principle bears a marked resemblance to the principles applicable in forum non conveniens cases. It seems to me inevitable that the question in both groups of cases must be, at bottom, that expressed by Lord Kinnear in Sim v. Robinow, 19 R. 665, 668, viz. to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice. That being said, it is desirable to identify the distinctions between the two groups of cases. These, as I see it, are threefold. The first is that, as Lord Wilberforce indicated, in the Order 11 cases the burden of proof rests on the plaintiff, whereas in the forum non conveniens cases that burden rests on the defendant. A second, and more fundamental, point of distinction (from which the first point of distinction in fact flows) is that in the Order 11 cases the plaintiff is seeking to persuade the court to exercise its discretionary power to **481** permit service on the defendant outside the jurisdiction. Statutory authority has specified the particular circumstances in which that power *may be* exercised, but leaves it to the court to decide whether to exercise its discretionary power in a particular case, while providing that leave shall not be granted "unless it shall be made sufficiently to appear to the court that the case is a proper one for service out of the jurisdiction:" see R.S.C., Ord. 11, r.4(2).

Third, it is at this point that special regard must be had for the fact stressed by Lord Diplock in the Amin Rasheed case [1984] A.C. 50, 65 that the jurisdiction exercised under Order 11 may be "exorbitant." This has long been the law. In Société Générale de Paris v. Dreyfus Brothers (1885) 29 Ch.D. 239, 242-243, Pearson J. said:

"it becomes a very serious question ... whether this court ought to put a foreigner, who owes no allegiance here, to the inconvenience and annoyance of being brought to contest his rights in this country, and I for one say, most distinctly, that I think this court ought to be exceedingly careful before it allows a writ to be served out of the jurisdiction."

That statement was subsequently approved on many occasions, notably by Farwell L.J. in The Hagen [1908] P. 189, 201, and by Lord Simonds in your Lordships' House in Tyne Improvement Commissioners v. Armement Anversois S/A (The Brabo) [1949] A.C. 326, 350. The effect is, not merely that the burden of proof rests on the plaintiff to persuade the court that England is the appropriate forum for the trial of the action, but that he has to show that this is clearly so. In other words, the burden is, quite simply, the obverse of that applicable where a stay is sought of proceedings started in this country as of right.

Even so, a word of caution is necessary. I myself feel that the word "exorbitant" is, as used in the present context, an old-fashioned word which perhaps carries unfortunate overtones: it means no more than that the exercise of the jurisdiction is extraordinary in the sense explained by Lord Diplock in the Amin Rasheed case [1984] A.C. 50, 65. Furthermore, in Order 11 cases, the defendant's place of residence may be no more than a tax haven to which no great importance should be attached. It is also significant to observe that the circumstances specified in Order 11, r. 1(1), as those in which the court may exercise its discretion to grant leave to serve proceedings on the defendant outside the jurisdiction, are of great variety, ranging from cases where, one would have thought, the discretion would normally be exercised in favour of granting leave (e.g., where the relief sought is an injunction ordering the defendant to do or refrain from doing something within the jurisdiction) to cases where the grant of leave is far more problematical. In addition, the importance to be attached to any particular ground invoked by the plaintiff may vary from case to case. For example, the fact that English law is the putative proper law of the contract may be of very great importance (as in B.P. Exploration Co. (Libya)

Ltd. v. Hunt [1976] 1 W.L.R. 788, where, in my opinion, Kerr J. rightly granted leave to serve proceedings on the defendant out of the jurisdiction); or it may be of little importance as seen in the context of the whole case. In these circumstances, it is, in *482 my judgment, necessary to include both the residence or place of business of the defendant and the relevant ground invoked by the plaintiff as factors to be considered by the court when deciding whether to exercise its discretion to grant leave; but, in so doing, the court should give to such factors the weight which, in all the circumstances of the case, it considers to be appropriate.

*(8) Treatment of "a legitimate personal or juridical advantage"*

Clearly, the mere fact that the plaintiff has such an advantage in proceedings in England cannot be decisive. As Lord Sumner said of the parties in the *Société du Gaz* case, 1926 S.C.(H.L.) 13, 22:
"I do not see how one can guide oneself profitably by endeavouring to conciliate and promote the interests of both these antagonists, except in that ironical sense, in which one says that it is in the interests of both that the case should be tried in the best way and in the best tribunal, and that the best man should win."
Indeed, as Oliver L.J. [1985] 2 Lloyd's Rep. 116, 135, pointed out in his judgment in the present case, an advantage to the plaintiff will ordinarily give rise to a comparable disadvantage to the defendant; and simply to give the plaintiff his advantage at the expense of the defendant is not consistent with the objective approach inherent in Lord Kinnear's statement of principle in Sim v. Robinow, 19 R. 665, 668.
The key to the solution of this problem lies, in my judgment, in the underlying fundamental principle. We have to consider where the case may be tried "suitably for the interests of all the parties and for the ends of justice." Let me consider the application of that principle in relation to advantages which the plaintiff may derive from invoking the English jurisdiction. Typical examples are: damages awarded on a higher scale; a more complete procedure of discovery; a power to award interest; a more generous limitation period. Now, as a general rule, I do not think that the court should be deterred from granting a stay of proceedings, or from exercising its discretion against granting leave under R.S.C. Ord. 11, simply because the plaintiff will be deprived of such an advantage, provided that the court is satisfied that substantial justice will be done in the available appropriate forum. Take, for example, discovery. We know that there is a spectrum of systems of discovery applicable in various jurisdictions, ranging from the limited discovery available in civil law countries on the continent of Europe to the very generous pre-trial oral discovery procedure applicable in the United States of America. Our procedure lies somewhere in the middle of this spectrum. No doubt each of these systems has its virtues and vices; but, generally speaking, I cannot see that, objectively, injustice can be said to have been done if a party is, in effect, compelled to accept one of these well-recognised systems applicable in the appropriate forum overseas. In this, I recognise that we appear to be differing from the approach presently prevailing in the United States: see, e.g., the recent opinion of Judge Keenan in Re Union Carbide Corp. (1986) 634 F.Supp. 842 in the District Court for the Southern District of New York, where a stay of proceedings in New York, commenced on behalf of Indian plaintiffs against Union Carbide *483 arising out of the tragic disaster in Bhopal, was stayed subject to, inter alia, the condition that Union Carbide was subject to discovery under the model of the United States Federal Rules of Civil Procedure after appropriate demand by the plaintiff. But in the Trendtex case [1982] A.C. 679, this House thought it right that a stay of proceedings in this country should be granted where the appropriate forum was Switzerland, even though the plaintiffs were thereby deprived of the advantage of the more extensive English procedure of discovery of documents in a case of fraud. Then take the scale on which damages are awarded. Suppose that two parties have been involved in a road accident in a foreign country, where both were resident, and where damages are awarded on a scale substantially lower than those awarded in this country. I do not think that an English court would, in ordinary circumstances, hesitate to stay proceedings brought by one of them against the other in this country merely because he would be deprived of a higher award of damages here.
But the underlying principle requires that regard must be had to the interests of all the parties and the ends of justice; and these considerations may lead to a different conclusion in other

cases. For example, it would not, I think, normally be wrong to allow a plaintiff to keep the benefit of security obtained by commencing proceedings here, while at the same time granting a stay of proceedings in this country to enable the action to proceed in the appropriate forum. Such a conclusion is, I understand, consistent with the manner in which the process of saisie conservatoire is applied in civil law countries; and cf. <u>section 26 of the Civil Jurisdiction and Judgments Act 1982</u>, now happily in force. Again, take the example of cases concerned with time bars. Let me consider how the principle of forum non conveniens should be applied in a case in which the plaintiff has started proceedings in England where his claim was not time barred, but there is some other jurisdiction which, in the opinion of the court, is clearly more appropriate for the trial of the action, but where the plaintiff has not commenced proceedings and where his claim is now time barred. Now, to take some extreme examples, suppose that the plaintiff allowed the limitation period to elapse in the appropriate jurisdiction, and came here simply because he wanted to take advantage of a more generous time bar applicable in this country; or suppose that it was obvious that the plaintiff should have commenced proceedings in the appropriate jurisdiction, and yet he did not trouble to issue a protective writ there; in cases such as these, I cannot see that the court should hesitate to stay the proceedings in this country, even though the effect would be that the plaintiff's claim would inevitably be defeated by a plea of the time bar in the appropriate jurisdiction. Indeed a strong theoretical argument can be advanced for the proposition that, if there is another clearly more appropriate forum for the trial of the action, a stay should generally be granted even though the plaintiff's action would be time barred there. But, in my opinion, this is a case where practical justice should be done. and practical justice demands that, if the court considers that the plaintiff acted reasonably in commencing proceedings in this country, and that, although it appears that (putting on one side the time bar point) the appropriate forum for the trial of the action is *484 elsewhere than England, the plaintiff did not act unreasonably in failing to commence proceedings (for example, by issuing a protective writ) in that jurisdiction within the limitation period applicable there, it would not, I think, be just to deprive the plaintiff of the benefit of having started proceedings within the limitation period applicable in this country. This approach is consistent with that of Sheen J. in <u>The Blue Wave [1982] 1 Lloyd's Rep. 151</u>. It is not to be forgotten that, by making its jurisdiction available to the plaintiff - even the discretionary jurisdiction under R.S.C., Ord. 11 - the courts of this country have provided the plaintiff with an opportunity to start proceedings here; accordingly, if justice demands, the court should not deprive the plaintiff of the benefit of having complied with the time bar in this country. Furthermore, as the applicable principles become more clearly established and better known, it will, I suspect, become increasingly difficult for plaintiffs to prove lack of negligence in this respect. The fact that the court has been asked to exercise its discretion under R.S.C., Ord. 11, rather than that the plaintiff has served proceedings upon the defendant in this country as of right, is, I consider, only relevant to consideration of the plaintiff's conduct in failing to save the time bar in the other relevant alternative jurisdiction. The appropriate order, where the application of the time bar in the foreign jurisdiction is dependent upon its invocation by the defendant, may well be to make it a condition of the grant of a stay, or the exercise of discretion against giving leave to serve out of the jurisdiction, that the defendant should waive the time bar in the foreign jurisdiction; this is apparently the practice in the United States of America.

*(9) Application of the principles to the facts of the present case*

The judge proceeded on the basis that the relevant test was that "if the English court is shown to be distinctly more suitable for the ends of justice, then the case is a proper one for service out of the jurisdiction." The applicable principles are, I believe, as I have stated them to be; and the judge's approach was in accordance with those principles. I am therefore unable to accept the submission made on behalf of Cansulex that there was any material error of principle on the part of the judge.
I turn then to the question whether the Court of Appeal was entitled to interfere with the judge's exercise of his discretion. First, I take the criticism of the judge's assessment of the factor of availability of witnesses. It was said that he erred in thinking that all Cansulex's expert witnesses in the *Cambridgeshire* action were from England, whereas in fact two were from England, and

four were from elsewhere. However, as I have recorded, this was drawn to his attention at the end of his judgment: he then took into account the true position, and said that this difference was not of significance. No doubt, in making that observation, he had it in mind that all the owners' expert witnesses in the *Cambridgeshire* action were from England. Next, Neill L.J. commented [1985] 2 Lloyd's Rep. 116, 123 that

"even on his own analysis of the facts the convenience of the parties and the witnesses probably tilted the scales towards British Columbia *485 as the forum, but certainly did not show that an English court would be ' distinctly more suitable for the ends of justice.'"

Similar observations were made by Oliver L.J. For my part, I consider, with all respect, that these comments were not justified. At this stage, the judge did not have to apply the overall test, but merely to assess the merits of the particular factor under consideration; and I cannot help but think that the judge, with all his experience derived from hearing a substantial part of the *Cambridgeshire* action, was better placed to make an assessment of this factor than the Court of Appeal.

Turning to the factor of multiplicity of proceedings, the judge referred to the possibility of M.M.T.C. being joined as co-defendants in the English proceedings as problematical. Before the Court of Appeal, Mr. Goldsmith submitted on behalf of Cansulex that the other proceedings were at most a neutral factor and certainly did not bring the scales down on the side of England. Neill L.J. saw force in this criticism. But, once again, the judge did not have to decide, and did not decide, that this particular factor was decisive of the case. Moreover, if (as I think) the judge gave weight to this factor, he was, in my judgment, entitled to do so. There is much to be said, in the interests of justice, in favour of the shipowners' claims against both Cansulex and M.M.T.C. being tried in the same proceedings; and, having regard to the advice given to M.M.T.C. by their solicitors, there was a prospect that, if it was decided that the case should be heard in England, M.M.T.C. would, acting in their own interests, accept their own solicitors' advice. Indeed, if this were to happen, it might also be agreed that a claim over by M.M.T.C. against Cansulex should be included in the same proceedings, rather than be arbitrated in London under an arbitration clause in the sale contract.

But the crucial point, in the judge's view, was the *Cambridgeshire* factor. This was regarded, certainly by Neill L.J., as relevant; and in this I find myself to be in agreement. The criticism of the judge's view of this factor goes, therefore, to its weight, as Neill L.J. indicated [1985] 2 Lloyd's Rep. 116, 124 when he said that it seemed to him that the judge attached far too much importance to this factor. With all respect, however, when I read the judgments of both the Lords Justices, I consider that they underrated it. I believe that anyone who has been involved, as counsel, in very heavy litigation of this kind, with a number of experts on both sides and difficult scientific questions involved, knows only too well what the learning curve is like; how much information and knowledge has to be, and is, absorbed, not only by the lawyers but really by the whole team, including both lawyers and experts, as they learn about the interrelation of law, fact and scientific knowledge, having regard to the contentions advanced by both sides in the case, and identify in their minds the crucial matters on which attention has to be focused, why these are the crucial matters, and how they are to be assessed. The judge in the present case has considerable experience of litigation of this kind, and is well aware of what is involved. He was, in my judgment, entitled to take the view (as he did) that this matter was not merely of advantage to the shipowners, but also constituted an *486 advantage which was not balanced by a countervailing equal disadvantage to Cansulex; and (more pertinently) further to take the view that having experienced teams of lawyers and experts available on both sides of the litigation, who had prepared for and fought a substantial part of the *Cambridgeshire* action for Cansulex (among others) on one side and the relevant owners on the other, would contribute to efficiency, expedition and economy - and he could have added, in my opinion, both to assisting the court to reach a just resolution, and to promoting a possibility of settlement, in the present case. This is not simply a matter, as Oliver L.J. suggested, of financial advantage to the shipowners; it is a matter which can, and should, properly be taken into account, in a case of this kind, in the objective interests of justice.

For these reasons alone, I am of the opinion that this is a classic example of a case where the appellate court has simply formed a different view of the weight to be given to the various factors, and that this was not, therefore, an appropriate case for interfering with the exercise of

the judge's discretion. But, in addition, there are two other factors which the judge could, but did not, take into account, in support of the conclusion which he in fact reached. First, he was, in my judgment, entitled to take into account, in assessing the *Cambridgeshire* factor, the fact that, although the owners in the two cases were different, the solicitors for the owners were in both cases instructed by the same insurers; and he was also entitled to take into account that the insurers of the shipowners in the present case are managed in England. Usually this is a matter of no concern in English litigation; because, in subrogation claims, the action is in this country (unlike other countries) brought in the name of the assured, and the rights being enforced are the rights of the assured. But in the case of an application such as that in the present case, it is shutting one's eyes to reality to ignore the fact that it is the insurers who are financing the litigation and are dominus litis; and this is, in my view, a relevant factor to be taken into account: see the Société du Gaz case, 1926 S.C.(H.L.) 13, 20, *per* Lord Sumner. Second, it was a relevant factor that this litigation was being fought under a contract of which the putative governing law was English law, and that this was by no means an insignificant factor in the present case, since there was not only a dispute as to the effect of the bill of lading contract (as to which, as I have already recorded, there appears to be some difference of opinion between English and Canadian judges), but also, it appears, as to the nature of the obligations under the contract in respect of what is usually called dangerous cargo. However, had the judge taken these matters into account, they would only have reinforced the conclusion which he in fact reached.

*(10) The effect of the time bar in British Columbia*

On the view of the case which I have formed, it is not strictly necessary to consider the effect of the time bar in British Columbia; but since the point has been fully argued before us, I propose briefly to express my views upon it.
First, I cannot think that the fact (if it be the case) that the shipowners' claim was not time barred if brought in the Federal Courts *487* of Canada in provinces other than British Columbia - one suggestion was the Federal Court sitting in the neighbouring Province of Alberta - was of any relevance. On this, I accept the submission of the shipowners that it cannot be in the interests of the parties or in the interests of justice that the action should effectively be remitted to a forum which cannot be described as appropriate for the trial of the action.
Second, I do not think that the discretionary power which is, I understand, vested in the courts of British Columbia to waive the time bar, is relevant in this case. The point is simply that the shipowners' claim is not time barred in England but may be treated as time barred in British Columbia. In these circumstances, the question inevitably arises whether the English court, if it were minded to set aside the leave to serve proceedings on Cansulex out of the jurisdiction, should do so on the condition that Cansulex should waive any right to rely on the time bar applicable in British Columbia.
So it is necessary to consider whether justice required the imposition of such a term. The evidence before the Court of Appeal showed that neither the shipowners nor their legal advisers were aware of the two-year limitation period applicable in British Columbia. Cansulex did not draw the matter to their attention in their affidavit evidence; the shipowners' solicitors simply stumbled upon it when investigating the availability of suitable lawyers in Vancouver. Next, although Cansulex had applied to the English court to set aside the proceedings in the *Cambridgeshire* action, they had not appealed from the judge's adverse decision on the point and the *Cambridgeshire* action had proceeded to trial. Furthermore, had the shipowners' solicitors considered the matter, experience would have indicated that, having regard to the law as generally understood to prevail before the decision of this House in the Amin Rasheed case [1984] A.C. 50, in which the speeches were delivered in July 1983, and to the prominence hitherto given to legitimate personal and juridical advantages in the English jurisdiction (see, in particular, the decisions of the Court of Appeal in Britannia Steamship Insurance Association Ltd. v. Ausonia Assicurazioni S.p.A. [1984] 2 Lloyd's Rep. 98 and the Ilyssia case [1985] 1 Lloyd's Rep. 107), it was improbable that any different conclusion would be reached on an application to set aside the leave granted in the present case. In this connection, it is to be observed that the shipowners' cause of action against Cansulex in the present case must have accrued in

November 1980 (when the loading of the cargo on board the Spiliada in Vancouver was completed) and so was prima facie time barred in British Columbia by November 1982, nine months before the decision of this House in the Amin Rasheed case. In my judgment, had the point arisen, I would have been minded to hold that, in all the circumstances of the case, the shipowners had acted reasonably in commencing proceedings in this country, and that they had not acted unreasonably in failing to commence proceedings in British Columbia before the expiry of the limitation period there. In these circumstances, had I agreed with the Court of Appeal that the judge erred in the exercise of his discretion, I would nevertheless only have set aside the proceedings, to enable proceedings to be brought in *488 British Columbia, on the condition that Cansulex should waive their right to rely on the time bar in British Columbia.
However, for the reasons I have given I would allow the appeal with costs here and below, and restore the order of Staughton J.

*(11) Postscript*

I feel that I cannot conclude without paying tribute to the writings of Jurists which have assisted me in the preparation of this opinion. Although it may be invidious to do so, I wish to single out for special mention articles by Mr. Adrian Briggs in (1983) 3 Legal Studies 74 and in [1984] L.M.C.L.Q. 227, and the article by Miss Rhona Schuz in (1986) 35 I.C.L.Q. 374. They will observe that I have not agreed with them on all points; but even when I have disagreed with them, I have found their work to be of assistance. For jurists are pilgrims with us on the endless road to unattainable perfection; and we have it on the excellent authority of Geoffrey Chaucer that conversations among pilgrims can be most rewarding.

**Representation**

Solicitors: Holman Fenwick & Willan; Linklaters & Paines.

Appeal allowed with costs. (C.T.B. )

(c) Incorporated Council of Law Reporting For England & Wales
END OF DOCUMENT

**[2002] C.L.C. 265**
Cgu International Insurance plc v. Szabo & Ors.
Queen's Bench Division (Commercial Court)
Judgment delivered 6 November 2001

**\*265** Cgu International Insurance plc v. **Szabo** & Ors.

Queen's Bench Division (Commercial Court)

QBD (Comm)

Toulson J.

Judgment delivered 6 November 2001

Insurance--Conflict of laws--Service out of jurisdiction--Defendants claimed in Ohio on global liability policy written in London for international group of companies--Daughter of employee of group company injured in car accident in Ohio--Claim on policy based on extended underinsured motorist coverage imposed by operation of law in Ohio--Insurer sought declaration of non-liability on basis that defendants were not within definition of insured under policy and that car accident was not occurrence within insuring clause--Whether insurer had good arguable case that policy was governed by English law--Whether England natural forum for determining construction of policy--Whether service on defendants out of jurisdiction in Ohio should be set aside.

This was an application by the first, second and third defendants to set aside the order giving permission to serve the proceedings on them out of the jurisdiction in Ohio.

The claimant, 'CGU', issued a global liability policy for the period from 1 July 1997 to 31 December 2000. The policy was placed in London by London brokers. It provided worldwide coverage against various kinds of legal liabilities incurred by an international group of companies. The policy defined the insured as the parent companies and/or their subsidiary and associated companies. Under the public liability section, the definition of insured was to include, if the insured so requested, any employee of the insured so as to provide cover to that employee against any liability in respect of which the insured would itself have been entitled to indemnity under the policy. Clause 16 provided cover to the insured throughout the world, except the UK, in respect of all sums which the insured became legally liable to pay for bodily injury or damage to property, in excess of US$1m, arising out of the use of motor vehicles by or on behalf of the insured. One of the group companies was a US company with a division in Dayton, Ohio. The second defendant was an employee of that company and lived in Ohio. In 1999 the second defendant's daughter (the first defendant) was severely injured in a road accident in Ohio. She recovered $1m from the driver's motor insurers and the US company's insurers and, acting through her father, brought a claim against CGU in Ohio for compensation for her injuries, the cost of medical treatment and loss of earning capacity. Her parents and brother also claimed in those proceedings for loss of her consortium. The claims in Ohio were founded upon a provision of the Ohio Revised Code and a decision of the Ohio Supreme Court whose effect was to impose uninsured or underinsured motorist coverage by operation of law. The claimants in Ohio said that the CGU policy was covered by those provisions and that where the insured was a company the imposed coverage extended to employees whether acting on the company's business or otherwise and also extended to the close relatives of such employees. Therefore the first defendant obtained underinsured motorist cover by operation of law, despite the fact that her accident had nothing to do with her father's employer's business. CGU took proceedings in England for a declaration of non-liability on the basis that the CGU policy was governed by English law and not by the law of Ohio, that none of the defendants was within the definition of 'insured' in the policy and that the first defendant's accident was not an 'occurrence' within the insuring clause of the policy. Aikens J gave permission to serve proceedings on the defendants in Ohio. The defendants applied to set aside the order for service out of the jurisdiction. They

argued that the policy had no fixed proper law and that its proper law for the purposes of any individual claim was the law of the place where the claim arose, alternatively that the policy was severable and contained separate contracts between CGU and each insured and that the proper law of the contract between CGU and the defendants was that of Ohio.

***266** *Held*, refusing to set aside service out of the jurisdiction:

**1** CGU had a good arguable case that its claim was made in respect of a contract which was made within the jurisdiction under CPR, r. 6.20(5)(a), but the court would not as a matter of discretion allow the claim to proceed on that basis if it appeared that the relevant law of the contract was that of Ohio. The issue of the governing law under CPR, r. 6.20(5)(c) was therefore the determining factor.

**2** There appeared to be no practical distinction between the test in Ohio for determining the proper law and the test which would be applied in England. It was desirable that the question of construction of the policy should be determined at an early stage and the general choice of law rules appeared to be the same in both jurisdictions.

**3** CGU had a good arguable case that the policy was governed by English law on the basis that it was negotiated, concluded and issued in England. The court rejected the defendants' arguments that the proper law of the policy for the purposes of any individual claim was the law of the place where the claim arose, or that the policy contained separate contracts between CGU and each insured and that the proper law of the contract between CGU and the defendants was that of Ohio. There was nothing in the policy to suggest that 'the insured' was intended to have a variable meaning according to the law of the country of the person making a claim. The argument that the insuring clause and the definition of the insured should be taken to mean different things according to the country of the person claiming under it was inconsistent with the fundamental idea of a governing law and with the rule that, if the governing law had not been chosen by the parties, it should be that of the country with which the contract was most closely connected. Further, in relation to severability, it was plain from the structure of the policy that it was intended to provide those defined in it as the insured with a compendium of rights some of which might fairly be regarded as severable from others, but there was no sensible basis on which the words of the policy defining the insured could be severed so as to be interpreted by different laws and given possibly different meanings depending on where the events occurred which gave rise to a claim.

**4** On the basis that CGU had a strong case for saying that the policy was governed by English law, the English court was the natural forum for determining the construction of the policy. (New Hampshire Insurance Co v Philips Electronics North America Corp [1998] CLC 1062.)

**5** Allowing the English action to proceed will not involve any lack of comity towards the Ohio court, for, if the English court should decide that the policy was governed by Ohio law, CGU's claim would fail; and, as to the risks of delay and duplication of expense, the English action was likely to be short. There was a potential risk of conflicting outcomes if the English court were to determine that the policy was governed by English law and construe it on that basis, but the Ohio court determined that it was governed for relevant purposes by Ohio law. That was a valid consideration, but, having reached the view that CGU had a strong case saying that the policy was governed by English law, justice would not be served in this particular case by staying the action. On balance it would not be just to set aside or stay the action at this stage.

**The following cases were referred to in the judgment:**

Canada Trust Co v Stolzenberg (No. 2) [1998] CLC 23; [1998] 1 WLR 547 (CA); [2001] CLC 118; [2000] 3 WLR 1376 (HL).

EI Du Pont de Nemours & Co v Agnew [1987] 2 Ll Rep 585.

Gries Sports Ent Inc v Modell (1984) 15 Ohio St 3d 284.

Messier-Dowty Ltd v Sabena SA [2000] CLC 889; [2000] 1 WLR 2040.

New Hampshire Insurance Co v Philips Electronics North America Corp [1998] CLC 1062.

Ohayon v Safeco Insurance Co of Illinois (2001) 91 Ohio St 3d 474.

***267** Scott-Pontzer v Liberty Mutual Fire Insurance Co (1999) 85 Ohio St 3d 660; 710 NE 2d 1116.

Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran [1994] 1 AC 438.

Vitkovice Horni a Hutni Tezirstvo v Korner [1951] AC 869.

**Representation**

Alexander Layton QC (instructed by Kennedys) for the claimant.
Huw Davies (instructed by Jones Day Reavis & Pogue) for the first, second and third defendants.
Richard Waller (instructed by DJ Freeman) for the fourth and fifth defendants.

**JUDGMENT**

Toulson J: Introduction
**1** On 25 May 2001 Aikens J gave permission for the claimant, CGU, to serve proceedings out of the jurisdiction on Ashleigh Szabo, her father and mother (the first, second and third defendants) and Reed Elsevier Inc (the fifth defendant). The Szabos (as I will refer to the first, second and third defendants) live in Carlisle, Ohio, and are claimants in an action against CGU in Ohio.
**2** Reed International plc (the fourth defendant) is an English company and is one of two companies at the head of a multi-national publishing group. The other leading company in the group is a Dutch company called Elsevier NV. The fifth defendant is a member of the group. It is a Massachusetts company but it has a division, known as Lexis-Nexis, which has its headquarters in Dayton, Ohio. The Reed defendants (as I will refer the fourth and fifth defendants) are not parties to the Ohio action.
**3** When the present hearing began there were two applications; one by the Szabos to set aside the order giving permission to serve the proceedings on them out of the jurisdiction, and the other by the Reed defendants to strike out the proceedings against them. During the course of the hearing the Reed defendants' application was compromised on the basis that the action against them should be stayed on various cross-undertakings.
**4** Arguments over jurisdiction are not uncommon, but the facts giving rise to the jurisdictional dispute between the Szabos and CGU are rather unusual.

**The policy**

**5** At the heart of the dispute is a policy, called a global liability policy, issued by CGU for the period from 1 July 1997 to 31 December 2000. The evidence is that it was placed in London by a firm of London brokers.
**6** The schedule to the policy defines the insured as 'Reed International PLC, Elsevier NV and/or subsidiary and associated companies'. Investigations by the Reed defendants suggest that the brokers, who acted as the insured's agents in arranging the policy, received their instructions from Reed Elsevier (UK) Ltd, which (as its name suggests) is a UK company and member of the Reed group. Be that as it may, on the material before the court it appears that the policy was arranged by an English company (either the fourth defendant or Reed Elsevier (UK) Ltd) through London brokers on behalf of all the companies in the group, including the fifth defendant.
**7** As its title suggests, the policy provides worldwide coverage against various kinds of legal liabilities incurred by the insured towards others. More specifically, it provides cover against employer's liability, public liability, products liability, professional indemnity and libel claims, all as set out in the policy.
**8** Under s. 1 of the policy, which covers employer's, public and products liability, CGU agreed to indemnify the insured against 'all sums which the Insured shall become legally liable **\*268** to pay for damages ... in respect of any Occurrence to which this Policy applies as stated in the Specification and in connection with the Business', plus legal costs and expenses.
**9** The 'business' is defined as covering all activities undertaken by the insured at any time.
**10** For a comprehensive definition of any 'occurrence' to which the policy applies, it is necessary to go to the specification and a number of supplemental clauses. Relevantly for present purposes, cl. 16 provides cover to the insured throughout the world, except the UK, in respect of all sums which the insured shall become legally liable to pay for bodily injury or damage to property, in excess of US$1m, arising out of the use of motor vehicles by or on behalf of the insured.

**11** By reason of a further clause headed 'Reverse DIC/DIL' (difference in cover/difference in limits), where the policy provides cover in excess of that provided by a local policy (meaning any policy issued to an insured registered and/or domiciled outside the UK, the Channel Islands or Isle of Man), and the cover provided to the insured by the underlying policy is interpreted as broader than the cover provided under the CGU, the latter will respond as if the interpretation of cover applicable to the underlying policy applied also to the CGU policy.

**12** Under the public liability section, the definition of insured was to include, if the insured specified in the schedule so requested, any employee of the insured so as to provide cover to that employee against any liability in respect of which the insured would itself have been entitled to indemnity under the policy. In other words, the insured could opt to see that, in so far as it might incur vicarious liability for the conduct of an employee, the employee would be entitled to similar cover.

**13** Mr Ernest Szabo, the second defendant, was an employee of the fifth defendant, but no request was ever made by the Reed defendants that he should become an additional insured under the policy.

### The accident and its aftermath

**14** On 28 May 1999 Ashleigh Szabo suffered very severe injuries in a road accident. At the time of the accident she was a passenger in a car being driven by her cousin, Celeste Kline, in her home town of Carlisle. The accident was caused by Ms Kline's negligence.

**15** Ms Szabo recovered $100,000 from Ms Kline's motor insurers and $900,000 from another insurance company, Zurich, which had issued some form of policy to the fifth defendant.

**16** Acting through her father, she has brought a claim against CGU in Ohio for compensation for her injuries, the cost of medical treatment and loss of earning capacity. Claims have also been made against CGU in the same proceedings by her parents and brother, Brenton, for loss of her consortium.

**17** The Ohio action was begun on 18 May 2001, i.e. a week before Aikens J gave permission for service of the present proceedings out of the jurisdiction. CGU had hoped to issue its own proceedings in England before the Ohio action was begun, but it lost that race. (Brenton Szabo, who is a claimant in the Ohio action, is not a defendant in the English action, because CGU had not foreseen his loss of consortium claim. If the English action proceeds, CGU will seek to join him as an additional defendant.)

### The Ohio action

**18** The nature of the Ohio claims is explained in three documents; a letter dated 1 May 2001 from the Szabos' lawyer to CGU's lawyer in Ohio, the formal complaint and a memorandum of law filed by the Szabos' Ohio lawyer in opposition to an application by CGU to stay the Ohio proceedings. That application has yet to be determined.

**19** The claims made in Ohio are founded upon a provision of the Ohio Revised Code ('ORC') and a decision of the Ohio Supreme Court in the case of Scott-Pontzer v Liberty Mutual Fire Insurance Co (1999) 85 Ohio St 3d 660; 710 NE 2d 1116 ***269*** . The case advanced can be summarised as follows.

(1) ORC 3937.18 provides that no insurance policy covering risks of liability for death or personal injury suffered by a third party arising from the use of a motor vehicle shall be delivered or issued for delivery in Ohio, with respect to any motor vehicle registered or principally garaged in Ohio, unless the persons insured under the policy against such liability are offered by the insurer two additional forms of coverage, uninsured motorist coverage and under-insured motorist coverage. The latter is to be up to the same limit as the liability coverage afforded by the policy, and is to provide protection for the insured against bodily injury, illness or death, for which a third party is liable, to the extent that such limit exceeds the insurance cover available to the third party.

(2) ORC 3937.18 has been given an expansive meaning such that it applies to the policy under consideration, notwithstanding that it was issued in London and that cl. 16 (providing excess motor liability cover) was not specifically aimed at Lexis-Nexis (or risks in Ohio), but was a small

part of a global policy.

(3)If an insurer violates ORC 3937.18, by failing to offer uninsured or under-insured motorist coverage as required, the coverage not offered is created by operation of law.

(4) Where the insured is a company, the Ohio courts will construe the policy so as to include the company's employees within the definition of the insured, if the language of the policy so permits, in order to give to the employees the benefit of the right to be offered uninsured and under-insured motorist coverage.

(5) Where such coverage is not offered, the imposed coverage will apply to the employee whether acting on the company's business or otherwise.

(6) The same principles should by natural extension apply to close relatives of such employees, so that Mr Szabo's wife, daughter and son all acquired under-insured motorist coverage by operation of law.

(7) The fact that the language of the public liability part of the policy required there to have been an occurrence in connection with the business in order for any sum to become payable under the policy, and that Miss Szabo's tragic accident had nothing to do with her father's employer's business, should not prevent Ohio law from operating to confer rights on her against CGU.

(8) Because the provisions of ORC 3937.18 are mandatory under Ohio law, the Ohio court must treat the policy as governed by Ohio law for the purposes of the claim by the Szabos, whatever law might apply to the policy for any other purposes. Thus the memorandum of law to which I have referred asserts that:

'Applying any law could not be a valid application if inconsistent with the uninsured motorist laws in the State of Ohio,'

and that:

'The choice of law analysis relied upon by the defendant in suggesting that an international contract was negotiated in England cannot overshadow the fact that Ohio law mandates as a matter of law that there is underinsured motorist coverage.'

**20** Mr Alexander Layton QC on behalf of CGU has referred me to a judgment of the Supreme Court of Ohio in Ohayon v Safeco Insurance Co of Illinois (2001) 91 Ohio St 3d 474, in which Cook J, giving the judgment of the majority, stated that:

'RC 3937.18, unlike some Ohio statutes that apply to contractual relationships, imposes no choice of law on the parties if a dispute arises concerning the existence or extent of coverage.'

**21** The court held that a claim to coverage by virtue of ORC 393 7.18 is for the purposes of Ohio choice of law principles an action sounding in contract; and that, in the absence of an ***270** express choice of law clause, the law governing contractual rights and duties is the law of the state which 'bears the most significant relationship to the contract', as had been previously held by the Supreme Court of Ohio in Gries Sports Ent Inc v Modell (1984) 15 Ohio St 3d 284 at p. 287. In applying that test, the court in Ohayon, following its decision in Gries, adopted s. 188 of the Restatement (2d) of Conflict of Laws (1971), which provides that the factors to be taken into account include the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, the domicile, residence, nationality, place of incorporation and place of business of the parties.

**22** Therefore, as counsel agreed, there appears to be no practical distinction between the test in Ohio for determining the proper law of a contract which does not contain a choice of law clause and the test which would be applied in England, whether under art. 4 of the Rome Convention ('the contract shall be governed by the law of the country with which it is most closely connected') or otherwise. The factors enumerated in s. 188 of the Restatement are factors which would be taken into account in England. (It does not appear that Ohio law recognises the concept of an implied choice of law, which art. 3 of the Rome Convention recognises, but that would be unlikely to make any practical difference in the present case, since the factors arguably relevant to an implied choice of law would be equally relevant in the context of the test applicable in the absence of any choice of law.)

## The English action

**23** The particulars of claim, after reciting the background facts, set out the basis of CGU's claim and the relief sought as follows:

'22. The CGU policy is governed by English law. It is in any event not governed by the law of Ohio.

23. None of Ms Szabo, Mr Szabo, Mrs Szabo and Ms Kline was or is within the definition of "Insured" in the CGU policy.

26. The accident was not an Occurrence to which the CGU policy applied within the insuring clause ...

27. None of the provisions of the CGU policy [or of any applicable law] give rise to a right in the first to third defendants or any of them, or (relevantly) in the fourth and fifth defendants or either of them.

And the claimant claims against the defendants and each of them:

(1) A declaration that none of the first, second and third defendants is an insured under the CGU's Global Liability Policy No. UQ154P 15906; and

(2) A declaration that CGU is not liable [whether] pursuant to its Global Liability Policy No. UQ154P15906 [or in any other way] to the defendants or any of them, whether

(a) To indemnify them in respect of liability for Ms Szabo's injuries or for Mr Szabo's and/or Mrs Szabo's loss of consortium, or for the accident, or

(b) To make any other payment by way of damages or compensation for, or otherwise in respect of, Ms Szabo's injuries or Mr Szabo's and/or Mrs Szabo's loss of consortium, or the accident, [(c) Otherwise (save irrelevantly, the fourth and fifth defendants) at all.]'

**24** The words in square brackets were in the pleading as it was served. They appeared to open up the possibility of the English court being asked by CGU to rule on the validity of the Szabos' claim under Ohio law. Moreover, if the English action were to proceed with the particulars of claim in their original form, it would be inevitable that the defendants would replicate their case on Ohio law by way of defence and counterclaim. That could not be right. It is clear that the issues of Ohio law raised by the Szabos in the Ohio proceedings are controversial. CGU's Ohio lawyers consider that the claims go well beyond the principles ***271** properly deducible from Scott-Pontzer, not least by seeking to extend the rights afforded under ORC 3937.18 to a relation of an employee of an insured company going about his or her private affairs. Underlying the controversy about the true ambit of ORC 3937.18 there may be questions of Ohio public policy.

**25** It would be manifestly inappropriate, and profoundly contrary to ordinary principles of comity, if an English court were take to it on itself to adjudicate upon such a matter, a fortiori when the matter relates to proceedings already pending before a court in Ohio.

**26** After I expressed these concerns to Mr Layton during the argument, he said that CGU would delete the words in square brackets. The revised pleading limits the scope of the relief which it seeks from the English court to declarations, in summary, that (a) the policy is governed by English law and (b) CGU has no liability under it to the Szabos (i.e. by applying English law). Thus if CGU failed to establish that English law was the proper law of the policy, its claim would fail.

## The jurisdiction of the English court

**27** CGU contends that its claim falls within the jurisdiction of the English court under r. 6.20(5)(a) and/or (c) of the Civil Procedure Rules, i.e. that the claim is made in respect of a contract which was made within the jurisdiction and/or is governed by English law. CGU also contends that the case falls within CPR, r. 6.20(3) on the ground that there is between CGU and the fourth defendant (a company incorporated and carrying on business in England) a real issue which it is reasonable for the court to try, and that the Szabos are necessary or proper parties to that claim.

**28** CGU has to establish that the claim falls within one or more of those rules, applying the standard of a 'good arguable case', as explained and applied in a well known line of authorities including Vitkovice Horni a Hutni Tezirstvo v Korner [1951] AC 869, Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran [1994] 1 AC 438 and Canada Trust Co v Stolzenberg (No 2) [1998] CLC 23; [1998] 1 WLR 547 (CA); [2001] CLC 118; [2000] 3 WLR 1376 (HL). In the last of those cases Waller LJ said ([1998] CLC 23 at p. 28; [1998] 1 WLR at p. 555):

'Although there is power ... to order a preliminary issue on jurisdiction, as Staughton LJ pointed

out in <u>Attock Cement Co Ltd v Romanian Bank for Foreign Trade [1989] 1 WLR 1147</u> at p. 1156D, it is seldom that the power is used because trials on jurisdiction issues are to be strongly discouraged. It is also important to remember that the phrase which reflects the concept "good arguable case" and the other phrases in Korner "a strong argument" and "a case for strong argument" were originally employed in relation to points which related to jurisdiction but which might also be argued about at the trial. The court in such cases must be concerned not even to appear to express some concluded view as to the merits, e.g. as to whether the contract existed or not. It is also right to remember that the "good arguable case" test, although obviously applicable to the ex parte stage becomes of most significance at the inter partes stage where two arguments are being weighed in the interlocutory context which, as I have stressed, must not become a "trial". "Good arguable case" reflects in that context that one side has a much better argument on the material available. It is the concept which the phrase reflects on which it is important to concentrate, i.e. of the court being satisfied or as satisfied as it can be having regard to the limitations which an interlocutory process imposes that factors exist which allow the court to take jurisdiction.'

**29** If CGU establishes to this standard that the case falls within this court's jurisdiction on one or more of the grounds advanced, it then becomes a matter for the court's discretion whether the action begun by CGU in this country should be allowed to proceed.

**30** I am satisfied on the evidence that CGU has a good arguable case that its claim is made in respect of a contract, i.e. the relevant policy, which was made within the jurisdiction.

**31** *\*272* I am not persuaded that CGU has a good arguable case under <u>CPR, r. 6.20(3)</u>, i.e. that there is a real issue between CGU and the fourth defendant which it is reasonable for the court to try and that the Szabos are necessary or proper parties to that claim. The real issue is between CGU and the Szabos, and even if one were to make an assumption for these purposes that the fourth defendant is a necessary or proper party to the claim (which I doubt, although I have not heard full argument on the point), to say that in these circumstances the case falls within <u>CPR, r. 6.20(3)</u> would be to let the tail wag the dog.

**32** There remains the most important ground on which CGU contends that its claim comes within this court's jurisdiction, i.e. that the policy is governed by English law. It is the most important ground because it would obviously not be sensible, as a matter of discretion, to allow this action to proceed further at this stage if it appeared to the court that the relevant law of the contract was that of Ohio. The arguments therefore rightly concentrated upon the issue of the governing law.

**The governing law**

**33** Mr Layton submitted that the policy is governed by English law because England is the country most closely connected with it. The factors which he says point towards English law are the following:
(1) The policy was negotiated, concluded and issued in England.
(2) CGU has its headquarters and registered office in England, and the schedule to the policy states the address of the insured as 25 Victoria Street, London.
(3) The premium was in sterling.
(4) Various terms of the policy, e.g. the claims conditions, contained provisions pointing towards the policy being governed by English law.

**34** Looking at the matter negatively, Mr Layton submitted that there were no factors pointing towards any other system of law being the proper law of the policy.

**35** Mr Davies, on behalf of the Szabos, submitted that the policy was not governed by a single proper law, and that the law governing the proper construction of the contract for the purposes of the Szabos' claim is Ohio law. His argument in favour of the applicability of Ohio law was put on two alternative bases. His first submission was that the policy had, and has, no fixed proper law, but that its proper law for the purposes of any individual claim was the law of the place where the claim arose. His alternative submission was that the policy is severable, there being separate contracts between CGU and each insured, and that, for the purposes of determining the existence of a contract between CGU and the Szabos, the proper law is that of Ohio.

**36** As to the first submission, the doctrine of party autonomy, which underlies both traditional

English conflict of law rules in relation to contract and art. 3 of the Rome Convention, permits parties to choose that different laws should apply to different parts of their contract. The concept that a contract may be concluded without having any governing law until some later event occurs to determining it is more difficult. In EI Du Pont de Nemours & Co v Agnew [1987] 2 Ll Rep 585 at p. 592, Bingham LJ said that:

'this is not a concept to which an English Court could give effect, since the rights and obligations of contracting parties crystallise when a contract is made (subject to consensual variation thereafter), and contracts can only crystallise with reference to an existing proper law since they cannot exist in a legal vacuum: <u>Amin Rashid Shipping Corp v Kuwait Insurance Co [1984] AC 50</u>, 65; Armar Shipping Co Ltd v Caisse Algerienne d'Assurance et de Reassurance [1980] 2 Ll Rep 450. It may, I suppose, be theoretically possible for a proper law to be retrospectively varied on exercise of a contractual option, but that does not dispense with the need for a pre-existing proper law.'

**37 *273** There is good ground for arguing that under the Rome Convention an express choice by the parties of alternative systems of law in different circumstances will be effective: see *Dicey & Morris on the Conflict of Laws* (13th edn, 2000) para. 32-085. However, that does not mean that until an event occurred causing a particular law to govern the contract, there could exist a contract without any law governing it. That would be an impossible concept for the reasons given by Bingham LJ. It would not be an impossible concept to have a contract governed by a particular law, thereafter retrospectively varied, as Bingham LJ recognised. It would also not be impossible to envisage an inchoate agreement, which only acquired the force of law upon some act or event upon which the parties agreed that a particular system of law should apply to it. However, all that is far removed from this case.

**38** Nothing could be more fundamental to a contract of insurance than defining the insured. There is nothing in the policy to suggest that the insured was intended to have a variable meaning according to the law of the country of the person claiming to be an insured. In these circumstances, the argument that the insuring clause of the policy, and the definition of the insured, are to be governed by a harlequin proper law, so that the policy should be taken to mean different things according to the country of the person claiming under it, is inconsistent with the fundamental idea of a governing law and with the rule that, if the governing law has not been chosen by the parties, it should be that of the country with which the contract is most closely connected.

**39** The alternative argument, based on severability, presents similar difficulties. With a global policy which provides a wide variety of forms of cover, I would accept that certain provisions of the policy may properly be regarded as severable from other provisions for certain purposes. For example, a breach of a policy condition precluding the insured from making recovery from the insurer under a particular part of the policy might not affect the insured's rights under other parts of the policy. However, it is a very different matter to suggest that the definition of the insured in the policy can be dissected and giving different meanings by different systems of law. It seems to me plain from the structure of the policy that it is intended, within a uniform contractual framework, to provide to those defined in it as the insured a compendium of rights, some of which may fairly be regarded as severable from others, so that the loss of one right does not necessarily affect another. I can see no logical or commercially sensible basis on which the words of the policy defining the insured can be 'severed' so as to be interpreted by different laws and given possibly different meanings, depending on the part of the globe in which events may occur giving rise to a claim.

**40** On the question of the relevant proper law I conclude that CGU has much the better argument.

## Discretion

**41** The burden is on CGU to establish that England is the appropriate forum for this action.

**42** Mr Layton submitted that, on the premise that the construction of the policy is governed by English law, England is the natural and appropriate forum. He further submitted that, if the policy is governed by English law, it is plain as a matter of construction that the Szabos can have no claim under it in respect of Ms Szabo's unfortunate accident, but that in any event the point is

a short one, which could be decided by this court swiftly and inexpensively. For those reasons he argued that it was just that the action should be allowed to continue.

**43** Mr Davies submitted that this action by the insurers for purely negative relief was a blatant attempt to pre-empt the proceedings begun by the Szabos in Ohio; that such forum shopping was to be discouraged; and that it was particularly wrong that the Szabos should be put to the expense and inconvenience of having to litigate on two fronts.

**44** I was referred to two recent cases in which the Court of Appeal has considered the questions of forum non conveniens in the context of claims for negative relief.

**45** *274* In New Hampshire Insurance Co v Philips Electronics North America Corp [1998] CLC 1062, insurers brought proceedings in this court claiming declarations that they were not liable to indemnify a company, insured under three policies governed by English law, in respect of losses alleged to have been suffered by the company as a result of fraudulent acts of a senior employee in Illinois. The company had submitted a detailed proof of loss to the insurers, who made no admissions in relation to the facts alleged but contended that, if those facts were true, most of the losses fell outside the scope of the cover. The insurers sought to have the issues of construction decided by the English court. Rix J at first instance extracted the following principles from previous authorities, which the Court of Appeal approved, at p. 1066:

'1. There is power to grant a negative declaration in an appropriate case, the fundamental test being whether it would be useful.

2. However, careful scrutiny will be exercised not only to test the utility, or on the other hand the futility, of seeking to determine the claim by means of a negative declaration in England, but also to ensure that inappropriate forum shopping is not allowed, let alone encouraged.

3. A negative declaration will not be appropriate where it is premature or hypothetical, viz. where no claim has been made or threatened against the plaintiffs.

4. The existence of imminent or a fortiori current foreign proceedings is always a highly relevant consideration, not only for the purpose of testing the utility of the English claim, but also having in mind the need to avoid the twin dangers of forum shopping and of the vices of concurrent proceedings.'

**46** Phillips LJ observed, at p. 1066, that it was necessary to distinguish between two separate matters; the nature of the relief and the forum in which the relief should be sought. Where leave to serve out of the jurisdiction a writ claiming a negative declaration was challenged, the court would have to consider both the question whether there was justification for seeking that relief and the separate question whether England was the appropriate forum in which to seek it. He emphasised that in that situation the court must be particularly careful to ensure that the negative declaration was sought for 'a valid and valuable purpose' and not in 'an illegitimate attempt to pre-empt the jurisdiction' in which the dispute was to be resolved.

**47** That case, like the present case, contained the unusual feature that the relief sought by the insurers was confined to declarations as to the proper construction of the policy. On this aspect Phillips LJ said at p. 1070:

'In most of the cases concerning negative declarations, the declarations sought have related to facts which were agreed or which would be determined by the court. In such circumstances the decision of the court is likely to resolve the dispute between the parties one way or the other. Here the declarations sought seek the resolution of preliminary points of construction on the basis of assumed facts. The English hearing may obviate the need for a trial of the facts but it may not. And whereas England is the appropriate forum for determining the points of construction, Illinois is the appropriate jurisdiction for the trial of the facts. If facts and law were to be tried in the same proceedings, the latter consideration would dominate and Illinois would be the appropriate forum. It is normally undesirable that one jurisdiction should be seized of issues of law in a dispute while another is seized of issues of fact, let alone that the same issues should be tried in different jurisdictions ... Should then the English court in such a case decline to entertain the application for the negative declaration on the ground that it should be sought, if at all, in the jurisdiction that is appropriate for determination of the facts? I do not believe that it is possible to answer this question as a matter of principle. It must depend on the facts of the particular case and, in particular, on the complexity of the issues of construction and the likelihood that they will resolve the dispute. There is an obvious anomaly in requiring a plaintiff to resolve a point of law designed to obviate *275* an inquiry into fact, not in the country whose

law is applicable, but in the country where the issues of fact should be resolved if the plaintiff fails on the law.'

**48** In that case the Court of Appeal upheld Rix J's exercise of his discretion to allow the action to continue.

**49** In Messier-Dowty Ltd v Sabena SA [2000] CLC 889 at p. 897; [2000] 1 WLR 2040 at pp. 2050-2051, Lord Woolf MR described the approach of the English courts to the use of negative declarations as pragmatic, and said:

'The deployment of negative declarations should be scrutinised and their use rejected where it would serve no useful purpose. However where a negative declaration would help to ensure that the aims of justice are achieved the courts should not be reluctant to grant such declarations. They can and do assist in achieving justice.'

He added:

'While negative declarations can perform a positive role, they are an unusual remedy in so far as they reverse the more usual roles of the parties. The natural defendant becomes the claimant and vice versa. This can result in procedural complications and possible injustice to an unwilling "defendant". This in itself justifies caution in extending the circumstances where negative declarations are granted, but, subject to the exercise of appropriate circumspection, there should be no reluctance to their being granted when it is useful to do so.'

**50** A significant feature of the present case is that the claims in Ohio and in this court proceed on mutually exclusive bases. Szabo's claim against CGU in Ohio is premised upon the claim being governed by Ohio law. The foundation of CGU's claim in this court is that the policy is governed by English law. The common issue is that each court will have to make a choice of law decision, but, as stated above, the general choice of law rules applicable to contracts appear to be the same in both jurisdictions.

**51** In these circumstances, would the ends of justice be best served by staying this action at this stage or allowing it to proceed?

**52** It seems to me plainly desirable that the question of the construction of the policy should be determined at an early stage. Having reached the view that CGU has a strong case for saying that the construction of the policy is governed by English law, I would therefore regard the English court as the natural forum for determining its construction. In saying that, I am conscious that these proceedings were started after the Ohio proceedings and that there is an obvious undesirability in having concurrent litigation in two countries. However, allowing the English action to proceed will not involve any lack of comity towards the Ohio court, for, if the English court should decide that the policy is governed by Ohio law, CGU's claim will fail; and, as to the risks of delay and duplication of expense, the English action is likely to be short. Mr Davies has not indicated what his clients' position would be as to any rights under the policy, if it is governed by English law, preferring (as he was entitled) to reserve their position on that subject. In reality, it is difficult to see what argument they would have, but it will be a short question in any event. In theory, the Szabos might seek to counterclaim in the English proceedings not only for a declaration that the policy is governed for the purposes of their claim by Ohio law but also as to their rights under Ohio law, but this would be most unlikely, since they have already brought suit in Ohio for the determination of their rights under Ohio law, and in any event I consider that the Ohio court would plainly be the appropriate forum for determining their rights under Ohio law, if applicable.

**53** I recognise that there is a potential risk of conflicting outcomes if the English court were to determine that the policy is governed by English law and construe it on that basis, but the Ohio court determined that it was governed for relevant purposes by Ohio law. That is a valid consideration, but, having reached the view that CGU has a strong case saying that the policy is ***276** governed by English law, I do not think that justice would be served in this particular case by staying the action in the present circumstances on account of the potential risk to which I have referred. Indeed, it seems to me that the Ohio court, which is also seized of a jurisdictional argument, might welcome a ruling by this court on the proper law of the policy and its proper interpretation (if this court judges it to be governed by English law); but I hasten to add that, in saying that, I would not wish to give the appearance of seeking to influence the Ohio court. I am conscious that the Ohio court will have the opportunity of indicating how it would wish the litigation to proceed when it rules on the jurisdictional dispute before it. In determining the

future progress and timetable of this action, obviously this court will give great respect to any views which the Ohio court may express on that subject. In the meantime, I do not consider on balance that it would be just to set aside or stay the present action at this stage.

(Order accordingly)